# United States Court of Appeals for the Federal Circuit

LARRY GOLDEN,

*Plaintiff-Appellant,*

— v. —

QUALCOMM INCORPORATED,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the Northern District of California in No. 4:22-cv-03283-HSG, Honorable Haywood S. Gilliam, Jr., Judge*

## SUPPLEMENTAL APPENDIX

JOHN A. YATES
KYRIE CAMERON
PATTERSON & SHERIDAN LLP
24 Greenway Plaza, Suite 1600
Houston, Texas 77046
(713) 623-4844
jyates@pattersonsheridan.com
kcameron@pattersonsheridan.com

*Counsel for Defendant-Appellee*

JUNE 16, 2023

# TABLE OF CONTENTS

**Page(s)**

**ORDERS AND JUDGMENTS**

Judgment,

     Dkt. No. 50, filed March 15, 2023.........................................................SAppx1

Order Granting Motion to Dismiss,

     Dkt. No. 49, filed March 15, 2023.....................................................SAppx2-7

**DOCKET SHEET**

Docket for Northern District of California,

     Dkt. No. 3, filed May 15, 2023.........................................................SAppx8-14

**DOCKET ENTRIES AND RECORD FOR CASE**

**No. 4:22-cv-03283-HSG (Northern District of California)**

Complaint for Antitrust Law Violations and Patent Infringement,

     Dkt. No. 1, filed June 6, 2022.........................................................SAppx15-51

Defendant's Memorandum of Points and Authorities in Support of its Motion to Dismiss,

     Dkt. No. 6, filed July 22, 2022 .....................................................SAppx52-79

Defendant's Opposition to Plaintiff's Motion for Default Judgement,

     Dkt. No. 24, filed August 8, 2022 .................................................SAppx80-95

Plaintiff's Reply in Support of Plaintiff's Cross-Motion for Summary Judgement,

     Dkt. No. 29, filed August 15, 2022 ...........................................SAppx96-111

Plaintiff's Case Management Statement

Dkt. No. 35, filed August 30, 2022 ......................................... SAppx112-121

Plaintiff's Motion to Strike Defendant's Untimely Case Management Statement,

Dkt. No. 46, filed January 6, 2023 ......................................... SAppx122-170

Plaintiff's Motion for Reconsideration,

Dkt. No. 51, filed March 20, 2023 ........................................... SAppx171-185

Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Reconsideration,

Dkt. No. 52, filed March 29, 2023 ........................................... SAppx186-202

Defendant's Opposition to Plaintiff's Motion for Reconsideration,

Dkt. No. 53, filed March 31, 2023 ........................................... SAppx203-206

Plaintiff's Supplemental Authority in Support of Plaintiff's Motion for Reconsideration,

Dkt. No. 54, filed April 3, 2023 ............................................... SAppx207-270

Order Denying Motion for Reconsideration,

Dkt. No. 55, filed April 6, 2023 ............................................... SAppx271-272

Plaintiff's Notice of Appeal,

Dkt. No. 58, filed April 14, 2023 ............................................. SAppx273-275

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GOLDEN,<br><br>        Plaintiff,<br><br>    v.<br><br>QUALCOMM, INC.,<br><br>        Defendant. | Case No.  22-cv-03283-HSG<br><br>**JUDGMENT** |

Judgment is hereby entered consistent with the Court's Order Granting Motion to Dismiss, This document constitutes a judgment and a separate document for purposes of Federal Rule of Civil Procedure 58(a).

Dated at Oakland, California, this 15th day of March, 2023.

Mark B. Busby
Clerk of Court

By: _____
Nikki D. Riley
Deputy Clerk to the Honorable
HAYWOOD S. GILLIAM, JR.

1

2

3

4          UNITED STATES DISTRICT COURT

5          NORTHERN DISTRICT OF CALIFORNIA

6

7    LARRY GOLDEN,                          Case No. 22-cv-03283-HSG

8                   Plaintiff,              **ORDER GRANTING MOTION TO**
                                            **DISMISS**
9          v.
                                            Dkt. No. 6
10   QUALCOMM, INC.,

11                  Defendant.

## I.    BACKGROUND

This case is one of several Plaintiff has filed in different districts over a period of years raising overlapping or materially identical claims. *See Golden v. Intel Corp.*, No. 22-cv-03828-NC, 2022 WL 17735388, at *4-5 (N.D. Cal. Nov. 22, 2022), Dkt. No. 31 at 4-5, 7-8 (order granting motion to dismiss without leave to amend and listing prior cases); *Golden v. Apple, Inc.*, No. 22-cv-04152-VC (N.D. Cal. Oct. 20, 2022), Dkt. No. 29 (dismissing complaint without leave to amend, and observing that "Golden has been pressing these frivolous claims (or some variation thereof) for nearly 10 years in multiple jurisdictions").

With one exception, every case of which the Court is aware in which a court has issued a ruling has been dismissed as frivolous, in either this district, the District of South Carolina, or the Federal Court of Claims. *Golden v. Apple Inc.*, No. 19-cv-02557-DCC, 2020 WL 415896, at *2–3 (D.S.C. Jan. 27, 2020), *aff'd*, 819 Fed. App'x. 930, 931 (Fed. Cir. 2020) (affirming dismissal "not on the basis of duplicity, but on the ground of frivolousness"); *Golden v. Apple Inc.*, No. 20-cv-02270-JD-KFM, 2021 WL 4260782, at *2–3 (D.S.C. Sept. 20, 2021), *aff'd*, No. 21-2160, 2022 WL 986984, at *1 (4th Cir. Mar. 31, 2022); *Golden v. Apple Inc.*, No. 20-cv-04353-JD-KFM, 2021 WL 5074739, at *2–3 (D.S.C. Nov. 2, 2021), *aff'd*, No. 22-1229, 2022 WL 4103285, at *2 (Fed. Cir. Sept. 8, 2022); *Golden v. Google, LLC*, No. 21-cv-00244-JD-KFM, 2021 WL 5083804,

United States District Court
Northern District of California

1    at *3 (D.S.C. Nov. 2, 2021); *Golden v. Intel Corp.*, No. 22-03828-NC, 2022 WL 17735388, at *4–

2    5; *Golden v. Apple, Inc.*, No. 22-cv-04152-VC.

3    In particular, the Court of Claims dismissed Plaintiff's case against the United States

4    government, in which he alleged that the government "caused cell phone manufacturers,"

5    including Qualcomm, "to produce devices that infringe on one or more of his patents." *Golden v.*

6    *United States*, 156 Fed. Cl. 623, 625 (2021). The District of South Carolina then dismissed a

7    patent infringement lawsuit naming Qualcomm and fifteen other companies, and the Federal

8    Circuit affirmed that dismissal "on the ground of frivolousness." *See* Dkt. No. 6-6; *Golden v.*

9    *Apple Inc.*, No. 19-cv-02557, 2020 WL 415896 at *2–3; *Golden v. Apple Inc.*, 819 Fed. Appx. at

10   931. Six months later, Plaintiff filed another suit in the District of South Carolina against

11   Qualcomm and other defendants, alleging violations of state and federal antitrust law, and that suit

12   too was dismissed based on the Magistrate Judge's recommendation that the claims were "patently

13   frivolous." *Golden v. Apple Inc.*, No. 20-cv-02270-BHH-KFM, 2020 WL 11624670, *4 (D.S.C.

14   Sept. 11, 2020), *report and recommendation adopted by Golden v. Apple Inc.*, No. 20-cv-02270-

15   JD-KFM, 2021 WL 4260782 (D.S.C. Sept. 20, 2021). Plaintiff filed yet another lawsuit in the

16   District of South Carolina, which was dismissed as frivolous. *Golden v. Apple Inc.*, No. 20-cv-

17   04353-JD-KFM, 2021 WL 5890508, *5 (D.S.C. Feb. 5, 2021), *report and recommendation*

18   *adopted by Golden v. Apple Inc.*, No. 20-cv-04353-JD-KFM, 2021 WL 5074739 (D.S.C. Nov. 2,

19   2021). And shortly thereafter, Plaintiff filed another lawsuit in South Carolina naming Google as

20   the sole defendant, but alleging that Google jointly infringed his patents with both Qualcomm and

21   Apple. *Golden v. Google, LLC*, No. 21-cv-00244-JD-KFM, 2021 WL 5890440, *4 (D.S.C. Apr.

22   9, 2021), *report and recommendation adopted by Golden v. Google, LLC*, No. 21-cv-00244-JDK-

23   FM, 2021 WL 5083804 (Nov. 2, 2021). This case was also dismissed with prejudice as frivolous,

24   with the Magistrate Judge specifically noting that Plaintiff could not "circumvent prior rulings by

25   this court that infringement allegations against Apple/Qualcomm are frivolous." *Golden v.*

26   *Google, LLC*, 2021 WL 5890440 at *4 (D.S.C. Apr. 9, 2021).[1]

27   _____
     [1] The Federal Circuit affirmed the November 2, 2021 dismissal of the complaint against Apple,
     but reversed the April 9, 2021 dismissal of the complaint against Google. *Golden v. Apple*, 2022
28   WL 4103285 at *2 (Fed. Cir. 2022). As to the complaint against Google, the Federal Circuit
     found that the complaint included a claim chart that "attempts—whether successfully or not—to

United States District Court
Northern District of California

United States District Court
Northern District of California

1     The Court finds that the claims in this case are equally as frivolous as Plaintiff's many

2 allegations against Qualcomm that preceded them. As other courts have observed, "[b]ecause

3 Golden neither breaks his allegations down into counts, nor provides a numbering system, it is

4 challenging to say exactly how many counts are at issue." *Golden v. Intel*, 2022 WL 17735388 at

5 *3, n.1. The Court's challenge here is compounded because Plaintiff has attached nearly 1,200

6 pages of documents to the complaint. The Court need not, and will not, wade through the

7 attachments to attempt to ferret out aspects of the claims not fairly and squarely addressed in the

8 body of the 37-page complaint: Federal Rule of Civil Procedure 8(a) requires that a complaint

9 contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

10 Fed. R. Civ. P. 8(a)(2).

11     With these caveats, it appears Plaintiff is asserting three claims: (1) antitrust violations; (2)

12 unjust enrichment; and (3) patent infringement. Complaint at 1 ("COMPLAINT FOR

13 ANTITRUST LAW VIOLATIONS AND PATENT INFRINGEMENT").

## II.    MOTION TO DISMISS

### A.    Plaintiff fails to plausibly plead an antitrust claim.

15     The Complaint alleges that "[u]pon information and belief, Plaintiff believes Qualcomm

16 has formed or created its monopoly for chipsets by 'tying' Plaintiff's CPUs to its wireless cellular

17 modems." Compl. ¶ 52. The theory appears to be that "Qualcomm's 'hold out' strategy of 'no

18 license, no chip' was used to force the co-conspirator OEMs to purchase Plaintiff's patented CPU

19 that Qualcomm 'tied' to its modem." *Id.* ¶ 54. The alleged harm appears to be that "Qualcomm's

20 anticompetitive practices has [sic] restrained Plaintiff from entering the market to collect royalties

21 on his patented inventions." *Id.* ¶ 83. Plaintiff relies heavily throughout the complaint on the

22 district court's findings in *FTC. v. Qualcomm*, 411 F. Supp. 3d 658 (N.D. Cal. 2019), and attaches

23 a copy of that decision to the complaint, without recognizing that the case was reversed and

24

25 _____

map claim limitations to infringing product features, and it does so in a relatively straightforward
26 manner." *Id.* The Federal Circuit remanded to allow the complaint to be filed and served, but
noted that "[o]ur decision does not preclude subsequent motions to dismiss by the defendant for
27 failure to state a claim," and it "express[ed] no opinion as to the adequacy of the complaint or
claim chart except that it is not facially frivolous." *Id.* In the present case, as described below,
28 Plaintiff's allegations fail to meet this standard, and the issue comes before the Court on a fully-
briefed motion to dismiss.

1   vacated by the Ninth Circuit. *See id.* ¶¶ 76-78; *cf. FTC v. Qualcomm Inc.*, 969 F.3d 974, 1001-

2   1002 (9th Cir. 2020) (finding no antitrust violation based on "no license, no chips" policy because

3   district court "failed to identify how the policy directly impacted Qualcomm's competitors or

4   'distorted the area of effective competition,'" and policy "involve[d] potential harms to

5   Qualcomm's *customers*, not its competitors, and thus falls outside the relevant antitrust markets")

6   (citations omitted; emphasis in original).

7           Plaintiff's antitrust claim is frivolous. At the outset, Plaintiff lacks antitrust standing. A

8   party seeking to bring a private antitrust action must establish antitrust injury. *American Ad*

9   *Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 & n.3 (9th Cir. 1999); *Cargill, Inc. v.*

10  *Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986) (requiring antitrust injury to seek

11  injunctive relief under the Clayton Act). To plead antitrust injury, Plaintiff must allege that he

12  suffered the type of injury antitrust laws were designed to prevent and that he is a participant in the

13  same market as the alleged wrongdoers. *Golden v. Intel*, 2022 WL 17735388 at *4 (citing

14  *American Ad Mgmt.*, 190 F.3d at 1055, 1057). Plaintiff fails to allege that he is a participant in the

15  same market as Qualcomm or that he suffered injury in that market, and does not even allege the

16  contours of the claimed market. To the extent the claim is that he is "restrained" from "entering

17  the market to collect royalties on his patented inventions," Compl. ¶ 83, that is fatally implausible:

18  he is free to license his patents to whoever wants to license them, but this theory does not state a

19  viable antitrust claim. To the extent Plaintiff's actual purported injury is patent infringement, the

20  Court addresses that claim below.

21          **B.     Plaintiff fails to plausibly or adequately plead patent infringement.**

22          As in his prior cases, Plaintiff "fail[s] to include factual allegations beyond the identities of

23  the defendant[], reference to the alleged infringing devices, and the alleged infringed-upon

24  patents." *Golden v. Apple,* No. 20-cv-04353-JD-KFM, 2021 WL 5074739 at *2, *aff'd as to this*

25  *holding*, No. 22-1229, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022). The complaint lists two

26  illustrative claims, without explaining what product made by Qualcomm supposedly infringes, or

27  how. Compl. ¶¶ 86-88. Plaintiff references his complaint in *Golden v. United States* for the

28  premise that Qualcomm "had an opportunity" to show that certain claims were invalid, but "failed

United States District Court
Northern District of California

1    to appear." *Id.* ¶¶ 84-85.  That is irrelevant, and does nothing to adequately put Defendant on

2    notice of his theory of infringement.  Nor does a claim chart regarding a GM product, *id.* ¶ 107, or

3    a multi-hundred page claim chart concerning Samsung products, Dkt. No. 1-7, adequately state a

4    claim.

5          Plaintiff also fails to adequately plead contributory or induced infringement.  As for

6    contributory infringement, Plaintiff fails to plead any of the elements of that offense: (1) selling a

7    device capable of infringing the patent, which is not suitable for substantial non-infringing use; (2)

8    with knowledge that the infringing device was especially adapted for use in an infringement of

9    such patent; and (3) actual infringement by another.  *Golden v. Intel*, 2022 WL 17735388 at *2.

10   For example, Plaintiff fails to plead facts plausibly supporting a claim that the Snapdragon

11   chipsets or Snapdragon ride platform do not have other noninfringing uses.  *See Uniloc U.S.A.,*

12   *Inc. v. Logitech, Inc.*, No. 18-cv-01304, 2018 WL 6025597 (N.D. Cal. Nov. 17, 2018) (granting

13   motion to dismiss where plaintiff "fail[ed] to provide factual underpinnings for its allegations that

14   there are no substantial noninfringing uses of the accused devices").  Similarly, as to induced

15   infringement, Plaintiff fails to allege facts plausibly supporting an inference that Qualcomm

16   purposely induced another party to infringe any patent.  *See Lifetime Indus., Inc. v. Trim-Lok, Inc.*,

17   869 F.3d 1372, 1379 (Fed. Cir. 2017) ("For an allegation of induced infringement to survive a

18   motion to dismiss, a complaint must plead facts plausibly showing that the accused infringer

19   specifically intended another party to infringe the patent and knew that the other party's acts

20   constituted infringement.") (citation and internal quotation marks and brackets omitted).

21       **C.    Plaintiff fails to plausibly plead unjust enrichment.**

22        Because Plaintiff fails to state a claim for either direct or contributory infringement, he also

23   fails to state a claim for unjust enrichment.  *See Golden v. Intel*, 2022 WL 17735388 at *3.

24       **D.    The complaint is dismissed as frivolous without leave to amend.**

25        As noted above, Plaintiff's claims have almost uniformly been dismissed in jurisdictions

26   around the nation, often without leave to amend.  *See Golden v. Intel*, No. 22-cv-03828-NC, 2022

27   WL 17735388 (N.D. Cal, Nov. 22, 2022); *Golden v. Apple Inc.*, No. 19-cv-02557-DCC, 2020 WL

28   415896 (D.S.C. Jan. 27, 2020), *aff'd*, 819 Fed. App'x. 930 (Fed. Cir. 2020) (affirming dismissal

United States District Court
Northern District of California

"not on the basis of duplicity, but on the ground of frivolousness"); *Golden v. Apple Inc.*, No. 20-cv-02270-JD-KFM, 2021 WL 4260782 (D.S.C. Sept. 20, 2021), *aff'd*, No. 21-2160, 2022 WL 986984 (4th Cir. Mar. 31, 2022); *Golden v. Apple Inc.*, No. 20-cv-04353-JD-KFM, 2021 WL 5074739 (D.S.C. Nov. 2, 2021), *aff'd*, No. 22-1229, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022); *Golden v. Google, LLC*, No. 21-cv-00244-JD-KFM, 2021 WL 5083804 (D.S.C. Nov. 2, 2021); *Golden v. Apple*, 22-cv-04152-VC (N.D. Cal. Oct. 20, 2022).

The same result is warranted here: ultimately, Plaintiff has repeatedly shown that he is not capable of pleading these sprawling and repetitive claims against Qualcomm in a manner that satisfies the basic requirements of federal pleading, such that granting leave to amend under these unusual circumstances would be futile. In particular, given what has already been pled, including the complaint's very heavy reliance on the district court's reversed findings in *F.T.C. v. Qualcomm*, no amendment of the antitrust claim at the core of the complaint could cure the fundamental problem that Plaintiff does not have antitrust standing. *See United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011) (finding that leave to amend is only warranted "if the deficiencies can be cured with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint"). And Plaintiff's infringement claims against Qualcomm repeat, either directly or in substance, claims previously found more than once to be frivolous. Accordingly, this is the rare case in which dismissal without leave to amend is warranted on the first round motion to dismiss.

## III.  CONCLUSION

The motion to dismiss the complaint is **GRANTED WITHOUT LEAVE TO AMEND**. All pending motions, Dkt. Nos. 15, 22, 34, and 46, are denied as moot. The Clerk is directed to enter judgment against Plaintiff and in favor of Defendant and close the case.

**IT IS SO ORDERED.**

Dated:  3/15/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

ADRMOP,APPEAL,CLOSED,ProSe

# U.S. District Court
## California Northern District (Oakland)
## CIVIL DOCKET FOR CASE #: 4:22-cv-03283-HSG

Golden v. Qualcomm, Inc.                          Date Filed: 06/06/2022
Assigned to: Judge Haywood S Gilliam, Jr          Date Terminated: 03/15/2023
Case in other court:  USCA for the Federal Circuit, 23-01818    Jury Demand: None
Cause: 28:1331 Fed. Question                       Nature of Suit: 410 Anti-Trust
                                                   Jurisdiction: Federal Question

## Plaintiff

**Larry Golden**                    represented by   **Larry Golden**
                                                     740 Woodruff Rd., #1102
                                                     Greenville, SC 29607
                                                     864-288-5605
                                                     PRO SE

V.

## Defendant

**Qualcomm, Inc.**                  represented by   **John Allen Yates**
                                                     Patterson + Sheridan LLP
                                                     24 Greenway Plaza
                                                     Suite 1600
                                                     Houston, TX 77006
                                                     713-577-4817
                                                     Email: jyates@pattersonsheridan.com
                                                     *LEAD ATTORNEY*
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Barden Todd Patterson**
                                                     Patterson Sheridan LLP
                                                     24 Greenway Plaza, Suite 1600
                                                     Houston, TX 77046-2472
                                                     713-577-4801
                                                     Email: tpatterson@pattersonsheridan.com
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Joseph John Stevens**
                                                     Patterson and Sheridan LLP
                                                     50 W. San Fernando Street
                                                     Suite 250
                                                     San Jose, CA 95113
                                                     650-384-4418
                                                     Email: jstevens@pattersonsheridan.com
                                                     *ATTORNEY TO BE NOTICED*

SAppx8

**Kyrie Kimber Cameron**
Patterson Sheridan, LLP
24 Greenway Plaza, Suite 1600
Houston, TX 77046-2472
713-576-5026
Email: kcameron@pattersonsheridan.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2022 | 1 | COMPLAINT against Qualcomm, Inc. (Filing fee $ 402-Paid). Filed by Larry Golden. Consent/Declination due by 6/20/2022. (Attachments: # 1 Civil Cover Sheet, # 2 Receipt) (sfb, COURT STAFF) (Filed on 6/6/2022) (Additional attachment(s) added on 6/6/2022: # 3 Exhibit A, # 4 Exhibit B-J, # 5 Errata K-1, # 6 Exhibit K-2, # 7 Exhibit K-3, # 8 Exhibit L) (sfb, COURT STAFF). (Entered: 06/06/2022) |
| 06/06/2022 | 2 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 8/30/2022. Initial Case Management Conference set for 9/6/2022 01:30 PM in Oakland, - To be determined. (sfb, COURT STAFF) (Filed on 6/6/2022)** <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br><br> **(Entered: 06/06/2022)** |
| 06/09/2022 | 3 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Larry Golden. (sfb, COURT STAFF) (Filed on 6/9/2022) (Entered: 06/09/2022) |
| 06/10/2022 | 4 | Summons Issued as to Qualcomm, Inc.. (cv, COURT STAFF) (Filed on 6/10/2022) (Entered: 06/10/2022) |
| 07/19/2022 | 5 | SUMMONS Returned Executed by Larry Golden. Qualcomm, Inc. served on 6/28/2022, answer due 7/19/2022. (Attachments: # 1 Envelope)(sfb, COURT STAFF) (Filed on 7/19/2022) (Entered: 07/20/2022) |
| 07/22/2022 | 6 | MOTION to Dismiss *for Lack of Subject Matter Jurisdiction and Failure to State a Claim* filed by Qualcomm, Inc.. Motion Hearing set for 10/6/2022 01:30 PM in Do Not Use To Be Determined before Magistrate Judge Kandis A. Westmore. Responses due by 8/5/2022. Replies due by 8/12/2022. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order, # 3 Certificate/Proof of Service, # 4 Declaration, # 5 Declaration, # 6 Exhibit 1, # 7 Exhibit 2, # 8 Exhibit 3)(Stevens, Joseph) (Filed on 7/22/2022) (Entered: 07/22/2022) |
| 07/22/2022 | 7 | Certificate of Interested Entities by Qualcomm, Inc. (Stevens, Joseph) (Filed on 7/22/2022) (Entered: 07/22/2022) |
| 07/25/2022 | 8 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17378091.) filed by Qualcomm, Inc.. (Yates, John) (Filed on 7/25/2022) (Entered: 07/25/2022) |
| 07/25/2022 | 9 | **Order by Magistrate Judge Kandis A. Westmore granting 8 Motion for Pro Hac Vice as to John A. Yates. (wft, COURT STAFF) (Filed on 7/25/2022) (Entered: 07/25/2022)** |
| 07/25/2022 | 10 | CLERK'S NOTICE Re: Consent or Declination: Defendant shall file a consent or declination to proceed before a magistrate judge. Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. Consent/Declination due by 8/1/2022. (wft, COURT STAFF) (Filed on 7/25/2022) (Entered: 07/25/2022) |

| | | |
|---|---|---|
| 07/26/2022 | [11](#) | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17382385.) filed by Qualcomm, Inc.. (Cameron, Kyrie) (Filed on 7/26/2022) (Entered: 07/26/2022) |
| 07/26/2022 | [12](#) | **Order by Magistrate Judge Kandis A. Westmore granting [11](#) Motion for Pro Hac Vice as to Kyrie Cameron. (wft, COURT STAFF) (Filed on 7/26/2022) (Entered: 07/26/2022)** |
| 07/26/2022 | [15](#) | MOTION for Default Judgment and MOTION to Enter Qualcomm's Default by the Court filed by Larry Golden. Responses due by 8/9/2022. Replies due by 8/16/2022. (Attachments: # [1](#) Motion for Default, # [2](#) Envelope)(sfb, COURT STAFF) (Filed on 7/26/2022) (Entered: 07/27/2022) |
| 07/27/2022 | [13](#) | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Qualcomm, Inc... (Stevens, Joseph) (Filed on 7/27/2022) (Entered: 07/27/2022) |
| 07/27/2022 | [14](#) | CLERK'S NOTICE of Impending Reassignment to U.S. District Judge. (wft, COURT STAFF) (Filed on 7/27/2022) <br><br> Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) <br> (Entered: 07/27/2022) |
| 07/28/2022 | [16](#) | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Haywood S Gilliam, Jr for all further proceedings. Magistrate Judge Kandis A. Westmore no longer assigned to case. Signed by The Clerk on 07/28/2022. (jrs, COURT STAFF) (Filed on 7/28/2022)** <br><br> **Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)** <br> **(Entered: 07/28/2022)** |
| 07/28/2022 | [17](#) | CLERK'S NOTICE SETTING TELEPHONIC CASE MANAGEMENT CONFERENCE FOR REASSIGNED CIVIL CASE. Case Management Statement due by 8/30/2022. Initial Case Management Conference set for 9/6/2022 02:00 PM. <br><br> The September 6th proceeding will be held by AT&T Conference Line. The parties are advised that in the event of an audio problem, counsel should be prepared to attend the hearing via Zoom conference at the Courts direction. The court circulates the following conference number to allow the equivalent of a public hearing by telephone. <br><br> For conference line information, see: https://apps.cand.uscourts.gov/telhrg/ <br><br> All counsel, members of the public and press please use the following dial-in information below to access the conference line: <br><br> Dial In: 888-808-6929 <br><br> Access Code: 6064255 <br><br> The Court may be in session with proceedings in progress when you connect to the conference line. Therefore, mute your phone if possible and wait for the Court to address you before speaking on the line. For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines. The parties are further advised to ensure that the Court can hear and understand them clearly before speaking at length. <br><br> PLEASE NOTE: Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court |

SAppx10

| | | proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. See General Order 58 at Paragraph III.<br><br>(ndr, COURT STAFF) (Filed on 7/28/2022)<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 07/28/2022) |
|---|---|---|
| 07/29/2022 | 18 | NOTICE by Qualcomm, Inc. *(Re-Notice of Motion and Motion to Dismiss)* (Attachments: # 1 Certificate/Proof of Service)(Stevens, Joseph) (Filed on 7/29/2022) (Entered: 07/29/2022) |
| 07/29/2022 | 19 | CLERK'S NOTICE RE DOCKET NO. 18 . (ndr, COURT STAFF) (Filed on 7/29/2022)<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 07/29/2022) |
| 08/01/2022 | 22 | RESPONSE (re 6 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction and Failure to State a Claim* ) and Cross-MOTION for Summary Judgment filed by Larry Golden. (sfb, COURT STAFF) (Filed on 8/1/2022) Modified on 11/4/2022 to add gavel and edit text (ndr, COURT STAFF). (Entered: 08/02/2022) |
| 08/02/2022 | 20 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC-17403341.) filed by Qualcomm, Inc.. (Patterson, Barden) (Filed on 8/2/2022) (Entered: 08/02/2022) |
| 08/02/2022 | 21 | CLERK'S NOTICE RE DOCKET NO. 20 . *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (ndr, COURT STAFF) (Filed on 8/2/2022)<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (ndr, COURT STAFF). (Entered: 08/02/2022) |
| 08/03/2022 | 23 | NOTICE by Qualcomm, Inc. *(Second Re-Notice of Motion and Motion to Dismiss)* (Attachments: # 1 Certificate/Proof of Service)(Stevens, Joseph) (Filed on 8/3/2022) (Entered: 08/03/2022) |
| 08/03/2022 | | Reset Hearing as to 6 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction and Failure to State a Claim,* See Docket No. 23 : Motion Hearing set for 1/12/2023 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S. Gilliam Jr. (ndr, COURT STAFF) (Filed on 8/3/2022) (Entered: 08/03/2022) |
| 08/08/2022 | 24 | OPPOSITION/RESPONSE (re 15 MOTION for Default Judgment by the Court as to ) filed byQualcomm, Inc.. (Attachments: # 1 Declaration, # 2 Certificate/Proof of Service, # 3 Proposed Order)(Stevens, Joseph) (Filed on 8/8/2022) (Entered: 08/08/2022) |
| 08/08/2022 | 25 | REPLY (re 6 MOTION to Dismiss *for Lack of Subject Matter Jurisdiction and Failure to State a Claim* ) filed byQualcomm, Inc.. (Attachments: # 1 Certificate/Proof of Service, # 2 Proposed Order)(Stevens, Joseph) (Filed on 8/8/2022) (Entered: 08/08/2022) |
| 08/11/2022 | 26 | **Order by Judge Haywood S. Gilliam, Jr. Granting 20 Motion for Pro Hac Vice.(amg, COURT STAFF) (Filed on 8/11/2022)**<br><br>**Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)**<br><br>**(Entered: 08/11/2022)** |
| 08/12/2022 | 27 | Plaintiff's Reply in Support re 15 MOTION for Default Judgment by the Court as to filed by Larry Golden. (Attachments: # 1 Envelope)(Related document(s) 15 ) (sfb, COURT STAFF) (Filed on 8/12/2022) (Entered: 08/15/2022) |

SAppx11

| 08/15/2022 | 29 | Plaintiff's Reply in Support of Plaintiff's Cross-Motion for Summary Judgment filed by Larry Golden. (Attachments: # 1 Envelope)(sfb, COURT STAFF) (Filed on 8/15/2022) (Entered: 08/16/2022) |
|---|---|---|
| 08/16/2022 | 28 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Yates, John) (Filed on 8/16/2022) (Entered: 08/16/2022) |
| 08/16/2022 | 30 | MOTION to Consider if Cases Should be Related. filed by Larry Golden. (Attachments: # 1 Envelope)(sfb, COURT STAFF) (Filed on 8/16/2022) (Entered: 08/17/2022) |
| 08/19/2022 | 31 | OPPOSITION/RESPONSE (re 30 MOTION to Relate Case ) filed byQualcomm, Inc.. (Attachments: # 1 Certificate/Proof of Service, # 2 Proposed Order)(Stevens, Joseph) (Filed on 8/19/2022) (Entered: 08/19/2022) |
| 08/22/2022 | 32 | CLERK'S NOTICE. Initial Case Management Conference set for 1/12/2023 02:00 PM in Oakland, Courtroom 2, 4th Floor. (ndr, COURT STAFF) (Filed on 8/22/2022)<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 08/22/2022) |
| 08/23/2022 | 33 | Plaintiff's MEMORANDUM in Support re 30 MOTION to Relate Case filed byLarry Golden. (Related document(s) 30 ) (sfb, COURT STAFF) (Entered: 08/24/2022) |
| 08/23/2022 | 34 | MOTION for Permanent Injunction Relief filed by Larry Golden. Responses due by 9/6/2022. Replies due by 9/13/2022. (sfb, COURT STAFF) (Filed on 8/23/2022) (Entered: 08/24/2022) |
| 08/30/2022 | 35 | CASE MANAGEMENT STATEMENT filed by Larry Golden. (sfb, COURT STAFF) (Filed on 8/30/2022) (Entered: 08/31/2022) |
| 09/01/2022 | 36 | CLERK'S NOTICE. The Court has reviewed the motion and determined that no cases are related and no reassignments shall occur (ndr, COURT STAFF) (Filed on 9/1/2022)<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 09/01/2022) |
| 09/01/2022 | | *** 30 MOTION to Relate Case Terminated, See Docket No. 36 .*** (ndr, COURT STAFF) (Filed on 9/1/2022) (Entered: 09/01/2022) |
| 09/01/2022 | 37 | NOTICE Regarding Related Proceedings by Larry Golden (Attachments: # 1 Envelope) (sfb, COURT STAFF) (Filed on 9/1/2022) (Entered: 09/02/2022) |
| 09/06/2022 | 38 | OPPOSITION/RESPONSE (re 34 MOTION for Permanent Injunction ) filed byQualcomm, Inc.. (Attachments: # 1 Proposed Order)(Stevens, Joseph) (Filed on 9/6/2022) (Entered: 09/06/2022) |
| 09/06/2022 | 39 | EXHIBITS re 38 Opposition/Response to Motion *(Cert,ficate ɕf Service)* filed byQualcomm, Inc.. (Related document(s) 38 ) (Stevens, Joseph) (Filed on 9/6/2022) (Entered: 09/06/2022) |
| 09/12/2022 | 40 | REPLY in Support (re 34 MOTION for Permanent Injunction ) filed by Larry Golden. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Envelope)(sfb, COURT STAFF) (Filed on 9/12/2022) (Entered: 09/14/2022) |
| 09/27/2022 | 41 | NOTICE of Supplemental Authority in Support of Plaintiff's Cross-Motion for Summary Judgment by Larry Golden (Attachments: # 1 Envelope)(sfb, COURT STAFF) (Filed on 9/27/2022) (Entered: 09/28/2022) |
| 10/27/2022 | 42 | CLERK'S NOTICE RE DOCKET NO. 34 . Set Hearing as to 34 MOTION for Permanent Injunction : Motion Hearing set for 1/12/2023 02:00 PM in Oakland, Courtroom 2, 4th |

| | | Floor before Judge Haywood S. Gilliam Jr. (ndr, COURT STAFF) (Filed on 10/27/2022) |
|---|---|---|
| | | Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 10/27/2022) |
| 01/04/2023 | 43 | CLERK'S NOTICE. Reset Hearings as to 34 MOTION for Permanent Injunction, 6 MOTION to Dismiss and Initial Case Management Conference set for 1/12/2023 10:00 AM in Oakland, Courtroom 2, 4th Floor. (ndr, COURT STAFF) (Filed on 1/4/2023) |
| | | Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 01/04/2023) |
| 01/04/2023 | 44 | CASE MANAGEMENT STATEMENT filed by Qualcomm, Inc.. (Yates, John) (Filed on 1/4/2023) (Entered: 01/04/2023) |
| 01/06/2023 | 46 | MOTION to Strike 44 Case Management Statement filed by Larry Golden. Responses due by 1/20/2023. Replies due by 1/27/2023. (Attachments: # 1 Envelope)(sfb, COURT STAFF) (Filed on 1/6/2023) (Entered: 01/09/2023) |
| 01/09/2023 | 45 | CLERK'S NOTICE Re Docket Nos. 6 and 34 . (ndr, COURT STAFF) (Filed on 1/9/2023) |
| | | Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 01/09/2023) |
| 01/13/2023 | 47 | OPPOSITION/RESPONSE (re 46 MOTION to Strike 44 Case Management Statement ) filed byQualcomm, Inc.. (Attachments: # 1 Certificate/Proof of Service, # 2 Proposed Order)(Yates, John) (Filed on 1/13/2023) (Entered: 01/13/2023) |
| 01/18/2023 | 48 | REPLY in Support of Plaintiff's Motion (re 46 MOTION to Strike 44 Case Management Statement ) filed by Larry Golden. (Attachments: # 1 Envelope)(sfb, COURT STAFF) (Filed on 1/18/2023) (Entered: 01/19/2023) |
| 03/15/2023 | 49 | **ORDER GRANTING 6 MOTION TO DISMISS. *All pending motions, Dkt. Nos. 15, 22, 34, and 46, are denied as moot.* Signed by Judge Haywood S. Gilliam, Jr. on 3/15/2023. (ndr, COURT STAFF) (Filed on 3/15/2023)** |
| | | Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) **(Entered: 03/15/2023)** |
| 03/15/2023 | 50 | CLERK'S JUDGMENT in favor of Qualcomm, Inc. against Larry Golden. (ndr, COURT STAFF) (Filed on 3/15/2023) |
| | | Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 03/15/2023) |
| 03/20/2023 | 51 | MOTION for Reconsideration filed by Larry Golden. (Attachments: # 1 Certificate/Proof of Service)(sfb, COURT STAFF) (Filed on 3/20/2023) (Entered: 03/27/2023) |
| 03/29/2023 | 52 | MEMORANDUM in Support re 51 MOTION for Reconsideration filed by Larry Golden. (Attachments: # 1 Envelope)(Related document(s) 51 ) (sfb, COURT STAFF) (Filed on 3/29/2023) Modified on 3/30/2023 (sfb, COURT STAFF). (Entered: 03/30/2023) |
| 03/31/2023 | 53 | OPPOSITION/RESPONSE (re 51 MOTION for Reconsideration ) *Defendant's Opposition to Plaintiff's Motion for Reconsideration* filed byQualcomm, Inc.. (Attachments: # 1 Proposed Order, # 2 Certificate/Proof of Service)(Yates, John) (Filed on 3/31/2023) (Entered: 03/31/2023) |
| 04/03/2023 | 54 | Supplemental Brief re 51 MOTION for Reconsideration filed by Larry Golden. (Attachments: # 1 Envelope)(Related document(s) 51 ) (sfb, COURT STAFF) (Filed on 4/3/2023) (Entered: 04/04/2023) |

SAppx13

| 04/06/2023 | 55 | **ORDER by Judge Haywood S. Gilliam, Jr.DENYING 51 MOTION FOR RECONSIDERATION. \*\*The Clerk is directed not to accept any further filings in this closed case.\*\*(ndr, COURT STAFF) (Filed on 4/6/2023)** |
| | | <div align="center">Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)</div> **(Entered: 04/06/2023)** |
| 04/14/2023 | 56 | **\*Disregard Filed in Error\***NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Larry Golden. Appeal of Order Dismissing Case, 49 ($505 fee Paid. Receipt No. 411017801.) (Attachments: # 1 Receipt)(sfb, COURT STAFF) (Filed on 4/14/2023) Modified on 4/20/2023 (sfb, COURT STAFF). (Entered: 04/17/2023) |
| 04/14/2023 | 58 | NOTICE OF APPEAL to the Federal Circuit as to 49 Order Dismissing Case, by Larry Golden. $505 Filing Fee Paid. Receipt No. 411017801. Appeal Record due by 5/15/2023. (sfb, COURT STAFF) (Filed on 4/14/2023) (Entered: 04/20/2023) |
| 04/18/2023 | 57 | **\*Disregard NOA to the 9th Circuit filed in Error\***USCA No. 23-15560. USCA Scheduling Order as to 56 Notice of Appeal to the Ninth Circuit filed by Larry Golden. (sfb, COURT STAFF) (Filed on 4/18/2023) Modified on 4/20/2023 (sfb, COURT STAFF). (Entered: 04/18/2023) |
| 04/28/2023 | 59 | USCA Case Number 2023-1818 USCA for the Federal Circuit for 58 Notice of Appeal to the Federal Circuit filed by Larry Golden. (cv, COURT STAFF) (Filed on 4/28/2023) (Entered: 04/28/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/15/2023 07:46:20 | | | |
| **PACER Login:** | kyriecam | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:22-cv-03283-HSG |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

SAppx14

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

**FILED**

JUN 06 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

KAW

22   03283

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

CASE NO: _____

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

June 03, 2022



## COMPLAINT FOR ANTITRUST LAW VIOLATIONS AND PATENT INFRINGEMENT

This is a civil action brought under Antitrust Law violations commencing from competitor collaborations, conspiracy to restrain trade, and "tying" teaming agreements that likely resulted in a secret conspiracy and the anticompetitive practices recognized by this Court in *Federal Trade Commission v. Qualcomm Inc.* **Exhibit A: "Finding of Fact…"**

This action is also brought under Contributory Infringement commencing from the "manufacture, combination or composition; or, a material or an apparatus for use in practicing a

patented process, constituting a material part of the invention". This action is for damages and injunctive relief on behalf of the Plaintiff, against the defendant Qualcomm Inc. ("Qualcomm"); demanding a trial by jury, complains and alleges as follows:

## NATURE OF THE CASE

1.      This enforcement action challenges Qualcomm's unlawful maintenance of a monopoly in Qualcomm's Snapdragon chipsets that processes functional and operational instructions; and, enable cellular communications in new and improved cell phones and other products.

2.      Qualcomm has engaged in exclusionary conduct that reduces competitors' ability and incentive to innovate, and raises prices paid by consumers for the new and improved cell phones. Qualcomm is both a dominant supplier of Snapdragon chipsets (processors) and a licensor of patents that Qualcomm has declared essential to widely adopted cellular standards.

3.      The new and improved cell phones sold by Qualcomm's customers must comply with these standards, even when they incorporate processors supplied by Qualcomm's competitors.

4.      Qualcomm has excluded competitors and harmed competition through interrelated policies and practices that includes withholding its Snapdragon chipsets (processors) unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm.

5.      Qualcomm elevates royalties that the customer must pay when using competitors' processors ("no license-no chips"); and, without a patent(s) for the new and improved cell

COMPLAINT

phones, or a licensing agreement for the new and improved cell phones, collects a royalty on each new and improved cell phones (handset) sold.

6.  Qualcomm's behavior is especially problematic when it comes to bargaining over licenses for patents recognized as a "standard" or deemed to be "essential" to a particular industry. "No license, No chip" policy.

7.  Qualcomm is being hypocritical in that regard, because of Qualcomm's unauthorized use of a patented CPU(s) that the company "ties" to its cellular modems; the unauthorized use of a patented new and improve cell phone(s) that the company collects a royalty on the sale of each handset; and, the unauthorized use of a patented driver assistance system for the driverless, self-drive, and autonomous vehicle.

8.  Qualcomm's conduct has harmed competition and the competitive process. At a time when cellular technologies are expanding to new and varied applications, Qualcomm's practices threaten further consumer harm in an industry in which competition and innovation are vitally important.

## JURISDICTION AND VENUE

9.  This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover triple damages, injunctive relief, and costs of suit; for violation of Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2; conspiracy in the restraint of trade and single-firm violations).

10. This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

COMPLAINT

11.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

12.     For patent litigation cases, the venue statute, 28 U.S.C. §1400(b), provides "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

13.     The activities of the Defendant, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

**Intradistrict Assignment**

14.     Assignment to the San Jose Division is proper. The actions arose in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Qualcomm has offices in Santa Clara and San Jose. Third parties that have information relevant to this action, including leading cell phone manufacturers (also known as "original equipment manufacturers" or "OEMs") and Qualcomm competitors, also have offices in Santa Clara County.

**Related Case Dismissed "Without Prejudice"—Antitrust Law Violations**

15.     UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT No. 21-2160 *Larry Golden*, on behalf of himself and all others similarly situated, Plaintiff - Appellant, *v. Apple, Inc.; Samsung Electronics USA; Lg Electronics USA, Inc.; Qualcomm Inc.; Ford Global Technologies LLC; General Motors Company; FCA US, LLC*, Defendants - Appellees. USCA4 Appeal: 21-2160 Doc: 7 Filed: 03/31/2022

<div align="center">COMPLAINT</div>

16.     "PER CURIAM: Larry Golden appeals the district court's order accepting the recommendation of the magistrate judge and <u>dismissing without prejudice</u> Golden's civil complaint. We have reviewed the record and find no reversible error. Accordingly, we affirm the district court's order." *Golden v. Apple, Inc.*, No. 6:20-cv-02270-JD (D.S.C. Sept. 20, 2021) ...

**Related Case Dismissed "Without Prejudice"—Patent Infringement**

17.     IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA GREENVILLE DIVISION *Larry Golden, Plaintiff, vs. Apple Inc.; Samsung Electronics USA; LG Electronics USA, Inc.; Qualcomm Inc., Motorola Solutions, Inc.; Panasonic Corporation; AT&T Inc.; Verizon Corporation Service Group; Sprint Corporation; T-Mobile USA, Inc.; Ford Global Technologies, LLC; Fairway Ford Lincoln of Greenville; General Motors Company; Kevin Whitaker Chevrolet; FCA US LLC; Big 'O' Dodge Chrysler Jeep Ram, Defendants*. Case No.: 6:20-cv-04353-JD-KFM Date Filed 11/02/21 Entry No. 26.

18.     "Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein. IT IS, THEREFORE, ORDERED that Plaintiff's Complaint is <u>dismissed without prejudice</u> and without the issuance of service of process."

**Dismissal "Without Prejudice"**

19.     When a court dismisses a claim but leaves the plaintiff free to bring a subsequent suit based on the same grounds as the dismissed claim. *In Semtek Intern. Inc. v. Lockheed Martin Corp.*, the Supreme Court pointed out that one of the main features of dismissal without prejudice is that it does not prevent refiling of the claim... "a case that is dismissed "without prejudice" is only dismissed temporarily. This temporary dismissal means that the plaintiff is allowed to re-file charges, alter the claim, or bring the case to another court."

COMPLAINT

# THE PARTIES

20.     Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business (ATPG Technology, LLC), and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff is the author of three economic stimulus packages submitted to Government beginning in year 2003. The success of the packages was dependent on the development of certain intellectual property technology that is owned by the Plaintiff, and is asserted in this case (i.e., Communicating, Monitoring, Detecting, and Controlling (CMDC) devices; Central Processing Units (CPUs) for New and Improved Cell Phones; and, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS). **Exhibits B-H; '497, '752, '189, '439, '287, '619, '891 patents**

21.     On information and belief, Qualcomm is a California corporation with a principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 and does business in this judicial district. Qualcomm has offices in Santa Clara, CA and San Jose, CA. Qualcomm's unjust enrichment of profits, resulting from a violation of antitrust laws; anticompetitive practices; conspiracy in restraint of trade; direct infringement; and contributory infringement, give rise to this complaint. Qualcomm's monopolization and attempted monopolization violations require no agreement as Section 1 violations do. *E.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993) (explaining that "while § 1 . . . forbids contracts or conspiracies . . ., § 2 addresses the actions of single firms that monopolize or attempt to monopolize"). They are "single-firm" violations.

22.     Qualcomm's total revenue between the years 2013 and 2021 = $226.56B. Qualcomm may be served at its principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 [or] Qualcomm, Inc., c/o Prentice-Hall, Corporation System, Inc., 251 Little Falls Drive, Wilmington, DE 19808 (302)-636-5400.

COMPLAINT

## STATEMENT OF FACTS:

## QUALCOMM'S MOTIVE TO FORM A CONSPIRACY, AND CONSPIRACY IN RESTRAINT OF TRADE

23.     Qualcomm's motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion.

24.     Upon information and belief, Qualcomm has conspired with Apple, Samsung, & LG; who participated as co-conspirators with Qualcomm in violating certain antitrust laws, and laws governing the unauthorized use of Plaintiff's patented inventions.

25.     While performing work for the government, Qualcomm has engaged in assembling Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device [new and improved cell phone; handset], and has managed to avoid prosecution by shielding itself under the protection of the Government.

26.     Plaintiff has alleged, Qualcomm and its co-conspirators (Apple, Samsung, & LG), was aware that if they form a conspiracy, while under an agreement or contract with the Government to control the development, manufacture, commercialization, and pricing of Plaintiff's alleged infringing product(s), there would not be any reasonable substitute for the alleged infringing product or service.

27.     The acts charged in this complaint were done by Qualcomm and its co-conspirators, or were authorized, ordered or done by their respective officers, employees, representatives, or agents while actively engaged in management of Qualcomm and its co-conspirators business or affairs. Each of the co-conspirators named herein acted as the agent or representative of, or for Qualcomm with respect to the acts, violations and common course of conduct alleged herein.

28.     Upon information and belief, Qualcomm colluded and conspired under the protection of a Government [1] contract to develop Plaintiff's "new and improved cell phone" (i.e., smartphone) that is designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across multiple industries, agencies, groups, demographics, races, ages, and genders to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

29.     In 2007, Qualcomm and the Plaintiff was competing for the same government contract. The Department of Homeland Security (DHS) issued a 'request for proposal' [DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing*]. DHS was seeking proposals for a new and improved cell phone capable of biological and chemical sensing.

30.     Qualcomm's collusion, and conspiracy to hinder trade, has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC (handset) devices and Plaintiff's patented CPUs. The OEMs are already paying royalties to Qualcomm on every handset sold; and, the OEMs are already paying an increased royalty rate for Qualcomm's chipsets that include Plaintiff's patented CPUs.

---

[1] In the United States Court of Appeals for the Ninth Circuit, *Federal Trade Commission, Plaintiff-Appellee, V. Qualcomm Incorporated, Defendant-Appellant.* Case No. 19-16122. [Declaration of Under Secretary of Defense for Acquisition and Sustainment]; Ellen M. Lord writes, "Qualcomm is a global leader in the development and commercialization of foundational technologies and products used in mobile devices and other wireless products, including network equipment, broadband gateway equipment, and consumer electronic devices" … "DoD firmly believes that any measure that inappropriately limits Qualcomm's technological leadership, ability to invest in research and development (R&D), and market competitiveness, even in the short-term, could harm national security. The risks to national security include the disruption of DoD's supply chain and unsure U.S. leadership in 5G" …

COMPLAINT

31.     For the program's initial phase in 2007, DHS released a call for proposals inviting the private sector to develop a proof of concept for the "*Cell-All Ubiquitous Biological and Chemical Sensing*" project (U.S. Department of Homeland Security, 2007). Cell-All Ubiquitous Biological and Chemical Sensing. <https://http://www.fbo.gov/index?s=opportunity&mode= form&id =f292c1fdbd46777a3ff8ca64ef96658f&tab=core&_cview=1> (accessed 17.09.12).

32.     DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung— **Exhibit I** with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010, Cell-All: Super Smartphones Sniff Out Suspicious Substances <http://www.dhs.gov/cell-all-super-smartphones-sniff-out-suspicious-substances> (accessed 17.09.12)).

33.     Upon information and belief, it has always been Qualcomm's goal to monopolized the smartphone industry. According to Mr. Hoffman, "[e]nrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: *'Let's take advantage of the 300 million cell phones that are out there today*. They're always with us'" (Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28 <http://cellall.webcaston.tv/ home/homepage.php> (accessed 17.09.12)).

34.     It is the belief of the Plaintiff, that throughout the relevant period, Qualcomm and its co-conspirators Apple, Samsung, & LG, unlawful activities as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

COMPLAINT

35.      It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for the Central Processing units (CPUs) and the Communicating, Monitoring, Detecting, and Controlling (CMDC) devices.

36.      It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, act together in ways that limit competition by hindering Plaintiff's patented products from entering the market, while exercising an unreasonable horizontal restraint of trade.

37.      Qualcomm and its co-conspirators Apple, Samsung, & LG, agreements are considered unreasonable because their interaction is to such a degree that they were no longer acting independently, and the collaboration gave them the ability to wield market power together.

38.      It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, have engaged in a contract, combination, trust or conspiracy, the effect of which was to develop, manufacture, and commercialize Plaintiff's Central Processing units (CPUs) and Communicating, Monitoring, Detecting, and Controlling (CMDC) devices without paying royalty compensation.

39.      It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, through their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or conspiracy between themselves and their co-conspirators.

40.      In a related COFC case no 13-307C, *Larry Golden v. The United States*, Qualcomm [2019] and its co-conspirators Apple, Samsung, & LG [2021 respectfully], were all summoned to appear to protect any interested they may have had in the case.

41.     Qualcomm and its co-conspirators Apple, Samsung, & LG, made the decisions

not to appear. **Exhibit J**. By default, Qualcomm is barred from entering a defense in this Court

for non-infringement or that any of the following patent claims are invalided: Claim 1 of the '497

patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439

patent; and, claims 4-6 of the '287 patent.

42.     After a 10 year "teaming arrangement" [2] to commercialize the Plaintiff's new and

improved cell phones, and Plaintiff's new and improved CPUs developed and assembled under

the *Cell-All* initiative, Verto Analytics looked at the numbers. "Apple, Samsung, and LG

(CMDC devices) smartphones owned by U.S. consumers, is equivalent to 88% market share.

43.     January 2018, Apple led the pack, with 45% market share (representing nearly 84

million smartphones), while Samsung claims 33% of the market (61.5 million smartphones).

These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender,

had 10% market share, while all other brands combined account for 12% of the devices on the

U.S. smartphone market."

---

[2] "On October 13, 2021, the American Bar Association's Section of Public Contract Law held its
annual public procurement symposium to discuss important issues related to federal, state, and
local government contracting. Daniel Glad, Director of the Department of Justice ("DOJ")
Antitrust Division's Procurement Collusion Strike Force ("PCSF"), delivered the keynote
address outlining the growing importance of PCSF's work … PCSF will scrutinize joint
ventures, teaming arrangements, and other competitor collaborations to ensure that such
agreements are not shams for collusive conduct … PCSF's mission is to deter and prevent
collusion before it takes place. To that end, the PCSF has trained over 17,000 special agents,
attorneys and prosecutors, investigators, analysts, auditors, data scientists, and procurement
officials across more than 500 agencies regarding how to spot red flags of potential procurement
collusion…" https://www.jdsupra.com/legalnews/procurement-collusion-strike-force-4152293/

COMPLAINT

## QUALCOMM'S KNOWLEDGE OF PLAINTIFF'S
## CENTRAL PROCESSING UNITS (CPUs)

44.     Qualcomm fail to disclose to the OEMs (the handset and smartphone manufactures); its knowledge of Plaintiff's patented central processing unit (CPU) designed for Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device (i.e., handset; new and improved cell phone; smartphone).

45.     Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices.

46.     On November 4, 2010, Plaintiff emailed Kate Lane, Strategic IP, Qualcomm Incorporated (E-mail: clane@qualcomm.com); Direct: (858-658-2047)), to inform Ms. Lane of certain patented technology (i.e., CMDC—Smartphone—device; central processing unit (CPU); and, a Stall, Stop, and Vehicle Slowdown System for manned and unmanned electric, autonomous, and driverless vehicles).

47.     Plaintiff asked if Qualcomm would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff). Subject: "Patented Technology for Qualcomm's Review (copy available upon request).

48.     Plaintiff mailed out letters dated December 7, 2010 addressed to the attention of Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President Derek Aberle, (copies of the letters and return receipts are available upon request) informing the Executives of the Patent Owner's (Plaintiff) patented technology and asked if they would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff).

COMPLAINT

49.     After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate".

50.     On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate" (copy available upon request).

51.     On October 11, 2011, the Patent Owner (Plaintiff) returned via e-mail, the answered Patent Information Request form to Ms. Lane. The Patent Owner (Plaintiff) made several attempts to contact Ms. Lane via e-mail and by phone after that, but never heard back from Ms. Lane.

52.     Upon information and belief, Plaintiff believes Qualcomm has formed or created its monopoly for chipsets by "tying" Plaintiff's CPUs to its wireless cellular modems. A "tying," "tie-in," or "tied sale" arrangement has been defined as "an agreement by a party to sell one product . . . on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that [tied] product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992).

53.     Conditioning the ability of a licensee to license one or more items of intellectual property on the licensee's purchase of another item of intellectual property or a good or a service has been held in some cases to constitute illegal tying. See, e.g., *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 156-58 (1948) (copyrights); *Int'l Salt Co. v. United States*, 332 U.S. 392 (1947) (patent and related product), abrogated in part by *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

54.    Qualcomm's anticompetitive practices of its cellular-modem patents harm competitors. Qualcomm's "hold out" strategy of "no license, no chip", was used to force the co-conspirators OEMs to purchase Plaintiff's patented CPU that Qualcomm "tied" to its modem. "Tying" under U.S. law is defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product."

55.    Plaintiff also believes the OEMs were misled and misinformed into believing the CPUs tied to Qualcomm's chipsets [3] was not a patented product Qualcomm had received prior knowledge on. Plaintiff believes Qualcomm threaten the OEMs to purchase what was marketed as an unpatented product [CPU], tied to Qualcomm's patented product (wireless cellular modem), in a "no license, no chip[set]", policy contract.

56.    According to Doug Hoffman, program manager at Qualcomm, the [network] gateway authenticates the sensor and phone to determine whether they are authorized to be on the network ... (Hoffman, D., 2011. Qualcomm Project Presentation. *Cell-All Live Demonstration for Environmental Sensing (Webcast)*, September 28 <http://cellall.webcaston.tv/home/homepage.php> (accessed 17.09.12)).

---

[3] The Snapdragon® 8+ Gen 1 Mobile Platform is our latest premium-tier powerhouse ... while the Qualcomm® Kryo™ CPU provides 10% better CPU performance and 30% CPU improved power efficiency. The Snapdragon® 888+ 5G Mobile Platform—is a 4nm chipset that features a beefy octa-core CPU—boasts improvements in both processing and AI since the predecessor*, with our 6th gen Qualcomm® Artificial Intelligence (AI) Engine and Qualcomm® Kryo™ 680 CPU... The octa-core Qualcomm® Kryo™ 490 CPU provides up to 25% faster single- and multi-threaded performance ... Revealed in early 2021, the Snapdragon 870 is literally a tiny upgrade over 2020's Snapdragon 865 and 865 Plus flagship processors. All three of these chipsets sport a tri-cluster CPU arrangement, featuring one powerful Cortex-A77 core ... Retrieved from Qualcomm's websites.

57.     Plaintiff is challenging the tying arrangement because: (1) Qualcomm has market power in the tying product, *Cf.* 35 U.S.C. § 271(d) (2012) (requiring market power in patent misuse cases involving tying). (2) the arrangement has an adverse effect on competition in the relevant market for the tying product or the tied product, and (3) efficiency justifications for the arrangement do not outweigh the anticompetitive effects.

58.     "Qualcomm's Snapdragon CPU [*added*: that copies the functions of Plaintiff's CPU] is the 'brain' of your smartphone. The CPU receives commands, makes instant calculations, and sends signals throughout your device. There are multiple ways to gauge the performance of a CPU besides checking the Gigahertz (GHz) speed or the number of CPU cores (aka dual-core and quad-core). https://www.qualcomm.com/news/onq/2013/06/13/mobile-processors-101-why-smartphones-are-smarter-all-one-processor

59.     In 2014, Qualcomm's licensing practice of "No License, No Chips" was attacked by the antitrust authorities in China. This matter resulted in a settlement in which Qualcomm reduced its royalty rates charged for cellphones made and sold in China by 35%. Qualcomm was able to avoid deeper cuts by making a contribution of $150 million to the Chinese government. Antitrust investigations and penalties against Qualcomm have also occurred in Japan, Korea, Taiwan and Europe.

60.     Qualcomm, has a 90% share in the market for chipsets, and by withholding knowledge of "tying" a Plaintiff's patented CPU, coerced cellular telephone manufacturers (OEMs) to purchase only Qualcomm-manufactured chipsets. These actions are alleged to be part of Qualcomm's strategy to maintain a monopoly in the chipset market.

61.     The Federal Trade Commission began an investigation of Qualcomm in 2014, leading to its 2017 suit against Qualcomm for violations of section 5 of the Federal Trade

Commission Act, and sections 1 and 2 of the Sherman Act, the general antitrust laws of the United States.

62.      In the opinion of the U. S. District Court for the District of Northern California; "Qualcomm leveraged its monopoly position in chips to secure unreasonably high rates for its SEPs. Qualcomm, for example, refused to provide must-have chips unless customers took the unreasonable IP licenses—the "no license, no chip" model.

63.      Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to anticompetitive harm in modem chips. Here, Judge Koh, quoting the D.C. Circuit's decision in *United States v. Microsoft Corp*., held it sufficient that Qualcomm engaged in "anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43 (citations and internal quotation marks omitted)."

64.      As noted above, Qualcomm's, licensing practice of "No License, No Chips" was attacked by the antitrust authorities in China, Japan, Korea, Taiwan and Europe, that created penalties against Qualcomm.

65.      Qualcomm's anticompetitive practices violations intensifies when we add Qualcomm's failure to alert its OEM customers and the Securities Exchange Commission responsible for protecting investors; that for years, Qualcomm has sold a patented product (CPU), that Qualcomm "tied" to its chipsets (Snapdragon); with the knowledge that the CPUs for the new and improved cell phones (i.e., handsets) are the patented products of the Plaintiff.

66.      In the related case no. 13-307C, *Larry Golden v. The United States*, Qualcomm was summoned to show non-infringement of Plaintiff's patented CPUs for CMDC devices.

COMPLAINT

67.     Qualcomm had an opportunity to show at least independent claims 4-6 of

Plaintiff's '287 patent [**Exhibit K: Samsung chart: pgs. 191-219; pgs. 409-437; and, pgs. 627-655**] were invalided. Qualcomm fail to appear. Claims 4-6 of the '287 patent. [4]

---

[4] 4.     A communication device comprising:

at least one central processing unit (***CPU***) ...

at least one or more detectors in communication with the art least one ***CPU*** for detecting at least one of a chemical, biological, radiological, or explosive agents ...

at least one of a transmitter or a transceiver in communication with the at least one ***CPU*** configured to send signals ... to detect at least one of a chemical biological, radiological, or explosive agent such that ***the communication device is capable of communicating, monitoring, detecting, and controlling.***

5.     A monitoring device, comprising:

at least one central processing unit (***CPU***) ...

at least one sensor for chemical, biological, or human detection in communication with the at least one ***CPU*** ...

one or more detectors in communication with the at least one ***CPU*** for detecting at least one of chemical, biological, radiological, or explosive agents ...

at least one of a transmitter or a transceiver in communication with the at least one ***CPU*** configured to send signals ... to detect at least one of a chemical biological, radiological, ...

6.     A monitoring equipment, comprising:

at least one central processing unit (***CPU***) ...

at least one or more detectors in communication with the art least one ***CPU*** for detecting at least one of a chemical, biological, radiological, or explosive agents; ...

at least one of a transmitter or a transceiver in communication with the at least one ***CPU*** configured to send signals ... to detect at least one of a chemical biological, radiological, ...

COMPLAINT

68.    Plaintiff has two more independent claims 1 & 11 of Plaintiff's 619 patent [5] for

the central processing unit that was not included in the related case no. 13-307C, *Golden v. US*

---

[5] 1.    A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least *a central processing unit (CPU)*, capable of ...

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent ... (WMDs) ...

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission ...

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, ...

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory ...

11.    A *central processing unit (CPU)* of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs) ...

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission ...

whereupon, *the central processing unit (CPU)* of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

COMPLAINT

## QUALCOMM'S KNOWLEDGE OF PLAINTIFF'S COMMUNICATING, MONITORING, DETECTING, & CONTROLLING (CMDC) DEVICES

69.     As stated earlier in this document, Qualcomm was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices [see ¶¶ 45-51]. Paragraph 45 states, "Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices."

70.     Upon information and belief, Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of the phone, i.e., handset; smartphone, etc. The elements of unjust enrichment exist because: 1) Plaintiff provided something of value to the defendant Qualcomm; 2) Qualcomm acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Qualcomm to enjoy the benefit Plaintiff provided without compensating Plaintiff.

71.     Upon information retrieved from this Court: The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices:

72.     "Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a *5% running royalty on the price of each handset sold*. These licenses are called Subscriber Unit License Agreements ("SULA") …"

73.     "Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio… LG Electronics (LGE) paid Qualcomm a 5%

COMPLAINT

running royalty on handsets containing Qualcomm modem chips and a 5.75% running royalty on handsets containing non-Qualcomm [] chips… "

74.    "Qualcomm and LG signed … Subscriber Unit License … Steve Altman (Qualcomm President) sent to Irwin Jacobs (Qualcomm Co-Founder and former CEO): "They currently pay 5% when they use our chip and 5.75% when they don't. We have agreed to take their rate to 5% regardless of whose chip they use."

75.    Plaintiff believes Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition.  The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

76.    Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold…

- [O]n May 3, 2012, Sony and Qualcomm entered into a Subscriber Unit Patent License Agreement, effective February 16, 2012 through September 30, 2012 ("May 2012 Sony Interim License"). ECF No. 1326 at 9. Under the May 2012 Sony Interim License, Sony agreed to provisionally pay Qualcomm a 5% royalty on CDMA handsets."

- Under the [] SULA amendment, Samsung paid a 5% running royalty rate on CDMA handsets containing Qualcomm chips, subject to a $20 royalty cap."

COMPLAINT

- BenQ and Qualcomm signed a new patent license agreement. JX0030. Under the license agreement, BenQ owed Qualcomm's standard 5% running royalty rate, with the handset as royalty base. See JX0030-007 (defining the royalty base as "the Selling Price charged by LICENSEE for Subscriber Units Sold to such Purchaser."

- Apple does not manufacture handsets itself but instead uses contract manufacturers, including Pegatron and Wistron, to manufacture handsets. ECF No. 1326 at 4. These contract manufacturers pay Qualcomm a 5% running royalty rate on the manufacturers' handset selling price.

77.     Judge Koh determined, "Qualcomm's anticompetitive conduct is conduct that 'harms the competitive process and thereby harms consumers.'" 6ER1208 (quoting *Microsoft*, 253 F.3d at 58) … "[A]pplying that standard, the district court agreed with the FTC that Qualcomm's practices were anticompetitive."

78.     The Judge's decision severely chastised Qualcomm for basing its royalty on the price of the device (e.g., a handset). Significantly, the Judge framed this criticism based on principles of ***competition law and patent law***, not contract law. Judge Lucy Koh of the US District Court of the Northern District of California in her decision in *Federal Trade Commission v Qualcomm Incorporated* (5:17-cv-0220); determined that charging royalties based on the price of a handset was unreasonable and contrary to US law.

79.     If Qualcomm loses this case, Qualcomm will have to license its patent to competitors and renegotiate its licensing agreements with all its customers. No longer will Qualcomm be able to charge the 5% royalty rate per the price of the phone.

80.     Plaintiff believes his patents grant him the right to charge a royalty on the price of each phone sold, and is asking this Court to order Qualcomm to pay Plaintiff all royalties Qualcomm has received that was based on the sale of each handset (CMDC device).

81.     Plaintiff claims that Qualcomm's wrongdoing caused the OEMs to pay inflated prices for cellular modems, and that it would be unjust for Qualcomm to be permitted to retain the profits gained from its unfair and deceptive practices.

82.     Plaintiff has the right to exclude Qualcomm from "using" Plaintiff's CMDC devices—handsets to unjustly enrich itself.

83.     Plaintiff is entitled to stop Qualcomm's use of the Plaintiff's inventions to generate profits by seeking a legal injunction in Federal court. Qualcomm's anticompetitive practices has restrained Plaintiff from entering the market to collect royalties on his patented inventions. Plaintiff is entitled to collect damages for any unlicensed use of his inventions. Damages are generally calculated based on lost profits Plaintiff suffered as a result of the use.

84.     In the related COFC case no. 13-307C, *Larry Golden v. The United States*, Qualcomm was summoned [2019] to show non-infringement of Plaintiff's patented CMDC devices. **Exhibit K: Samsung chart; 9 alleged infringing products; 25 Ind. patent claims**

85.     Qualcomm had an opportunity to show at least independent claim 1 of Plaintiff's '497 patent; claim 10 of Plaintiff's '752 patent; claims 1-9 of Plaintiff's '189 patent; claims 13-23 of Plaintiff's '439 patent; and, claims 4-6 of Plaintiff's '287 patent [25 independent patent claims asserted in the case no. 13-307C, *Larry Golden v. The United States* for the CMDC device; new and improved cell phone; smartphone], were invalided. Qualcomm fail to appear.

86.     Plaintiff will illustrate only 2 of the 25 independent patent claims asserted in the related COFC case no. 13-307C, *Larry Golden v. The United States*.

87.     Claim 22 of Plaintiff's '439 patent is an illustration of how Plaintiff's cell phone,

smartphone, and handheld [handset] are grouped together by design similarities. Claim 23 of

Plaintiff's '439 patent is an illustration of Plaintiff's new and improved cell phone.

Claim 22.     *A communication device* of at least one of a cell phone, a smart

phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer

terminal, comprising:

*at least one of a chemical sensor, a biological sensor, an explosive sensor, a*

*human sensor, a contraband sensor, or a radiological sensor;* that is wired or wireless,

capable of being disposed within, on, upon or adjacent the communication device;

*at least one of a central processing unit (CPU), a network processor,* or a front-

end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-

sensor detection device, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of a multi-

sensor detection device, a cell phone detection device, or a locking device;

at least one of a satellite connection, Bluetooth connection, WiFi connection,

internet connection, *cellular connection*, long and/or short-range radio frequency (RF)

connection, or GPS connection;

the communication device being at least a fixed, portable or mobile

communication device, equipped with at least one wired or wireless sensor for the

detection of humans;

the communication device being equipped to receive signals from or send signals

to engage (lock), disengage (unlock), or disable (make unavailable) locks;

the communication device being equipped with biometrics that incorporates at

least one of a fingerprint recognition or a face recognition to at least one of gain access to

the device or to prevent unauthorized use;

the communication device being capable of wireless near-field communication

(NFC) which allows radio frequency (RF) data to be at least one of received or

transferred between the communication device and at least one tag that is read by the

communication device;

whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, *a cellular connection*, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; and

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, *cellular connection*, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, *or the central processing unit (CPU)*.

Claim 23.    *A cell phone comprising*:

*a central processing unit (CPU)* for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, *cellular connection*, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed

within, on, upon or adjacent the cell phone;

      wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, *cellular connection*, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver;

      wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and

      whereupon a signal sent to the receiver of *the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor*, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone.

    88.    Qualcomm, and its co-conspirators waived their rights for later argument on patent invalidity and noninfringement for not participating in the § 1498 litigation, "[w]hile a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed." As the USCFC held in *Bowser, Inc. v. United States*:

We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him. 420 F.2d 1057, 1060 (Ct. Cl. 1970). **Exhibit L**

# QUALCOMM WILLFULLY CONTRIBUTED TO THE INFRINGEMENT OF PLAINTIFF'S CPUs; CMDC DEVICES; STALL, STOP, & VEHICLE SLOWDOWN SYSTEMS

89.     Qualcomm and ASUS made a phone for Snapdragon Insiders. ASUS and Qualcomm have teamed up to make a smartphone. The "Smartphone for Snapdragon Insiders" harnesses Qualcomm's Snapdragon 888 5G chipset.  https://www.engadget.com/ qualcomm-asus-smartphone-snapdragon-insiders-150023369.html?guccounter...

90.     Liability for contributory infringement of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States ... a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, ... shall be liable as a contributory infringer."

91.     The threshold requirement for a claim of contributory infringement is the existence of direct infringement.  *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972).  There must also be a showing that the alleged contributory infringer knew of the patent and that his or her actions would lead to infringement of the patent.  *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).

92.     Qualcomm was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices [see ¶¶ 45-51]. Paragraph 45 states, "Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices."

93.     Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes actions that contribute (or potentially contribute) to someone

else infringing a patent, even if those actions do not directly infringe the patent. An example of contributory infringement include:

> The supply of Component A (i.e., Qualcomm's Snapdragon chipset that includes Plaintiff's central processing unit (CPU), with instructions to connect it to an available Component B (i.e., Qualcomm/Asus smartphone that Plaintiff claims as his patented CMDC device; smartphone); where A+B (Plaintiff's patented CPU (Qualcomm's Snapdragon) + Plaintiff's CMDC device (Qualcomm/Asus smartphone is a patented product. *See Ind. claims 4-6 of Plaintiff's '287 patent. See also Ind. claims 1 & 11, Dep. claims 2-10 & 12-20 of Plaintiff's '619 patent that covers Plaintiff's CPU. See Ind. claims 1-9 of Plaintiff's '189 patent; and, Ind. claims 13-23 of Plaintiff's '439 patent that covers Plaintiff's CMDC device.*

94.     Upon information and belief, Qualcomm continues to "tie" Plaintiff's central processing units (CPUs) to its system-on-a chip (Snapdragon by Qualcomm); and, continues to use Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices i.e., handsets, new and improved cell phones, smartphones, to generate profits, without a license or authorization to do so.

95.     Plaintiff's "tying" clams involving intellectual property are brought under Section 1 and Section 2 of the Sherman Act, Section 3 of the Clayton Act, and Section 5 of the Federal Trade Commission (FTC) Act.

96.     A chipset is the motherboard in a phone that is designed to accept all the components to sit upon it, and connect with each other. It is made of ICs (integrated circuits) and provides all the inter communication channels (buses) to connect for e.g., camera, Bluetooth, Wi-Fi, touch screen with CPU/Flash storage/Ram.

<div align="center">COMPLAINT</div>

97.     The CPU is the Central Processing Unit which is responsible for carrying out the instructions of a computer program [operating systems (android), contain and manage all the programs and applications that a computer or mobile device is able to run, which means managing the device's software and hardware functions], by performing the basic arithmetical, logical, and input/output operations of the system.

98.     In a mobile phone, combination of chipset and CPU is called a SoC (System on Chip) which integrates all the components on a single chip. Unlike in computers, CPU is soldered on the chipset inside a mobile device which tends to improve the performance, and saves lot of space. The most popular SoCs (also referred to as processors, chipsets, CPUs), are Snapdragons by Qualcomm.

99.     GM completely redesigned the compute architecture that powers its "hands-free" driving system that is integrated with the "Snapdragon Ride Platform" of Qualcomm. GM has the first advanced driver assist system (ADAS) to use Qualcomm's new Snapdragon Ride Platform. https://www. theverge.com/2022/1/6/22870416/gm-ultra-cruise-qualcomm-snapdragon-compute-adas

100.     The Snapdragon Ride Platform is built on scalable and modular heterogenous high-performance multi-core CPUs. It is intended to address the needs of complex self-driving technology and Advanced Driver Assistance Systems (ADAS) with high performance and power efficiency.

101.     Genaral Motors had prior knowledge of Plaintiff's Stall, Stop, and Vehicle Slowdown System before conspiring with Qualcomm to combine the two alleged infringing products—GM's ADAS system and Qualcomm's Snapdragon Ride.

COMPLAINT

102.    Plaintiff first contacted GM/OnStar during the summer months of 2007 to ask if they would like to participate with Plaintiff in responding to a Department of Homeland Security (DHS) solicitation: (Broad Agency Announcement; BAA 07-02A).

103.    Plaintiff's primary contact person at GM/OnStar was Mr. Jim Culbertson. The Plaintiff asked Mr. Culbertson if GM/OnStar has the capability of bringing a moving vehicle to a stall, stop, or slowdown. Mr. Culbertson's response to me was, "I need time to find out if we have those capabilities and if there is interest from upper management".

104.    After several conversations and several failed attempts to reach Mr. Culbertson, Plaintiff never heard back from GM/OnStar. Plaintiff noticed while watching TV, an announcement made by GM/OnStar on October 9, 2007 of a new, "Stolen vehicle slow down system" that was being offered by GM/OnStar beginning the following year on the 2009 models.

105.    GM/OnStar's "Stolen vehicle slow down system" is substantially the same as the Plaintiff's "stall, stop, and vehicle slowdown systems (SSVSS)" that Plaintiff had discussed earlier with GM/OnStar's Mr. Culbertson during the summer months of 2007. Plaintiff called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791. Mr. Culbertson referred Plaintiff to Angie Miller at 313-665-1485. When Plaintiff dialed Ms. Miller's number, the answering machine for a Michelle came on; therefore, Plaintiff did not leave a message.

106.    On April 14, 2008, Plaintiff faxed a letter of interest to the General Motors Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several members of the General Motors leadership team, to include, Mr. Frederick A. Henderson, President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel.

COMPLAINT

107.    Below are illustrative charts to show GM's Advanced Driver Assistance System

(ADAS)) reads on Ind. claim 44, and Dep. claims 47, 48, 49, 50, 51, & 53 of the '891 patent:

| GM's Advanced Driver Assistance System (ADAS) | Patent Owner's CMDC Device Patent #: RES#,891; Independent Claim 44 |
|---|---|
| GM Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Chrysler, Dodge, Jeep, and Ram vehicles (i.e., Advanced Driver Assistance System (ADAS)) | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |

COMPLAINT

| GM's Advanced Driver Assistance System (ADAS) | Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 47, 48, 49, 50, 51, & 53 |
|---|---|
| Enhanced Smart Pedal Technology: Known as brake override, reduces power to the engine in cases where the brake and accelerator pedal are being simultaneously depressed. | 47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration. |
| Front Automatic Braking: Helps a driver avoid a forward crash or reduce the severity of crashing into a vehicle in front of it, whether it is moving or has come to a stop. | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Rear Automatic Braking: Helps the driver avoid a crash or to mitigate the impact into objects directly behind their vehicle by bringing the vehicle to a stop. | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |
| Electronic Stability Control (ESC): Detects loss of steering control, it automatically applies the brakes to help "steer" the vehicle. Braking is automatically applied. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| Lane Keep Assist: Represents an upgrade of Lane Departure Warning. The feature is listed as "Lane Keep Assist with Lane Departure Warning". | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Adaptive Cruise Control: The technology automatically accelerates and brakes the vehicle up to moderate levels to maintain a driver-selected following gap (distance). | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

108.    After the doctrine of contributory infringement developed in the courts,

Qualcomm found ways to use it to extend their patent monopolies beyond the scope of their

COMPLAINT

patents. This was accomplished primarily through the use of "tying arrangements", which required purchasers of patented products to also purchase unpatented goods.

109.    Congress responded by enacting a special antitrust law, the Clayton Act, which included prohibiting the use of "tying arrangements" to create a monopoly in unpatented goods, 15 U.S.C. § 14 (2000). In addition, the Supreme Court developed the doctrine of patent misuse to bar a patentee from extending a patent monopoly beyond the scope of the patent, See *Carbice Corp. of Am. v. American Patents Dev. Corp.*, 283 U.S. 27 (1931).

110.    Upon information and belief, Qualcomm misled the public by marketing Plaintiff's CPUs (tied to its cellular modems—SoC) as an unpatented product, and GM misled the public by marketing Plaintiff's Stall, Stop, and Vehicle Slowdown Systems (tied to its autonomous, driverless, self-drive vehicles) as an unpatented product. [6]

111.    American courts first encountered "tying arrangements" in the course of patent infringement litigation. *See, e.g., Heaton-Peninsular Button-Fastening Co. v. Eureka Specialty Co.*, 77 F. 288 (CA6 1896). Such a case came before the Supreme Court in *Henry v. A. B. Dick Co.*, 224 U. S. 1 (1912).

---

[6] Contributory infringement originated in case law as a way to enable a patentee to enforce a patent when it was being infringed by a large number of persons whom it was impractical to sue together. The doctrine of contributory infringement permitted the patentee to sue an entity that had instigated the collective infringement either by selling a product that had no use other than to infringe the patent, or using other means to encourage infringement, such as providing instructions on how to infringe the patent. Liability for contributory infringement of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States … a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, … shall be liable as a contributory infringer."

112.    Although not required, Plaintiff included the above illustrative charts to ensure Plaintiff is providing "enough factual allegations, accepted as true, to "state a claim to relief that is plausible on its face".

113.    In *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018), the Federal Circuit expressly stated: "'the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met.'" *Id. at 1350* (quoting *In re Bill of Lading,* 681 F.3d 1323, 1339 (Fed. Cir. 2012) (emphasis added). *Nalco* appears to hold that element-by-element allegations are unnecessary.

114.    Plaintiff reserves the right to enter claim 1 of Plaintiff's pending patent application [17/300230]. The claim is in furtherance of Plaintiff's right to exclude Qualcomm from making or using, selling or offering to sell, Plaintiff's CPUs for carrying out the operational and functional instructions for at least that of the driverless vehicle.

115.    Claim 1 of the 17/300230 patent claims a "stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of … processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle …"

116.    To date, the only outstanding office action requirement before allowance is the "terminal disclaimer". What is claimed in claim 1 of Plaintiff's 17/300230 patent application:

1.    A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of:

processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

COMPLAINT

processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing unintended acceleration;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing lane departure;

processing instructions to stall, stop, or slow-down a vehicle when a collision or crash is detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle has been reported as stolen;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter;

processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,

Wherein, when the central processing unit (CPU) processes instructions to stall, stop, or slow-down a vehicle, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage.

117.    The DOJ intervene in the appealed case to the Nineth Circuit in *FTC v. Qualcomm*, declaring Qualcomm should not be penalized for its anticompetitive because of their work for the Gov't in providing national security.

118.    Plaintiff's patented technology was conceived in the wake of 9/11 that includes technology to mitigate terrorist attacks. Plaintiff's inventions are the "technical rational" for the three economic stimulus packages Plaintiff submitting to members of Congress shortly after 9/11

119.    The Clayton Act also authorizes private parties to sue for triple damages when they have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

# Relief

A. Temporary injunctive relief for Qualcomm to discontinue the sale of all Snapdragon processors where Plaintiff's patented CPUs (i.e., chipsets; systems-on-a-chip) are "tied" to Qualcomm's wireless cellular modems.

B. Temporary injunctive relief for Qualcomm to discontinue the sale of all Snapdragon "Ride" processors where Plaintiff's patented Stall, Stop, and Vehicle Slowdown Systems (i.e., Advanced Driver Assistance Systems (ADAS)) are "tied" to Qualcomm's Snapdragon "Ride" processors for autonomous and driverless vehicles.

C. Temporary injunctive relief for Qualcomm to discontinue the sale of all Snapdragon processors where Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e., new and improved cell phones; smartphones) are being used, without authorization, by Qualcomm and Asus (i.e., Smartphone for Snapdragon Insiders) to generate revenues.

D. Temporary injunctive relief for Qualcomm to discontinue charging a royalty on the entire handset. First, the handsets (i.e., Smartphones) are the patented inventions of Plaintiff; and second, the CPUs that are tied to Qualcomm's Snapdragon processors, for the unjust enrichment of Qualcomm, are the patented inventions of Plaintiff.

E. Summary judgement on the merits of the case for willful infringement; direct infringement; induced infringement; contributory infringement; divided infringement; and, infringement under the *doctrine of equivalents.*

F. Damages found or assessed for willful infringement; direct infringement; induced infringement; contributory infringement; divided infringement; and, infringement under the *doctrine of equivalents.*

G. Damages up to three times the amount found or assessed for willful infringement.

H. Summary judgement on the merits of the case for Qualcomm's single-firm anticompetitive conduct (under section 2 of the Sherman Act), and unjust enrichment (charging a 5% royalty rate per the price of the patented phone(s) for which Qualcomm has no authorization to receive), that 'harms the competitive process and thereby harms consumers.

COMPLAINT

I.  Damages found or assessed for Qualcomm's single-firm anticompetitive conduct (under Section 2 of the Sherman Act), and unjust enrichment (charging a 5% royalty rate per the price of Plaintiff's patented phone(s) for which Qualcomm has no authorization to receive), that harms the competitive process and thereby harms consumers.

J.  Trible damages for the injury imposed by Qualcomm for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.

K.  The Court orders Qualcomm to establish, at minimum, a $20 billion dollar reserve with the SEC for "Probability of the Incurrence of a Loss". The reserve is returned to Qualcomm if found not liable.

**Qualcomm Inc.**

As of May 2022, **QUALCOMM** has a market cap of **$156.45 Billion**. This makes QUALCOMM the world's **69th** most valuable company by market cap according to our data. https://companiesmarketcap.com/qualcomm/marketcap/

| Year | Market cap | Change |
|------|-----------|--------|
| 2022 | $156.45 B | -23.95% |
| 2021 | $205.72 B | 19.4% |
| 2020 | $172.29 B | 70.85% |

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

COMPLAINT

# SERVICE OF PROCESS

Qualcomm Inc.,

5775 Morehouse Drive,

San Diego, CA 92121


Qualcomm, Inc.,

c/o Prentice-Hall,

Corporation System, Inc.,

251 Little Falls Drive,

Wilmington, DE 19808

(302)-636-5400

Joseph John Stevens (CA Bar No. 242495)
jstevens@pattersonsheridan.com
50 W. San Fernando Street, Suite 250
San Jose, CA 95113
Tel: 650-384-4418
Fax: 650-330-2314

B. Todd Patterson (*pro hac vice* forthcoming)
tpatterson@pattersonsheridan.com
John A. Yates (*pro hac vice* forthcoming)
jyates@pattersonsheridan.com
Kyrie K. Cameron (*pro hac vice* forthcoming)
kcameron@pattersonsheridan.com
24 Greenway Plaza, Suite 1600
Houston, Texas 77030
713-623-4844 | 713-623-4846
*Attorneys for Defendant*
*Qualcomm Incorporated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LARRY GOLDEN,<br><br>    *Pro Se* Plaintiff,<br><br>vs.<br><br>QUALCOMM INC.,<br><br>    Defendant. | Case No.: 4:22-cv-03283-KAW<br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS**<br><br>[Filed concurrently: Memorandum of Points and Authorities in Support; Proposed Order; Proof of Service]<br><br>Date:       October 6, 2022<br>Time:       1:30pm<br>Courtroom:  TBD<br>Judge:     Honorable Kandis A. Westmore |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION.................................................................................1

II.  STATEMENT OF THE ISSUES....................................................1

III. FACTUAL BACKGROUND: PLAINTIFF'S HISTORY OF FRIVOLOUS
     LITIGATION....................................................................................2

IV.  LEGAL STANDARD .......................................................................6

V.   ARGUMENT......................................................................................8

     A. THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION..........8

        1. Federal Courts Do Not Have Subject Matter Jurisdiction
           Over Frivolous Claims..........................................................8

        2. Issue Preclusion Bars Plaintiff From Litigating Subject
           Matter Jurisdiction...............................................................15

        3. Plaintiff Lacks Standing to Bring Antitrust Claims ..........15

     B. THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF
        MAY BE GRANTED..........................................................................16

        1. Plaintiff Failed to State a Claim of Direct Infringement.......16

        2. The Complaint Fails to Plead Enough Facts to Support the
           Claim of Indirect Infringement ..........................................19

        3. Plaintiff Fails to State a Claim for Antitrust Violation .......21

        4. The Non-Patent Claims Should be Dismissed Because They Are
           Wholly Dependent Upon Defective Patent Infringement Claims....................21

        5. Plaintiff's Claims are Time Barred ......................................22

VI.  CONCLUSION ................................................................................22

i

# TABLE OF AUTHORITIES

Page

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006)........................................................7, 14

*Arnold v. United States*, No. 19-cv-4223, 2020 U.S. Dist. LEXIS 25392
    (N.D. Cal. Feb 13, 2020)............................................................................7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)......................................................7, 8, 17, 21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................7, 8, 21

*Bell v. Hood*, 327 U.S. 678 (1946).........................................................................7

*Bender v. LG Elecs. U.S.A.*, Inc., 2010 U.S. Dist. LEXIS 33075
    (N.D. Cal. March 11, 2010) ......................................................................16

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) ...............................6

*Bird v. United States*, 51 Fed. Cl. 536 (C. Cl. 2002) .............................................18

*Bowser, Inc. v. United States.* 420 F.2d 1057 (C. Cl. 1970)..................................18

*Creagri, Inc. v. Pinnacle Inc.*, 2013 U.S. Dist. LEXIS 427
    (N.D. Cal. January 1, 2013) .....................................................................20

*Deutsch v. Flannery*, 823 F.2d 1361 (9th Cir. 1987)...........................................15

*First Data Corp. v. Inselberg*, 870 F.3d 1367 (Fed. Cir. 2017)..............................7

*Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010) ...............................20

*FTC v. Qualcomm*, 411 F. Supp. 3d 658 (N.D. Cal. May 21, 2019) ......................13

*FTC v. Qualcomm Inc.*, 969 F.3d 974, 982 (9th Cir. 2020).........................13-14, 21

*Golden v. Apple Inc.*, et al., No 6:19-cv-02557-DCC, 2020 U.S. Dist. LEXIS 12940 (D.S.C. 2020) ..............................................................................................3-4

*Golden v. Apple Inc.*, 819 Fed. Appx. 930 (Fed. Cir. 2020),
    *cert. denied* 141 S. Ct. 1067............................................................4, 10, 17-19

*Golden v. Apple Inc. et al.*, No.: 6:20-cv-02270-JD-KFM, 2021 U.S. Dist.
    LEXIS 178626, at *7 (D.S.C Sept. 20, 2021) *aff'd Golden v. Apple, Inc. et al.*,
    No. 21-2160, 2022 U.S. App. LEXIS 8656 (4th Cir. Mar. 31, 2022) ......................4-5, 12

ii

*Golden v. Apple Inc. et al.*, 6:20-cv-04353-JD-KFM, 2021 U.S. Dist. LEXIS
211540 (D.S.C. Nov. 2, 2021) *appeal docketed* Fed. Cir. No. 22-1229 .......................5, 11

*Golden v. Apple Inc.*, Case 5:22-cv-04152-VKD (July 15, 2022) .................................6

*Golden v. Google, LLC*, No. 6:21-cv-00244-JD-KFM, 2021 U.S. Dist. LEXIS
210872 (D.S.C. Nov. 2, 2021) ...................................................................6

*Golden v. Intel Corp.*, No. 5:22-cv-03828-NC (June 8, 2022) .................................6

*Golden v. United States*, 156 Fed. Cl. 623 (C. Cl. 2021) *appeal pending*
Fed. Cir. No. 2022-1196 ....................................................................2, 18, 22

*Golden v. United States*, 955 F.3d 981 (Fed. Cir. 2020)..........................................2

*Golden v. United States*, 137 Fed. Cl. 155 (C. Cl. 2018)..........................................3

*Hagans v. Lavine*, 415 U.S. 528 (1974)........................................................7

*Hitachi Kokusai Elec. Inc. v. ASM Int'l, N.V.*, 2018 U.S. Dist. LEXIS 122967
(N.D. Cal. July 23, 2018)...................................................................20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)..........................................16

*Kamilche Co. v. United States*, 53 F.3d 1059 (9th Cir. 1995) ...............................15

*Mast v. Long*, 84 F. Appx. 786 (9th Cir. 2003)..............................................15

*Nalco Company v. Chem-Mod, LLC*, 883 F.3d 1337 (2018).............................16, 20

*Reddy v. Litton Indus.*, 912 F.2d 291 (9th Cir. 1990) ......................................8

*Rivera v. Patel*, No. 16-cv-304, 2016 U.S. Dist. LEXIS 150682
(N.D. Cal. Oct. 31, 2016)...................................................................6

*Sapphire Crossing LLC v. Abbyy USA Software House, Inc.*, 497 F. Supp. 3d 762
(N.D. Cal. Oct. 28, 2020)..................................................................19

*Sentius Int'l, LLC v. Apple Inc.*, 2020 U.S. Dist. LEXIS 192203, at *5
(N.D. Cal. Oct. 15, 2020)..................................................................19

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)...........................7, 15

*The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22 (1913)..............................7

iii

*Uniloc U.S.A., Inc. v. Logitech, Inc.*, No. 18-CV-01304, 2018 U.S. Dist. 197194
    (N.D. Cal. Nov. 17, 2018)............................................................20

*U.S. Dep't of Homeland Sec. v. Golden*, No. IPR2014-00714 ................................2

**Statutes**

Fed. R. Civ. P. 12(b)(1)........................................................................1, 22

Fed. R. Civ. P. 12(b)(6)........................................................................*passim*

15 U.S.C. §15(b)........................................................................22

35 U.S.C. §286........................................................................22

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION TO DISMISS**

Defendant Qualcomm Incorporated ("Qualcomm") hereby moves pursuant to Fed. R. Civ. P. 12(b)(1) and (6) to dismiss Plaintiff's Original Complaint for Antitrust Law Violations and Patent Infringement.  Dkt. 1.

## I.      INTRODUCTION

Plaintiff is a serial filer of frivolous complaints relating to his patent portfolio.  Plaintiff now brings patent infringement, antitrust, and unjust enrichment claims, which were already dismissed as frivolous in the District of South Carolina against Qualcomm.  Plaintiff has filed, and will likely continue to file, additional frivolous suits before this Court now that he has worn out his welcome in South Carolina.

The egregiousness of Plaintiff's litigation behavior is further evidenced by Plaintiff's delay in filing its certificate of service and returning the executed summons.  On July 19, 2022, Plaintiff filed a certificate of service and executed summons indicating Qualcomm was served on June 28, 2022—21 days earlier (Dkt. 5), which, if true, would render Plaintiff's answer due the very same day Plaintiff filed the executed summons—July 19, 2022.  But, the June 28, 2022 date of service upon a "Jane Doe" is not correct.  As set forth in the declaration of Elizabeth Ann Crowe submitted herewith. Qualcomm was not served until July 7, 2022—nine days after the date alleged in Plaintiff's certificate of service—rendering Qualcomm's response due July 28, 2022.

Qualcomm respectfully requests that the Court put a stop to Plaintiff's behavior, specifically by dismissing Plaintiff's Complaint in its entirety **with prejudice** and sanctioning Plaintiff for his baseless, vexatious litigation.

## II.     STATEMENT OF THE ISSUES

1.      Whether the court has subject matter jurisdiction over Plaintiff's claims pursuant to Rule 12(b)(1) due to the frivolity of the Complaint and his lack of standing to bring antitrust claims?

2.      Whether Plaintiff is collaterally estopped from arguing subject matter jurisdiction

based on the frivolity of his claims?

3.      Whether Plaintiff fails to state a claim for direct infringement, divided infringement, indirect infringement pursuant, or antitrust violation pursuant to Rule 12(b)(6)?

## III.   FACTUAL BACKGROUND:  PLAINTIFF'S HISTORY OF FRIVOLOUS LITIGATION

Plaintiff has a long history of filing frivolous complaints that never pass the pleading stage. This case is no different.

In 2013, Plaintiff sued the United States Government, alleging "the United States, through the Department of Homeland Security, has caused cell phone manufacturers to produce devices that infringe on one or more of his patents." *Golden v. United States*, 156 Fed. Cl. 623, 625 (C. Cl. 2021) *appeal pending* Fed. Cir. No. 2022-1196 (Case 1).  One of these entities was Qualcomm. The case was dismissed *with prejudice* after **six** amended complaints, and Plaintiff never came up with "a plausible theory of infringement against the United States and the third parties whose products he alleges were made at the behest of the government."  *Id.* at 632. ("Enough time and resources have been expended by the court and the Department of Justice dealing with these allegations. Because plaintiff has failed to conform his preliminary infringement contentions with Patent Rule 4 and has failed to follow a court order in that regard, the case must be dismissed.").

Before Case 1 was decided, Plaintiff filed a second complaint with the Court of Federal Claims "seeking 'reasonable and entire compensation for the unlicensed use and manufacture' of his 'inventions described in and covered by' various patents."  *Golden v. United States*, 955 F.3d 981, 983 (Fed. Cir. 2020) (Case 2).  His complaint was dismissed by the Federal Court of Claims, and the decision was affirmed by the Federal Circuit. *Id.* at 983.

After years of litigation, including the institution of an *inter partes* review of the U.S. Pat. No. Re 43,990 by the DHS,[1] Plaintiff sent the following in an email to the Department of Justice on August 24, 2017 in the midst of his litigation of Case 1:

> As you know my strategy was to continue submitting claims of "takings" and "infringement" for as long as the Government

---

[1] *See U.S. Dep't of Homeland Sec. v. Golden*, No. IPR2014-00714 (P.T.A.B. filed April 30, 2014) (resulting in the cancellation of claims 11, 74, and 81 of U.S. Patent No. RE43,990).

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW

continued to prolong this case. (*Larry Golden v. The United States*: Case # 13-307 C). With that said, of course you know the claims ha[ve] moved from twelve (12) claims of "takings" and "infringement" that began in the year 2013, to seventy-two (72) claims of "takings" and "infringement" as of this year 2017.

The Judge has ordered a final complaint and a final claim chart that was due on August 15. 2017. **Because of the Judge order I can no longer continue my strategy of introducing new "takings" and "infringement" claims or new patents and patent claims.**

**Therefore, I have changed my strategy. My new strategy is to file a complaint(s) in Federal District Court against Apple, Samsung, LG, Panasonic, and Motorola for Patent infringement on March 1, 2018**. The strategy here is to force Apple, Samsung, and LG to decide between one or two choices: (1) In an effort to avoid any responsibility for infringement or liability of paying hundreds of billions of dollars in damages, the companies cho[o]se to throw the Government under the bus by presenting evidence that they were under contract to develop and manufacture devices that infringes my communication/monitoring device. If they cho[o]se this option it makes them a witness for me in my current case (*Larry Golden v. The United States*; Case # 13-307 C). (2) Deny the allegations of infringement. In this case I will present evidence to support the fact that the companies were under contract with the Government to develop and manufacture devices that infringe[] my communication/monitoring device, but that the companies decided to continue to develop and manufacture my communication/monitoring device beyond the specifications agreed upon with the Government, even after I notified the companies in 2010 to stop their manufacturing. If they chos[o]e this option it opens the companies up to willful infringement and the possibility of a temporary injunction to stop the manufacturing and development of my communication/monitoring device. If you were Apple, Samsung, and LG which option would you cho[o]se.

*Golden v. United States*, 137 Fed. Cl. 155, 167-168 (C. Cl. 2018) (Memorandum Opinion And Order Granting-in-Part and Denying-in-Part the Government's Motion for Partial Dismissal of Case 1) (alterations in original).

Plaintiff made good on his word, and has filed several additional suits relating to the infringement of his patents. On September 11, 2019, Plaintiff filed his third case (Case 3) in this saga: a patent infringement lawsuit against Qualcomm and fifteen other companies (including those referenced in the email to the DOJ) in the District of South Carolina. *Golden v. Apple Inc.*,

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW

et al., No 6:19-cv-02557-DCC, 2020 U.S. Dist. LEXIS 12940, *1 (D.S.C. 2020).  The court's local practice is to have a magistrate judge screen all cases filed by a *pro se* plaintiff before the clerk of court is permitted to issue the summons.[2]   Unamused, the Magistrate recommended that the complaint is subject to dismissal because the "claims appear patently frivolous."  Report and Recommendation, *Golden v. Apple Inc., et al.*, No. 6:19-cv-2557, ECF No. 12, at 3 (D.S.C. Oct. 1, 2019).  The Magistrate recommended that the complaint be dismissed for failure to state a claim for relief and also warned Golden of possible Rule 11 sanctions—citing his email to the DOJ.  *Id.* at 4-6.  The Plaintiff amended his complaint, but failed to cure the defects.  *See* Exhibit 1[3] (Case 3 amended complaint).  The Magistrate recommended that the amended complaint be dismissed as being duplicative with Case 1.  Report and Recommendation, *Golden v. Apple Inc., et al.*, No. 6:19-cv-2557, ECF No. 27, 2020 U.S. Dist. LEXIS 26613, at *8-9 (D.S.C. January 9, 2020).  The District Court dismissed Plaintiff's case without prejudice as duplicative in view of his pending case in the Court of Federal Claims.  *Golden v. Apple Inc.*, 819 Fed. Appx. 930, 930 (Fed. Cir. 2020), *cert. denied* 141 S. Ct. 1067.  Plaintiff appealed to the Federal Circuit, which affirmed the decision to dismiss without prejudice on the basis of **frivolousness**—rather than duplicity.  *Id.* at 931 ("[W]e agree with the magistrate judge's conclusion that 'the plaintiff's vague and conclusory allegations fail to state a claim for relief.'").

Six months after the District of South Carolina dismissed his first case, Golden filed his fourth suit (Case 4) against similar defendants, including Qualcomm, alleging various violations of state and federal antitrust law.  *Golden v. Apple Inc. et al.*, No.: 6:20-cv-02270-JD-KFM, 2021 U.S. Dist. LEXIS 178626, at *7 (D.S.C Sept. 20, 2021) *aff'd Golden v. Apple, Inc. et al.*, No. 21-2160, 2022 U.S. App. LEXIS 8656 (4th Cir. Mar. 31, 2022).  *See* Exhibit 2 (Case 4 complaint).  The Magistrate recommended dismissal as frivolous, noting that:

> On June 16, 2020, the plaintiff filed the instant action, seeking

---

[2] *Information on Representing Yourself in a Civil Action*, U.S. DIST. CT. DIST. S.C. at 11 (Aug. 17, 2021), http://www.scd.uscourts.gov/DOCS/PROSE.pdf; *see also* Local Civ. Rule 73.02(B)(2)(e) (D.S.C.).

[3] Three of Plaintiff's prior complaints for his frivolous claims are attached as Exhibits 1-3 of the Declaration of Joseph John Stevens in Support of Defendant's Motion to Dismiss.

---

4

> damages against many of the same defendants as named in [Case 3]. Having unsuccessfully sought patent infringement damages against these defendants in [Case 3], the instant matter seeks relief for patent infringement and failure to pay royalties, although **the plaintiff has attempted to circumvent the court's prior ruling by asserting that the defendants' actions have violated the Sherman Act, the Clayton Act, and various South Carolina Laws** .... Nevertheless, ... the instant matter is subject to summary dismissal because the claims appear patently frivolous.

Report and Recommendation, *Golden v. Apple, et. al.*, No. 6:20-cv-2270, ECF No. 16, 2020 U.S. Dist. LEXIS 258437 at *10, 11-14, 16 (D.S.C. Sep. 11, 2020) (emphasis added).  The court adopted Magistrate's recommendation and dismissed the case without prejudice.  *Golden*, 2021 U.S. Dist. LEXIS 178626 at *7.

Approximately six months after filing Case 4, Golden filed yet another lawsuit (Case 5) in the District of South Carolina.  *Golden v. Apple Inc. et al.*, 6:20-cv-04353-JD-KFM, 2021 U.S. Dist. LEXIS 211540, *5 (D.S.C. Nov. 2, 2021) *appeal docketed* Fed. Cir. No. 22-1229.  *See* Exhibit 3 (Case 5 complaint).  According to the Magistrate, "this action represents the plaintiff's attempt to re-litigate the claims from [Case 3] because although [that case] was dismissed as frivolous it was dismissed without prejudice."  Report and Recommendation, *Golden v. Apple, Inc., et al.*, No. 6:20-cv-4353, ECF No. 20, 2021 U.S. Dist. LEXIS 212549, at *14-15 (D.S.C. Feb. 5, 2021).  He again recommended dismissal of the case as frivolous.  *Id.* at *10-14.  ("In light of the vague conclusory allegations in the complaint in this action, and the plaintiff's attempt to circumvent the prior dismissals of his patent infringement claims, the instant matter is subject to summary dismissal as frivolous.").  The Magistrate recommended that the court dismiss the action *with* prejudice, and that the court sanction Golden $400 for continuing to file frivolous lawsuits before it.  *Id.* at*14-15.  The District Court agreed with the Magistrate that the complaint should be dismissed as frivolous; however, it declined to dismiss the case with prejudice or impose sanctions.  *Golden*, 2021 U.S. Dist. LEXIS 211540, at *8.  Plaintiff was warned that if he "attempts to file another frivolous action in this Court, the Court will consider the imposition of sanctions as warranted."  *Id.* at 3, n. 2.

Within a month of filing Case 5, Golden filed another lawsuit (Case 6) in the District of

South Carolina naming Google as the sole defendant. *Golden v. Google, LLC*, No. 6:21-cv-00244-JD-KFM, 2021 U.S. Dist. LEXIS 210872 (D.S.C. Nov. 2, 2021), *appeal dismissed*.  Plaintiff alleged that Google jointly infringed his patents with both Apple and Qualcomm.  Report and Recommendation, *Golden v. Google,* No. 6:21-cv-00244-JD-KFM, ECF No. 14, 2021 U.S. Dist. LEXIS 211502, at *1-2 (D.S.C. April 9, 2021).  The Magistrate again recommended dismissal: "[A]lthough the plaintiff has made allegations against a new alleged infringer, Google, his allegations are still frivolous and thus subject to summary dismissal." *Id.* at *12-16.   He also noted that "to the extent the plaintiff alleges joint infringement by Google and Apple and/or Qualcomm, such allegations may not be used in this action to circumvent prior rulings by this court that infringement allegations against Apple/Qualcomm are frivolous." *Id.* at *12.    He recommended dismissal *with* prejudice and that the court sanction Golden $400. *Id.* at *16-17.   The court adopted the Magistrate's recommendation and "dismissed the case with prejudice because it is frivolous" and without service of process, but declined to impose sanctions. *Golden*, 2021 U.S. Dist. LEXIS 210872 at *7-8.

Plaintiff then proceeded to file this suit.  Plaintiff continues to advance his frivolous claims of patent infringement, antitrust violations, and unjust enrichment that were rejected as frivolous in South Carolina.  All of his claims hinge on his unfounded belief that Qualcomm infringes his patents as part of a conspiracy against him.  Plaintiff has also filed suit against Intel[4] and Apple[5] individually in this district for antitrust, patent infringement, and unjust enrichment claims.  Qualcomm expects more frivolous suits to follow.

## IV.   LEGAL STANDARD

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Article III of the United States Constitution and statutes enacted by Congress pursuant thereto." *Rivera v. Patel*, No. 16-cv-304, 2016 U.S. Dist. LEXIS 150682, at *8 (N.D. Cal. Oct. 31, 2016) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)).  When a claim is "so

---

[4] *Golden v. Intel Corp.*, No. 5:22-cv-03828-NC (June 8, 2022).

[5] *Golden v. Apple Inc.*, Case 5:22-cv-04152-VKD (July 15, 2022).

insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy," dismissal on the basis of lack of federal subject-matter jurisdiction is proper. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 n.10 (2006) (citing *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)); *First Data Corp. v. Inselberg*, 870 F.3d 1367, 1373 (Fed. Cir. 2017) (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913)) ("No doubt if it should appear that the plaintiff was not really relying upon the patent law for his alleged rights, or if the claim of right were frivolous, the case might be dismissed."); *Arnold v. United States*, No. 19-cv-4223, 2020 U.S. Dist. LEXIS 25392, at *4-5 (N.D. Cal. Feb 13, 2020) (quoting *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974)) ("[F]ederal courts lack subject matter jurisdiction over claims that are 'essentially fictitious,' 'wholly insubstantial,' 'obviously frivolous,' or 'obviously without merit.'").

To survive a motion to dismiss, Plaintiff must allege facts sufficient to state a claim that is facially plausible. The Federal Rules require a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must be dismissed when it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If the factual allegations "do not permit the court to infer more than the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679, then the pleader has "not nudged [its] claims… across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Accordingly, a claim has facial plausibility when the pleader "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79 (emphasis added).

Although a court must assume that the facts alleged by a plaintiff are true in determining whether a complaint has alleged sufficient facts to state a plausible claim for relief, the Court should not credit conclusory allegations or allegations that merely restate the legal elements of a claim. *Iqbal*, 556 U.S. at 678. Thus, a complaint is insufficient if it only offers "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Id*. If a complaint's

well-pled allegations do not show "more than a sheer possibility that a defendant has acted unlawfully," or does not identify a violation of any law at all, the complaint must be dismissed. *Id*. Moreover, it is insufficient for a complaint to "plead facts that are merely consistent with a defendant's liability[.]" *Twombly*, 550 U.S. at 557. The pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A court may grant a motion to dismiss and dismiss a claim with prejudice where amendment would be futile. *Reddy v. Litton Indus.,* 912 F.2d 291, 296 (9th Cir. 1990).

## V.    ARGUMENT

In this lawsuit, Plaintiff alleges the infringement of unspecified patents that rises to the level of antitrust violation and unjust enrichment. Plaintiff has yet to make it past the pleading stage in his multiple litigations against the government and others that he believes are engaging in a conspiracy to infringe his patents without paying him a royalty. Plaintiff has time and again demonstrated his inability to plead his claims in a non-frivolous way to state a claim for which relief can be granted. This case is no different.

### A.    The Court Does Not Have Subject Matter Jurisdiction

Plaintiff continues to advance claims that have been dismissed as frivolous. This Court does not have subject matter jurisdiction over these frivolous claims. Further, Plaintiff is collaterally estopped from contesting subject matter jurisdiction because of the frivolity of his recycled claims. Nor does Plaintiff have standing to assert his antitrust claims.

#### 1.    Federal Courts Do Not Have Subject Matter Jurisdiction Over Frivolous Claims

The Court should dismiss Plaintiff's claims for lack of subject matter jurisdiction because the claims are patently frivolous. The Complaint includes rambling and incoherent paragraphs, consists of vague and conclusory allegations of infringement and conspiracy, and formulaic recitations of the elements of various causes of action. Plaintiff has attached the following patents to his Complaint: U.S. Pat. No. 7,385,497 ("the '497 Patent"), U.S. Pat. No. 8,106,752 ("the '752 Patent), U.S. Pat. No. 9,096,189 ("the '189 Patent"), U.S. Pat. No. 9,589,439 ("the '439 Patent"), U.S. Pat. No. 10,163,287 ("the '287 Patent"), U.S. Pat. No. 10,984,619 ("the '619 Patent"), and

SAppx64

U.S. Pat. No. RE 43,891[6] ("the '891 Patent").  The backbone of his claims, that Qualcomm is infringing his patents, is wholly unsupported.  Not only does the Complaint not identify what patent Qualcomm is allegedly infringing, it fails to even put Qualcomm on notice of any patent infringement as explained in Section V.B.  The below chart shows the claims of Plaintiff's patents that are referenced in the Complaint.  No patent claims are specifically asserted.

| Patent Referenced in Complaint | Claim Referenced in Complaint |
| --- | --- |
| '497 Patent | 1 |
| '189 Patent | 1-9 |
| '439 Patent | 13-23 |
| '287 Patent | 4-6 |
| '619 Patent | 1, 11  (1-20) |
| '891 Patent | 44, 47, 48, 49, 50, 51, 53 |
| '752 Patent | 10 |

Plaintiff continues to make deficient pleadings despite his three previous complaints against Qualcomm, and others, for claims of patent infringement, antitrust, and unjust enrichment being dismissed with prejudice as frivolous in South Carolina.  As will be shown below, Plaintiff is recycling his frivolous claims in the Northern District of California expecting a different result.

In Case 3 and Case 4, Plaintiff alleged that Qualcomm and others infringed the '287 Patent, the '439 Patent, the '189 Patent, the '497 Patent, and the '891 Patent.  The below chart is included to show the previous allegations of patent infringement made by Plaintiff against Qualcomm in Case 3 and 5.

---

[6] Plaintiff only references the '891 Patent in the Complaint with respect to General Motors—not Qualcomm.  *See* Dkt. 1, ¶¶ 170,

| Prior Case | Asserted Patents and Claims |
|---|---|
| Case 3 | Plaintiff asserted that Qualcomm jointly, directly, and/or indirectly infringed the following patents by "selling certain processing devices as Central Processing Units (i.e. Qualcomms' Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) … included without limitation to Plaintiff's CMDC devices[.]" *See* Ex. 1, ¶¶166.<br><br>'287 Patent:  At least claims 4 and 5.  Ex. 1 at ¶¶166-168.<br>'439 Patent:  At least claim 22.  *Id.* at ¶¶216-218.<br>'189 Patent:  At least claims 1-5, 7, 8.  *Id.* at ¶¶266-268.<br>'497 Patent:  At least claims 1-6.  *Id.* at ¶¶382-384. |
| | "Plaintiff alleges that at least one of the Defendants named in this complaint" infringes at least claims 11, 23, 44, 47-51, 53 of the '891 Patent.  *Id.* at ¶356.  Qualcomm and General Motors were both named defendant. |
| Case 5: | Plaintiff again asserted that Qualcomm jointly, directly, indirectly and/or under the doctrine of equivalents for each of the following Patents.  Plaintiff asserted that the following Qualcomm products infringed the below patents:  Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series, Snapdragon 888 Mobile Platform, Snapdragon 865 + 5G Mobile Platform.<br><br>'287 Patent:  At least claims 4-5.  Ex. 3, at ¶31.<br>'439 Patent:  At least claims 13-15, 22-23.  *Id.* at ¶48.<br>'189 Patent:  At least claims 1-3.  *Id.* at ¶65.<br>'497 Patent:  At least claims 1-6.  *Id.* at ¶108. |

In Case 3, Plaintiff alleged that Qualcomm, and others, had infringed his patents.  The District Court adopted the Magistrate's recommendation to dismiss the complaint without prejudice as frivolous and duplicative of his parallel proceedings against the United States Government. *Golden*, 819 Fed. Appx. at 930.  The Federal Circuit affirmed the dismissal "not on the basis of duplicity, **but on the ground of frivolousness**."  *Id.* at 931 ("The complaint itself offers only vague generalities and block quotes of statutes, cases and treatises, but nowhere points us to any nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold by any defendant.").

In Case 5, Plaintiff made an additional attempt to sue Qualcomm, and others, for infringing the '287 Patent, the '439 Patent, the '189 Patent, the '497 Patent, and the '891 Patent.  According to Plaintiff, this Complaint was filed to correct his previous deficiencies.  *Golden*, 2021 U.S. Dist.

1   LEXIS 211540, *5.  The District Court determined that Plaintiff had "not cured the frivolousness

2   of his allegations" and continues to run afoul of the same issues that doomed his previous

3   complaints.  *Id.* at *5-7.  The District Court adopted[7] the Magistrate's recommendation to dismiss,

4   but without prejudice.  *Id.* at 7-8 ("this Court agrees … that Plaintiff's amended complaint should

5   be dismissed because it is frivolous").

6        In the instant case, Plaintiff relies on the same threadbare and conclusory allegations of

7   infringement that got his previous cases dismissed as frivolous.  Like in Cases 3 and 5, Plaintiff is

8   relying on Qualcomm's Snapdragon.  More specifically, the Snapdragon Chipset and Snapdragon

9   Ride Share Platform.  As explained in Section V.B, Plaintiff falls well short of the standard to

10  plead a claim of patent infringement.  Plaintiff again makes the same mistakes that resulted in

11  dismissal of his complaints in South Carolina because the Complaint once again offers vague

12  generalities, block quotes of statutes and cases without pointing to any nonfrivolous allegation of

13  infringement by a Qualcomm product.  In fact, Plaintiff makes no attempt to map any claim of any

14  patent to a Qualcomm product.

15      In Case 4, Plaintiff dressed up vague assertions of infringement of the '287 Patent, the '439

16  Patent, the '752 Patent, the '189 Patent, the '497 Patent, and the '891 Patent by Qualcomm and

17  others in antitrust and unjust enrichment claims.  Plaintiff did not assert any claim of any of these

18  patents specifically like in the instant Complaint.  The Magistrate saw through this ploy, noting

19  that Plaintiff "unsuccessfully sought damages against many of the defendants in the court for

20  patent infringement in [Case 3], here, appears to seek relief for the same infringing actions by

21  dressing the case as asserting violations of the Sherman Act, the Clayton Act, and various South

22  Carolina Laws …. Upon review, however, the claims appear patently frivolous."  Report and

23  Recommendation, *Golden*, 2020 U.S. Dist. LEXIS 258437, at *10.

24      The Magistrate also noted that "plaintiff's patent infringement claims are subject to dismissal

25  because the plaintiff has failed to include factual allegations beyond the identities of the

26  defendants, reference to the CMDC device, and the alleged infringed-upon patents[.]"  *Id.* at *13.

27

28  ─────────────
    [7] The Report was modified to lift a 35-page limit restriction for an amended complaint.  *Id.* at 7,
    n. 4.

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW

Plaintiff's antitrust claims were predicated on his prior frivolous patent infringement claims. *Id.* at *13-14 ("antitrust allegations, in essence, are that he has been prevented from accessing the market for CMDC devices because the defendants have refused to pay him licensing royalties."). The Magistrate made clear that Plaintiff cannot "circumvent the court's prior ruling by labeling substantially similar allegations as seeking damages under the Sherman/Clayton Acts instead of for patent infringement" and that the Complaint did not point to any no frivolous allegation of any claim. *Id.* As a result, the Magistrate recommended that the complaint be dismissed with prejudice. *Id.* at *16-17. The District Court adopted the Magistrate's report that found the claims to be frivolous, and dismissed the Complaint without prejudice. *Golden*, 2021 U.S. Dist. LEXIS 178626, at *7 (disagreeing with Magistrate's change to change cause of action from antitrust to patent infringement).

Nevertheless, Plaintiff attempts to make the same and similar frivolous allegations of infringement, antitrust, and unjust enrichment made in Case 4—with Qualcomm now as the main character of the conspiracy against him. For example, Plaintiff continues to allege that Qualcomm, Apple, Samsung, and LG are conspiring together to violate antitrust laws. *Compare* Dkt. 1, ¶¶23-43, 119 *with* Ex. 2, ¶¶ 46-56, 71-74. Below are additional examples of the Plaintiff recycling his frivolous claims:

- The conspirators are allegedly conspiring to avoid prosecution by hiding behind the government. *Compare* Dkt. 1, at ¶¶ 25, 28 *with* Ex. 2, ¶¶ 48.

- The conspiracy has prevented Plaintiff from receiving royalties. *Compare* Dkt. 1, at ¶ 30 *with* Ex. 2, ¶¶ 54-55.

- The conspiracy took place within the United States and "substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States." *Compare* Dkt. 1, at ¶ 34 *with* Ex. 2, ¶ 52.

- "It is the belief of the Plaintiff, that [Qualcomm, Apple, Samsung, and LG] are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for the Central Processing units (CPUs) and the

Communicating, Monitoring, Detecting, and Controlling (CMDC) devices." *Compare* Dkt. 1, at ¶ 35 *with* Ex. 2, ¶ 53.

- "It is the belief of the Plaintiff, that [Qualcomm, Apple, Samsung, and LG] act together in ways that limit competition by hindering Plaintiff's patented products from entering the market, while exercising an unreasonable horizontal restraint of trade." *Compare* Dkt. 1, at ¶ 36 *with* Ex. 2, ¶ 54 (using same language but for substituting "patented products" for "businesses").

- Qualcomm, Apple, LG and Samsung's "agreements are considered unreasonable because their interaction is to such a degree that they were no longer acting independently, and the collaboration gave them the ability to wield market power." *Compare* Dkt. 1, at ¶ 37 *with* Ex. 2, ¶ 55 (using same language but for typo correction).

- "It is the belief of the Plaintiff, that [Qualcomm, Apple, Samsung, and LG] have engaged in a contract, combination, trust or conspiracy, the effect of which was to develop, manufacture, and commercialize Plaintiffs … Communicating, Monitoring, Detecting, and Controlling (CMDC) devices without paying royalty compensation." *Compare* Dkt. 1, at ¶ 38 *with* Ex. 2, ¶ 55.

- "It is the belief of the Plaintiff, that [Qualcomm, Apple, Samsung, and LG], through their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or conspiracy between themselves and their co-conspirators." *Compare* Dkt. 1, at ¶ 39 *with* Ex. 2, ¶ 56.

- Plaintiff repeats old data about market share. *Compare* Dkt. 1, at ¶¶ 42-43 *with* Ex. 2, ¶ 51.

- Plaintiff again asserts that Qualcomm has been unjustly enriched by not paying Plaintiff a royalty. *Compare* Dkt. 1, at ¶¶ 70, *with* Ex. 2, ¶ 51.

Plaintiff's antitrust and unjust enrichment claims are based on Qualcomm's business practices and *FTC v. Qualcomm*, 411 F. Supp. 3d 658 (N.D. Cal. May 21, 2019). *See* Dkt. 1, ¶¶59-64, 71-79. Plaintiff relied on this judgment <u>despite</u> the fact that it was reversed and the injunction was vacated. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 982, 1005 (9th Cir. 2020) ("We now hold that

the district court went beyond the scope of the Sherman Act, and we reverse.").  The 9th Circuit made clear that hypercompetitive behavior does not violate antitrust law.  *Id.* at 105.  As explained by the 9th Circuit:

> *First*, Qualcomm's practice of licensing its SEPs exclusively at the [original equipment manufactures ("OEM")] level does not amount to anticompetitive conduct in violation of § 2 [of the Sherman Act], as Qualcomm is under no antitrust duty to license rival chip suppliers.  To the extent Qualcomm has breached any of its [fair, reasonable, and nondiscriminatory] commitments, a conclusion we need not and do not reach, the remedy for such a breach lies in contract and patent law. *Second*, Qualcomm's patent-licensing royalties and "no license, no chips" policy do not impose an anticompetitive surcharge on rivals' modem chip sales. Instead, these aspects of Qualcomm's business model are "chip-supplier neutral" and do not undermine competition in the relevant antitrust markets. *Third*, Qualcomm's 2011 and 2013 agreements with Apple have not had the actual or practical effect of substantially foreclosing competition in the [code division multiple access] modem chip market.

*Id.* (emphasis in original) The facts alleged by Plaintiff cannot plausibly establish a claim for antitrust violation based on the reversal by the 9th Circuit.  Plaintiff's reliance on a now-reversed decision to establish his antitrust claims illustrates the frivolousness of his claims.

While the '619 Patent was not asserted against Qualcomm in Cases 3, 4, and 5, Plaintiff makes no attempt to separately plead the '619 Patent in a non-frivolous way.  In other words, his allegations of infringement against the '619 Patent are inextricably linked to his frivolous allegations of infringement of his other patents.  Adding a new patent does not cure their frivolity. The cure for frivolity would instead be complying with the appropriate pleading standard that Plaintiff cannot seem to meet despite numerous attempts.  As a result, the Court also fails to have subject matter jurisdiction over these frivolous claims relating to the '619 Patent.

Plaintiff has yet to file a complaint that was not dismissed as frivolous despite **six** lawsuits. Plaintiff's claims against Qualcomm are just as frivolous in California as they are in South Carolina.  This Court should find that it does not have subject matter jurisdiction over these patently frivolous claims.  And, if the Court finds it lacks subject matter jurisdiction on the ground of frivolousness, then the Court should also dismiss Plaintiff's complaint in its entirety, including any supplemental state law claims.  *See Arbaugh*, 546 U.S. at 514.

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW

### 2. Issue Preclusion Bars Plaintiff From Litigating Subject Matter Jurisdiction

The frivolity of Plaintiff's claims against Qualcomm is decided.  Plaintiff is barred from litigating subject matter jurisdiction of his claims on the issue of frivolity.  The Ninth Circuit has held that "a district court's decision that it lacks subject matter jurisdiction over a plaintiff's claim precludes the plaintiff from relitigating the issue of jurisdiction in a later action." *Mast v. Long*, 84 F. Appx. 786 (9th Cir. 2003).  Unlike claim preclusion, "it matters not that the prior action resulted in a dismissal without prejudice, so long as the determination being accorded [issue] preclusive effect was essential to the dismissal." *Deutsch v. Flannery*, 823 F.2d 1361 (9th Cir. 1987).  "The party asserting [issue preclusion] must first show that the estopped issue is identical to an issue litigated in a previous action." *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995).

Here, the core issue is whether or not Plaintiff's claims are frivolous.  Plaintiff is once again asserting the same frivolous claims of infringement of the '497 Patent, the '189 Patent, the '439 Patent, the '287 Patent, the '752 Patent, and the '891 Patent dressed up as unfounded antitrust and unjust enrichment claims.  Plaintiff continues to make deficient pleadings in this Court despite his many attempts in the Court of Federal Claims and the District of South Carolina.  The Court does not have subject matter jurisdiction over frivolous claims. *See e.g.*, *Steel Co.*, 523 U.S. at 89.  The issue of frivolity of the claims against Qualcomm is decided, and Plaintiff should be estopped from asserting otherwise. *See Mast*, 84 at 786.

Plaintiff should also be estopped from litigating the issue of frivolity of the '619 Patent if Plaintiff is actually asserting the '619 Patent against Qualcomm.  Plaintiff makes no attempt to separately plead the '619 Patent.  For this reason, Plaintiff should be estopped from asserting that the underlying allegations supporting his claim of infringement of the '619 Patent are not frivolous and thus the court has subject matter jurisdiction.

### 3. Plaintiff Lacks Standing to Bring Antitrust Claims

Plaintiff must have standing to pursue his antitrust claims under the Sherman and Clayton Acts.  For a dispute to fall within the subject-matter jurisdiction of a federal court, the plaintiff

1   must allege, at a minimum: (1) the plaintiff has suffered a concrete injury, (2) that injury is fairly

2   traceable to actions of the defendant, and (3) it must be likely—not merely speculative—that the

3   injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

4   560-61 (1992).  To establish constitutional standing at the pleading stage, the plaintiff must set

5   forth at least "general factual allegations of injury resulting from the defendant's conduct."  *Id.* at

6   561.  Plaintiff fails to meet this standard.

7          Plaintiff alleges that Qualcomm has "coerced cellular telephone makers (OEMs) to

8   purchase only Qualcomm-manufactured chipsets."  Dkt. 1, ¶ 60.  Plaintiff also references several

9   prior and ongoing antitrust investigations involving Qualcomm.  *Id.* at ¶¶ 59, 61-65, 76-78.  And

10  Plaintiff "believes Qualcomm's 5% royalty rate on the price of each phone sold is a species of

11  unfair competition."  *Id.* at ¶ 75.  In each of these allegations, Plaintiff fails to allege how he has

12  suffered any concrete injury as the result of Qualcomm's alleged anticompetitive practices.  The

13  only injury Plaintiff claims as a result of Qualcomm's alleged anticompetitive practices is the

14  infringement of his patents.  *Id.* at ¶ 94.  Plaintiff has failed to establish constitutional standing to

15  bring the antitrust claims because a favorable decision on Plaintiff's antitrust claims would not

16  redress his alleged injury—patent infringement.

17     **B.    The Complaint Fails to State A Claim Upon Which Relief May be
               Granted**

18
          Plaintiff's patent infringement claims should be dismissed under Rule 12(b)(6) because

19  Plaintiff has failed to state a claim for direct or indirect infringement.  Plaintiff's antitrust and

20  unjust enrichment claims should also be dismissed because they are predicated on his deficient

21  patent infringement claims.

22          **1.   Plaintiff Failed to State a Claim of Direct Infringement**

23
          A complaint must, at a minimum, "place the potential infringer ... on notice of what activity

24  ... is being accused of infringement."  *Nalco Company v. Chem-Mod, LLC*, 883 F.3d 1337, 1350

25  (2018).  Where a patent infringement claim fails to provide "enough specificity to give the

26  defendant notice of what products or aspects of products allegedly infringe" upon the plaintiff's

27  rights, the claim must be dismissed."  *Bender v. LG Elecs. U.S.A.*, Inc., 2010 U.S. Dist. LEXIS

28

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW

1   33075, *15 (N.D. Cal. March 11, 2010).  "Sufficient allegations would include, at a minimum, a

2   brief description of what the patent at issue does, and an allegation that certain named and

3   specifically identified products or product components also do what the patent does, thereby

4   raising a plausible claim that the named products are infringing." *Id.* at 19-20.  Nor is "pointing

5   to broad categories of products" sufficient to establish a plausible claim of infringement. *Id.* at 10.

6   Plaintiff falls remarkably short of this standard.

7        At no point does the Complaint explain which of Plaintiff's patents, or the claims thereof,

8   are actually being asserted against Qualcomm.  While the Complaint reproduces claims of several

9   patents, the Complaint does not specify which claims are allegedly being infringed.  The

10  Complaint fails to provide a brief description of what the asserted patents claim.  The Complaint

11  vaguely asserts that Qualcomm is infringing the Plaintiff's patented central processing units

12  ("CPUs") and communicating, monitoring, detecting, and controlling ("CMDC") devices.  The

13  Plaintiff makes no attempt to explain how any product made, used, or sold by Qualcomm infringes

14  any claim of the Plaintiff's patents.  While the Complaint mentions Snapdragon chipsets and the

15  Snapdragon Ride Platform, the Complaint fails to provide any explanation as to how any of the

16  products in these categories infringe.  Instead, Plaintiff simply concludes, without more, that

17  Qualcomm is infringing unidentified patents. *See Iqbal* at 678 (pleading standard "demands more

18  than an unadorned, the-defendant-unlawfully-harmed-me accusation.").

19       Nor can Plaintiff rely on the two claim charts on the face of the Complaint to "provid[e]

20  'enough factual allegations, accepted as true, to 'state a claim to relief that is plausible on its face.'"

21  Dkt. 1, at 33.  These two claim charts[8] map General Motors'—**not Qualcomm's**—Advanced

22  Driver Assistance System to claims of the '891 Patent.  He also cites Exhibit K, a chart of

23  Samsung's—**not Qualcomm's**—alleged infringement.  Consequently, these charts cannot put

24  Qualcomm on notice of how an identified product made, used, or sold **by Qualcomm** infringes

25  any claim.  And, Plaintiff has a habit of providing claim charts that "present a dizzying array of

26  disorganized assertions over several hundred pages, disingenuously using the words of the claims

27

28  ---
    [8] These Charts are recycled from the Complaint in Case 4. *See* Ex. 2, at ¶30.

1  to generally describe cryptically identified structures." *Golden,* 819 Fed. Appx. at 931.

2  One of Plaintiff's theories is that Qualcomm waived its right to argue patent infringement

3  and patent invalidity against select patents[9] the Plaintiff asserted against the United States based

4  on a fundamental misunderstanding of *Bowser, Inc. v. United States.* 420 F.2d 1057, 1060 (C. Cl.

5  1970). Dkt. 1, ¶¶41, 88. Plaintiff relies on a quote from *Bowser* that the Court of Federal Claims

6  confirmed "must be read in the context of the narrow holding in that case: 'If the third party

7  indemnitor fails to appear in response to the summons or notice, it may not, in later litigation for

8  the enforcement of the indemnity against it, assert that this court incorrectly decided that plaintiff's

9  patent is valid and was infringed by the apparatus furnished by the third party.'" *Bird v. United*

10  *States*, 51 Fed. Cl. 536, 543 (C. Cl. 2002) (superseded by statute) (quoting *Bowser*, 420 F.2d at

11  1060).

12  Plaintiff's theory fails because his litigation with the United States is not an action by the

13  government for the enforcement of indemnity against Qualcomm. As a result, *Bowser* is

14  inapplicable. Nor does the Complaint demonstrate that Qualcomm manufactured infringing

15  devices under contract with the United States Government, or agreed to indemnify the United

16  States Government. Plaintiff also fails to inform the Court that the Court of Federal Claims has

17  not ruled in his favor, or that his suit against the government never made it past the pleading stage

18  despite eight years of litigation and six amended complaints. *Golden*, 156 Fed. Cl. at 625-26. In

19  fact, his complaint was dismissed *with* prejudice, and he never came up with a "a plausible theory

20  of infringement against the United States and the third parties whose products he alleges were

21  made at the behest of the government" despite the court allowing six amended complaints. *Id.* at

22  632. Plaintiff is appealing this decision. Even if *Bowser* was not limited to government

23  indemnitors, Plaintiff cannot establish issue preclusion since his complaint was dismissed for his

24  failure to state a claim or comply with a court order. No decision was made regarding validity,

25  invalidity, or infringement of his patents.

26  ---

27  [9] "By default, Qualcomm is barred from entering a defense in this Court for non-infringement or that any of the following patent claims are invalid: Claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent; and, claims 4-6 of the

28  '287 patent." Dkt. 1 at ¶41.

1    As a result, Qualcomm is not on notice as to (1) which patents or claims are being asserted,

2    and (2) is not on notice as to what products allegedly infringe.   Nor can Plaintiff rely on

3    Qualcomm's lack of response to a Rule 14(b) Notice to establish any waiver of patent infringement

4    or patent validity defenses to avoid giving the requisite notice and complying with the pleading

5    standard.

6    The Complaint mentions divided infringement twice in the request for relief.   Divided

7    infringement is a species of direct infringement.   *Sentius Int'l, LLC v. Apple Inc.*, 2020 U.S. Dist.

8    LEXIS 192203, at *5, n.2 (N.D. Cal. Oct. 15, 2020).   Stating a claim for divided infringement

9    requires alleging facts "sufficient to allow a reasonable inference that all steps of the claimed

10   method are performed and either (1) one party exercises the requisite 'direction or control' over

11   the others performance or (2) the actors form a joint enterprise such that performance of every step

12   is attributable to the controlling party."   *Sapphire Crossing LLC v. Abbyy USA Software House,*

13   *Inc.*, 497 F. Supp. 3d 762, 766 (N.D. Cal. Oct. 28, 2020) (citations omitted).   Despite Plaintiff's

14   vague allegations of Qualcomm conspiring with its competitors, Plaintiff has not alleged that

15   Qualcomm controls or directs others or that Qualcomm and other entities have formed a joint

16   enterprise to infringe the patents beyond conclusory allegations.   Consequently, Plaintiff has failed

17   to state a claim for divided infringement.

18   The Complaint is consistent with Plaintiff's previous frivolous complaints that have been

19   dismissed in South Carolina.   *See Golden,* 819 Fed. Appx. at 931 ("complaint itself offers only

20   vague generalities and block quotes of statutes, cases and treatises, but nowhere points us to any

21   nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold

22   by any defendant").   This Court should similarly dismiss Plaintiff's grossly inadequate

23   infringement allegations under Fed. R. Civ. P. 12(b)(6).

24                    **2.   The Complaint Fails to Plead Enough Facts to Support The**
                          **Claim of Indirect Infringement**
25
     Plaintiff asserts that Qualcomm is liable for contributory infringement and induced
26
     infringement.   Plaintiff's indirect infringement claims appear to be directed to an unidentified
27
     smartphone for "Snapdragon Insiders" made by Qualcomm and Asus and GM's driving system
28

1   that is "integrated with the 'Snapdragon Ride Platform" of Qualcomm." Dkt. 1, ¶¶89, 99.  The

2   Complaint's main focus is on contributory infringement, with all mentions of induced infringement

3   being found in the request for relief.

4        Contributory and induced infringement requires direct infringement by another.  *Creagri,*

5   *Inc. v. Pinnacl.fe Inc.*, 2013 U.S. Dist. LEXIS 427, at *8 (N.D. Cal. January 1, 2013).  In order to

6   establish contributory infringement, the Federal Circuit has held that a patent owner must show:

7   "1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3)

8   that the component has no substantial noninfringing uses, and 4) that the component is a material

9   part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).  To

10  survive a motion to dismiss on induced infringement, the "complaint must plead facts plausibly

11  showing that the accused infringer 'specifically intended [another party] to infringe [the patent]

12  and knew that the [other party]'s acts constituted infringement.'" *Nalco*, 883 F.3d at 1355.

13       With respect to contributory infringement, Plaintiff fails to establish that the Snapdragon

14  chipsets or Snapdragon Ride Platform do not have substantial noninfringing uses, *i.e.*, that they

15  are not staple articles or commodities of commerce.  As a result, Plaintiff has failed to state a claim

16  of contributory infringement.  *See Uniloc U.S.A., Inc. v. Logitech, Inc.*, No. 18-CV-01304, 2018

17  U.S. Dist. 197194, at *9 (N.D. Cal. Nov. 17, 2018) (granting defendants motion to dismiss

18  contributory infringement claims where the plaintiff did not "provide factual underpinnings for its

19  allegations that there are no substantial noninfringing uses of the accused devices.").

20       With respect to induced infringement, Plaintiff has alleged no facts that Qualcomm

21  specifically intended another party to infringe any patent or that the other party's acts constituted

22  infringement.  As a result, Plaintiff has failed to state a claim for induced infringement.  *See Hitachi

23  Kokusai Elec. Inc. v. ASM Int'l, N.V.*, 2018 U.S. Dist. LEXIS 122967, *13 (N.D. Cal. July 23,

24  2018) (dismissing claim of induced infringement "because the general allegations regarding

25  Defendants' customer-related activities are not sufficiently related to infringement of the claimed

26  methods").

27       In any case, Plaintiff has failed to establish a claim of direct infringement, which is fatal to

28  his indirect infringement claims.  The Court should dismiss these deficient indirect infringement

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW

claims under Rule 12(b)(6).

### 3. Plaintiff Fails to State a Claim for Antitrust Violation

Plaintiff's antitrust claims are based on his frivolous patent infringement claims and a now overturned Northern District of California judgment.  Plaintiff cannot plausibly state a claim for anti-trust violations when the 9th Circuit has held otherwise.  *See FTC,* 969 F.3d at 1005 ("Qualcomm's patent-licensing royalties and 'no license, no chips' policy do not impose an anticompetitive surcharge on rivals' modem chip sales.").  Plaintiff's assertions, in addition to being frivolous, simply fail to establish a plausible claim of antitrust violations. *Iqbal*, 556 U.S. at, 697; *Twombly*, 550 U.S. at 570.

### 4. The Non-Patent Claims Should be Dismissed Because They are Wholly Dependent Upon Defective Patent Infringement Claims

Plaintiff's antitrust and unjust enrichment claims should be dismissed because they are derivative of and seek the same relief as his defective patent infringement claims.  Plaintiff's antitrust allegations are, in essence, that he being prevent from accessing the market because Qualcomm is not paying him royalties. *See* Dkt. 1, ¶¶ 35, 38, 83, 94-95, 110.  This injury is similar to the harm he alleged in Case 4.  Report and Recommendation, 2020 U.S. Dist. LEXIS 258437 at *13-14 (Alleged harm is "that he has been prevented from accessing the market for CMDC devices because the defendants have refused to pay him licensing royalties.").  Similarly, Plaintiff's unjust enrichment claim alleges that Qualcomm has been unjustly enriched by infringing his patents. *Id.* at ¶ 70, D, H, I.  In other words, Plaintiff's antitrust and unjust enrichment claims are predicated on his deficient patent infringement claims.  Plaintiff is again attempting disguise his patent infringement claims as antitrust and unjust enrichment claims to avoid having the patent infringement claims dismissed.  Plaintiff's previous attempts at this ploy was ineffectual in South Carolina.  Report and Recommendation, 2020 U.S. Dist. LEXIS 258437 at *11-12, *14 (Mr. Golden cannot "circumvent the dismissal of his patent infringement claims" by "dressing the case as asserting violations of the Sherman Act, the Clayton Act.")  This Court should similarly not be fooled.

### 5.   Plaintiff's Claims are Time Barred

Plaintiff alleges that the conspiracy began in 2007. Dkt. 1, ¶¶28-29, 31, 102-105. Plaintiff brought Case 1 against the Government for this conspiracy in 2013, alleging infringement by the government. *See Golden*, 156 Fed. Cl., at 625-26 ("He alleges generally that the United States, through the Department of Homeland Security, has caused cell phone manufacturers to produce devices that infringe on one or more of his patents."). There, Plaintiff mentioned Qualcomm was a third party. *Id.* at 628. Plaintiff has made the frivolous claim that Qualcomm is collaterally estopped from asserting invalidity and non-infringement based on a notice issued in this case. Plaintiff never got past the pleading stage. Plaintiff was aware of this alleged conspiracy to infringe his patents in at least 2013 when he filed suit. The statute of limitations for the Sherman Act is four years. *See* 15 U.S.C. §15(b). The year is now 2022. As a result, plaintiff's Sherman Act claims are time barred.

Based on Plaintiff's assertion that Qualcomm was in a conspiracy to infringe his patents in 2007, Plaintiff's patent infringement claims are barred to the extent they are more than six years prior to the filing of the Complaint. *See* 35 U.S.C. §286.

## VI.   CONCLUSION

Pleading standards are in place for a reason—to prevent frivolous litigation and the unwarranted burdens it imposes on the courts and parties. This case is a prime example of impermissible frivolity. Plaintiff has made repeated frivolous claims against Qualcomm and others in South Carolina and is now bringing his frivolous claims to the Northern District of California. For the foregoing reasons, Qualcomm respectfully requests the Court dismiss the Complaint without amendment under Fed. R. Civ. P. 12(b)(1) and (6), and exercise its inherent power to enter appropriate sanctions to deter Plaintiff from continuing to attempt to engage in baseless, vexatious litigation against Qualcomm and others.

DATED: July 22, 2022

Respectfully submitted,

PATTERSON + SHERIDAN, LLP

By: /s/ Joseph John Stevens
    Joseph John Stevens (CA Bar No. 242495)
    jstevens@pattersonsheridan.com

    50 W. San Fernando Street, Suite 250
    San Jose, CA 95113
    Tel: 650-384-4418
    Fax: 650-330-2314

    B. Todd Patterson (*pro hac vice* forthcoming*)*
    tpatterson@pattersonsheridan.com
    John A. Yates (*pro hac vice* forthcoming)
    jyates@pattersonsheridan.com
    Kyrie K. Cameron (*pro hac vice* forthcoming)
    kcameron@pattersonsheridan.com

    24 Greenway Plaza, Suite 1600
    Houston, Texas 77030
    713-623-4844 | 713-623-4846

    *Attorneys for Defendant*
    *Qualcomm Incorporated*

1    Joseph John Stevens (CA Bar No. 242495)
     jstevens@pattersonsheridan.com
2    50 W. San Fernando Street, Suite 250
     San Jose, CA 95113
3    Tel: 650-384-4418
     Fax: 650-330-2314
4

5    B. Todd Patterson (*pro hac vice* pending)
     tpatterson@pattersonsheridan.com
6    John A. Yates (*pro hac vice*)
     jyates@pattersonsheridan.com
7    Kyrie K. Cameron (*pro hac vice*)
     kcameron@pattersonsheridan.com
8    24 Greenway Plaza, Suite 1600
     Houston, Texas 77030
9    713-623-4844 | 713-623-4846
     *Attorneys for Defendant*
10   *Qualcomm Incorporated*

11

12                   UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                        OAKLAND DIVISION

15   LARRY GOLDEN,                        Case No.: 4:22-cv-03283- HSG

16              *Pro Se* Plaintiff,       **DEFENDANT'S OPPOSITION TO**
                                          **PLAINTIFF'S MOTION FOR DEFAULT**
17   vs.                                  **JUDGMENT**

18   QUALCOMM INC.,                       [Filed concurrently:  Proposed Order; Proof of
                                          Service]
19              Defendant.
                                          Date:        Unnoticed by Plaintiff
20                                        Time:        2:00pm
                                          Courtroom:   2
21

22

23

24

25

26

27

28   DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
     Case No.: 4:22-CV-03283-HSG

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

I.   INTRODUCTION ........................................................................................... 1

II.  LEGAL STANDARD ...................................................................................... 2

III. ARGUMENT ................................................................................................... 2

     A. Plaintiff's Motion Should be Denied Because Qualcomm Responded Early ............... 2

     B. Default Judgment is Inappropriate under *Eitel* ............................................. 2

IV.  CONCLUSION ............................................................................................... 11

# TABLE OF AUTHORITIES

**Page**

*AllChem Performance Prods. v. Aqualine Warehouse LLC*, No. CV-12-1520-PHX-DGC, 2013 U.S. Dist. LEXIS 118812, at *7-8 (D. Ariz. Aug. 21, 2013)................................9

*Bender v. LG Elecs. U.S.A., Inc.*, 2010 U.S. Dist. LEXIS 33075, *19-20 (N.D. Cal. March 11, 2010) ..............................................................................5

*Bird v. United States*, 51 Fed. Cl. 536 (C. Cl. 2002) ..................................5

*Bowser, Inc. v. United States.* 420 F.2d 1057 (C. Cl. 1970) ....................5

*Collins v. Neven*, 812 Fed. Appx. 595 (9th Cir. 2020) ...............................3

*Cooksey v. Ocean*, No. 2:17-cv-00839-SVW-AGR, 2017 U.S. Dist. LEXIS 234875, *4 (C.D. Cal. May 26, 2017) ....................................................3, 9, 10

*Creagri, Inc. v. Pinnacl.fe Inc.*, 2013 U.S. Dist. LEXIS 427, at *8 (N.D. Cal. January 1, 2013) ........................................................................6

*Danning v. Lavine*, 572 F.2d 1386 (9th Cir. 1978)................................9, 10

*Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986) ........................2, 3, 4, 9, 11

*Falk v. Allen*, 739 F.2d 461 (9th Cir. 1984)..............................................2

*FTC v. Qualcomm Inc.*, 969 F.3d 974....................................................7, 9

*Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010) ....................6

*Golden v. Apple Inc.*, 819 Fed. Appx. 930 (Fed. Cir. 2020), *cert. denied* 141 S. Ct. 1067 (2021) ......................................................7

*Golden v. Apple, et. al.*, No. 6:20-cv-2270, ECF No. 16, 2020 U.S. Dist. LEXIS 258437 at *10-14 (D.S.C. Sep. 11, 2020)................................................4

*Golden v. Apple Inc. et al.*, No.: 6:20-cv-02270-JD-KFM, 2021 U.S. Dist. LEXIS 178626, at *7 (D.S.C Sept. 20, 2021) ..............................................4, 7

*Golden v. Apple, Inc. et al.*, No. 21-2160, 2022 U.S. App. LEXIS 8656 (4th Cir. Mar. 31, 2022) ....................................................................4, 8

*Golden v. Apple Inc. et al.*, 6:20-cv-04353-JD-KFM, 2021 U.S. Dist. LEXIS 211540, *5 (D.S.C. Nov. 2, 2021) ......................................................8

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
Case No.: 4:22-CV-03283- HSG

*Golden v. United States*, 156 Fed. Cl. 623 (C. Cl. 2021)
  *appeal pending* Fed. Cir. No. 2022-1196 ...............................................................6, 7

*Helwan Cement S.A.E. v. Tahaya Misr Inv. Inc.*, No. 2:17-cv-00543-CAS-AFM,
  2017 U.S. Dist. LEXIS 87641 (C.D. Cal. June 5, 2017 .................................................9

*Lujan v. Defenders of Wildlfe*, 504 U.S. 555 (1992) ...............................................8

*Mast v. Long*, 84 F. Appx. 786 (9th Cir. 2003).......................................................8

*Mohanna v. Bank of Am., N.A.*, No. 16-cv-01033-HSG, 2017 U.S. Dist. LEXIS
  36481 (N.D. Cal. Mar. 14, 2017)..............................................................3, 4, 8, 9, 10

*Morris v. Fresno Police Dep't*, 1:08-cv-01422 OWW-GSA, 2009 U.S. Dist. LEXIS
  94915 (E.D Cal. Sept. 24, 2009)...........................................................................3

*Muhammad v. California*, No. C10-01449-SBA, 2011 U.S. Dist. LEXIS 109979,
  (N.D. Cal. Sept. 27, 2011) ...................................................................................3

*Nalco Company v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018)..........................4, 6

*Pearson v. Nationstar Mortg.*, LLC, 5:16-cv-01079-CAS-AJW, 2016 U.S. Dist. LEXIS
  133825 (C.D. Cal. Sept. 26, 2016)........................................................................9

*PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172 (C.D. Cal. 2002) ..................3, 8

*Sapphire Crossing LLC v. Abbyy USA Software House, Inc.*, 497 F. Supp. 3d 762
  (N.D. Cal. Oct. 28, 2020)......................................................................................5

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).......................................8

*Uniloc U.S.A., Inc. v. Logitech, Inc.*, No. 18-CV-01304, 2018 U.S. Dist. 197194,
  at *9 (N.D. Cal. Nov. 17, 2018)..............................................................................6

**Rules and Statutes**

Fed. R. Civ. P. 12 ...................................................................................................1

Fed. R. Civ. P. 12, 55 ..............................................................................................2

iii

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

Defendant Qualcomm Incorporated ("Qualcomm") hereby opposes Plaintiff's Motion for Default Judgment.  Plaintiff did not notice a hearing date and time.  Qualcomm suggests scheduling a hearing, if one is required, at the same time as the hearing for Qualcomm's Motion to Dismiss (Dkt. 6-1).

## I.   INTRODUCTION

Elizabeth Ann Crowe accepted service of this suit on behalf of Qualcomm on July 7, 2022.  Dkt. 6-4.  Qualcomm pointed out the discrepancy in Plaintiff's alleged date of service in it Motion to Dismiss.  Dkt. 6-1 at 6.

Qualcomm's counsel was preparing a Motion to Dismiss to be filed within 21 days of July 7, 2021.  John A. Yates Declaration.  On July 19, 2022, Plaintiff filed a certificate of service and executed summons indicating Qualcomm was served on June 28, 2022—21 days earlier (Dkt. 5), which, if true, would render Plaintiff's answer due the very same day Plaintiff filed the executed summons—July 19, 2022.  The executed summons was not entered on the docket until July 20, 2022.  Qualcomm filed the Motion to Dismiss three (or two) days later on July 22, 2022.  Qualcomm believes the Motion to Dismiss was filed early based on the July 7, 2022 service.  Qualcomm served the Motion to Dismiss and accompanying documents on Plaintiff on July 22, 2022 by email and mail.  Dkt. 6-3.  FedEx delivered Qualcomm's Motion to Dismiss to Plaintiff's address on July 25, 2022 at 9:29am.  Ex. 4.  Plaintiff mailed his Motion for Default Judgment on July 25, 2022 at 2:37pm demanding an unreasonable sum of **$40 Billion** despite being served with Qualcomm's filed Motion to Dismiss.  Dkt. 15-2.

Plaintiff is a serial filer of frivolous complaints alleging a conspiracy against him by the Government and other entities to infringe his patents.  *See* Dkt. 6-1, at 7-11.  This case is no different.  Qualcomm's Motion to Dismiss explains why the Court should dismiss this frivolous suit for lack of subject matter jurisdiction and for failure to state a claim.

1    Plaintiff's Motion for default judgment is equally frivolous.  First, Qualcomm filed its

2    Motion to Dismiss within 21 days of service as required by Fed. R. Civ. P. 12.  Second, Plaintiff

3    cannot—and makes no attempt to—establish why a default judgment is justified.

## II.    LEGAL STANDARD

5    Plaintiff failed to address the standard for granting a default judgment.  As a threshold

6    issue, default judgment is inappropriate if the Defendant files a responsive pleading—**as**

7    **Qualcomm did**—within 21 days of receiving service.  Fed. R. Civ. P. 12, 55.

8    Default judgment "is a drastic step appropriate only in extreme circumstances; a case

9    should, whenever possible, be decided on the merits." *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir.

10   1984).  The 9th Circuit relies on a factor test to determine whether or not to enter a default

11   judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's
> substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at
> stake in the action; (5) the possibility of a dispute concerning material facts;
> (6) whether the default was due to excusable neglect, and (7) the strong policy
> underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) (affirming denial of a default judgment)

(citations omitted).  Default judgments are disfavored and lawsuits "should be decided upon their

merits whenever reasonably possible." *Id* at 1472 (citation omitted).

## III.   ARGUMENT

Default judgment is not appropriate because (1) Qualcomm was not late, and (2) no *Eitel*

Factor supports entering a default judgment.

### A.    Plaintiff's Motion Should Be Denied Because Qualcomm Responded Early

Qualcomm was served July 7, 2022.  Dkt. 6-4.  Qualcomm filed its Motion to Dismiss

within the 21 day window on July 22, 2022.  Plaintiff's Motion for Default Judgment should be

denied for this reason.

### B.    Default Judgment is Inappropriate under *Eitel*

Default judgment is inappropriate because none of the *Eitel* factors weigh in favor of

granting a default judgment even if Qualcomm was served on June 28, 2022 as alleged by Plaintiff.

1    Plaintiff ignored these factors.  Instead, Plaintiff made a poor attempt to rehabilitate his complaint

2    by adding in additional allegations not included in the Complaint.

3              1.       *Eitel* Factor 1:  Plaintiff Is Not Prejudiced

4         A plaintiff is prejudiced "when, in the absence of a default judgment, plaintiff would be

5    left with no 'other recourse for recovery.'" *Mohanna v. Bank of Am., N.A.*, No. 16-cv-01033-HSG,

6    2017 U.S. Dist. LEXIS 36481, at *7 (N.D. Cal. Mar. 14, 2017) (quoting *PepsiCo, Inc. v. Cal. Sec.*

7    *Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002)) (denying a motion for default judgment).  In

8    other words, prejudice is present when "when a defendant has failed to appear or defend against a

9    suit, and the plaintiffs could not otherwise seek relief." *Id.*

10        This is not a case where the defendant is nowhere to be found or has failed to defend against

11   the suit.  Qualcomm filed a Motion to Dismiss and is intent on defending this frivolous suit.

12   Plaintiff has not established why Qualcomm's response—even if it was three days late (it was

13   not)—is prejudicial.  Courts have denied motions for default judgment despite a late pleading.  *See*

14   *e.g.*, *Eitel*, 782 F.2d at 1742 (denying a motion for default judgment even though the answer was

15   filed late); *Collins v. Neven*, 812 Fed. Appx. 595, 596 (9th Cir. 2020) ("The district court did not

16   abuse its discretion by denying [plaintiff's] motion for default judgment [where the defendant] had

17   already answered the complaint."); *Muhammad v. California*, No. C10-01449-SBA, 2011 U.S.

18   Dist. LEXIS 109979, at 5-6 (N.D. Cal. Sept. 27, 2011) ("Defendant's answer was filed late, but

19   less than two weeks after it was due.  There is no evidence that plaintiff was prejudiced by this

20   delay."); *Morris v. Fresno Police Dep't*, 1:08-cv-01422 OWW-GSA, 2009 U.S. Dist. LEXIS

21   94915, at *9 (E.D Cal. Sept. 24, 2009) (one day late responsive pleading did not prejudice

22   plaintiff).

23        Plaintiff will not be left without recourse if his Motion for Default Judgment is denied

24   because Plaintiff will have the opportunity to prove the merits of his case (if any).  Having to prove

25   the case on the merits is not prejudice.  *Cooksey v. Ocean*, No. 2:17-cv-00839-SVW-AGR, 2017

26   U.S. Dist. LEXIS 234875, *4 (C.D. Cal. May 26, 2017) ("Losing out on the chance for a default

27   judgment is not sufficient to sustain a fording of prejudice.").

28

1    To the extent Plaintiff's alleges prejudice, it is in relation to fifteen years of his own failed

2    efforts to assert his patents.  Dkt. 15-1 at 3.  Plaintiff has spent years fruitlessly trying to sue the

3    Government and others, including Qualcomm, for alleged infringement.  Plaintiff failed to inform

4    the Court that all his previous lawsuits about this conspiracy were dismissed and that all lawsuits

5    naming Qualcomm as a defendant were dismissed as frivolous.  *See* Dkt. 6-1, at 8-11.  Plaintiff

6    cannot possibly establish prejudice by his own decades-long failure to state a claim.  This factor

7    weighs against granting the Motion for Default Judgment.

8                    **2.    *Eitel* Factors 2 and 3:  The Complaint is Patently Frivolous**

9    "Of all the *Eitel* factors, courts often consider the second and third factors to be 'the most

10   important.'"  *Mohanna*, 2017 U.S. Dist. LEXIS 36481, at *8.  "These two factors are often

11   analyzed together, and require the Court to consider whether Plaintiff has 'state[d] a claim on

12   which [he] may recover.'"  *Id.* (citations omitted) (alterations in original) (finding time barred

13   claims to weigh against granting default judgment).

14   Plaintiff is again attempting his failed[1] tactic of disguising his patent infringement claims

15   as antitrust and unjust enrichment claims to avoid having the patent infringement claims dismissed.

16   Qualcomm has already established in its Motion to Dismiss (1) why Plaintiff has failed to state a

17   claim, and (2) why the Court does not have subject matter jurisdiction.  Below are reasons why—

18   without rearguing the Motion to Dismiss in its entirety—Plaintiff's claims lack merit.  The Second

19   and Third *Eitel* factor weigh against granting the motion to dismiss for the reasons articulated

20   below.

21                    i.    *Plaintiff has failed to Plead a Claim for Direct Infringement*

22   Plaintiff failed to plead a claim for direct infringement because the Complaint does not

23   include facts sufficient to put Qualcomm on notice of the accused infringement.  *See Nalco*

24

25   [1] "[Mr. Golden] cannot circumvent the court's prior ruling by labeling substantially similar
26   allegations as seeking damages under the Sherman/Clayton Acts instead of for patent
     infringement." Report and Recommendation, *Golden v. Apple, et. al.*, No. 6:20-cv-2270, ECF No.
27   16, 2020 U.S. Dist. LEXIS 258437 at *10-14 (D.S.C. Sep. 11, 2020) *adopted as modified Golden
     v. Apple Inc. et al.*, No.: 6:20-cv-02270-JD-KFM, 2021 U.S. Dist. LEXIS 178626, at *7 (D.S.C
28   Sept. 20, 2021) *a'd Golden v. Apple, Inc. et al.*, No. 21-2160, 2022 U.S. App. LEXIS 8656 (4th
     Cir. Mar. 31, 2022).

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
Case No.: 4:22-CV-03283-HSG

*Company v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (A complaint must "place the potential infringer…on notice of what activity…is being accused of infringement.").   At no point does the Complaint explain which of Plaintiff's patents, or the claims thereof, are actually being asserted against Qualcomm.

The Complaint vaguely asserts that Qualcomm is infringing the Plaintiff's patented central processing units ("CPUs") and communicating, monitoring, detecting, and controlling ("CMDC") devices.   The Plaintiff makes no attempt to explain how any product made, used, or sold by Qualcomm—including the Snapdragon Chipsets or Snapdragon Ride Platform mentioned in the Complaint—infringes any patent.[2]   The two "claim charts" included in the Complaint are directed to alleged infringement by General Motors and Samsung—**not how a Qualcomm product allegedly infringes**.   Plaintiff fell fall short putting Qualcomm on notice of the accused infringement.  *See Bender v. LG Elecs. U.S.A., Inc.*, 2010 U.S. Dist. LEXIS 33075, *19-20 (N.D. Cal. March 11, 2010).   ("Sufficient allegations would include, at a minimum, a brief description of what the patent at issue does, and an allegation that certain named and specifically identified products or product components also do what the patent does, thereby raising a plausible claim that the named products are infringing.").   Nor did Plaintiff establish the requisite control required to state a claim for divided infringement.  *See Sapphire Crossing LLC v. Abbyy USA Software House, Inc.*, 497 F. Supp. 3d 762, 766 (N.D. Cal. Oct. 28, 2020).

One of Plaintiff's theories is that Qualcomm waived its right to argue patent infringement and patent invalidity against select patents[3] the Plaintiff asserted against the United States based on a fundamental misunderstanding of *Bowser, Inc. v. United States*.   420 F.2d 1057, 1060 (C. Cl. 1970). Dkt. 1, ¶¶41, 88.  *Bowser* is read narrowly and applies to the United States Government

---

[2] Plaintiff, for the first times, provides a specific list of Qualcomm products that allegedly infringe an unidentified patent.  *See* Dkt. 15, at 8-11. Plaintiff again does not explain how any of these products infringes any patent beyond the allegation of infringement.

[3] "By default, Qualcomm is barred from entering a defense in this Court for non-infringement or that any of the following patent claims are invalided: Claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent; and, claims 4-6 of the '287 patent." Dkt. 1 at ¶41.

1  enforcing indemnity against a third party. *Bird v. United States*, 51 Fed. Cl. 536, 543 (C. Cl. 2002)

2  (superseded by statute). *Bowser* is inapplicable here because Plaintiff's lawsuit against the United

3  States was not an enforcement action for indemnity by the United States against Qualcomm.

4  Additionally, the Complaint fails to demonstrate Qualcomm manufactures any infringing device

5  for the United States. Plaintiff also fails to inform the Court that his case against the Government

6  was dismissed having never proceeded past the pleading stage over the course of eight years. *See*

7  *Golden v. United States*, 156 Fed. Cl. 623 (C. Cl. 2021) (dismissing Plaintiff's case with prejudice)

8  *appeal pending* Fed. Cir. No. 2022-1196.

9        Plaintiff has failed to point to any non-frivolous allegation of infringement by a Qualcomm

10  product. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (pleading standard "demands more than

11  an unadorned, the-defendant-unlawfully-harmed-me accusation"). Plaintiff simply failed to state

12  a claim for direct infringement of any patent by Qualcomm. *See* Dkt. 6-1, at 21-24.

13      *ii.   Plaintiff has failed to Plead a Claim for Indirect Infringement*

14        Plaintiff has failed to state a claim for indirect infringement. *See* Dkt. 6-1, at 24-26.

15  Contributory and induced infringement requires direct infringement by another. *Creagri, Inc. v.*

16  *Pinnacle Inc.*, 2013 U.S. Dist. LEXIS 427, at *8 (N.D. Cal. January 1, 2013). Plaintiff has failed

17  to establish a claim for direct infringement which dooms his claims of indirect infringement.

18        To establish contributory infringement, Plaintiff must show "that the component has no

19  substantial noninfringing uses…." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir.

20  2010). The Complaint makes no attempt to establish that the Snapdragon chipsets or Snapdragon

21  Ride Platform do not have substantial noninfringing uses, *i.e.*, that they are not staple articles or

22  commodities of commerce. As a result, Plaintiff has failed to state a claim of contributory

23  infringement for this additional reason. *See Uniloc U.S.A., Inc. v. Logitech, Inc.*, No. 18-CV-

24  01304, 2018 U.S. Dist. 197194, at *9 (N.D. Cal. Nov. 17, 2018) (granting defendants motion to

25  dismiss contributory infringement claims where the plaintiff did not "provide factual

26  underpinnings for its allegations that there are no substantial noninfringing uses of the accused

27  devices").

28

To state a claim for induced infringement, the "complaint must plead facts plausibly showing that the accused infringer 'specifically intended [another party] to infringe [the patent] and knew that the [other party]'s acts constituted infringement.'" *Nalco*, 883 F.3d at 1355. Plaintiff failed to allege any facts that show Qualcomm specifically intended another party to infringe or that the other party's acts constituted infringement.

### iii.   Plaintiff Failed To State A Claim for Antitrust Violation

Plaintiff's antitrust claims are based on his frivolous patent infringement claims and an **overturned** Northern District of California judgment. *See* Dkt. 1, ¶¶59-64, 71-79; Dkt. 15, at 4-7. Plaintiff cannot plausibly state a claim for anti-trust violations based on Qualcomm's business practices when the 9th Circuit has held otherwise. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 1005 ("Qualcomm's patent-licensing royalties and 'no license, no chips' policy do not impose an anticompetitive surcharge on rivals' modem chip sales."). Plaintiff has simply failed to establish a plausible claim of antitrust violations. *See* Dkt. 6-1, at 26.

### iv.   Plaintiff's Claims Are Time Barred

Plaintiff alleges that the conspiracy relates to activities in 2007. Dkt. 1, ¶¶28-29, 31, 102-105. Plaintiff was aware of the alleged conspiracy against him by the Government, Qualcomm, and others in at least 2013. *See Golden*, 156 Fed. Cl., at 625-26, 28. The statute of limitations for claims under the Sherman Act is four years. *See* 15 U.S.C. §15(b). The year is now 2022—15 years after the alleged conspiracy. As a result, plaintiff's Sherman Act claims are time barred. *See* Dkt. 6-1, at 27. Plaintiff's patent damages are time barred to the extent they extend more than six years. *See* 35 U.S.C. §286.

### v.   The Non-Patent Claims Should be Dismissed Because They are Wholly Dependent Upon Defective Patent Infringement Claims

Plaintiff's antitrust allegations are, in essence, that he is prevented from accessing the market because Qualcomm is not paying him royalties for his patents. *See* Dkt. 1, ¶¶ 35, 38, 83, 94-95, 110; Dkt. 15, at 5. Plaintiff's antitrust and unjust enrichment claims are predicated on patent infringement. Plaintiff's claims of antitrust and unjust enrichment cannot stand when he has failed to state a claim for patent infringement. *See* Dkt. 6-1, at 26.

vi.    The Court Lacks Subject Matter Jurisdiction Over These Frivolous Claims

Plaintiff's prior lawsuits[4] against Qualcomm have been dismissed as frivolous.  Dkt. 6-1, at 8-10.  This case is no different.  The Complaint includes rambling and incoherent paragraphs, consists of vague and conclusory allegations of infringement and conspiracy, and formulaic recitations of the elements of various causes of action.  Plaintiff is recycling claims found frivolous in South Carolina expecting a different result.  Dkt. 6-1, at 13-20.  Courts do not have subject matter jurisdiction over frivolous claims.  *See e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).  Plaintiff is precluded from litigating subject matter jurisdiction over his recycled claims on the issue of frivolity.  *See Mast v. Long*, 84 F. Appx. 786, 787 (9th Cir. 2003) ("a district court's decision that it lacks subject matter jurisdiction over a plaintiff's claim precludes the plaintiff from relitigating the issue of jurisdiction in a later action."); Dkt. 6-1, at 20.

Finally, Plaintiff lacks standing to bring his antitrust claims.  *See* Dkt. 6-1, at 20-21.  Plaintiff's alleged antitrust injury is infringement of his patents.  Dkt. 1, at ¶94.  Plaintiff has failed to establish constitutional standing to bring the antitrust claims because a favorable decision on Plaintiff's antitrust claims would not redress his alleged injury—patent infringement.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (Standing requires likelihood that "the injury will be redressed by a favorable decision.").

### 3.    *Eitel* Factor 4:  Plaintiff Wants $40 Billion!!!

The Court must weigh the "amount of money at stake in relation to the seriousness of Defendant's conduct."  *PepsiCo*, 238 F. Supp. 2d at 1176.  "When the money at stake in the litigation is 'substantial or unreasonable,' default judgment is discouraged."  *Mohanna*, 2017 U.S. Dist. LEXIS 36481, at *11-12.

---

[4] *Golden v. Apple Inc.*, 819 Fed. Appx. 930, 930-31 (Fed. Cir. 2020) (Affirming dismissal "on the ground of frivolousness."), *cert. denied* 141 S. Ct. 1067 (2021); *Golden v. Apple Inc. et al.*, No.: 6:20-cv-02270-JD-KFM, 2021 U.S. Dist. LEXIS 178626, at *7 (D.S.C Sept. 20, 2021) *aff'd Golden v. Apple, Inc. et al.*, No. 21-2160, 2022 U.S. App. LEXIS 8656 (4th Cir. Mar. 31, 2022); *Golden v. Apple Inc. et al.*, 6:20-cv04353-JD-KFM, 2021 U.S. Dist. LEXIS 211540, *5 (D.S.C. Nov. 2, 2021) *appeal docketed* Fed. Cir. No. 22-2229.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
Case No.: 4:22-CV-03283-HSG

Plaintiff wants, amongst other things, what appears to be the unreasonable sum of **$40 Billion** within 30 days based on four separate awards of **$10 billion**.[5] Dkt. 15, at 20-21. Plaintiff appears to pull the four awards of $10 Billion from thin air rather than making any attempt to show how the damages are tied to Qualcomm's alleged infringement or alleged antitrust violations within any window of eligible recovery. Plaintiff instead points to Qualcomm's market cap and revenue.

Qualcomm has established that the Complaint is frivolous. The crux of Plaintiff's antitrust claims rests on Qualcomm's business practices found not to violate antitrust law. *See FTC*, 969 F.3d at 982, 1005 ("We now hold that the district court went beyond the scope of the Sherman Act, and we reverse"). Plaintiff cannot point to any definitive explanation how any Qualcomm product infringes any patent since the requisite analysis was omitted from his Complaint. The best Plaintiff can muster is the conclusory allegation that Qualcomm infringes. Nor is Qualcomm's decision to not buy Plaintiff's patent portfolio despite initial interest in 2011 bad conduct commiserate with **$40 Billion** in damages.

The Fourth *Eitel* Factor clearly weighs against default judgment because the Plaintiff is requesting an unreasonable sum based on a frivolous complaint. *See e.g.*, *Eitel*, 782 F.2d at 1472 (affirming denial of motion for default judgment where alleged damages were $3 million); *Cooksey*, 2017 U.S. Dist. LEXIS 234875, *4 ("Plaintiff asks for $14 million from the Defendant, a large sum of money that weighs against granting default judgment."); *Helwan Cement S.A.E. v. Tahaya Misr Inv. Inc.*, No. 2:17-cv-00543-CAS-AFM, 2017 U.S. Dist. LEXIS 87641, (C.D. Cal. June 5, 2017) ($3 billion in damages weighed against granting default judgment; *AllChem Performance Prods. v. Aqualine Warehouse LLC*, No. CV-12-1520-PHX-DGC, 2013 U.S. Dist. LEXIS 118812, at *7-8 (D. Ariz. Aug. 21, 2013) ("request for $483,096 in damages weighs against awarding default judgment, particularly where the majority of [the plaintiff's] claims lack merit").

### 4. *Eitel* Factor 5: There is a Dispute of Material Fact

The Fifth *Eitel* factor requires the Court to consider the possibilities of a dispute of material

---

[5] The relief requested in the Motion for Default is inconsistent with the relief requested in the Complaint. *Compare* Dkt. 15, at 20-21 *with* Dkt. 1, at 35-36.

1    fact.  "Where a plaintiff fails to adequately plead a legal claim, this factor 'is either neutral or

2    disfavors default [judgment]."  *Mohanna*, 2017 U.S. Dist. LEXIS 36481, at *12 (quoting *Fulton*

3    *v. Bank of Am. N.A.*, No. 2:16-cv-04870-CAS-JCx, 2016 U.S. Dist. LEXIS 169344, at *5 (C.D.

4    Cal. Dec. 6, 2016)) (parenthetical citations omitted).  Facts and claims that are not well-pled "are

5    not binding and cannot support the judgment." *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir.

6    1978); *Pearson v. Nationstar Mortg.*, LLC, 5:16-cv-01079-CAS-AJW, 2016 U.S. Dist. LEXIS

7    133825, *15 (C.D. Cal. Sept. 26, 2016)  (denying motion for default judgment in part because

8    "plaintiff has not adequately alleged his claims, which are barred pursuant to the doctrine of res

9    judicata.").

10   Qualcomm has demonstrated that Plaintiff failed to file a well-pled complaint that states a

11   claim.  Nor does the Court have subject matter jurisdiction over his frivolous claims.  Plaintiff's

12   failure to file a well-plead Complaint cannot support a default judgment.  *See Danning*, 572 F.2d

13   at 1388.

14   There is a high likelihood of a dispute of material fact in addition to Plaintiff's failure to

15   file a well-pled Complaint.  There is a material dispute of fact regarding the date of service.

16   Qualcomm and the 9th Circuit both dispute the facts central to Plaintiff's antitrust allegations.

17   Qualcomm will dispute factual allegations made by Plaintiff—including infringement and the

18   validity of his patents—in an Answer should its Motion to Dismiss be denied.

19   This factor weighs against granting a default judgment because: (1) Plaintiff failed to plead

20   a claim, and (2) the high likelihood of a dispute of material fact.  *See Mohanna*, 2017 U.S. Dist.

21   LEXIS 36481, at *12 ("Because Plaintiff here has not pled a legally viable claim, this factor weighs

22   against entry of default judgment"); *Cooksey*, 2017 U.S. Dist. LEXIS 234875, at *4 ("There is a

23   large probability that the parties will dispute the material facts, again weighing against default").

24        **5.    *Eitel* Factor 6:  Even if Late, the Delay was Excusable**

25   Qualcomm believes it filed the Motion to Dismiss early.  If service did occur on June 28,

26   2022, Qualcomm's reliance on the July 7, 2022 service is still excusable.  Qualcomm was served

27   and recorded service on July 7, 2022. John A. Yates Declaration; Dkt 6-4.  Counsel was preparing

28   the now filed Motion to Dismiss based on this date. John A. Yates Declaration.  Qualcomm had

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
Case No.: 4:22-CV-03283-HSG

no reason to suspect that it had been served prior to July 7, 2022.  In any event, the Motion to Dismiss was filed three days after July 19, 2022, and Qualcomm is here to defend against the suit. If the Motion to Dismiss was late, the lateness was due to Qualcomm's reliance on Plaintiff's July 7, 2022 service.  This reliance is at least excusable neglect.  Therefore, this factor weighs against granting Plaintiff's Motion for Default Judgment.

### 6. *Eitel* Factor 7:  Policy Favors Deciding Cases on the Merits

*Eitel* emphasizes that legal disputes "should be decided upon their merits whenever reasonably possible" and that "default judgments are ordinarily disfavored[.]"  *Eitel*, 782 F. 2d at 1742 (citation omitted).  Qualcomm is defending the lawsuit.  Plaintiff's claims can against Qualcomm can be decided on the merits (or lack thereof, in this case).  This factor weighs against granting Plaintiff's Motion for Default Judgment.

## IV.   CONCLUSION

Plaintiff has made repeated frivolous claims against Qualcomm and others in South Carolina and has brought his frivolous claims to the Northern District of California.  Plaintiff wants an unreasonable sum without proving his frivolous claims.  Default judgment is inappropriate because Qualcomm's Motion to Dismiss filed in response to Plaintiff's frivolous Complaint is not late.  Nor does any *Eitel* factor weigh in Plaintiff's favor.  Plaintiff's Motion for Default Judgment should be denied.

DATED: August 8, 2022.                          Respectfully submitted,

                                                PATTERSON + SHERIDAN, LLP

                                                By: */s/ Joseph John Stevens*
                                                  Joseph John Stevens (CA Bar No. 242495)
                                                  jstevens@pattersonsheridan.com

                                                  50 W. San Fernando Street, Suite 250
                                                  San Jose, CA 95113
                                                  Tel: 650-384-4418
                                                  Fax: 650-330-2314

                                                  B. Todd Patterson (*pro hac vice* pending)
                                                  tpatterson@pattersonsheridan.com
                                                  John A. Yates (*pro hac vice*)
                                                  jyates@pattersonsheridan.com

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
Case No.: 4:22-CV-03283-HSG

Kyrie K. Cameron (*pro hac vice*)
kcameron@pattersonsheridan.com

24 Greenway Plaza, Suite 1600
Houston, Texas 77030
713-623-4844 | 713-623-4846

*Attorneys for Defendant*
*Qualcomm Incorporated*

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
Case No.: 4:22-CV-03283-HSG

SAppx95

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

**FILED**

AUG 15 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

CASE NO: <u>4:22-cv-03283-HSG</u>

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

August 13, 2022

## PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGEMENT

The Defendant is seeking a final judgement on its motion to dismiss. "It should be clear by now that Plaintiff will continue this unwarranted conduct against Qualcomm unless his meritless Complaint is dismissed with prejudice." *Golden v. Qualcomm:* Case 4:22-cv-03283-HSG Document 25 Filed 08/08/22 Page 18 of 19

# DISMISSED "WITHOUT PREJUDICE" – PLAINTIFF IS ALLOWED TO RE-FILE CHARGES, ALTER THE CLAIM, OR BRING THE CASE TO ANOTHER COURT

Dismissal "Without Prejudice": **"**When a court dismisses a claim but leaves the plaintiff free to bring a subsequent suit based on the same grounds as the dismissed claim. *In Semtek Intern. Inc. v. Lockheed Martin Corp.*, the Supreme Court pointed out that one of the main features of dismissal without prejudice is that it does not prevent refiling of the claim… "a case that is dismissed "without prejudice" is only dismissed temporarily. This temporary dismissal means that the plaintiff is allowed to re-file charges, alter the claim, or bring the case to another court."

The pleadings [Complaint] in this case, *Golden v. Qualcomm:* Case 4:22-cv-03283-HSG Document 1 Filed 06/06/22 Pages 4 & 5 of 37; Plaintiff included the following:

### Related Case Dismissed "Without Prejudice"—Antitrust Law Violations

15.    UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT No. 21-2160 *Larry Golden*, [] Plaintiff-Appellant, *v.* ... *Qualcomm Inc* ..., Defendant[s]–Appellee[s]. USCA4 Appeal: 21-2160 Doc: 7 Filed: 03/31/2022

16.    "PER CURIAM: Larry Golden appeals the district court's order accepting the recommendation of the magistrate judge and <u>dismissing without prejudice</u> Golden's civil complaint. We have reviewed the record and find no reversible error. Accordingly, we affirm the district court's order." *Golden v. Apple, Inc.*, No. 6:20-cv-02270-JD (D.S.C. Sept. 20, 2021) ...

### Related Case Dismissed "Without Prejudice"—Patent Infringement

17.    IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA GREENVILLE DIVISION *Larry Golden*, Plaintiff, vs. ... *Qualcomm Inc* ..., Defendant[s]. Case No.: 6:20-cv-04353-JD-KFM Date Filed 11/02/21 Entry No. 26.

18.    "Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein. IT IS, THEREFORE, ORDERED that Plaintiff's Complaint is <u>dismissed without prejudice</u> and without the issuance of service of process."

2

**Dismissal "Without Prejudice":**

19.    When a court dismisses a claim but leaves the plaintiff free to bring a subsequent suit based on the same grounds as the dismissed claim. *In Semtek Intern. Inc. v. Lockheed Martin Corp.*, the Supreme Court pointed out that one of the main features of dismissal without prejudice is that it does not prevent refiling of the claim… "a case that is dismissed "without prejudice" is only dismissed temporarily. This temporary dismissal means that the plaintiff is allowed to re-file charges, alter the claim, or bring the case to another court."

Plaintiff is re-filing this case of antitrust law violations against Qualcomm that include receiving royalties without a patent, a license, or authorization to do so; "tying" CPUs that allegedly infringes Plaintiff patent claims for CPUs to Qualcomm's chipsets and force selling the chipsets under Qualcomm's policy of "no license, no chip"; and, unjust enrichment.

Plaintiff is also re-filing this case because in a related case, *Larry Golden* v. *The United States* Case 1:13-cv-00307-EGB Document 176 Filed 05/30/19, Qualcomm fail to appear to protect its interest: "Certificate of Service on Qualcomm: Pursuant to Rule 14(b) and the Court's April 16, 2019 order (Dkt. 166), the United States ("the Government") files with the Clerk its return of service on Qualcomm Inc., indicating completion of the required of the Clerk's RCFC 14 Notice (see Dkt. 169) …"

When Qualcomm fail to appear in response to a notice under Rule 14(b), the Government decided not to present a defense on Qualcomm's behalf. Qualcomm never defend the alleged contributory patent infringement claims brought against Qualcomm. Also, Qualcomm's failure to appear, means Qualcomm "waived its right to present later argument in another Court", or "to offer evidence and advance legal arguments appropriate to protect its own interests".

Because patent infringement is a federal cause of action, federal courts have the jurisdiction to hear patent disputes [28 U.S. Code § 1338]. When a patent owner files a complaint for patent infringement in a federal district court under 35 U.S.C. 271 (a) – (c), subject matter jurisdiction automatically arises when pled.

Patent cases, are governed by their own venue rule: 28 U.S.C. § 1400(b). The Supreme Court, in *TC Heartland*, held that an accused infringer [Qualcomm] can be sued only in its state of incorporation, or where the Defendant has committed acts of infringement and has a regular and established place of business, *See TC Heartland LLC v. Kraft Foods Group Brands LLC*,

3

137 S.Ct. 1514 (2017). After *TC Heartland*, Qualcomm is no longer subject to suit in forums where they lack a regular and established "place of business."

## AFTER SIX YEARS THE DEPARTMENT OF JUSTICE (DOJ) DISCONTINUED DEFENDING QUALCOMM BECAUSE THE PRIME CONTRACTOR QUALCOMM FAIL TO APPEAR

Qualcomm was awarded a contract "BAA07-10," entitled "CELL-ALL Ubiquitous Biological and Chemical Sensing," in 2007. An "initiative to equip cell phones with hazardous-materials sensors in order to mitigate the risk of terrorist attacks".

"In 2007, S&T called upon the private sector to develop concepts of operations. To this end, three teams from *Qualcomm*, the National Aeronautics and Space Administration (NASA), and Rhevision Technology are perfecting their specific area of expertise. *Qualcomm* engineers specialize in miniaturization and know how to shepherd a product to market. Similarly, S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: *Qualcomm*, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes." *Cell-All: Super Smartphones Sniff Out Suspicious Substances*. Retrieved from: https://www.dhs.gov/science-and-technology/cell-all-super-smartphones-sniff-out-suspicious-substances

"[T]he third-party contractors that received the Government's authorization of or consent to private parties' infringement," *Sheridan v. United States*, 120 Fed. CL at 131, are Rhevision, Seacoast Science, NASA, Synkera, *Qualcomm*, Apple, Samsung, and LG. Qualcomm was given "authorization and consent" by the Government to development and assemble what Plaintiff has alleged is his patented communicating, monitoring, detecting and controlling (CMDC) device i.e., a new, useful, and improved cell phone—smartphone.

Plaintiff filed a cause of action, *Larry Golden v. The United States* Case 1:13-cv-00307-EGB, of alleged patent infringement against Rhevision, Seacoast Science, NASA, Synkera, *Qualcomm*, Apple, Samsung, and LG on May 1, 2013 in the U.S. Court of Federal Claims:

*28 U.S.C. § 1498(a)* provides a remedy against the Federal Government for the unlicensed "use or manufacture of an invention described in and covered by a patent of

the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government."

Plaintiff more specifically brought an action against the third-party government prime contractor of the *Cell-All* initiative, Qualcomm, for "tying" Plaintiff's patented CPUs to its wireless cellular modems to form its Snapdragon Series of Chipsets [2007]. A "tying," "tie-in," or "tied sale" arrangement has been defined as "an agreement by a party to sell one product . . . on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that [tied] product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992), See also, *Federal Trade Commission v. Qualcomm Incorporated,* Case 5:17-cv-00220-LHK "Qualcomm's anticompetitive conduct is conduct that 'harms the competitive process and thereby harms consumers.'" 6ER1208 (quoting *Microsoft*, 253 F.3d at 58) … "[A]pplying that standard, the district court agreed with the FTC that Qualcomm's practices were anticompetitive."

In the United States Court of Federal Claims No. 13-307C (Filed: February 26, 2021) *LARRY GOLDEN*, Plaintiff, v. *THE UNITED STATES*, Defendant.

"On October 21, 2013, the court granted defendant's motion for a more definite statement and directed plaintiff to file such, which he did a month later. Plaintiff's more definite statement became his operative, second amended complaint. It continued to assert infringement of the 990 patent by DHS and NASA and a host of third-party electronics manufacturers, such as LG, Apple, and *Qualcomm*, whom he alleged had "cooperative agreements" with DHS. Second Am. Compl. ¶ 30."

"Golden alleged infringement of the same '990 patent and elaborated his allegation that DHS indirectly infringed "the claims of Golden's [US RE43,990] patent" under 35 U.S.C. § 271(b) (2000), through solicitation number "BAA07-10," entitled "CELL-ALL Ubiquitous Biological and Chemical Sensing," which was released on October 2007. Third Am. Compl. ¶¶ 28 (ECF No. 29). Plaintiff claimed infringement by third parties: "Seacoast Science Inc., Center for Nanotechnology at NASA's Ames Research Center, and Rhevision Technology Inc., Samsung Electronics Co. Ltd, LG Electronics Inc., Apple Computer Inc., and *Qualcomm Inc*.," but asserted that all the third parties had entered into cooperative agreements from the Department of Homeland

Security for providing hardware, providing software, and providing wireless service. Id. ¶ 30."

In the United States Court of Federal Claims No. 13-307C (Filed: November 10, 2021; Dkt. 249) *LARRY GOLDEN*, Plaintiff, v. *THE UNITED STATES*, Defendant.

"He then quotes from the specifications of all five patents regarding the use of the CPU in his invention. Although not explicitly argued, we understand this to be an argument that the ability of the CPU in the accused devices to instruct the phones to perform functions, such as running a sensor, is sufficient to infringe on his device, given the central importance of the CPU to both his CMDC and the accused phones by LG, Apple, and Samsung. He also discusses documents from **Qualcomm**, a mobile phone chip producer, apparently submitted to DHS in response to the Cell-All solicitation. Lastly, plaintiff reiterates that Claim 1 of the '497 patent is infringed by the accused products' CPUs, chipsets, and biometric locking disablers (fingerprint reading)"

## The Department of Justice (DOJ) Quit on Defending Qualcomm because of Qualcomm's Failure to Appear.

In the United States Court of Federal Claims No. 13-307C (Filed: May 30, 2019; Dkt. 176), *LARRY GOLDEN*, Plaintiff, v. *THE UNITED STATES*, Defendant.

"Certificate of Service on **Qualcomm**: Pursuant to Rule 14(b) and the Court's April 16, 2019 order (Dkt. 166), the United States ("the Government") files with the Clerk its return of service on Qualcomm Inc., indicating completion of the required of the Clerk's RCFC 14 Notice (see Dkt. 169) ..."

"While a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed." *Intellectual Property Suits in the United States Court of Federal Claims*. Retrieved from: https://www.uscfc.uscourts.gov/node/2927

As the USCFC held in *Bowser, Inc. v. United States*: "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and

protect his interest after timely notice or summons had been served upon him."
420 F.2d 1057, 1060 (Ct. Cl. 1970)

When Qualcomm fail to appear in response to a notice under Rule 14(b), the Government decided not to present a defense on Qualcomm's behalf. Also, Qualcomm's failure to appear, means Qualcomm "waived its right to present later argument in another Court", or "to offer evidence and advance legal arguments appropriate to protect its own interests".

"[T]he Federal Circuit held in *In re UUSI, LLC*; 110 Fed. Cl. 604 (2013), "that a third party's [Qualcomm] potential obligation to indemnify the government for any patent infringement liability provides "sufficient interest in litigation to offer evidence and advance legal arguments appropriate to protect its own interests."

Qualcomm had six years "to offer evidence and advance legal arguments appropriate to protect its own interests." In other words, Qualcomm had six years to show that Plaintiff's patents and/or Plaintiff's patent claims are invalid, and that there's no infringement. Qualcomm made the decision not to appear and the Government made the decision not to continue defending Qualcomm against the allegations of contributory patent infringement.

This alone is enough to strike and dismiss Qualcomm's Motion to Dismiss, and to grant Plaintiff's motion for summary judgement.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to prolong summary judgement in this case; and, no genuine dispute as to who own the patent rights for the CMDC devices and CPUs designed specifically for Plaintiff's CMDC devices, Qualcomm is unjustly enriching itself with. Plaintiff is entitled to judgment as a matter of law.

## PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE DEFENDANT HAS NOT PRESENTED A MERITORIOUS DEFENSE

Qualcomm fail to defend against Plaintiff's claim that Qualcomm is collecting a 5% running royalty on the price of each handset (i.e., new and improved cell phone; smartphone) that Plaintiff alleges is his patented communicating, monitoring, detecting, and controlling (CMDC) device (i.e., new and improved cell phone; smartphone). Plaintiff alleged "Qualcomm engaged in 'anticompetitive conduct that reasonably appear[s] capable of making significant

7

contribution to . . . maintaining monopoly power'." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43."

Qualcomm fail to defend against Plaintiff's claim that Qualcomm does not have the patent(s), patent rights, license, or authorization to collect a 5% running royalty on the price of each handset (i.e., new and improved cell phone; smartphone). Plaintiff alleges he has the patent(s), and patent rights to collect a royalty on the price of each handset sold (i.e., new and improved cell phone; smartphone).

Qualcomm fail to defend against Plaintiff's claim that Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of each phone sold, i.e., handset; smartphone, etc. According to Judge Koh, *in FTC v. Qualcomm Inc.*, No. 17-CV-00220-LHK "Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition." The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices."

> "[t]he elements of unjust enrichment exist because: 1) Plaintiff provided something of value to the defendant Qualcomm; 2) Qualcomm acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Qualcomm to enjoy the benefit Plaintiff provided without compensating Plaintiff"

Qualcomm fail to defend against Plaintiff's claim that Qualcomm is being unjustly enriched for "tying" a CPU that Plaintiff alleges infringes his patented CPU—designed for use with Plaintiff's patented new and improved cell phones and smartphones—to its cellular modems and selling the component as a system-on-a-chip (SoC).

Qualcomm fail to defend against Plaintiff's contributory infringement claim that Qualcomm sells a Snapdragon CPU/Chipset/SoC that would be useful only if combined with Plaintiff's patented products of at least a new and improved cell phone, smartphone, handset, smartwatch, or stall, stop, vehicle slowdown system.

Qualcomm fail to defend against Plaintiff's claim that all of the alleged violations listed above was allegedly done by Qualcomm, with the goal of maintaining a monopoly.

> "… exploit existing public resources, in the form of people with smartphones …; as a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011) Hoffman, D., Program Manager at Qualcomm, (2011). Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28. (accessed 17.09.12).

Qualcomm fail to defend against Plaintiff's claim that Plaintiff suffered from antitrust injuries. Qualcomm fail to argue antitrust standing. Plaintiff has "shown he suffered an antitrust injury and that Plaintiff is the proper party to bring suit."

Pursuant to FRCP Rule 55: Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to prolong a default judgement in this case; and, no genuine dispute as to whether Qualcomm has presented a meritorious defense. Plaintiff is entitled to default judgment as a matter of law.

## Antitrust Injury

Qualcomm fail to defend against Plaintiff's claim that Qualcomm is collecting a 5% running royalty on the price of each handset (i.e., new and improved cell phone; smartphone) that Plaintiff alleges is his patented communicating, monitoring, detecting, and controlling (CMDC) device (i.e., new and improved cell phone; smartphone). Plaintiff alleged "Qualcomm engaged in 'anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power'." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43."

Plaintiff alleges he has suffered an antitrust injury because Plaintiff owns the patent(s), and patent rights to collect a royalty on the price of each handset sold (i.e., new and improved cell phone; smartphone).

In the opinion of the U. S. District Court for the District of Northern California; "Qualcomm leveraged its monopoly position in chips to secure unreasonably high rates for its SEPs. Qualcomm, for example, refused to provide must-have chips unless customers took the unreasonable IP licenses—the "no license, no chip" model.

Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to anticompetitive harm in modem chips. Here, Judge Koh, quoting the D.C. Circuit's decision in *United States v. Microsoft Corp.*, held it sufficient that Qualcomm engaged in "anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43."

Qualcomm's "no license, no chip" policy is designed to force sell CPUs Plaintiff believe infringes his patented CPUs, that's tied to Qualcomm's cellular modem. Qualcomm's "no

9

license, no chip" policy is only made possible by Qualcomm's unauthorized use of allegedly infringing CPUs of Plaintiff's patented CMDC devices (i.e., smartphones; handsets of OEM's).

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of each phone sold, i.e., handset; smartphone, etc. The elements of unjust enrichment exist because: 1) Plaintiff provided something of value to the defendant Qualcomm; 2) Qualcomm acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Qualcomm to enjoy the benefit Plaintiff provided without compensating Plaintiff.

The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices: "Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a *5% running royalty on the price of each handset sold*. These licenses are called Subscriber Unit License Agreements ("SULA") ..."

"Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio. Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition. The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold...

Qualcomm's anticompetitive practices has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC (handset) devices and Plaintiff's patented CPUs. The OEMs are already paying royalties to Qualcomm on every handset sold; and, the OEMs are already paying an increased royalty rate for Qualcomm's chipsets that include

Plaintiff's patented CPUs. This injury is of the type the antitrust laws were intended to prevent; which makes the defendant's conduct unlawful.

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of the phone, i.e., Plaintiff's CMDC device; handset; smartphone, etc. Plaintiff has the right to exclude Qualcomm from "using" Plaintiff's CMDC devices—handsets to unjustly enrich itself.

Plaintiff is entitled to stop Qualcomm's use of the Plaintiff's inventions to generate revenue (5% royalty on each handset sold) by seeking a legal injunction in Federal Court.

Qualcomm's anticompetitive practices has restrained Plaintiff from entering the market to collect royalties on his patented inventions. Plaintiff is entitled to collect damages from Qualcomm for any unlicensed use of his inventions. Damages are generally calculated based on lost profits Plaintiff suffered as a result of the antitrust injury.

The Federal Trade Commission and U. S. District Court for the District of Northern California has already determined Qualcomm's anticompetitive practices include collecting royalties on the price of each handset sold. This issue was not overturned by the Ninth Circuit and Qualcomm has not corrected the matter.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to retry the *FTC v. Qualcomm* case; and, no genuine dispute as to who own the patent rights for the handsets Qualcomm is unjustly enriching itself with. Plaintiff is entitled to judgment as a matter of law.

Plaintiff is willing to settle damages at 5% of the estimated total annual revenues Qualcomm has receive beginning in year 2010 and carried through 2026 [$439.31B]. To compensate Plaintiff for his antitrust injury, Plaintiff is asking the Court to award Plaintiff $20B; which is 4.6% of Qualcomm's total revenue for the years 2010-2026. Under the Clayton Act, if Qualcomm refuses or challenges this offer, Plaintiff is asking the Court to triple the amount for the antitrust injury.

**Qualcomm's Combined Forward Look and Actual Annual Revenues for years 2010–2026 (*Data retrieved from Macrotrends*)**

| | |
|---|---|
| **Total Revenue** | **$439.317B** |

## Contributory Infringement

Plaintiff's contributory infringement claim is demonstrated when Qualcomm sells a Snapdragon CPU/Chipset/SoC that would be useful only if combined with Plaintiff's patented products of at least a new and improved cell phone, smartphone, handset, or stall, stop, vehicle slowdown system (Advanced Driver Assistance System (ADAS)).

**Defendant Fabricates 'Notice Requirement' for Contributory Infringement:**
Amongst the many areas the Defendant is attempting to misguide this Court, the Defendant has only concocted the requirement of 35 U.S.C. § 271(c) to include putting a Defendant on notice. Defendant writes: "Plaintiff failed to plead a claim for direct infringement because the Complaint does not include facts sufficient to put Qualcomm on notice of the accused infringement" … "[a] complaint must "place the potential infringer…on notice of what activity … is being accused of infringement" … "Plaintiff fell fall short putting Qualcomm on notice of the accused infringement." 35 U.S.C. § 271(c) does not include a notice requirement:

> *"Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."*

35 U.S.C. § 271(c) only has a knowledge requirement and an intent requirement. Qualcomm must know of the patent(s) to be liable for its contributory infringement: "§ 271(c) requires knowledge of the existence of the patent that is infringed." *Global-Tech* (U.S. 05/31/2011) (calling this "§ 271(c)'s intent requirement."). § 271(c) does require a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing." *Aro Mfg. (Aro II)* (U.S. 06/08/1964); "In *Aro II*, a majority held that a violator of § 271(c) must know 'that the combination for which his component was especially designed was both patented and infringing, '377 U.S., at 488.

Therefore, Qualcomm's misguided and concocted theories of "fail to show direct infringement" and "fail to give notice requirement" is only introduced to prolong this case and to have Plaintiff defend a theory that is not founded in contributory infringement law.

Qualcomm commits contributory infringement when Qualcomm supply the Snapdragon CPU/Chipset/SoC as components of a patented invention, knowing that the components will be

used to infringe Plaintiff's patents. Qualcomm may be held liable for contributory patent infringement even though Qualcomm did not actually engage in infringing activities.

Qualcomm is directing this Court's attention to direct infringement only; not as a necessary predicate to proving contributory infringement, but to get the Court to dismiss Plaintiff's case for failure to give Qualcomm notice of the direct infringement [Qualcomm knew the Snapdragon CPU/Chipset/SoC will be used to infringe Plaintiff's patents or designed for infringing use. (35 U.S.C. § 271(c)]. For this reason, also, Defendant's Motion to Dismiss should be stricken from the record and dismissed.

Unlike direct infringement, the standard for contributory infringement imposes a knowledge requirement. The contributory infringer must have known that the component, material or apparatus was either: Used to infringe a patent or designed for infringing use. (35 U.S.C. § 271(c)).

Qualcomm has had nine (9) years to present a patent(s) that proves Qualcomm has patent rights to exclude others from making, using, selling, or offering for sale, a CMDC device of at least that of a handset, smartphone, or new and improved cell phone.

Qualcomm has had an equal amount of time to pull from the original engineering manufacturers (OEMs)—Apple, Samsung, & LG—collection of patents to produce at least one patent that gives Qualcomm the patent rights to exclude others from making, using, selling, or offering for sale, a CMDC device of at least that of a handset, smartphone, or new and improved cell phone.

Willful infringement requires that Plaintiff plead Qualcomm were "aware of the asserted patents but acted despite an objectively high likelihood that [their] actions constituted infringement of Plaintiff's valid patents." The complaint adequately alleges that Qualcomm committed acts of infringement with full knowledge of the Plaintiff's rights in its patents. That is sufficient.

Pursuant to FRCP Rule 56: Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to retry the *FTC v. Qualcomm* case; and, no genuine dispute as to whether Qualcomm's alleged contributory infringement is willful. Plaintiff is entitled to judgment as a matter of law.

Plaintiff is willing to settle damages at 5% of the estimated total annual revenues Qualcomm has receive beginning in year 2010 and carried through 2026 [$439.31B] (*Data retrieved from Macrotrends*). Plaintiff is asking the Court to award Plaintiff $20B, which is 4.6%

13

of Qualcomm's total revenue. If Qualcomm refuses or challenges this offer, Plaintiff is asking the Court to triple the amount for willful infringement.

## QUALCOMM HAS NO GENUINE DISPUTE AS TO SUBJECT MATTER JURISDICTION

Pleading patent infringement does not require a claim chart, says a court considering the requirements for pleading both direct and indirect [contributory] infringement under *FRCP 8* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). *Crypto Research, LLC v. Assa Abloy, Inc.*, No. 16 Civ. 1718 (AMD) (RER) (E.D.N.Y. Feb 17, 2017), "the mere sale of [Qualcomm's Snapdragon CPU/Chipset/SoC] is enough to plead Qualcomm's intent to induce its end-users' infringement."

In this case Plaintiff has submitted into record, seven of Plaintiff's patents that are issued with the *presumption of validity* to show Plaintiff owns the patent rights to the "smartphone".

> ***35 U.S.C. § 282(a). In General.*** *A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim.*

Issued patents are not *frivolous*. "A patent shall be presumed valid." 35 U.S.C. § 282. The courts have interpreted this statutory provision to mean that, in order for a challenger to prove that a patent is invalid for violating one of the provisions of the Patent Act, he must make such proof by the heightened standard of 'clear and convincing' evidence.

The rationale behind this statutory provision is that the PTO is a Federal agency that has already passed on the validity of the claims of issued patents. Patent examiners are presumed to be experts in the subject matter of reviewing patent applications and granting patents. Thus, for the initial Federal review by an expert to have any meaning, a challenger must present evidence that reaches a higher level than merely more likely than not.

The threshold requirement for a claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972).

When Qualcomm, sells or offers to sell a component or part [Qualcomm's Snapdragon CPU/Chipset/SoC] that's used exclusively for a patented item [Plaintiff's CMDC device—new

14

SAppx109

and improved cell phone, smartphone, etc.] or process; is likely contributorily liable. Qualcomm do not have to be involved in the sale, manufacture or use themselves to be liable.

Plaintiff's is only responsible for showing that the existence of direct infringement is with the new and improved cell phone or smartphone, not, with the central processing unit (CPU).

## RELIEF

Plaintiff is asking the Court to grant Plaintiff's Motion for Summary Judgement. Plaintiff has alleged Defendant's "failure to appear" and "default" was *willful* and that Defendant's pattern of not appearing or responding to summons, is not the first. Defendant fail to appear to protect in interest against the alleged patent infringement claims of Plaintiff, (*Golden v. USA*).

It is the belief of Plaintiff that setting aside the default judgement will prejudice Plaintiff. Plaintiff also believes the Defendant has not presented a meritorious defense. For these reasons, Plaintiff is entitled to default judgment and summary judgement as a matter of law.

Plaintiff is asking the Court to strike Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim, and Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order, # 3 Certificate/Proof of Service, # 4 Declaration, # 5 Declaration, # 6 Exhibit 1, # 7 Exhibit 2, # 8 Exhibit 3) Filed as (Dkt. 6) on 7/22/2022, because a default judgement nullifies the Motion to Dismiss.

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 13th day of August, 2022, a true and correct copy of the foregoing "Plaintiff's Reply in Support of Plaintiff's Motion for Summary Judgement", was served upon the following Defendant by priority "express" mail:

> Joseph John Stevens
>
> PATTERSON & SHERIDAN, LLP
>
> 50 West San Fernando Street, Suite 250
>
> San Jose, CA 95113
>
> Phone: (650) 384-4418
>
> Fax: (650) 330-2314
>
> Email: jstevens@pattersonsheridan.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

16

| 1 | Your Name: | Larry Golden |
| 2 | Address: | 740 Woodruff Rd 1102 G'ville SC 29 |
| 3 | Phone Number: | 864-288-5605 |
| 4 | Fax Number: | |
| 5 | E-mail Address: | atpg-tech@charter.net |
| 6 | Pro Se | |

**FILED**

AUG 30 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

Division *[check one]*: ☐ San Francisco ☑ Oakland ☐ San Jose ☐ Eureka

Larry Golden

          Plaintiff,

   vs.

Qualcomm, Inc.

          Defendant.

Case Number: 4:22-cv-03283-HSG

*[Check box for party submitting statement]:*

☑ **Plaintiff's**          ☐ **Defendant's**

**CASE MANAGEMENT STATEMENT**

DATE: 08/30/2022

TIME:

JUDGE: Hon. Haywood S. Gilliam, Jr.

*[See the Instructions for more detailed information about how to complete this template.]*

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. 1   OF 8   *[JDC TEMPLATE – Rev. 05/17]*

SAppx112

1

2

### 1. JURISDICTION

*Mark the option that applies to your case.*

3  This Court has subject matter jurisdiction in this case under:

4  ☑ Federal question jurisdiction because it is about federal laws or rights. *[List the laws*

5  *or rights involved]* Sherman Act, Clayton Act, Contributory Infringement, Unjust

6  Enrichment

7  ☑ Diversity jurisdiction because none of the Plaintiffs live in the same state as any of the

8  Defendants AND the amount of damages is more than $75,000.

9

### 2. SERVICE

*Complete the table to show when each defendant was served with the Complaint and whether*

10  *any defendant will argue that this Court is not the correct one to decide this case.*

11

| Defendant's Name | Date Served or Expected to Serve | Does Defendant dispute that the Court has personal jurisdiction? | | Does Defendant dispute that this is the correct venue? | |
|---|---|---|---|---|---|
| Qualcomm, Inc. | 06/28/2022 | ☑ Yes | ☐ No | ☐ Yes | ☑ No |
| | | ☐ Yes | ☐ No | ☐ Yes | ☐ No |

16  ☐ *Check box if there are more defendants, and provide the above information for each*

17  *defendant on an additional page at the end of this document.*

18

### 3. FACTS

*Give a short description of the important facts in this case including facts that you and*

19  *the other side disagree about. Add an additional page if needed.*

20  Qualcomm, Inc.

21  Improved cell phone. Plaintiff and Qualcomm began licensing conversations in 2010 &

22  2011. Qualcomm is illegally collecting royalties on Plaintiff's new improved cell phones

23  and central processing units. Qualcomm is contributing to the infringement of Plaintiff's

24  patents with the cell phone manufacturers. Qualcomm was given years and multiple

25  opportunities to challenge Plaintiff's patent validity and alleged infringe claims. They

26  decided not to appear to defend; and decided to file a response in this case out of time

27  Qualcomm's anticompetitive extortionist licensing practices ahve been litigated in FTC

28  v. Qualcomm and Apple v. Qualcomm.

## 4. LEGAL ISSUES

*Briefly explain the laws the Plaintiff says the Defendant violated.*

Qualcomm "extorts", through its anticompetitive licensing practices, at least 5% running royalty rate on each handset sold. The handset is referred to as a new improved cell phone/smartphone/ CMDC device. Qualcomm "ties" Plaintiff's central processing units (CPUs) to its modems to form SoCs or chipsets and forces its customers to purchase the chipsets by threatening "no license, no chip". Qualcomm, after receiving knowledge in 2010 of Plaintiff's CPUs and CMDC devices; "forcibly supplied" under its "no license, no chip" policy, the OEMs with the chipsets that includes Plaintiff's CPUs; thereby contributing [contributory infringement] to the OEMs infringement of Plaintiff's patented new and improved cell phoner, smartphone, or CMDC device.

## 5. MOTIONS

*Complete the table to list any motions that have been filed or might be filed.*

| Party filing motion | Type of Motion | Date of Ruling (or "pending" or "to be filed") |
|---|---|---|
| Plaintiff | Default (Dkt.15); Summary (Dkt.22) | pending |
| Plaintiff | Related (Dkt.30); Injunction (Dkt.34) | pending |

☐ *Check box if there are more motions and add a page at the end with additional information.*

## 6. AMENDING THE COMPLAINT, ANSWER, COUNTERCLAIM/CROSSCLAIM

*Mark one option to tell the Court whether you plan to change your claims or defenses.*

- The submitting party *[name]* Larry Golden

    ☑ does <u>not</u> plan to amend the Complaint.

    ☐ plans to amend the Complaint by *[date]* _____

☐ *Check box if you need to list more parties, and provide the above information for each party on an additional page at the end of this document.*

\\

\\

1

## 7. **EVIDENCE PRESERVATION**

2

*Parties to a lawsuit must make sure that they are protecting and not destroying evidence*
*that might be used in the case. Check the correct box or boxes.*

3

4

- The submitting party *[name]* Larry Golden _____ has

5

☐ reviewed the Guidelines for the Discovery of Electronically Stored Information

6

☑ spoken with the opposing parties about preserving evidence relevant to the issues

7

one could reasonably understand to be part of this case

8

☐ plans to do the above by *[date]* _____

9

☐ *Check if you need to list more parties, and provide the above information for each party on an*
*additional page at the end of this document.*

10

## 8. **INITIAL DISCLOSURES**

11

*Initial Disclosures are lists of information that the parties must send each other at the*
*beginning of a case. Check the box that applies, and provide the agreed date if needed.*

12

13

☐ Parties have sent each other Initial Disclosures.

14

☑ Parties have **not** yet sent each other Initial Disclosures, but agree to exchange

15

them by *[date]* no date agreed upon _____

16

## 9. **DISCOVERY**

17

*Give a short description of what you plan to investigate during discovery and if there are*
*any discovery issues.*

18

Total number of handsets Qualcomm has received royalties on based on the selling

19

price of the handset. Total number of handsets Qualcomm has contributed to adding a

20

CPU. Total dollar amount of settlements; fines and penalties Qualcomm has paid out

21

over the years for its anticompetitive extortionist licensing practices, both domestic and

22

abroad.

23

24

25

26

## 10. **CLASS ACTIONS**

27

Not applicable.

28

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. 4  OF  8    *[JDC TEMPLATE – Rev. 05/17]*

SAppx115

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 11. RELATED CASES

*Check the correct box to explain whether you are aware of any cases related to this one. If you check the second box, list the case number and the court, government agency, or other administrative body that will decide that case.*

The party submitting this statement

☐ is <u>not</u> aware of any related cases.

☑ is aware of related cases *[list cases]*: Northern District - Golden v Intel &
Golden v Apple. CAFC - Golden v USA

## 12. RELIEF SOUGHT

*State what the Plaintiff wants from the Defendant, or wants the Court to do, including any amount of money sought and how that amount was calculated. If a Defendant filed a counter or crossclaim, state the same information for the Defendant. Insert a page if needed.*

Plaintiff wants the Court to consider triple damages for violation of Antitrust Laws; to

consider triple damages for willful infringement; to stop Qualcomm from receiving any

royalties based on the price of each handset (new improved cell phone) sold; and, to

stop Qualcomm from making chipsets that include Plaintiff's CPU for handset & vehicles

Calculation: 2 billion worldwide users of 3G, 4G, and 5G handsets since 2010. Price

capped at $400 dollars for each handset equals $800 billion dollars. $800 billion dollars

at a 5% running royalty rate equals $40 billion dollars. Plaintiff will settle for 2% = $8

billion dollars.

## 13. SETTLEMENT AND ALTERNATIVE DISPUTE RESOLUTION ("ADR")

*Check at least one box in each section. If you need information to help you decide how to resolve the case, explain what that information is.*

The parties:

☑ have tried to settle the case.

☐ have not tried to settle the
case.

The submitting party agrees to the following form of ADR:

☑ Settlement conference with a magistrate judge

☑ Mediation

☑ Other  Jury

Information needed: _____

_____

_____

_____

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. <u>5</u>  OF <u>8</u>   *[JDC TEMPLATE – Rev. 05/17]*

**14. <u>CONSENT TO HAVE A MAGISRATE JUDGE HEAR THE CASE</u>**

*Mark one option to let the Court know if you consent to have a magistrate judge hear the case.*

- The submitting party *[name]* <u>Larry Golden</u>

  ☐ does consent to a magistrate judge.

  ☐ does <u>not</u> consent to a magistrate judge.

☐ *Check box if you need to list more parties, and provide the above information for each party on an additional page at the end of this document.*

**15. <u>OTHER REFERENCES</u>**

*In unusual cases, the judge may refer a case to another decision-maker. If this is one of those cases, cross out "Not Applicable," and write in who should hear this case.*

Not applicable.

**16. <u>NARROWING OF ISSUES, CLAIMS, OR DEFENSES</u>**

*Use this section to explain if issues in this case could be resolved by agreement or by written papers submitted by the parties ("motion"). Check the box that applies, and explain.*

☐ Not applicable.

☑ Issues that can be resolved by agreement: That nine years is enough time for any patent challenges, and any infringement challenges

☐ Issues that can be resolved by motion:_____

**17. <u>EXPEDITED TRIAL PROCEDURE</u>**

*If you have questions about the Court's Expedited Trial Procedure, contact the Legal Help Center.*

Not applicable.

**18.    <u>SCHEDULING</u>**

*The Court usually fixes the case deadlines. If you want to propose a schedule, you can do so below. Be sure you will be in town and able to meet any deadlines proposed.*

☑ Agree to have Court set deadlines.

☐ Proposed deadlines:

1
2

### 19.   **TRIAL**
*Check the box that applies and estimate how long the trial will last.*

3    ☑   This case will be tried by a jury.  The trial is expected to last ____ days.

4    ☐   This case will be tried by a judge.  The trial is expected to last ____ days.

5    ### 20. <u>DISCLOSURE OF NON-PARTY INTERESTED PERSONS OR ENTITIES</u>

6    *This Section tells the Court if anyone who is not named as a party in the case will be affected by
the outcome. Usually, if you are representing yourself, the answer is "None." If there is an
"interested party," cross out "None" and write in the names.*

7

8    None.

9    ### 21. <u>OTHER MATTERS</u>

10   *Use this section to discuss other issues that would assist with the just, speedy, and
inexpensive resolution of this case.*

11

12   12(b)(1) and 12(b)(6) motions to dismiss this case is a waste of tax payers dollars. This

13   case stems for the years of research and discovery made bt the Federal Trade

14   Commission (FTC v. Qualcomm) where the 5% running royalty rate for each handset

15   sold was never disputed by Qualcomm; and, the anticompetitive extortionist licensing

16   practices alleged by Apple (Apple v. Qualcomm) where Qualcomm settled the case.

17   The anticompetitive conduct of Qualcomm resulted in Qualcomm's unjust enrichment

18   Therefore, why would this case be "frivolous" only to an African-American inventor?

19

20   *NOTE: This document should not be longer than ten pages, including any pages you add at the
end. Each party submitting this statement must sign and date below.*

21

22   Date: 08/26/2022          Sign Name: *Larry Golden*

23                             Print Name: Larry Golden

24                                         *Pro se*

25
26
27
28

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. _7_ OF _8_   *[JDC TEMPLATE – Rev. 05/17]*
SAppx118

*Use this page if you need additional space for any Section. Be sure to write the Section number.*

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. 8   OF 8   *[JDC TEMPLATE – Rev. 05/17]*

SAppx119

Justice *&* Diversity
CENTER
OF THE BAR ASSOCIATION OF SAN FRANCISCO

1

## CERTIFICATE OF SERVICE OF DOCUMENT OTHER THAN COMPLAINT

2
*\* You must serve each document you file by sending or delivering to the opposing side. Complete this form, and include it with the document that you file and serve. \**

3   1.  **Case Name:** Larry Golden _____ v. Qualcomm, Inc. _____

4   2.  **Case Number:** 4:22-cv-03283-HSG _____

5   3.  **What documents were served?** Case Management Statement

6   4.  **How was the document served?** *[check one]*

7           ✔ Placed in U.S. Mail

8           ☐ Hand-delivered

9           ☐ Sent for delivery (e.g., FedEx, UPS)

10          ☐ Sent by fax (if the other party has agreed to accept service by fax)

11  5.  **Who did you send the document to?** *[Write the full name and contact information for each person you sent the document.]*

12

13  John A. Yates _____ _____

14  Patterson & Sheridan, LLP _____ _____

15  24 Greenway Plaza, Suite 1600 _____ _____

16  Houston, Texas 77046 _____ _____

17  6.  **When were the documents sent?** 08/27/2022 _____

18  7.  **Who served the documents?** *[Whoever puts it into the mail, faxes, delivers or sends for delivery should sign, and print their name and address. You can do this yourself.]*

19

20      I declare under penalty of perjury under the laws of the United States that the foregoing

21  is true and correct.

22      Signature: _Larry Golden_____

23      Name: Larry Golden _____

24      Address: 740 Woodruff Rd. #1102 _____

25               Greenville, SC 29607 _____

26

27

28

**CERTIFICATE OF SERVICE** *[JDC TEMPLATE Rev. 05/2017]*

PRESS FIRMLY TO SEAL

PRESS FIR[

# PRIORITY
## MAIL
# EXPRESS®

UNITED STATES
POSTAL SERVICE®

PRIORITY
MAIL
EXPRESS®

FLAT RATE
ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP



**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)   PHONE ( 864 ) 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**DELIVERY OPTIONS (Customer Use Only)**

☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)   PHONE (        )

U.S. DISTRICT COURT-NDC-OAKLAND
CASE No: 4:22-CV-03283-HSG
1301 CLAY STREET, SUITE 400S
OAKLAND, CA
94612

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

PEEL FROM THIS CORNER

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct No.      Federal Agency Acct. No. or Postal Service™ Acct No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code          Day          Scheduled Delivery Date (MM/DD/YY)     Postage
                     8K16 15       8-29-22                               $ 26.95

Date Accepted (MM/DD/YY)    Scheduled Delivery Time     Insurance Fee    COD Fee
8-27-22                     ☐ 12 Noon  ☐ 6:00 PM                         $        $

Time Accepted              10:13 ☐ AM ☐ PM     Military     Return Receipt Fee   Live A
                                                            $                     Transp

Weight                     Flat Rate            Sunday/Holiday Premium Fee   Total Postage & Fees
3 lbs 20 oz.               ☐                    $                           $ 26.95

Special Handling/Fragile   Acceptance Employee Initials
$                          SM

Delivery Attempt (MM/DD/YY)  Time   ☐ AM ☐ PM    Employee Signature

Delivery Date (MM/DD/YY)     Time   ☐ AM ☐ PM    Employee Signature

LABEL 11-B, JULY 2021      PSN 7690-02-000-9996

**DELIVERY (POSTAL SERVICE USE ONLY)**

1007

94612

EI 313 647 204 US




U.S. POSTAGE PAID
PME
GREENVILLE, SC
29615
AUG 27, 22
AMOUNT
**$26.95**
R2305K142754

EP13E May 2020





SAppx121

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND**

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net



**FILED**

JAN -6 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

---

CASE NO: <u>4:22-cv-03283-HSG</u>

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

January 06, 2023

**PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S UNTIMELY CASE MANAGEMENT STATEMENT**

The thrust of Plaintiff's motion is that the Court should strike Qualcomm's Case Management Statement. Qualcomm failed to comply with this Court's order to file its Case Management Statement on or before the August 30, 2022 deadline. The Defendant filed the Case Management Statement four (4) months after the scheduled due date of August 30, 2022:

"Notice is hereby given that a Telephonic Case Management Conference has been set for September 6, 2022, before Judge Haywood S. Gilliam, Jr., at 2:00 p.m., in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA. *Case Management Statement due by August 30th*."

*Golden v. Qualcomm*: Case 4:22-cv-03283-HSG Document 17 Filed 07/28/22

USDC Local Civil Rules 16-9: Case Management Statement and Proposed Order (a) Joint or Separate Case Management Statement. Unless otherwise ordered, no later than the date specified in Fed. R. Civ. P. 26(f), counsel must file a Joint Case Management Statement addressing all of the topics set forth in the Standing Order for All Judges of the Northern District of California []. If one or more of the parties is not represented by counsel, the parties may file separate case management statements.

Qualcomm failed to inform the Court and Qualcomm failed to seek leave to file the Case Management Statement out of time.

Qualcomm also failed to comply with the California Rules of Court (2022); Rule 3.725. Case Management Statement (a) Timing of statement: "No later than 15 calendar days before the date set for the case management conference or review, each party must file a case management statement and serve it on all other parties in the case."

Qualcomm filed its Case Management Statement on January 4, 2023. For Qualcomm to be in compliance with the California Rules of Court (2022); Rule 3.725. Case Management Statement (a) Timing of statement, Qualcomm should have filed the Case Management Statement on or prior to December 28, 2022 to meet the 15 calendar days' time limit.

Qualcomm also failed to comply with the California Rules of Court (2022); Rule 3.725. Case Management Statement (c) Contents of statement: Parties must use the mandatory Case Management Statement (form CM-110) **Exhibit A**, or another template allowed by the Court **Exhibit B**.

There's no excuse for the scandalous document the Defendant submitted as a Case Management Statement. It is obviously written to add confusion to this case.

# PLAINTIFF'S MOTION FOR PERMANENT INJUNCTIVE RELIEF

## Qualcomm's Alleged Antitrust Law Violations

Upon information retrieved from this Court: The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices:

"Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a *5%* running royalty on the price of each handset sold. These licenses are called Subscriber Unit License Agreements ("SULA") …"

"Specifically, Qualcomm charges a *5%* running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio… LG Electronics (LGE) paid Qualcomm a *5%* running royalty on handsets containing Qualcomm modem chips and a *5.75%* running royalty on handsets containing non-Qualcomm [] chips… "

"Qualcomm and LG signed … Subscriber Unit License … Steve Altman (Qualcomm President) sent to Irwin Jacobs (Qualcomm Co-Founder and former CEO): "They currently pay *5%* when they use our chip and *5.75%* when they don't. We have agreed to take their rate to *5%* regardless of whose chip they use."

Plaintiff believes Qualcomm's *5%* royalty rate on the price of each phone sold is a species of unfair competition. The Federal Trade Commission Act bans "unfair methods of

3

SAppx124

competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of *5%* on the price of each phone sold…

- [O]n May 3, 2012, Sony and Qualcomm entered into a Subscriber Unit Patent License Agreement, effective February 16, 2012 through September 30, 2012 ("May 2012 Sony Interim License"). ECF No. 1326 at 9. Under the May 2012 Sony Interim License, Sony agreed to provisionally pay Qualcomm a *5%* royalty on CDMA handsets."

- Under the [] SULA amendment, Samsung paid a *5%* running royalty rate on CDMA handsets containing Qualcomm chips, subject to a $20 royalty cap."

- BenQ and Qualcomm signed a new patent license agreement. JX0030. Under the license agreement, BenQ owed Qualcomm's standard *5%* running royalty rate, with the handset as royalty base. See JX0030-007 (defining the royalty base as "the Selling Price charged by LICENSEE for Subscriber Units Sold to such Purchaser."

- Apple does not manufacture handsets itself but instead uses contract manufacturers, including Pegatron and Wistron, to manufacture handsets. ECF No. 1326 at 4. These contract manufacturers pay Qualcomm a *5%* running royalty rate on the manufacturers' handset selling price.

4

Judge Koh determined, "Qualcomm's anticompetitive conduct is conduct that 'harms the competitive process and thereby harms consumers.'" 6ER1208 (quoting *Microsoft*, 253 F.3d at 58) … "[A]pplying that standard, the district court agreed with the FTC that Qualcomm's practices were anticompetitive."

The Judge's decision severely chastised Qualcomm for basing its royalty on the price of the device (e.g., a handset). Significantly, the Judge framed this criticism based on principles of ***competition law and patent law***, not contract law. Judge Lucy Koh of the US District Court of the Northern District of California in her decision in *Federal Trade Commission v Qualcomm Incorporated* (5:17-cv-0220); determined that charging royalties based on the price of a handset was unreasonable and contrary to US law.

If Qualcomm loses this case, Qualcomm will have to license its patent to competitors and renegotiate its licensing agreements with all its customers. No longer will Qualcomm be able to charge the *5%* royalty rate per the price of the phone.

On Appeal in the United States Court of Appeals for the Ninth Circuit, *Federal Trade Commission, Plaintiff-Appellee, v. Qualcomm Incorporated, Defendant-Appellant*. Case No. 19-16122, the Ninth Circuit never changed the entire patent system and said it was legal for Qualcomm to collect royalties on Plaintiff's patented products without obtaining a license.

Owning a patent gives Plaintiff valuable property rights. Under federal patent law, Plaintiff have the exclusive right to make, use or sell Plaintiff's patented invention(s) throughout the United States and its territories. Plaintiff also have the right to receive royalties from patent licensing agreements that give others permission to make, use or sell your invention.

Qualcomm does not have the right to collect a *5%* running royalty on the price Plaintiff's inventions are sold for. Plaintiff is entitled to permanent injunctive relief as a matter of law.

Upon information and belief, Plaintiff believes Qualcomm has formed or created its monopoly for chipsets by "tying" Plaintiff's CPUs to its wireless cellular modems. A "tying," "tie-in," or "tied sale" arrangement has been defined as "an agreement by a party to sell one product . . . on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that [tied] product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992).

Conditioning the ability of a licensee to license one or more items of intellectual property on the licensee's purchase of another item of intellectual property or a good or a service has been held in some cases to constitute illegal tying. See, e.g., *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 156-58 (1948) (copyrights); *Int'l Salt Co. v. United States*, 332 U.S. 392 (1947) (patent and related product), abrogated in part by *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

Qualcomm's anticompetitive practices of its cellular-modem patents harm competitors. Qualcomm's "hold out" strategy of "no license, no chip", was used to force the co-conspirators OEMs to purchase Plaintiff's patented CPU that Qualcomm "tied" to its modem. "Tying" under U.S. law is defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product."

Plaintiff also believes the OEMs were misled and misinformed into believing the CPUs tied to Qualcomm's chipsets [3] was not a patented product Qualcomm had received prior knowledge on. Plaintiff believes Qualcomm threaten the OEMs to purchase what was marketed as an unpatented product [CPU], tied to Qualcomm's patented product (wireless cellular modem), in a "no license, no chip[set]", policy contract.

Plaintiff is challenging the tying arrangement because: (1) Qualcomm has market power in the tying product, *Cf.* 35 U.S.C. § 271(d) (2012) (requiring market power in patent misuse cases involving tying). (2) the arrangement has an adverse effect on competition in the relevant market for the tying product or the tied product, and (3) efficiency justifications for the arrangement do not outweigh the anticompetitive effects.

Qualcomm, has a 90% share in the market for chipsets, and by withholding knowledge of "tying" a Plaintiff's patented CPU, coerced cellular telephone manufacturers (OEMs) to purchase only Qualcomm-manufactured chipsets. These actions are alleged to be part of Qualcomm's strategy to maintain a monopoly in the chipset market.

Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to anticompetitive harm in modem chips. Here, Judge Koh, quoting the D.C. Circuit's decision in *United States v. Microsoft Corp.*, held it sufficient that Qualcomm engaged in "anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43 (citations and internal quotation marks omitted)."

According to the Department of Justice, "A tying arrangement occurs when, through a contractual or technological requirement, a seller conditions the sale or lease of one product or service on the customer's agreement to take a second product or service … the Supreme Court stated in *International Salt Co. v. United States* that "it is unreasonable, per se, to foreclose competitors from any substantial market," and in *Standard Oil Co. v. United States* that "[t]ying agreements serve hardly any purpose beyond the suppression of competition … Classic "contractual" patent tying occurs when the tying product (such as a mimeograph machine) is

patented, the tied product is an unpatented commodity used as an input for the tying product (such as ink or paper), and the sale of the patented product is conditioned on the purchase of the unpatented product. A "technological tie" may be defined as one in which "the tying and tied products are bundled together physically or produced in such a way that they are compatible only with each other." The government's tying claim against Microsoft involved both the contractual and technological bundling of the Internet Explorer web browser (the tied product) with its Windows operating system (the tying product). https://www.justice.gov/atr/chapter-5-antitrust-issues-tying-and-bundling-intellectual-property-rights

American courts first encountered "tying arrangements" in the course of patent infringement litigation. *See, e.g., Heaton-Peninsular Button-Fastening Co. v. Eureka Specialty Co.*, 77 F. 288 (CA6 1896). Such a case came before the Supreme Court in *Henry v. A. B. Dick Co.*, 224 U. S. 1 (1912).

On Appeal in the United States Court of Appeals for the Ninth Circuit, *Federal Trade Commission, Plaintiff-Appellee, v. Qualcomm Incorporated, Defendant-Appellant*. Case No. 19-16122, the Ninth Circuit never changed the antitrust "anticompetitive" law that governs "tying" and "tying arrangements" and said it was legal for Qualcomm to "tie" Plaintiff's patented central processing units CPUs to it Snapdragon SoCs.

Owning a patent gives Plaintiff valuable property rights. Under federal patent law, Plaintiff have the exclusive right to make, use or sell Plaintiff's patented invention(s) throughout the United States and its territories. Plaintiff also have the right to receive royalties from patent licensing agreements that give others permission to make, use or sell your invention.

Qualcomm does not have the right to "tie" Plaintiff's patented central processing units CPUs to it Snapdragon SoCs. Plaintiff is entitled to permanent injunctive relief as a matter of law

**Qualcomm's Alleged Infringement of Plaintiff's Patents**

Plaintiff's patents give Plaintiff the exclusive right to make, ***use***, offer to sell, sell, or import, a specified invention in the United States, for a limited time. Upon inventing Plaintiff's now patented CPUs; CMDC devices; Stall, Stop, & Vehicle Slowdown Systems, Plaintiff has the right to exclude Qualcomm from "***using***" any of Plaintiff's patented handsets i.e., smartphones, to generate billions in annual revenues.

If Qualcomm ***uses*** Plaintiff's patented invention in the United States without authorization – called "infringement" – Plaintiff can enforce the patent(s) in court.  Plaintiff can obtain monetary compensation for the unauthorized ***use*** of Plaintiff's invention; or, a court order that prohibits Qualcomm from continuing to ***use*** the inventions.

Plaintiff is alleging Qualcomm willfully contributed to the infringement of Plaintiff's CPUs; CMDC devices; and Stall, Stop, & Vehicle Slowdown Systems.

Qualcomm and ASUS made a phone for Snapdragon Insiders. ASUS and Qualcomm have teamed up to make a smartphone. The "Smartphone for Snapdragon Insiders" harnesses Qualcomm's Snapdragon 888 5G chipset.  https://www.engadget.com/ qualcomm-asus-smartphone-snapdragon-insiders-150023369.html?guccounter...

Liability for contributory infringement of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States ... a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, ... shall be liable as a contributory infringer."

Plaintiff has alleged Qualcomm's Snapdragon SoCs is the apparatus Qualcomm uses in practicing the patented process; constituting a material part of Plaintiff's inventions; knowing the

Snapdragon SoCs to be especially made or especially adapted for use in an infringement of such patents.

The threshold requirement for a claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972). There must also be a showing that the alleged contributory infringer knew of the patent and that his or her actions would lead to infringement of the patent. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).

Qualcomm was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices.

Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes actions that contribute (or potentially contribute) to someone else infringing a patent, even if those actions do not directly infringe the patent. An example of contributory infringement include:

The supply of Component A (i.e., Qualcomm's Snapdragon chipset that includes Plaintiff's central processing unit (CPU), with instructions to connect it to an available Component B (i.e., Qualcomm/Asus smartphone that Plaintiff claims as his patented CMDC device; smartphone); where A+B (Plaintiff's patented CPU (Qualcomm's Snapdragon) + Plaintiff's CMDC device (Qualcomm/Asus smartphone is a patented product).

*See Ind. claims 4-6 of Plaintiff's '287 patent. See also Ind. claims 1 & 11, Dep. claims 2-10 & 12-20 of Plaintiff's '619 patent that covers Plaintiff's CPU. See Ind. claims 1-9 of Plaintiff's '189 patent; and, Ind. claims 13-23 of Plaintiff's '439 patent that covers Plaintiff's CMDC device.*

Qualcomm has yet to stop allegedly infringing Plaintiff's patents in every way they can. Attached as **Exhibit C** is an excerpt of an article that describes three versions of Qualcomm's Snapdragon processors (Snapdragon Vision SoC; Snapdragon ADAS SoC; and Snapdragon Accelerator), Qualcomm has designed for vehicles. Plaintiff's patent claims are included in the document, which outlines how Plaintiff's patented CPUs are being "used" by Qualcomm.

Qualcomm is also developing Snapdragon processors for the internet of things (IoTs) platform that encumbrances Plaintiff's patented CPUs; CMDC devices; and Stall, Stop, & Vehicle Slowdown Systems. **Exhibit D**

Plaintiff has alleged Qualcomm has willfully infringed Plaintiff's patented CPUs; CMDC devices; and Stall, Stop, & Vehicle Slowdown Systems. The alleged willful infringement begins in year 2010, when Plaintiff submitted to Qualcomm a proposed licensing agreement and cease and desist notice.

Plaintiff is entitled to permanent injunctive relief as a matter of law because Qualcomm has not shown any signs of stopping its infringing actions.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT

### Since Receiving Knowledge of Plaintiff's Intellectual Property Subject Matter, Qualcomm Has Had Plenty Opportunities to Challenge the Validity of Plaintiff's Patents

Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices.

In 2008, Qualcomm, Apple, Samsung, and LG were awarded contracts to perform work for the Government. The Government "authorized and consented" to Qualcomm infringing

11

SAppx132

Plaintiff's patents. Upon information, Qualcomm chose to protect itself against any patent infringement claims by performing work under a Government contract. With the knowledge of Plaintiff's Intellectual Property Subject Matter [patents], Qualcomm could have challenged my patents at the USPTO.

On November 4, 2010, Plaintiff emailed Kate Lane, Strategic IP, Qualcomm Incorporated (E-mail: clane@qualcomm.com); Direct: (858-658-2047)), to inform Ms. Lane of certain patented technology (i.e., CMDC—Smartphone—device; central processing unit (CPU); and, a Stall, Stop, and Vehicle Slowdown System for manned and unmanned electric, autonomous, and driverless vehicles).

Plaintiff asked if Qualcomm would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff). Subject: "Patented Technology for Qualcomm's Review (copy available upon request).

Plaintiff mailed out letters dated December 7, 2010 addressed to the attention of Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President Derek Aberle, (copies of the letters and return receipts are available upon request) informing the Executives of the Patent Owner's (Plaintiff) patented technology and asked if they would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff).

After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate".

On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate" (copy available upon request).

On October 11, 2011, the Patent Owner (Plaintiff) returned via e-mail, the answered Patent Information Request form to Ms. Lane. The Patent Owner (Plaintiff) made several attempts to contact Ms. Lane via e-mail and by phone after that, but never heard back from Ms. Lane.

In 2013, Qualcomm was named with Apple, Samsung and LG, as the third-party contractors in the Court of Federal Claims case *Larry Golden v. The United States*; Case No. 13-307C; filed 2013. At that very moment, under RCFC 24, Qualcomm was allowed to proactively intervene, permissively or by right, to defend against patent infringement claims, and to offer

## Qualcomm has had Twelve (12) Years to Challenge the Validity of Plaintiff's Patents in Any of the Following Ways:

**Pre-issuance Submissions:** A pre-issuance submission can be used to challenge a patent publication or patent application that has not been granted or issued a patent. If a patent has not been issued by the United States Patent and Trademark Office ("USPTO"), then you can challenge the patent application by submitting "prior art" to the USPTO before a patent issues. Prior art is evidence that an element of an invention was publicly known before a patent application was filed with the USPTO. After the prior art has been submitted, an examining patent attorney at the USPTO will determine if a patent should be issued in light of the newly submitted prior art.

**Post Grant Review:** A post grant review can be used to challenge an issued patent within nine months after the grant of a patent. A post grant review can be filed by any person who is not the patent owner and has not filed a civil action challenging the validity of a claim of the patent. A post grant review is filed with the Patent Trial and Appeal Board (the "PTAB"). The PTAB will review the patentability of one or more of a patent's claims. In reviewing the patentability during a post grant review, the PTAB will consider if a patent claims are valid in

light of 35 U.S.C. § 101 (patentable subject matter issues), 35 U.S.C. § 102 (novelty issues), 35 U.S.C. § 103 (obviousness issues) and 35 U.S.C. § 112 (adequate disclosure/definiteness issues).

**Inter Partes Review:** An inter partes review can be used to challenge an issued patent after nine months after the grant of a patent. The process begins by a third party filing a petition for inter partes review with the PTAB. The patent owner may file a preliminary response to the petition. In reviewing the patentability during an inter partes review, the PTAB will consider if the patent claims are valid in light of 35 U.S.C. § 102 (novelty issues) and 35 U.S.C. § 103 (obviousness issues).

In 2013, Qualcomm was named with Apple, Samsung and LG, as the third-party contractors in the Court of Federal Claims case *Larry Golden v. The United States*; Case No. 13-307C; filed 2013. In 2014, the DHS and DOJ, who was not persons authorized to petition the PTAB, petitioned for an *Inter Partes Review* (IPR) against Plaintiff. Qualcomm, who was considered a person authorized to petition the PTAB for review, and who was being represented by the DOJ, could have filed the petition to challenge Plaintiff's patent claims.

**Ex Parte Reexamination:** An ex parte reexamination can be used to challenge an issued patent during the term of a patent. If the patent has already been issued by the USPTO, then a third party can challenge the patent at the USPTO by filing a request for reexamination of the patent. An ex parte reexamination can be filed by any person. A request for reexamination requests that the patent office reexamine a patent in light of newly submitted prior art that was not considered during the prosecution of the patent, or in light of prior art that was considered, but now is to be considered in a new way. Ex parte reexaminations require documents that include legal arguments drafted according to very specific formats and administrative rules. It is

well advised to seek the help of a registered patent attorney for assistance in preparing and filing a request for reexamination with the USPTO.

**RCFC 14(b):** The Rules of the COFC ("RCFC") provide contractors at least two avenues for being heard at court. First, RCFC 14(b) allows parties to formally notify any interested third-party, such as an indemnitor, of the § 1498(a) complaint. A noticed party "may file an appropriate pleading setting forth the person's interest in the subject matter of the litigation." RCFC 14(c)(1)(a). Second, RCFC 24 allows interested parties to proactively intervene, permissively or by right.

In the COFC case *Larry Golden v. USA*; Case 1:13-cv-00307-EGB Document 169 Filed 04/22/19 Page 7 of 11; Qualcomm, Inc. was provided notice to appear to protect any interest Qualcomm may have in the case. Qualcomm failed to appear to protect its interest. Claiming an interest in this current case is an indication Qualcomm deliberately defaulted on its responsibility to appear and defend any interest Qualcomm may have had in the case. It is a waste of judicial resources to allow Qualcomm the opportunity to defend against Plaintiff's current claims of infringement and to challenge Plaintiff's patents; especially after the Federal Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267.

Under Rule 14(b) of the Rules of the United States Court of Federal Claims (RCFC), the court "may notify any person with the legal capacity to sue or to be sued who is alleged to have an interest in the subject matter of the suit." Further, a "person served with a notice issued . . . may file an appropriate pleading setting forth the person's interest in the subject matter of the litigation."

In resolving a petition for mandamus, the Federal Circuit held in *In re* UUSI, LLC, that a third party's potential obligation to indemnify the government for any patent infringement

15

liability provides "sufficient interest in litigation to offer evidence and advance legal arguments appropriate to protect its own interests. As the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him." 420 F.2d 1057, 1060 (Ct. Cl. 1970).

The DOJ is the Government Agency representing Qualcomm in the case of *Larry Golden v. USA*; Case 1:13-cv-00307-EGB; Filed 2013. The DOJ is also the Government Agency who spent nine (9) years of tax payer's dollars challenging Plaintiff's patents. Plaintiff submitted the same three (3) patent references; the same nineteen (19) publications; and the same Expert declaration used against Plaintiff in the Government's petition for Inter Partes Review, to the USPTO in an IDS for prosecution of Plaintiff's now issued '189 patent; '439 patent; '287 patent; and '619 patent. All patents were issued post the Inter Partes Review.

On June 9, 2011, the Supreme Court handed down a decision in *Microsoft Corp. v. i4i L.P* No. 10-290, 564 U.S. ___, slip op. at 2-3 (2011). that affirmatively ended any debate about the standard an opponent bears for proving a patent invalid. The 8-0 decision holds that the party asserting patent invalidity must always persuade the jury by the clear and convincing standard— the lower preponderance of the evidence standard never applies for patent invalidity, even if the asserted prior art was never before the PTO during examination.

The Court, and Justice Sotomayor in delivering the opinion, relied heavily on Congress' intent in drafting 35 U.S.C. § 282, which provides that "[a] patent shall be presumed valid" and "[t]he burden of establishing invalidity … rest[s] on the party asserting such invalidity." The Court understood Congress' intent in including "a patent shall be presumed valid" as codifying

the common-law presumption of a clear and convincing evidentiary standard for proving invalidity.

If Qualcomm failed to invalidate Plaintiff's patents on the lower standard of "preponderance of the evidence", why are we to believe Qualcomm is prepared to invalidate Plaintiff's patents on the higher standard of "clear and convincing evidence?"

Under Rule 56, Plaintiff is asking the Court to grant Plaintiff summary judgement on the validity of Plaintiff's patents. (Document 22; Filed 08/01/2022; Plaintiff's response and cross-motion for summary judgement).

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 6th day of January, 2023, a true and correct copy of the foregoing "Plaintiff's Motion to Strike Defendant's Untimely Case Management Statement", was served upon the following Defendant by priority "express" mail:

Joseph John Stevens

PATTERSON & SHERIDAN, LLP

50 West San Fernando Street, Suite 250

San Jose, CA 95113

Phone: (650) 384-4418

Fax: (650) 330-2314

Email: jstevens@pattersonsheridan.com


Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# Exhibit A

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:        FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
  STREET ADDRESS:
  MAILING ADDRESS:
  CITY AND ZIP CODE:
  BRANCH NAME:

  PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| *(Check one):* ☐ **UNLIMITED CASE** ☐ **LIMITED CASE**<br>(Amount demanded   (Amount demanded is $25,000<br>exceeds $25,000)   or less) | |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:
Date:                Time:            Dept.:          Div.:          Room:
Address of court *(if different from the address above)*:

☐ **Notice of Intent to Appear by Telephone, by** *(name)*:

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
  a. ☐ This statement is submitted by party *(name)*:
  b. ☐ This statement is submitted **jointly** by parties *(names)*:


2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
  a. The complaint was filed on *(date)*:
  b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
  a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
  b. ☐ The following parties named in the complaint or cross-complaint
    (1) ☐ have not been served *(specify names and explain why not)*:

    (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:

    (3) ☐ have had a default entered against them *(specify names)*:

  c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served)*:

4. **Description of case**
  a. Type of case in ☐ complaint ☐ cross-complaint *(Describe, including causes of action)*:

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court,
rules 3.720–3.730
www.courts.ca.gov

| | | CM-110 |
|---|---|---|
| PLAINTIFF/PETITIONER: | CASE NUMBER: | |
| DEFENDANT/RESPONDENT: | | |

4. b.   Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐   *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.   **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial.   *(If more than one party, provide the name of each party requesting a jury trial):*

6.   **Trial date**
a. ☐ The trial has been set for *(date):*
b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.   Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.   **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐ days *(specify number):*
b. ☐ hours (short causes) *(specify):*

8.   **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.   Attorney:
b.   Firm:
c.   Address:
d.   Telephone number:      f.   Fax number:
e.   E-mail address:      g.   Party represented:
☐   Additional representation is described in Attachment 8.

9.   **Preference**
☐   This case is entitled to preference *(specify code section):*

10.   **Alternative dispute resolution (ADR)**
a.   **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.
(1)   For parties represented by counsel: Counsel ☐ has ☐ has not   provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2)   For self-represented parties: Party ☐ has ☐ has not   reviewed the ADR information package identified in rule 3.221.

b.   **Referral to judicial arbitration or civil action mediation** (if available).
(1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

SAppx142

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. c. Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled <br> ☐ Mediation session scheduled for *(date)*: <br> ☐ Agreed to complete mediation by *(date)*: <br> ☐ Mediation completed on *(date)*: |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled <br> ☐ Settlement conference scheduled for *(date)*: <br> ☐ Agreed to complete settlement conference by *(date)*: <br> ☐ Settlement conference completed on *(date)*: |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled <br> ☐ Neutral evaluation scheduled for *(date)*: <br> ☐ Agreed to complete neutral evaluation by *(date)*: <br> ☐ Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled <br> ☐ Judicial arbitration scheduled for *(date)*: <br> ☐ Agreed to complete judicial arbitration by *(date)*: <br> ☐ Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled <br> ☐ Private arbitration scheduled for *(date)*: <br> ☐ Agreed to complete private arbitration by *(date)*: <br> ☐ Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled <br> ☐ ADR session scheduled for *(date)*: <br> ☐ Agreed to complete ADR session by *(date)*: <br> ☐ ADR completed on *(date)*: |

CM-110 [Rev. July 1, 2011]

**CASE MANAGEMENT STATEMENT**

Page 3 of 5

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**11. Insurance**

  a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:

  b. Reservation of rights: ☐ Yes ☐ No

  c. ☐ Coverage issues will significantly affect resolution of this case *(explain)*:


**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

  ☐ Bankruptcy ☐ Other *(specify)*:

Status:

**13. Related cases, consolidation, and coordination**

  a. ☐ There are companion, underlying, or related cases.

  (1) Name of case:

  (2) Name of court:

  (3) Case number:

  (4) Status:

  ☐ Additional cases are described in Attachment 13a.

  b. ☐ A motion to ☐ consolidate ☐ coordinate   will be filed by *(name party)*:

**14. Bifurcation**

  ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

**15. Other motions**

  ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

**16. Discovery**

  a. ☐ The party or parties have completed all discovery.

  b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|
|  |  |  |

  c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify)*:

<table>
<tr><td>PLAINTIFF/PETITIONER:</td><td>CASE NUMBER:</td></tr>
<tr><td>DEFENDANT/RESPONDENT:</td><td></td></tr>
</table>

**CM-110**

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20.** Total number of pages attached *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____          ▶ _____
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY)

_____          ▶ _____
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

**CASE MANAGEMENT STATEMENT**

# Exhibit B

1  | Your Name:      Larry Golden

2  | Address:        740 Woodruff Rd 1102 G'ville SC 29

3  | Phone Number:   864-288-5605

4  | Fax Number:

5  | E-mail Address: atpg-tech@charter.net

6  | Pro Se

**FILED**

AUG 30 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

7

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10  Division *[check one]*: ☐ San Francisco   ☑ Oakland   ☐ San Jose   ☐ Eureka

11

12  Case Number:  4:22-cv-03283-HSG

13  Larry Golden

14  Plaintiff,          *[Check box for party submitting statement]*:

15  vs.                  ☑ **Plaintiff's**        ☐ **Defendant's**

16  Qualcomm, Inc.        **CASE MANAGEMENT STATEMENT**

17  DATE:  08/30/2022

18  TIME:

19  JUDGE: Hon. Haywood S. Gilliam, Jr.

20

21  Defendant.

22

23

24

25

26

27

28  *[See the Instructions for more detailed information about how to complete this template.]*

CASE MANAGEMENT STATEMENT; CASE NO.:  4:22-cv-03283-HSG
PAGE NO. 1  OF  8    *[JDC TEMPLATE – Rev. 05/17]*

1. **JURISDICTION**

*Mark the option that applies to your case.*

This Court has subject matter jurisdiction in this case under:

☑ Federal question jurisdiction because it is about federal laws or rights. *[List the laws or rights involved]* Sherman Act, Clayton Act, Contributory Infringement, Unjust Enrichment

☑ Diversity jurisdiction because none of the Plaintiffs live in the same state as any of the Defendants AND the amount of damages is more than $75,000.

2. **SERVICE**

*Complete the table to show when each defendant was served with the Complaint and whether any defendant will argue that this Court is not the correct one to decide this case.*

| Defendant's Name | Date Served or Expected to Serve | Does Defendant dispute that the Court has personal jurisdiction? | | Does Defendant dispute that this is the correct venue? | |
|---|---|---|---|---|---|
| Qualcomm, Inc. | 06/28/2022 | ☑ Yes | ☐ No | ☐ Yes | ☑ No |
| | | ☐ Yes | ☐ No | ☐ Yes | ☐ No |

☐ *Check box if there are more defendants, and provide the above information for each defendant on an additional page at the end of this document.*

3. **FACTS**

*Give a short description of the important facts in this case including facts that you and the other side disagree about. Add an additional page if needed.*

Qualcomm, Inc.

Improved cell phone. Plaintiff and Qualcomm began licensing conversations in 2010 & 2011. Qualcomm is illegally collecting royalties on Plaintiff's new improved cell phones and central processing units. Qualcomm is contributing to the infringement of Plaintiff's patents with the cell phone manufacturers. Qualcomm was given years and multiple opportunities to challenge Plaintiff's patent validity and alleged infringe claims. They decided not to appear to defend; and decided to file a response in this case out of time Qualcomm's anticompetitive extortionist licensing practices ahve been litigated in FTC v. Qualcomm and Apple v. Qualcomm.

### 4. <u>LEGAL ISSUES</u>

*Briefly explain the laws the Plaintiff says the Defendant violated.*

Qualcomm "extorts", through its anticompetitive licensing practices, at least 5% running royalty rate on each handset sold. The handset is referred to as a new improved cell phone/smartphone/ CMDC device. Qualcomm "ties" Plaintiff's central processing units (CPUs) to its modems to form SoCs or chipsets and forces its customers to purchase the chipsets by threatening "no license, no chip". Qualcomm, after receiving knowledge in 2010 of Plaintiff's CPUs and CMDC devices; "forcibly supplied" under its "no license, no chip" policy, the OEMs with the chipsets that includes Plaintiff's CPUs; thereby contributing [contributory infringement] to the OEMs infringement of Plaintiff's patented new and improved cell phoner, smartphone, or CMDC device.

### 5. <u>MOTIONS</u>

*Complete the table to list any motions that have been filed or might be filed.*

| Party filing motion | Type of Motion | Date of Ruling (or "pending" or "to be filed") |
|---|---|---|
| Plaintiff | Default (Dkt.15); Summary (Dkt.22) | pending |
| Plaintiff | Related (Dkt.30); Injunction (Dkt.34) | pending |

☐ *Check box if there are more motions and add a page at the end with additional information.*

### 6. <u>AMENDING THE COMPLAINT, ANSWER, COUNTERCLAIM/CROSSCLAIM</u>

*Mark one option to tell the Court whether you plan to change your claims or defenses.*

- The submitting party *[name]* Larry Golden _____

  ☑ does <u>not</u> plan to amend the Complaint.

  ☐ plans to amend the Complaint by *[date]* _____

☐ *Check box if you need to list more parties, and provide the above information for each party on an additional page at the end of this document.*

\\

\\

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. <u>3</u> OF <u>8</u>   *[JDC TEMPLATE – Rev. 05/17]*

1

## 7. EVIDENCE PRESERVATION

*Parties to a lawsuit must make sure that they are protecting and not destroying evidence that might be used in the case. Check the correct box or boxes.*

- The submitting party *[name]* Larry Golden _____ has

  ☐ reviewed the Guidelines for the Discovery of Electronically Stored Information

  ☑ spoken with the opposing parties about preserving evidence relevant to the issues

     one could reasonably understand to be part of this case

  ☐ plans to do the above by *[date]* _____

☐ *Check if you need to list more parties, and provide the above information for each party on an additional page at the end of this document.*

## 8. INITIAL DISCLOSURES

*Initial Disclosures are lists of information that the parties must send each other at the beginning of a case. Check the box that applies, and provide the agreed date if needed.*

☐ Parties have sent each other Initial Disclosures.

☑ Parties have **not** yet sent each other Initial Disclosures, but agree to exchange them by *[date]* no date agreed upon _____

## 9. DISCOVERY

*Give a short description of what you plan to investigate during discovery and if there are any discovery issues.*

Total number of handsets Qualcomm has received royalties on based on the selling price of the handset. Total number of handsets Qualcomm has contributed to adding a CPU. Total dollar amount of settlements; fines and penalties Qualcomm has paid out over the years for its anticompetitive extortionist licensing practices, both domestic and abroad.

## 10. CLASS ACTIONS

Not applicable.

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. 4   OF 8   *[JDC TEMPLATE – Rev. 05/17]*

**11. RELATED CASES**

*Check the correct box to explain whether you are aware of any cases related to this one.*
*If you check the second box, list the case number and the court, government agency, or other*
*administrative body that will decide that case.*

The party submitting this statement

☐ is not aware of any related cases.

☑ is aware of related cases *[list cases]*: ___Northern District - Golden v Intel &___

___Golden v Apple. CAFC - Golden v USA___

**12. RELIEF SOUGHT**

*State what the Plaintiff wants from the Defendant, or wants the Court to do, including*
*any amount of money sought and how that amount was calculated. If a Defendant filed a counter*
*or crossclaim, state the same information for the Defendant. Insert a page if needed.*

Plaintiff wants the Court to consider triple damages for violation of Antitrust Laws; to

consider triple damages for willful infringement; to stop Qualcomm from receiving any

royalties based on the price of each handset (new improved cell phone) sold; and, to

stop Qualcomm from making chipsets that include Plaintiff's CPU for handset & vehicles

Calculation: 2 billion worldwide users of 3G, 4G, and 5G handsets since 2010. Price

capped at $400 dollars for each handset equals $800 billion dollars. $800 billion dollars

at a 5% running royalty rate equals $40 billion dollars. Plaintiff will settle for 2% = $8

billion dollars.

**13. SETTLEMENT AND ALTERNATIVE DISPUTE RESOLUTION ("ADR")**

*Check at least one box in each section. If you need information to help you decide how to*
*resolve the case, explain what that information is.*

The parties:

☑ have tried to settle the case.

☐ have not tried to settle the
case.

The submitting party agrees to the following form of
ADR:

☑ Settlement conference with a magistrate judge

☑ Mediation

☑ Other ___Jury___

Information needed: _____

_____

_____

_____

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. 5   OF 8   *[JDC TEMPLATE – Rev. 05/17]*

**14. <u>CONSENT TO HAVE A MAGISRATE JUDGE HEAR THE CASE</u>**

*Mark one option to let the Court know if you consent to have a magistrate judge hear the case.*

- The submitting party *[name]*   Larry Golden

☐ does consent to a magistrate judge.

☐ does <u>not</u> consent to a magistrate judge.

☐ *Check box if you need to list more parties, and provide the above information for each party on an additional page at the end of this document.*

**15. <u>OTHER REFERENCES</u>**

*In unusual cases, the judge may refer a case to another decision-maker. If this is one of those cases, cross out "Not Applicable," and write in who should hear this case.*

Not applicable.

**16. <u>NARROWING OF ISSUES, CLAIMS, OR DEFENSES</u>**

*Use this section to explain if issues in this case could be resolved by agreement or by written papers submitted by the parties ("motion"). Check the box that applies, and explain.*

☐ Not applicable.

☑ Issues that can be resolved by agreement:  That nine years is enough time for any patent challenges, and any infringement challenges

☐ Issues that can be resolved by motion: _____

**17. <u>EXPEDITED TRIAL PROCEDURE</u>**

*If you have questions about the Court's Expedited Trial Procedure, contact the Legal Help Center.*

Not applicable.

**18.    <u>SCHEDULING</u>**

*The Court usually fixes the case deadlines. If you want to propose a schedule, you can do so below. Be sure you will be in town and able to meet any deadlines proposed.*

☑ Agree to have Court set deadlines.

☐ Proposed deadlines:

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. 6   OF 8    *[JDC TEMPLATE – Rev. 05/17]*

1

2

### 19.   **TRIAL**
*Check the box that applies and estimate how long the trial will last.*

3    [✔]   This case will be tried by a jury.  The trial is expected to last _____ days.

4    [  ]   This case will be tried by a judge.  The trial is expected to last _____ days.

5    **20. DISCLOSURE OF NON-PARTY INTERESTED PERSONS OR ENTITIES**

6    *This Section tells the Court if anyone who is not named as a party in the case will be affected by*
*the outcome. Usually, if you are representing yourself, the answer is "None." If there is an*

7    *"interested party," cross out "None" and write in the names.*

8        None.

9    ### 21. **OTHER MATTERS**

10   *Use this section to discuss other issues that would assist with the just, speedy, and*
*inexpensive resolution of this case.*

11

12   12(b)(1) and 12(b)(6) motions to dismiss this case is a waste of tax payers dollars. This

13   case stems for the years of research and discovery made bt the Federal Trade

14   Commission (FTC v. Qualcomm) where the 5% running royalty rate for each handset

15   sold was never disputed by Qualcomm; and, the anticompetitive extortionist licensing

16   practices alleged by Apple (Apple v. Qualcomm) where Qualcomm settled the case.

17   The anticompetitive conduct of Qualcomm resulted in Qualcomm's unjust enrichment

18   Therefore, why would this case be "frivolous" only to an African-American inventor?

19

20   *NOTE: This document should not be longer than ten pages, including any pages you add at the*
*end. Each party submitting this statement must sign and date below.*

21

22   Date: 08/26/2022          Sign Name: *Larry Golden*

23                             Print Name: Larry Golden

24                                          *Pro se*

25

26

27

28

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. 7    OF  8    *[JDC TEMPLATE – Rev. 05/17]*

*Use this page if you need additional space for any Section. Be sure to write the Section number.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CASE MANAGEMENT STATEMENT; CASE NO.: 4:22-cv-03283-HSG
PAGE NO. 8    OF 8    *[JDC TEMPLATE – Rev. 05/17]*

Justice & Diversity
C E N T E R
OF THE BAR ASSOCIATION OF SAN FRANCISCO

## CERTIFICATE OF SERVICE OF DOCUMENT OTHER THAN COMPLAINT

*\* You must serve each document you file by sending or delivering to the opposing side. Complete
this form, and include it with the document that you file and serve. \**

1.  **Case Name:** Larry Golden _____ v. Qualcomm, Inc. _____

2.  **Case Number:** 4:22-cv-03283-HSG _____

3.  **What documents were served?** Case Management Statement

4.  **How was the document served?** *[check one]*

    ☑ Placed in U.S. Mail

    ☐ Hand-delivered

    ☐ Sent for delivery (e.g., FedEx, UPS)

    ☐ Sent by fax (if the other party has agreed to accept service by fax)

5.  **Who did you send the document to?** *[Write the full name and contact information for
    each person you sent the document.]*

    John A. Yates _____

    Patterson & Sheridan, LLP _____

    24 Greenway Plaza, Suite 1600 _____

    Houston, Texas 77046 _____

6.  **When were the documents sent?** 08/27/2022 _____

7.  **Who served the documents?** *[Whoever puts it into the mail, faxes, delivers or sends for
    delivery should sign, and print their name and address. You can do this yourself.]*

    I declare under penalty of perjury under the laws of the United States that the foregoing
    is true and correct.

    Signature: _____

    Name: Larry Golden

    Address: 740 Woodruff Rd. #1102

    Greenville, SC 29607

**CERTIFICATE OF SERVICE** *[JDC TEMPLATE Rev. 05/2017]*

PRESS FIRMLY TO SEAL

PRESS FIR

# PRIORITY MAIL EXPRESS®

## FLAT RATE ENVELOPE
### ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP



EP13F May 2020

⇦ PEEL FROM THIS CORNER

UNITED STATES
POSTAL SERVICE®

PRIORITY
MAIL
EXPRESS®

PAYMENT BY ACCOUNT (if applicable)

U.S. POSTAGE PAID
PME 2-DAY
GREENVILLE, SC
AUG 27, 22
AMOUNT
$26.95
R2305K142754

EI 393 697 284 US

**CUSTOMER USE ONLY**
FROM: (PLEASE PRINT)   PHONE ( 864 ) 283-5605

Larry Golden
740 Woodruff Rd.
#1102
Greenville, SC 29607

DELIVERY OPTIONS (Customer Use Only)
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)   PHONE ( )

U.S. District Court - NDC - Oakland
Case No: 4:22-cv-03283-HSG
1301 Clay Street, Suite 400S
Oakland, CA
94612

USPS TRACKING® #

| ORIGIN (POSTAL SERVICE USE ONLY) | |
|---|---|
| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) |
| 94615 | 8-29-22 |
| Date Accepted (MM/DD/YY) | Scheduled Delivery Time |
| 8-27-22 | ☐ 12:00 NOON ☐ 3:00 PM |
| Time Accepted | Insurance Fee |
| 8:31 PM | $ |
| | Return Receipt Fee |
| | $ |
| | Live Animal Transportation Fee |
| | $ |

| DELIVERY (POSTAL SERVICE USE ONLY) | | |
|---|---|---|
| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
| $ | $ 26.95 | $ |
| Weight | Acceptance Employee Initials | |
| 3 lb. 20 oz. | SM | |
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |

PSN 7690-02-000-9996

LABEL 11-B, MAY 2021

SApx156

# Exhibit C

# Qualcomm Expands Snapdragon Ride For All ADAS Levels

Jim McGregor Contributor / https://www.forbes.com/sites/tiriasresearch/2022/01/06/qualcomm-expands-snapdragon-ride-for-all-adas-levels/?sh=382157e026e0

"Qualcomm announced major enhancements to its product portfolio for ADAS and Autonomous Drive (AD) systems … Qualcomm is announcing a new generation of its Snapdragon ADAS SoC and an entirely new family of SoC's aimed just at automotive vision applications. Combined with the Snapdragon Accelerator, the three chips form a scalable platform to handle every automotive application, ranging from simple level-one ADAS applications through level 4 and 5 fully autonomous vehicles."



"The Vision SoC is **designed to handle _all_ the sensor processing** from a vehicle's sensor array both inside and outside the vehicle. Inside the vehicle, image sensors are used for driver and passenger monitoring. Outside the vehicle, a variety of sensors, including image sensors, radar, and lidar, are used as a vehicle's perception system …"



1

## Claims for Re-Issue Patent RE43,891
## [Advanced Driver-Assistance System (ADAS)]

44.      A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:

an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means;

a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor.

45.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a global positioning system (GPS) receiver adapted for communication with at least one satellite.

46.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a cellular communication device adapted for communication with at least one cell phone tower; further including, at least one satellite connection capable of communicating with the pre-programmed automated system; further including, at least one modem connection for short and long range radio frequency transmissions to and from the pre-programmed automated system.

47.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration.

48.      The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as

2

a pre-crash system for stopping or slowing a vehicle to prevent a crash.

49.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse.

50.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover.

51.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane.

52.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a remote vehicle slowdown system for stopping or slowing a vehicle by remote means.

53.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash.

54.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a door lock and unlocking system for stopping or slowing the vehicle and locking a terrorist, thief, or user trying to elude the law inside the vehicle.

55.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle for stopping or slowing a vehicle that is in operation with or without a user, driver or operator inside the vehicle.

56.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a chemical, biological, radiological, nuclear and explosives detection system for stopping or slowing a vehicle when a harmful, hazardous, or dangerous compound or agent is detected.

57.        The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, wherein a communication link is present of at least one of a WiFi connection, a Broadband connection, an Internet connection, a Cellular connection, a Radio Frequency (RF) connection, a Bluetooth connection, and a Satellite connection, capable of signal communication thereto and therefrom monitoring equipment and a central processing unit (CPU) or a transceiver on the vehicle.

## Claims for Patent Application 17/300,230 / Claims Allowed 12/20/2022

1.          A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of:

          processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

          processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);

          processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing unintended acceleration;

          processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing lane departure;

          processing instructions to stall, stop, or slow-down a vehicle when a collision or crash is detected;

          processing instructions to stall, stop, or slow-down a vehicle when the vehicle has been reported as stolen;

          processing instructions to stall, stop, or slow-down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter;

          processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;

          processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,

          Wherein, when the central processing unit (CPU) processes instructions to stall, stop, or slow-down a vehicle, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage.

2.          A vehicle, that comprises at least one onboard computer system, electronic system, fuel system, air system, braking system, ignition system, transmission system, or PowerDrive system, capable of:

          stalling, stopping, or slowing down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

          stalling, stopping, or slowing down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);

stalling, stopping, or slowing down a vehicle when the vehicle is experiencing unintended acceleration;

stalling, stopping, or slowing down a vehicle when the vehicle is experiencing lane departure; stalling, stopping, or slowing down a vehicle when a pedestrian, obstacle, collision or crash is detected;

stalling, stopping, or slowing down a vehicle when the vehicle has been reported as stolen;

stalling, stopping, or slowing down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter;

stalling, stopping, or slowing down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;

stalling, stopping, or slowing down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,

Wherein, the vehicle is stalled, stopped, or slowed down, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage.

## CONCLUSION

As demonstrated above, Qualcomm must be stopped. Qualcomm has not only used Plaintiff's patented CMDC devices [communication devices that are grouped together by common features and design similarities that include, but is not limited to, a new, improved upon, and useful, cell phone, tablet, laptop, desktop PC, or smartphone], Qualcomm has expanded its market by designing Snapdragon SoCs that "ties" Plaintiff's patented central processing units for controlling a vehicle's functional and operational systems.

The only way to stop Qualcomm from allegedly contributing to the infringement of Plaintiff's patented CMDC devices; to stop Qualcomm from allegedly "tying" Plaintiff's patented central processing units (CPUs) to its Snapdragon SoCs; and, the only way to stop Qualcomm from collecting royalties on the price of each of Plaintiff's patented handsets i.e., smartphones, is to grant Plaintiff's motion for permanent injunctive relief.

5

# Exhibit D

## Qualcomm's Internet of Things



## A guide to IoT CPUs Color-coded Document to Patent Claims

*This is a guest post by Alexandru Voica is a senior marketing manager for Imagination Technologies. You can follow him on Twitter @alexvoica. https://anysilicon.com/guide-iot-cpus/*

"The Internet of Things is a fast-growing industry built on the promise of ubiquitous connectivity that will enable billions of devices to talk to each other and to people. The estimates for the number of IoT devices to ship by 2020 … 200 billion projection provided by Intel.

For the purpose of this blog post, I will therefore refer to IoT to mean any new device that integrates a sensor, a *CPU* and connectivity;

[T]his includes everything from wearables, mobile or home entertainment devices to connected cars, smart farming, energy, healthcare and other M2M applications.

1

By bringing multiple communications standards such as Wi-Fi, Bluetooth or cellular onto the *SoC*, overall … costs … is significantly cut down leading to more affordable devices

Designing an *SoC* for wearables on the other hand is all about minimizing power consumption. Depending on the target market and use case, wearables can be configured as a standalone device or tethered to a smartphone…

Firstly, since a vast majority of IoT devices need some form of wireless connectivity, integrating the radio baseband on chip is becoming a standard practice. … This means reducing the range of wireless standards to a combination of Bluetooth, Wi-Fi … and adopting a *CPU* … configuration optimized for energy efficiency …

IoT promises to be a driving force that will create new business models … [s]calable solutions are designed to target every level of IoT device and system …  High-density compute nodes [that] feature a heterogeneous *CPU* architecture: A typical high-density compute node is defined by a more specialized architecture that integrates a manycore *CPU* alongside other hardware accelerators (e.g., GPUs, DSPs, FPGAs) used for compression, data filtering and other complex algorithms.

[A] particular feature of the manycore *CPU*: hardware multithreading [] allows the compute node *SoC* designer to scale much better in terms of performance by turning on individual threads inside each of the *CPUs* before powering on multiple cores. This heterogeneous *CPU* computing solution leads to significant gains in efficiency, both in terms of area and power."

## COLOR-CODED PATENT CLAIMS IDENTIFYING
## THE IOT CPU PLATFORM

**Claims 1, of Patent No. 10,984,619 [the '619 patent] claims a "communication device" that comprises a "central processing unit", capable of …**

1.  A communication device that is at least a personal computer (PC), a cellphone, **a smartphone,** a laptop, or a handheld scanner, **comprising at least a *CENTRAL PROCESSING UNIT (CPU)*,** capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

2

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a **chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;**

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a **Bluetooth,** a **Wi-Fi,** a satellite, a global positioning system (GPS), or a **cellular** transmission;

processing instructions to connect the communication device to the internet or **internet-of-things (IoTs) platform** to sync, to at least one of a building's computer or security system, a **vehicle's computer or security system,** a lock, a detection device, or another communication device; and,

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

2.   The communication device of claim 1, **comprising at least a *CENTRAL PROCESSING UNIT (CPU)*,** capable of processing operational instructions for at least a personal computer (PC), a cellphone, **a smartphone,** a laptop, or a handheld scanner.

3.   The communication device of claim 1, comprising at least a ***CENTRAL PROCESSING***

3

***UNIT (CPU)***, capable of receiving a signal to lock, unlock, or disable the lock of the communication device.

4.      The communication device of claim 1, comprising at least a ***CENTRAL PROCESSING UNIT (CPU)***, capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

5.      The communication device of claim 1, comprising at least a ***CENTRAL PROCESSING UNIT (CPU)***, capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6.      The communication device of claim 1, comprising at least a ***CENTRAL PROCESSING UNIT (CPU)***, capable of receiving a signal from at least **chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor**.

7.      The communication device of claim 1, comprising at least a ***CENTRAL PROCESSING UNIT (CPU)***, capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8.      The communication device of claim 1, comprising at least a ***CENTRAL PROCESSING UNIT (CPU)***, capable of receiving a signal through at least a **Bluetooth,** a **Wi-Fi,** a satellite, a **cellular,** or GPS connection.

9.      The communication device of claim 1, comprising at least a ***CENTRAL PROCESSING UNIT (CPU)***, capable of receiving a signal of the communication device connection to the internet or **internet-of-things (IoTs) platform** to sync at least a building's computer or security system, a **vehicle's computer or security system,** a lock, a detection device, or another communication device.

10.     The communication device of claim 1, comprising at least a ***CENTRAL PROCESSING UNIT (CPU)***, capable of receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

**Claims 11, of Patent No. 10,984,619 [the '619 patent] claims a "central processing unit" of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of … "processing instructions for operational and functional execution"**

11.     A ***CENTRAL PROCESSING UNIT (CPU)*** of at least a personal computer (PC), a cellphone, **a smartphone**, a laptop, or a handheld scanner, capable of:

        processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of **a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor**;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a **Bluetooth**, a **Wi-Fi**, a satellite, a global positioning system (GPS), or a **cellular** transmission;

processing instructions to connect the communication device to the internet or **internet-of-things (IoTs) platform** to sync, to at least one of a building's computer or security system, a **vehicle's computer or security system**, a lock, a detection device, or another communication device; and,

whereupon, the ***CENTRAL PROCESSING UNIT (CPU)*** of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

12.    The ***CENTRAL PROCESSING UNIT (CPU)*** of claim 11, capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, **a smartphone**, a laptop, or a handheld scanner.

5

13.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions to lock, unlock, or disable the lock of the communication device.

14.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

15.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

16.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions from at least **chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor**.

17.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

18.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions through at least a **Bluetooth,** a **Wi-Fi,** a satellite, a **cellular,** or GPS connection.

19.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions of the communication device connection to the internet or **internet-of-things (IoTs) platform** to sync at least a building's computer or security system, a **vehicle's computer or security system**, a lock, a detection device, or another communication device.

20.    The *CENTRAL PROCESSING UNIT (CPU)* of claim 11, capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.


# CONCLUSION

As demonstrated above, Qualcomm must be stopped. Qualcomm has not only used

Plaintiff's patented CMDC devices [communication devices that are grouped together by

common features and design similarities that include, but is not limited to, a new, improved

upon, and useful, cell phone, tablet, laptop, desktop PC, or smartphone], Qualcomm has

expanded its market by designing Snapdragon SoCs that "ties" Plaintiff's patented central

6

processing units for controlling an Internet-of-Things (IoTs) platform, that include, but is not limited to: integrated sensors, connected cars, Wi-Fi, Bluetooth or cellular, standalone device / smartphone, short-range wireless connectivity, and IoT **CPUs**,

The only way to stop Qualcomm from allegedly contributing to the infringement of Plaintiff's patented CMDC devices; to stop Qualcomm from allegedly "tying" Plaintiff's patented central processing units (CPUs) to its Snapdragon SoCs; and, the only way to stop Qualcomm from collecting royalties on the price of each of Plaintiff's patented handsets i.e., smartphones, is to grant Plaintiff's motion for permanent injunctive relief.

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

**F I L E D**

MAR 2 0 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

CASE NO: <u>4:22-cv-03283-HSG</u>

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a
Conspiracy) (Conspiracy) (Unreasonable
Restraint on Trade) (The Clayton Act)
(Unjust Enrichment) (Contributory
Infringement).**

March 17, 2023

## <u>PLAINTIFF'S MOTION FOR RECONSIDERATION</u>

Plaintiff is as this Court to reconsider its Order Granting Defendant's Motion to Dismiss,
Dkt. 49, filed 03/15/2023, and reinstating all of Plaintiff's pending motions.

A claim is frivolous when the claim lacks any arguable basis either in law or in fact
*Neitze v. Williams*, 490 U.S. 319, 325 (1989). Ridiculous, absurd, ludicrous, and nonsensical—
these are all words that can be used to describe a frivolous lawsuit. This Court agreed with the

Magistrate Judge of South Carolina in *Golden v. Google, LLC* to define "frivolousness" and

dismiss Plaintiff's Case, "[t]his case was also dismissed with prejudice as frivolous, with the

Magistrate Judge specifically noting that Plaintiff could not "circumvent prior rulings by this

court that *infringement allegations* against Apple/Qualcomm are frivolous." *Golden v. Google,*

*LLC*, 2021 WL 5890440 at *4 (D.S.C. Apr. 9, 2021).

It is my understanding that according to 35 U.S. Code § 271(a)(b)(c), the infringement

allegations Plaintiff alleged in this case has an arguable basis either in law or in fact.

(a) Except as otherwise provided in this title, *whoever* without authority makes, uses,
offers to sell, or sells any patented invention … infringes the patent.

(b) *Whoever* actively induces infringement of a patent shall be liable as an infringer.

(c) *Whoever* offers to sell or sells within the United States or imports into the United
States a component of a patented machine, manufacture, combination or composition, or
a material or apparatus for use in practicing a patented process, constituting a material
part of the invention, knowing the same to be especially made or especially adapted for
use in an infringement of such patent, and not a staple article or commodity of commerce
suitable for substantial noninfringing use, shall be liable as a contributory infringer.

My questions to the Court are: Did the Court dismiss Plaintiff's case because the

infringement allegations lack any arguable basis in law or in fact [see 35 U.S. Code §

271(a)(b)(c) above]; or, did the Court dismiss Plaintiff's claims because they are too fantastical,

too unbelievable, ridiculous, absurd, ludicrous, and nonsensical? Maybe this Court dismissed

Plaintiff's case for the same reasons the Magistrate Judge in the State of South Carolina, the one

who started the "frivolous" dismissals; dismissed Plaintiff's case because Plaintiff is only one-

third human and does not have the ability to invent;  Plaintiff is property and therefore cannot

own property; Plaintiff cannot bring an action in Court against Whites concerning property;

2

Plaintiff needs to know his place and then stay in his place; someone who looks like Plaintiff does not deserve a fair trial or trial by his peers.

According to 35 U.S. Code § 271(d), Plaintiff is well within his rights to bring an action against Qualcomm for infringement allegations with patents issued with the presumption of validity, and chats to show an element-by-element infringement.

> 35 U.S. Code § 271(d) "No patent owner otherwise entitled to relief for infringement; or, contributory infringement of a patent shall be denied relief or deemed guilty of misuse [] of the patent right by reason of his having done one or more of the following: (3) sought to enforce his patent rights against infringement or contributory infringement ..."

Proving patent infringement in court requires Plaintiff to prove two broad elements: ownership and validity of the patent(s), and infringement of the patent by the defendant(s). In this current case Plaintiff's patents-in-suit were issued with the presumption of validity, and just the patents *validity* alone provides an arguable basis either in law or in fact *Neitze v. Williams*, 490 U.S. 319, 325 (1989) that this case not be dismissed for frivolousness.

> 35 U.S. Code § 282(a) In General. "A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."

Qualcomm is broadcasting and falsely advertising to the World, they are the one responsible for the creation of the modern-day smartphone and the CPU designed specifically for the smartphone:

- "Enabling the rise of the smartphone: Chronicling the developmental history at Qualcomm: An engineer looks back at Qualcomm's essential role in groundbreaking

3

innovations, key technology developments, and bold integration decisions in creating today's smartphone. DEC 8, 2020 Snapdragon and Qualcomm branded products are products of Qualcomm Technologies, Inc. and/or its subsidiaries."
https://www.qualcomm.com/news/onq/2020/12/enabling-rise-smartphone-chronicling-developmental-history-qualcomm

- "Qualcomm is the San Diego region's largest publicly traded company and the county's largest telecommunications employer. A world leader in wireless technologies, Qualcomm is also a driver of local and global innovation. Qualcomm invented technologies at the heart of 3G and 4G wireless and the first smartphone, and Qualcomm continues to pioneer new technologies that range from 5G to artificial intelligence, the industrial internet of things (IoT) to artificial, and augmented reality."
https://www.sandiegobusiness.org/sites/default/files/EDC-QUALCOMM-STUDY-FINAL%20-WEB2.pdf

- "Qualcomm has grown to manufacture and market semiconductor components throughout the years. It also created semiconductor components and software for automobiles, watches, laptop computers, wireless networks, smartphones, and other devices" https://www.internetsearchinc.com/qualcomm-wireless-technology-innovators

- "Qualcomm has been one of the main suppliers of smartphone chipsets. These chipsets range from midrange to flagship chipsets with the best specs known at the time of their launch. While most Android phones use Qualcomm Snapdragon chipset, Qualcomm manufactures smartphones" https://www.internetsearchinc.com/qualcomm-wireless-technology-innovators

- "Qualcomm has been a technology innovator for many years, monetizing R&D on two fronts: marketing smartphones and other smart devices for sensors, and paying patent licensing" ... https://www.internetsearchinc.com/qualcomm-wireless-technology-innovators/

- "In December 2007, the Snapdragon QSD8250 was released. It included the first 1 GHz mobile phone CPU. Qualcomm's "Krait" microarchitecture was introduced in the second generation of Snapdragon SoCs in 2011, allowing each CPU core to alter its speed dependent on the needs of the device." https://www.internetsearchinc.com/qualcomm-wireless-technology-innovators/

4

- "Qualcomm Snapdragon is a line of system-on-a-chip (SoC) semiconductor components manufactured and marketed by Qualcomm Technologies Inc. for mobile smartphones. The ARM architecture is used by Snapdragon's central processing unit (CPU). A single SoC may include multiple CPU cores, an Adreno GPU, a Snapdragon wireless modem, a Hexagon digital signal processor (DSP), a Qualcomm Spectra image signal processor (ISP), and other software and hardware to support a smartphone's GPS, camera, video, audio, gesture recognition, and AI acceleration."
https://www.internetsearchinc.com/qualcomm-wireless-technology-innovators/

My question to the Court is: Why not order Qualcomm to produce to the Court, before dismissing Plaintiff's case, at least one of its 130,000 patents that antedates Plaintiff's patents for at least the smartphone and/or the CPU made for the smartphone? Qualcomm has had multiple opportunities over multiple years to present the patents, but fail to do so. As indicated above, Qualcomm is advertising they are the creator of the smartphone. Qualcomm is openly disclosing to the World they are charging 4% / 5% on the selling price of Plaintiff's claimed invention.

"Qualcomm 5G NR Royalty Terms Statement: "Qualcomm will continue to offer licenses for OEM branded mobile handsets that include both Qualcomm's cellular standard essential patents as well as those patents not essential to the standard, a total portfolio of over 130,000 patents and pending applications worldwide at royalty rates of 4% of the selling price for branded single-mode handsets [smartphones] and 5% of the selling price for branded multi-mode handsets [smartphones]." https://www.qualcomm.com/content/dam/qcomm-martech/dm-assets/documents/qualcomm-5g-nr-royalty-terms-statement.pdf

Possible grounds for Qualcomm to challenge the validity of a Plaintiff's patent may include:

1. The patented invention is not novel because of prior art;

2. The patented invention consists of obvious subject matter, based on prior art;

3. The patent claims are so unclear or ambiguous that they "fail to inform, with reasonable certainty," people with knowledge of the subject matter involved (*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014)); or

4. The patent holder omitted information or provided inaccurate information when applying to the USPTO.

This Court stated, "Plaintiff also fails to adequately plead contributory or induced infringement" ... "As for contributory infringement, Plaintiff fails to plead any of the elements of that [contributory] offense:"

(1) selling a device capable of infringing the patent, which is not suitable for substantial non-infringing use. The Court is quoted as saying, "[f]or example, Plaintiff fails to plead facts plausibly supporting a claim that the Snapdragon chipsets or Snapdragon ride platform do not have other noninfringing uses. See *Uniloc U.S.A., Inc. v. Logitech, Inc.*, No. 18-cv-01304, 2018 WL 6025597 (N.D. Cal. Nov. 17, 2018) (granting motion to dismiss where plaintiff "fail[ed] to provide factual underpinnings for its allegations that there are no substantial noninfringing uses of the accused devices")."

- The Snapdragon chipsets are not suitable for substantial non-infringing use because Plaintiff's patented CPUs are "tied" to Qualcomm's Snapdragon chipsets. The CPU or processor is one of the first components that we identify in a phone. The CPU of a phone, just like that of a computer, is responsible for processing general data on a day-to-day basis. If we want to open a program, the CPU is the one that requests the information from the storage and transfers it to the RAM memory. Something curious is that the CPU does not have a single specialized role, but its operation is present in practically all the tasks of the phone. In modern smartphones, most CPUs tend to

6

have 8 cores. An 8 core CPU can run 8 hardware threads simultaneously, or 16 if it has 2-way hyperthreading. The CPU is considered the "brains" of the smartphone. Hypothetically, Qualcomm's modems would receive operational and functional instructions from Plaintiff's patented CPUs.

(2) with knowledge that the infringing device was especially adapted for use in an infringement of such patent.

- Plaintiff reference Qualcomm's knowledge at ¶¶ 44-51, 55, 60, 69-70, & 90 of the Complaint.

- "On November 4, 2010, Plaintiff emailed Kate Lane, Strategic IP, Qualcomm Incorporated (E-mail: clane@qualcomm.com); Direct: (858-658-2047)), to inform Ms. Lane of certain patented technology (i.e., CMDC—Smartphone—device; central processing unit (CPU); and, a Stall, Stop, and Vehicle Slowdown System for manned and unmanned electric, autonomous, and driverless vehicles).

- Plaintiff asked if Qualcomm would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff). Subject: "Patented Technology for Qualcomm's Review (copy available upon request).

- Plaintiff mailed out letters dated December 7, 2010 addressed to the attention of Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President Derek Aberle, (copies of the letters and return receipts are available upon request) informing the Executives of the Patent Owner's (Plaintiff) patented technology and asked if they would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff).

7

- After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate".

- On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate" (copy available upon request).

- On October 11, 2011, the Patent Owner (Plaintiff) returned via e-mail, the answered Patent Information Request form to Ms. Lane. The Patent Owner (Plaintiff) made several attempts to contact Ms. Lane via e-mail and by phone after that, but never heard back from Ms. Lane.

(3) actual infringement by another.

- Element 3 is why Plaintiff submitted the Claim Chart on Samsung—to show actual infringement by another. The Samsung Claim Chart compares nine (9) of Samsung's allegedly infringing products as infringing at least independent claim 1 of Plaintiff's '497 patent; claim 10 of Plaintiff's '752 patent; claims 1-9 of Plaintiff's '189 patent; claims 13-23 of Plaintiff's '439 patent; and, claims 4-6 of Plaintiff's '287 patent. Twenty-five (25) independent patent claims asserted that covers Plaintiff's patented smartphone and CPU. Plaintiff also alleged infringement of independent claims 1 & 11, and dependent claims 2-10 & 12-20 Plaintiff's '619 patent. Samsung was selected because Plaintiff believes Samsung actually infringes Plaintiff's patents, and Samsung is Qualcomm's No. 1 customer.

Plaintiff diligently pled all the elements to support a claim of contributory infringement in Plaintiff's complaint. Which makes Plaintiff question the Court's motive. Plaintiff can accept it if the Court erred in missing one of the elements described in Plaintiff's complaint, but to miss all three. Please explain, how is that even possible?

**The Court writes**: "The Complaint alleges that "[u]pon information and belief, Plaintiff believes Qualcomm has formed or created its monopoly for chipsets by 'tying' Plaintiff's CPUs to its wireless cellular modems." Compl. ¶ 52. The theory appears to be that "Qualcomm's 'hold out' strategy of 'no license, no chip' was used to force the co-conspirator OEMs to purchase Plaintiff's patented CPU that Qualcomm 'tied' to its modem." Id. ¶ 54. The alleged harm appears to be that "Qualcomm's anticompetitive practices has [sic] restrained Plaintiff from entering the market to collect royalties on his patented inventions." Id. ¶ 83. Plaintiff relies heavily throughout the complaint on the district court's findings in *FTC. v. Qualcomm*, 411 F. Supp. 3d 658 (N.D. Cal. 2019), and attaches a copy of that decision to the complaint, without recognizing that the case was reversed and vacated by the Ninth Circuit. See id. ¶¶ 76-78; cf. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1001- 1002 (9th Cir. 2020)"

**Plaintiff stated**: at ¶ 54 of Plaintiff's complaint, "'Tying' under U.S. law is defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product."

**Qualcomm admits**: "Qualcomm itself has admitted that plaintiffs' claims differed from those at issue in the FTC's case including an explicit allegation regarding "tying". *See* Qualcomm Opening Br., *FTC v. Qualcomm Inc.*, Case No. 19-16122, ECF No. 80, at 41 (9th Cir.) (acknowledging that the FTC "never made" a "tying" claim). In remanding this case to the district court to decide the effect of *FTC v. Qualcomm* in the first instance, the panel agreed with

9

Plaintiffs that the merits of Plaintiffs' case were not at issue in the limited 23(f) appeal." U.S. District Court—NDC—San Francisco Division; In Re: Qualcomm Antitrust Litigation [Joint Case Management Statement] Case 3:17-md-02773-JSC Dkt. 881 Filed 04/14/22 Page 6 of 19.

The Ninth Circuit never weigh in, or give an opinion on whether or not it is okay, or even legal for someone to collect royalties on another's patented inventions without authorization or license to do so. Likewise, this Court has not weigh in on whether or not it is okay, or even legal for someone to collect royalties on another's patented inventions without authorization or license to do so.

It's very important we receive an answer to this question because it could reshape the entire patent industry or destroy it all together. If the answer is "yes", it takes away the need for anyone, anywhere to ever apply for and obtain a patent. Which also means the 130,000 patents Qualcomm currently hold will become worthless. If the answer is "no" it means Qualcomm needs to cease and desist collecting royalties on Plaintiff's patented CMDC devices i.e., handsets, cell phones, smartphones.

According to 35 U.S. Code § 271(a) … *whoever* without authority makes, uses, offers to sell, or sells any patented invention … infringes the patent; and according 35 U.S. Code § 271(c) … *Whoever* offers to sell or sells within the United States [] a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, … shall be liable as a contributory infringer.

> "If someone *uses* your invention without your permission, you are entitled to stop their *use* of the invention by seeking a legal injunction in Federal court. In addition, you are entitled to collect damages for any unlicensed *use* of your invention. Damages are generally calculated based on lost profits that you suffered as a result of the infringement,

or if you are not actually producing the product, to the unjust enrichment the infringer received through the unauthorized *use* of your patent. If the infringer *used* your technology knowingly and willfully, you may be entitled to receive up to three times the actual damages suffered" *Carr & Ferrell LLP, one of Silicon Valley's foremost technology law firms, and specializes in patent and intellectual property law matters,* https://www.carrferrell.com/what-if-someone-uses-my-patented-invention-without-my-permission

**Antitrust Injury**

Qualcomm fail to defend against Plaintiff's claim that Qualcomm is collecting a 5% running royalty on the price of each handset (i.e., new and improved cell phone; smartphone) that Plaintiff alleges is his patented communicating, monitoring, detecting, and controlling (CMDC) device (i.e., new and improved cell phone; smartphone). Plaintiff alleged "Qualcomm engaged in 'anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power'." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43."

Plaintiff alleges he has suffered an antitrust injury because Plaintiff owns the patent(s), and patent rights to collect a royalty on the price of each handset sold (i.e., new and improved cell phone; smartphone).

In the opinion of the U. S. District Court for the District of Northern California; "Qualcomm leveraged its monopoly position in chips to secure unreasonably high rates for its SEPs. Qualcomm, for example, refused to provide must-have chips unless customers took the unreasonable IP licenses—the "no license, no chip" model.

Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to anticompetitive harm in modem chips. Here, Judge Koh, quoting the D.C. Circuit's decision

11

in *United States v. Microsoft Corp.*, held it sufficient that Qualcomm engaged in "anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43."

Qualcomm's "no license, no chip" policy is designed to force sell CPUs Plaintiff believe infringes his patented CPUs, that's tied to Qualcomm's cellular modem. Qualcomm's "no license, no chip" policy is only made possible by Qualcomm's unauthorized use of allegedly infringing CPUs of Plaintiff's patented CMDC devices (i.e., smartphones; handsets of OEM's).

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of each phone sold, i.e., handset; smartphone, etc. The elements of unjust enrichment exist because: 1) Plaintiff provided something of value to the defendant Qualcomm; 2) Qualcomm acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Qualcomm to enjoy the benefit Plaintiff provided without compensating Plaintiff.

The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices: "Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a *5% running royalty on the price of each handset sold*. These licenses are called Subscriber Unit License Agreements ("SULA") ..."

"Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio. Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition. The Federal Trade Commission Act bans "unfair

methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold...

Qualcomm's anticompetitive practices has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC (handset) devices and Plaintiff's patented CPUs. The OEMs are already paying royalties to Qualcomm on every handset sold; and, the OEMs are already paying an increased royalty rate for Qualcomm's chipsets that include Plaintiff's patented CPUs. This injury is of the type the antitrust laws were intended to prevent; which makes the defendant's conduct unlawful.

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of the phone, i.e., Plaintiff's CMDC device; handset; smartphone, etc. Plaintiff has the right to exclude Qualcomm from "using" Plaintiff's CMDC devices—handsets to unjustly enrich itself.

Plaintiff is entitled to stop Qualcomm's use of the Plaintiff's inventions to generate revenue (5% royalty on each handset sold) by seeking a legal injunction in Federal Court.

Qualcomm's anticompetitive practices has restrained Plaintiff from entering the market to collect royalties on his patented inventions. Plaintiff is entitled to collect damages from Qualcomm for any unlicensed use of his inventions. Damages are generally calculated based on lost profits Plaintiff suffered as a result of the antitrust injury.

If nothing else happens as a result of Plaintiff's motion for reconsideration, please answer the following: Is it legal for Qualcomm to tie Plaintiff's patented CPUs to its chipsets without authorization or license to do so? Is it legal for Qualcomm to collect a royalty off of Plaintiff's patented CMDC devices i.e., handsets, cell phones, smartphones without authorization or license to do so? Is it legal for Qualcomm to collect a royalty off of Plaintiff's patented Central Processing Units (CPUs) without authorization or license to do so?

Ever since the late 1940s, when the Supreme Court stated in *International Salt Co. v. United States* that "it is unreasonable, per se, to foreclose competitors from any substantial market," and in *Standard Oil Co. v. United States* that "[t]ying agreements serve hardly any purpose beyond the suppression of competition," U.S. courts have found tying to be *per se* unlawful.

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net



S1000100006

PS.COM/PICKUP

chule free Package Pickup,
can the QR code.

EP13F May 2020
OD: 12 1/2 x 9 1/2

# PRIORITY
# MAIL
# EXPRESS®

T RATE
ELOPE

E ● ANY WEIGHT



← PEEL FROM THIS CORNER

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments.
Misuses may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; May 2020; All rights reserved.

FIRMLY TO SEAL



**UNITED STATES POSTAL SERVICE ®**

CUSTOMER USE ONLY
FROM: (PLEASE PRINT)

PHONE ( 864 ) 288-5605

Larry Golden
740 Woodruff Rd.
#1102
Greenville, SC 29607

TO: (PLEASE PRINT)      PHONE ( 510 ) 637-3530

U.S. District Court-NDC-Oakland
Case No: 4:22-CV-03283
1301 Clay Street
Oakland, CA

ZIP + 4® (U.S. ADDRESSES ONLY)

9 4 6 1 2 -

**PRIORITY MAIL EXPRESS®**

ORIGIN (POSTAL SERVICE USE ONLY)

PO ZIP Code
2 9 6 0 6

Date Accepted (MM/DD/YY)
03.17.23

Time Accepted
2PM □ AM ☑ PM

Scheduled Delivery Date (MM/DD/YY)
03/8/23

Postage
$ 28.75

Scheduled Delivery Time
□ 10:30 AM ☑ 6:00 PM

Return Receipt Fee

Insurance Fee
$

10:30 AM Delivery Fee
$

COD Fee
$

Time

Total Postage & Fees
$ 28.75

Live Animal Transportation Fee
$

Weight
□ Flat Rate

Acceptance Employee Initials

Delivery Attempt (MM/DD/YY)  Time  □ AM □ PM
Employee Signature

Delivery Attempt (MM/DD/YY)  Time  □ AM □ PM
Employee Signature

**DELIVERY OPTIONS (Customer Use Only)**
☑ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1)
Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4)
Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's
mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options
□ No Saturday Delivery (delivered next business day)
□ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

LABEL 11-B, MAY 2020   PSN 7690-02-000-9996

PAYMENT BY ACCOUNT (if applicable)
USPS® Corporate Acct. No.        Federal Agency Acct. No. or Postal Service™ Acct. No.

94612

EI 436 403 824 US

US POSTAGE PAID
GREENVILLE, SC
29606
MAR 17 23
AMOUNT
$28.75
R2303S102300-09

RDC 07



**UNITED STATES POSTAL SERVICE®**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net



FILED

MAR 29 2023

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

M/C

---

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

---

CASE NO: <u>4:22-cv-03283-HSG</u>

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

March 27, 2023

---

## <u>PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION</u>

Plaintiff is asking this Court to reconsider its Order Granting Defendant's Motion to Dismiss, Dkt. 49, filed 03/15/2023, and reinstating all of Plaintiff's pending motions.

A claim is frivolous when the claim lacks any arguable basis either in law or in fact *Neitze v. Williams*, 490 U.S. 319, 325 (1989). Ridiculous, absurd, ludicrous, and nonsensical— these are all words that can be used to describe a frivolous lawsuit.

A complaint may not be dismissed under Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In reviewing a Rule 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 117 (1994). The review of such a motion is limited, and "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)).

Recovery may appear remote and unlikely on the face of the pleading, but that is not the test for dismissal. *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995) (citing *Scheuer*, supra, 416 U.S. at 236).

All Plaintiff's cases concern motions to dismiss. Such motions do not resolve whether Plaintiff will ultimately prevail, but simply whether the complaint was sufficient to cross the Court's pleading threshold. In *Intel Corp. v. Future Link Sys., LLC*, the District of Delaware considered a policy of non-review of patents in the context of a motion for summary judgment … the Court denied Intel's motion. In so doing, however, the Court noted that "[i]t may be difficult to see how a reasonable factfinder would view" Intel's conduct—including an alleged "corporate atmosphere encouraging employees to 'turn a blind eye' to patents"—to be "egregious . . . wanton, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Intel Corp. v. Future Link Sys., LLC*, 268 F.Supp.3d 605, 608–09 (2017). Qualcomm has "turn[ed] a blind eye to [plaintiff's] patents".

2

Every time, and in every court, the Judge improperly dismisses Plaintiff's patents as "frivolous", the Judge improperly expands the scope of the Defendants' patents—used to restrain trade beyond enforcing the exclusive rights that a lawfully obtained patent provides and expands the scope of the patent beyond its boundaries. Plaintiff refers to the dismissals as a dismissal to his patents, instead of cases, because the patents are at the core of all Plaintiff's pleadings.

Proving patent infringement in court requires Plaintiff to prove two broad elements: ownership and validity of the patent(s), and infringement of the patent by the defendant(s). Proving anti-competitive practices, "tying", and unjust enrichment in court requires Plaintiff to prove two broad elements: ownership and validity of the patented inventions, and the "use" or "misuse" of the patented inventions by the defendant(s).

The Trial Court erred in dismissing this current case for "frivolousness" because valid patents have a place in law and in fact. 35 U.S. Code § 282(a) states In General. "A patent shall be presumed valid. Each claim of a patent (… independent, dependent, or multiple dependent …) shall be presumed valid independently of the validity of other claims". In the District Courts, invalidity must be proven on the heightened standard of "clear and convincing evidence".

Each time a Judge prematurely dismisses Plaintiff's patents; without reviewing the Defendant's invalidity contentions; and without a Marksman Hearing/claim construction, the Judge involves himself/herself in a conspiracy against rights: 18 U.S.C. § 241: "Section 241 makes it unlawful for two or more persons to agree to injure, threaten, or intimidate a person in the United States in the free exercise or enjoyment of any right or privilege secured by the Constitution or laws of the Unites States or because of his or her having exercised such a right." Unlike most conspiracy statutes, §241 does not require, as an element, the commission of an overt act. *Department of Justice* https://www.justice.gov/crt/statutes-enforced-criminal-section#:

3

The Northern District of California Judges has improperly dismissed Plaintiff's [patents] cases against Apple, Intel, and Qualcomm as "frivolous", while overlooking and allowing for the Defendants' "misuse" of their patents. Apple's "misuse" involves the use of its first *design* patent (2007) as the first *utility* patent for the smartphone. Intel continues to claim the right to exclude others and collects royalties on old, outdated, and expired patents. Qualcomm forces its customers to pay royalties on unpatented products, or products that are patented by the Plaintiff.

The one time the Federal Circuit in *Larry Golden V. Google LLC*; CAFC Case No. 22-1267 issued a decision that Plaintiff's complaint and claim charts are not "facially frivolous" because "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,096,189" … "Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart" [vacated and remanded]; the Northern District of California Judges in Apple, Intel, and Qualcomm blatantly disrespected the opinion of the Federal Circuit that Plaintiff's [patents] are not "facially frivolous", and reverted back to improperly dismissing Plaintiff's patents as "frivolous"; meaning the patents "lacks any arguable basis either in law or in fact" *Neitze v. Williams*, 490 U.S. 319, 325 (1989).

Question: Are the Judges willfully depriving Plaintiff of his rights and privileges that are protected by the Constitution and laws of the United States? [1]

---

[1] TITLE 18, U.S.C., SECTION 242 Section 242 of Title 18 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States. For the purpose of Section 242, acts under "color of law" include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties. Persons acting under color of law within the meaning of this statute include police officers, prisons guards and other law enforcement officials, **as well as judges**… *Department of Justice*

4

The Trial Court erred in dismissing Plaintiff's *Golden v. Intel Corporation* Case No. 5:22-cv-03828-NC as having already been decided in *Golden v. US* Case No. 13-307C. *Golden v. US* was a case against the United States Government—for infringement allegations against the DHS.

## Patent Misuse Reform Act of 1988

In 1988, Congress enacted legislation that narrowed the scope of the patent misuse by creating safe harbors for patent holders in 35 U.S.C. § 271(d). It clarified that patentees did not misuse their patents by suing people creating products which could be used to infringement patents (contributory infringement). Requiring people to buy another license or product to obtain a patented product is also not misuse, unless the patentee holds "market power."

Qualcomm has two primary business units. Its chip (or chipset) division designs cellular modems that allow phones to communicate with cellular networks and markets those modem chips to independent device producers (also referred to as original equipment manufacturers or OEMs). Its licensing division negotiates with the same OEM customers to secure royalty-bearing patent license agreements. *"Tying and Exclusion in FRAND Licensing: Evaluating Qualcomm"*; the antitrust source www.antitrustsource.com February 2022.

Qualcomm has market power in both lines of business. In particular, its chip division accounts for a very high share of modem sales for certain wireless technologies (CDMA and high-end LTE). At the same time, its licenses grant rights to standard essential patents (SEPs), which OEMs and rival chipmakers must infringe in order to practice the protocols that allow independently designed networks and devices to communicate. https://www.americanbar.org/

In a tying arrangement, the sale of one product is conditioned on the buyer's [OEMs—Google; Samsung, etc.] agreement to take a second good as well. In such cases, the antitrust

plaintiff (Golden) usually identifies one product as the "tying good" (Qualcomm's Snapdragon chipset) and the other as the "tied good" (Golden's patented CPUs).

In a typical case, the defendant (Qualcomm) already possesses a monopoly in the market for the tying product (Qualcomm's Series of Snapdragon chipset that includes its modems), whereas many consumers would have bought the tied good (Golden's patented CPU) from another provider but for the tie. The alleged exclusion therefore occurs in the tied market.

As described above, Qualcomm's tying strategy involved discounts and incentives for handset producers that agreed to purchase chipsets primarily or exclusively from Qualcomm. While the most notable example was a set of contracts with Apple that provided large royalty rebates conditioned on exclusivity. Judge Koh's decision also noted that similar terms were offered to Blackberry, LG Electronics, Samsung, and Motorola. *Qualcomm*, 2019 WL 2206013 at *153–54. https://www.americanbar.org/content/dam/aba/publishing/antitrust-magazine-online/2020/feb-2020/feb20_hovenkamp_2_13f.pdf

**Qualcomm admits**: "Qualcomm itself has admitted that Plaintiffs' claims differed from those at issue in the FTC's case including an explicit allegation regarding "tying". *See* Qualcomm Opening Br., *FTC v. Qualcomm Inc.*, Case No. 19-16122, ECF No. 80, at 41 (9th Cir.) (*acknowledging that the FTC "never made" a "tying" claim*). "In remanding the case to the district court to decide the effect of *FTC v. Qualcomm* in the first instance, the panel agreed with Plaintiffs that the merits of Plaintiffs' case were not at issue in the ... [] appeal." U.S. District Court—NDC—San Francisco Division; In Re: Qualcomm Antitrust Litigation [Joint Case Management Statement] Case 3:17-md-02773-JSC Dkt. 881 Filed 04/14/22 Page 6 of 19.

The following charts illustrates how Qualcomm uses "tying" to maintain its monopoly and the significance of Plaintiff's CPUs in the tying arrangement to Qualcomm's revenue.

6

## The Impact of "Tying" Plaintiff's Central Processing Units (CPUs)

Qualcomm's Baseband Processor (modem) is a mobile Semiconductor Device or chip in a smartphone, smartwatch, tablet, or other mobile device that convert digital data into radio frequency signals and manages all the radio functions.



A baseband processor allows devices to connect to wireless cellular networks. It is used in conjunction with a *Central Processing Unit or (CPU)*. Inside every cellular device is a component known as a cellular modem, which handles the actual communications with the cellular network.



Qualcomm Snapdragon Gen 8 Deep Dive CPU Display

7

"Intelligent system-level integration of the digital baseband (modem), RF transceiver, and all key RF front-end components." "The CPU *processors* utilize a strong heritage in engineering to deliver best-in-class security, AI, and connectivity solutions" *Qualcomm* https:// www.qualcomm.com/products/technology/processors#:



Snapdragon 888 Modem-RF System

The Ninth Circuit never weighed in, or issued an opinion on whether or not it is okay, or even legal for Qualcomm, or anyone, to collect royalties on another's patented inventions (i.e.,

CMDC devices; CPUs) without authorization or license to do so. Likewise, this Court has not weighed in on whether or not it is okay, or even legal for Qualcomm, or anyone to collect royalties on Plaintiff's patented inventions (i.e., CMDC devices; CPUs) without authorization or license to do so.

Below, is a summary chart that illustrates three (3) original engineering manufacturers (OEMs)—Google; Samsung, Asus/Qualcomm—allegedly infringing smartphones, that illustrates the chipsets Qualcomm "contributes" to the infringing smartphones; and the allegedly infringing CPUs "tied" to Qualcomm's modems, that are forced on the OEMs thru "no license, no chip"

| Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | Asus / Qualcomm Smartphone for Snapdragon Insiders |
|---|---|---|
|  |  |  |
| **Chipset**: Qualcomm Snapdragon 765G | **Chipset**: Qualcomm SM8350 Snapdragon 888 5G (5 nm) | **Chipset**: Qualcomm SM8350 Snapdragon 888 5G (5 nm) |
| **Modem**: Snapdragon® X52 5G Modem-RF System. | **Modem**: Snapdragon® X60 5G Modem-RF System. | **Modem**: Snapdragon® X60 5G Modem-RF System. |
| **CPU**: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) | **CPU**: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz Cortex-A78 & 4x1.80 GHz Cortex-A55) | **CPU**: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz Cortex-A78 & 4x1.80 GHz Cortex-A55) |
| **OS**: Android 11, upgradable to Android 13 | **OS**: Android 11, upgradable to Android 13 | **OS**: Android 11 |

9

## Antitrust Injury

"Qualcomm's first weapon against competitors: patent licensing terms requiring customers (i.e., OEMs) to **pay a royalty on every phone sold**… This gave Qualcomm an inherent advantage in competition with chipmakers… Qualcomm could afford to cut the price of its own chips, knowing that the customer would still be paying Qualcomm a hefty patent licensing fee on every phone." *Qualcomm's chip deals boxed out competitors*, https://arstechnica.com/tech-policy/2019/05/how-qualcomm-shook-down-the-cell-phone-industry-for-almost-20-years/

Qualcomm fail to defend against Plaintiff's claim that Qualcomm is collecting a 5% running royalty on the price of each handset (i.e., new and improved cell phone; smartphone) that Plaintiff alleges is his patented communicating, monitoring, detecting, and controlling (CMDC) device (i.e., cell phone; smartphone).

Plaintiff alleges he has suffered an antitrust injury because Plaintiff owns the patent(s), and patent rights to collect a royalty on the price of each handset (i.e., new and improved cell phone; smartphone) Qualcomm collects on, and each allegedly infringing CPU Qualcomm sells.

In the opinion of the U. S. District Court for the District of Northern California; "Qualcomm leveraged its monopoly position in chips to secure unreasonably high rates for its SEPs. Qualcomm, for example, refused to provide must-have chips unless customers took the unreasonable IP licenses—the "no license, no chip" model [that includes the "tied" CPU].

Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to anticompetitive harm in modem chips [and CPUs]. Here, Judge Koh, quoting the D.C. Circuit's decision in *United States v. Microsoft Corp.*, held it sufficient that Qualcomm engaged in

"anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43."

Qualcomm's "no license, no chip" policy is designed to force sell CPUs Plaintiff believe infringes his patented CPUs, that's tied to Qualcomm's cellular modem. Qualcomm's "no license, no chip" policy is only made possible by Qualcomm's unauthorized use of allegedly infringing CPUs of Plaintiff's patented CMDC devices (i.e., smartphones; handsets of OEM's).

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of each phone sold, i.e., handset; smartphone, etc. The elements of unjust enrichment exist because: 1) Plaintiff provided something of value to the defendant Qualcomm; 2) Qualcomm acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Qualcomm to enjoy the benefit Plaintiff provided without compensating Plaintiff.

The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices: "Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a *5% running royalty on the price of each handset sold*. These licenses are called Subscriber Unit License Agreements ("SULA") …"

"Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio. Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition. The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

11

SAppx196

Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold…

Qualcomm's anticompetitive practices has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC (handset) devices and Plaintiff's patented CPUs. The OEMs are already paying royalties to Qualcomm on every handset sold; and, the OEMs are already paying an increased royalty rate for Qualcomm's chipsets that include Plaintiff's patented CPUs. This injury is of the type the antitrust laws were intended to prevent; which makes the defendant's conduct unlawful.

Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of the phone, i.e., Plaintiff's CMDC device; handset; smartphone, etc. Plaintiff has the right to exclude Qualcomm from "using" Plaintiff's CMDC devices—handsets to unjustly enrich itself. Plaintiff is entitled to stop Qualcomm's use of the Plaintiff's inventions to generate revenue (5% royalty on each handset sold) by seeking a legal injunction in Federal Court. Qualcomm's anticompetitive practices restrained Plaintiff from entering the market to collect royalties. Plaintiff is entitled to collect damages from Qualcomm that are calculated based on lost profits Plaintiff suffered as a result of the antitrust injury.

The above-described injuries to the Plaintiff are of a type that the antitrust laws were intended to prevent; and Plaintiff's injuries flows from that which makes the Defendant's acts unlawful.

12

**The Anti-Competitive Impact on Qualcomm's Competitors; Plaintiff's Antitrust Injury; Intellectual Property Theft; and the Break-Down of the Entire Patent System**

If Qualcomm is allowed to collect royalties on anyone's patented inventions without authorization or legal right to do so; allowed to "tie" anyone's patented inventions to their own while forcing competitors to compete against the illegal "tie"; contributing to the infringement of its customers by contributing the Snapdragon Series of Chipsets that includes the "tying" product Qualcomm's wireless cellular modems and the "tied" product Plaintiff's patented CPUs; inducing the infringement of its customers with its "no license, no chip" policy of purchasing the "tied" and "tying" products when both can be sold separately, Qualcomm will eventually destroy the entire patent grant system.

Qualcomm was given notice by the Plaintiff and by the DOJ that its smartphones may infringe upon Plaintiff's patented CMDC devices; after being given notice of Plaintiff's intellectual property subject matter in a "cease and desist" letter (2010), plus a notice to appear by the CFC / DOJ (2019) it is alleged that Qualcomm willfully violated certain Antitrust laws i.e., tying arrangements, maintaining a monopoly, etc. Qualcomm, having knowledge of Plaintiff's inventions, willfully violated certain antitrust laws—elements of Clayton Act 4]; and, after being given notice of Plaintiff's intellectual property subject matter in a "cease and desist" letter (2010), plus a notice to appear by the CFC / DOJ (2019) Qualcomm's willfully infringed Plaintiff's patents; constitutes a complete breakdown of the Patent grant system.

Unjust enrichment stems from the theory that no one [Qualcomm] should be allowed to profit at another's [Plaintiff] expense in circumstances which suggest mistake, fraud, illegality or bad faith. Unjust enrichment claims may exist with or without a contract between the parties. The elements of Qualcomm's unjust enrichment exist because:

1. Plaintiff provided something of value to Qualcomm;

2. Qualcomm acknowledged, accepted and benefitted from what Plaintiff provided; and,

3. It would be inequitable for the Qualcomm to enjoy the benefit(s) Plaintiff provided without compensating Plaintiff.

In this case, and in Plaintiff's related cases, the cases were dismissed because the Courts agreed with Defendants' that "the same patent claims have been presented and denied as "frivolous". Plaintiff believes Qualcomm, and others named in the related cases, business practices and behavior is no less than the characteristics of "pirating".

Qualcomm's violations are far worse than having a policy of not reviewing the patents of others. Qualcomm has deliberately ignored Plaintiff's patents, and as long as the Courts are complicit with Qualcomm's practices, and not demand Qualcomm to appear to defend the allegations brought against them, Qualcomm will continue to "pirate" its competitors or potential competitors, and Plaintiff until it destroys the entire patent grant system.

## Intellectual Property Thief

Qualcomm's intellectual theft occurs when Qualcomm steals or uses without permission Plaintiff's intellectual property (IP). Qualcomm's theft of intellectual property happens when Qualcomm knowingly uses, misappropriates, takes, or steals Plaintiff's property that falls under the protection of laws around intellectual property. In order to qualify as theft, Plaintiff's intellectual property is used, and royalties collected, without the consent of Plaintiff.

IP theft is an extremely expensive problem that costs businesses in the United States billions of dollars annually [antitrust violation], so the FBI has gotten more involved recently by making the investigation and prevention of this issue more of a priority. Intellectual theft is

14

quick, easy, and cheap to commit. All that has to happen for Qualcomm to steal Plaintiff's intellectual property is to copy Plaintiff's work, idea, or product.

It's possible for intellectual property thieves, such as Qualcomm, to financially benefit from their theft by collecting royalties on the inventions without license or legal right to do so. This loss of profit can affect the owner [Plaintiff] of the intellectual property deeper than just a simple theft.

For any type of stolen intellectual property, the first step is generally to send a cease-and-desist letter. Plaintiff's cease-and-desist letter was the first contact with the intellectual property thief to just let them know they need to stop using and stealing Plaintiff's intellectual property.

The majority of intellectual property cases are tried as federal cases, making them federal crimes. The possible consequences of intellectual property theft are: * Criminal fines, * Imprisonment (the length of time depends on the nature of the charges), * Seizure of the stolen intellectual property, * Civil charges (could include business profits lost due to the theft), * Suspension or loss of an operating license held by a business. The laws around intellectual property protection come with stiff, costly penalties for violation.

If Qualcomm is allowed to collect royalties on Plaintiff's patented inventions without authorization or legal right to do so, then Plaintiff should likewise be allowed to collect royalties on Qualcomm's patented inventions without authorization or legal right to do so. For that matter, anyone who is currently paying Qualcomm royalties on inventions covered by Qualcomm patents should be allowed to stop, because Qualcomm has changed patent law to read; "it's okay to collect tens of billions of dollars in royalties on the inventions of someone else without being authorized to collect the royalties or having the legal right to do so".

Qualcomm should be enjoined to cease collecting royalties on CMDC devices (cell phones) Qualcomm does not have authorization or a legal right to collect royalties on. Qualcomm should be ordered to pay triple damages to Plaintiff for collecting royalties on CMDC devices (handsets) Qualcomm does not have authorization or a legal right to collect royalties on. Qualcomm should be enjoined to cease collecting royalties on CPUs Qualcomm has "tied" to its Snapdragon chipset that Qualcomm does not have authorization or a legal right to collect royalties on. Qualcomm should be ordered to pay triple damages to Plaintiff for collecting royalties on CPUs Qualcomm has "tied" to its Snapdragon chipset that Qualcomm does not have authorization or a legal right to collect royalties on. Qualcomm should be ordered to pay triple damages to Plaintiff for contributing to the infringement of Plaintiff CMDC devices with Plaintiff's patented CPUs Qualcomm has "tied" to its Snapdragon chipset [Qualcomm threatens and force OEMs to purchase the "tied" and "tying" products together; "no license, no chip".

Note: In *Golden v. Qualcomm*, Case 4:22-cv-03283-HSG Dkts 1-5, 1-6, & 1-7 Filed 06/06/22, are supportive claim charts for direct, contributory, induced, 'doctrine of equivalents' and willful infringement. Nine (9) alleged infringing products that infringes twenty-five (25) of Plaintiff's patent claims—claim 1 of '497 patent; claim 10 of '752 patent; claims 1-9 of '189 patent; claims 13-23 of '439 patent; and claims 4-6 of '287 patent. Claims 1-20 of '619 patent not included in charts but asserted in case.

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(M) 8649927104

Email: atpg-tech@charter.net

16

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 27th day of March, 2023, a true and correct copy of the foregoing "Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Reconsideration", was served upon the following Defendant by priority "express" mail:

Joseph John Stevens

PATTERSON & SHERIDAN, LLP

50 West San Fernando Street, Suite 250

San Jose, CA 95113

Phone: (650) 384-4418

Fax: (650) 330-2314

Email: jstevens@pattersonsheridan.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

1   Joseph John Stevens (CA Bar No. 242495)
    jstevens@pattersonsheridan.com
2   50 W. San Fernando Street, Suite 250
3   San Jose, CA 95113
    Tel: 650-384-4418
4   Fax: 650-330-2314

5   B. Todd Patterson (*pro hac vice*)
    tpatterson@pattersonsheridan.com
6   John A. Yates (*pro hac vice*)
7   jyates@pattersonsheridan.com
    Kyrie K. Cameron (*pro hac vice*)
8   kcameron@pattersonsheridan.com
    24 Greenway Plaza, Suite 1600
9   Houston, Texas 77030
    713-623-4844 | 713-623-4846
10  *Attorneys for Defendant*
    *Qualcomm Incorporated*
11

12                  UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                        OAKLAND DIVISION

15

16  LARRY GOLDEN,                       Case No.: 4:22-cv-03283-HSG

17         *Pro Se* Plaintiff,          **DEFENDANT'S OPPOSITION TO**
                                         **PLAINTIFF'S MOTION FOR**
18  vs.                                  **RECONSIDERATION**
                                         [Filed concurrently:  Proposed Order; Proof of
19  QUALCOMM INC.,                       Service]

20         Defendant.
                                         Date:       Unnoticed by Plaintiff
21                                       Time:       Unnoticed by Plaintiff
                                         Courtroom:  Unnoticed by Plaintiff
22

23

24

25

26

27

28  DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION
    CASE NO.: 4:22-CV-03283-HSG

1 **DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION**

2      Defendant Qualcomm Incorporated ("Qualcomm") hereby opposes Plaintiff's Motion for

3 Reconsideration ("Motion") and later filed Memorandum of Law in Support of Plaintiff's Motion

4 for Reconsideration ("Memorandum").  Nothing in Plaintiff's Motion nor Memorandum changes

5 the fact that Plaintiff's claims are frivolous and not plausibly pleaded.

6 **I.     Plaintiff Fails to Establish Why His Claims Should be Reinstated**

7      Plaintiff's Motion and Memorandum in support thereof are merely an attempt to re-litigate

8 arguments and to express Plaintiff's displeasure and disagreement with the outcome of this lawsuit

9 rather than a real attempt to explain why this Court should reinstate his frivolous and deficient

10 claims.  Plaintiff's Motion for Reconsideration fails procedurally and substantively.

11      *First*, Plaintiff fails to identify any Rule under which his Motion is brought.  Plaintiff's

12 failure is unsurprising because the Federal Rules of Civil Procedure do not expressly recognize a

13 motion for reconsideration.  *See Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, No. 13-cv-

14 04513-PJH, 2019 U.S. Dist. LEXIS 78882, at *3 (N.D. Cal. May 9, 2019).  While a party can seek

15 leave to file a motion for reconsideration of an **interlocutory order** under Local Rule 7.9, such

16 reconsideration is inapplicable here since the Court entered Judgment in Qualcomm's favor.

17      *Second*, Plaintiff fails to identify or analyze any applicable test or rule that would warrant

18 reinstating his frivolous claims.  Instead, Plaintiff largely rehashes the same arguments that

19 previously failed to persuade this Court—including failing to once again recognized that *FTC. v.*

20 *Qualcomm* was overturned.  *See* Dkt. 51, at 11-13.  Repetition does not transform frivolous claims

21 into non-frivolous ones.  Furthermore, a motion for reconsideration is not an appropriate vehicle

22 to re-litigate issues.  *Maraziti v. Thorpe*, 52 F.3d 252, 255 (9th Cir. 1995) (affirming dismissal of

23 motion for reconsideration that was denied for reiterating previously raised arguments).  Plaintiff's

24 real basis for the motion is his disagreement with this Court's ruling—which is simply not a valid

25 basis for a motion for reconsideration.  *Lenk v. Monolithic Power Sys., Inc.*, No. 20-cv-08094-BLF

26 (HSG), 2022 U.S. Dist. LEXIS 199668, at *2 (N.D. Cal. Nov. 2, 2022) (A "[p]laintiff may disagree

27 with the Court's conclusions, but that is not a basis for reconsideration").  Plaintiff falls well short

28 of meeting his burden to establish why his frivolous claims should be reinstated.  The Motion

SAppx204

1    should be denied for this reason.

2        To the extent Plaintiff seeks to raise a new issue, any such arguments are waived. *Baker*

3 *v. Walker*, No. 2:08-CV-01370-KJD-PAL, 2011 U.S. Dist. LEXIS 103798, at \*3-4 (E.D. Cal. Sept.

4 13, 2011) (denying motion for reconsideration that contained arguments raised in prior briefing

5 and new arguments that could have been raised earlier). Plaintiff has been given so many bites

6 that the apple has long gone to seed.

7        Unfortunately, Plaintiff's displeasure with the outcome leads him to make scandalous and

8 unsubstantiated allegations against a Federal Magistrate Judge and this Court that Qualcomm will

9 not dignify by repeating here. Dkt. 51, at 2-3. A *pro se* litigant is given latitude, but is not immune

10 to Rule 11. These allegations clearly cross the line. Plaintiff also poses irrelevant rhetorical

11 questions and asks the Court to directly engage the scandalous allegations. Dkt. 51, at 2, 3, 5, 9,

12 10, 14. These questions (or any answers there to) cannot cure the deficiencies of the Complaint.

13 Plaintiff's Motion and Memorandum are less about convincing the Court to reinstate his claims

14 under an applicable standard than it is about trying to convince himself that the Court is part of the

15 imagined conspiracy against him.

16        Plaintiff's Motion and Memorandum are simply an attempt to re-litigate issues presented

17 to the Court and should be treated as such. To the extent the Court treats the motion under Rule

18 59(e), the Motion should be denied because Plaintiff failed to show an intervening change in the

19 law, new evidence, a need to correct clear error, or why altering the judgment would prevent

20 manifest injustice. *See Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th

21 Cir. 1989). To the extent the Court treats this Motion under Rule 60(b), the Motion similarly fails

22 to meet the applicable test outlined by the Rule. Plaintiff has failed to show "mistake,

23 inadvertence, surprise or excusable neglect" or introduce newly discovered evidence. Fed. R. Civ.

24 P. 60(b)(1)-(2). Nor does Plaintiff establish "fraud," that the judgment is void or satisfied, or "any

25 other reason that justifies relief." Fed. R. Civ. P. 60(b)(3)-(6). Under any analysis, the Motion

26 should be denied.

27

28

SAppx205

## II.     Conclusion

Plaintiff has failed to establish any basis to reconsider his frivolous claims or why he adequately pleaded a claim.  The Court should treat this motion for what it is—an attempt to re-litigate arguments and express displeasure at the outcome—rather than a motion under Rule 59 or Rule 60.  Even under Rule 59 or 60, Plaintiff fails to allege any reason for reconsideration.  The Court should deny this Motion.

DATED: March 31, 2023

Respectfully submitted,

PATTERSON + SHERIDAN, LLP

By: */s/ John A. Yates*

John A. Yates (*pro hac vice*)
jyates@pattersonsheridan.com
B. Todd Patterson (*pro hac vice*)
tpatterson@pattersonsheridan.com
Kyrie K. Cameron (*pro hac vice*)
kcameron@pattersonsheridan.com

24 Greenway Plaza, Suite 1600
Houston, Texas 77030
713-623-4844 | 713-623-4846

Joseph John Stevens (CA Bar No. 242495)
jstevens@pattersonsheridan.com

50 W. San Fernando Street, Suite 250
San Jose, CA 95113
Tel: 650-384-4418
Fax: 650-330-2314

*Attorneys for Defendant*
*Qualcomm Incorporated*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net



FILED

AR - 3 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LARRY GOLDEN<br><br>*Pro Se* Plaintiff,<br><br>V.<br><br>QUALCOMM INC.<br><br>Defendant. | CASE NO: <u>4:22-cv-03283-HSG</u><br><br>**(JURY TRIAL DEMANDED)**<br><br>**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**<br><br>March 30, 2023 |

## <u>PLAINTIFF'S SUPPLEMENTAL AUTHORITY IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION</u>

Proving patent infringement in court requires Plaintiff to prove two broad elements:

ownership and validity of the patent(s), and infringement of the patent by the defendant(s).

Qualcomm has already recently been found guilty—twice—of infringement for "using" patented

inventions i.e., smartphones, tablet, processors/chips without authorization, consent, or legal

right to do so.

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process".

The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous." Plaintiff alleged Qualcomm and Google jointly infringed Plaintiff's patents in in the *Golden v. Google* case by Qualcomm "contributing" its Snapdragon chipsets to the infringement of Plaintiff's CMDC device by Google.

What that means is, Plaintiff owns the patent rights to exclude Qualcomm from "using" any of Plaintiff's CMDC devices (i.e., new, improved upon, or useful desktop PCs, laptops, tablets, PDAs, cell phones, etc. and smartphones).

Plaintiff realizes how difficult it is for some to accept that fact, because they want to believe so very badly that the White man, Steve Jobs invented the smartphone; or, believe at the very least that the smartphone was not invented by a Black man.

The same allegations were brought against Qualcomm [the illegal use of patented inventions] by the Plaintiff Larry Golden in this current case but was rejected and denied because of the number of times Plaintiff has filed complaints. The Defendants named in any of the previous filings realize the way to stop filings is to ***present a patent that antedates***.

While the Qualcomm case *Kaist IP US LLC, v. Samsung Electronics Co., LTD., et al.*; Civil Action No. 2:16-CV-01314-JRG was tried by a jury, the same causes of action and allegations was rejected in this current case as being frivolous.

2

A claim is frivolous when the claim lacks any arguable basis either in law or in fact *Neitze v. Williams*, 490 U.S. 319, 325 (1989). Ridiculous, absurd, ludicrous, and nonsensical— these are all words that can be used to describe a frivolous lawsuit.

In the *Kaist IP US LLC, v. Samsung Electronics Co., LTD., et al.*; Civil Action No. 2:16-CV-01314-JRG case, Qualcomm "tied" the patented technology (FinFet) of *Kaist* to its modem processors and sold the systems-on-a-chip as the Snapdragon chipset. Likewise, Qualcomm "tied" the patented technology (CPUs) of Plaintiff to its modem processors and sold the systems-on-a-chip as the Snapdragon chipset.

Plaintiff's case is much more significant than just the "tying" arrangements discuss above. Plaintiff's case against Qualcomm extends to the accused systems-on-a-chip, that includes the patented technology (CPUs) of Plaintiff, was forced upon the OEMs (Samsung) in a "no license, no chip" contract; which means the OEMs were "induced" to infringe Plaintiff's CMDC devices, and Qualcomm also "contributed" to the infringement of Plaintiff's patented CMDC devices with its Snapdragon chipsets.

More importantly is Qualcomm collecting a 5% royalty on the price of every handset (CMDC device) sold. Qualcomm is not authorized; does not have Plaintiff's consent; and does not have the legal right, nor patents to do so.

Plaintiff is introducing *Kaist IP US LLC, v. Samsung Electronics Co., LTD., et al.*; Civil Action No. 2:16-CV-01314-JRG as supplemental authority to the relevant issues, the causes of actions, and the infringement "use" of Plaintiff's patented inventions that has already been decided by a jury. Qualcomm was found guilty of the allegations brought against them. In view of *Kaist IP US LLC, v. Samsung Electronics Co., LTD., et al,* Plaintiff's motion for reconsideration should be granted:

3

"KAIST IP filed the new patent infringement suit [] claiming Samsung Electronics has additionally violated its patent in new products production including smartphones. In its written accusation, KAIST IP reportedly claimed the defendants have not stopped infringing on the university's patent despite last year's court ruling, saying they have continued to develop and commercialize new products by utilizing the FinFet technology. KAIST IP claimed those products included smartphones such as Samsung Galaxy S8, Galaxy S9, Galaxy Note 8 and Galaxy Note 9 as well as the next generation modem chip Exynos Modem 5100 and infotainment system supporting drivers." *KAIST sues Samsung, Qualcomm for patent infringement.* https://www.koreatimes.co.kr/www/tech/2019/03/133_265114.html **Exhibit A**

"Samsung argues that Mr. Weinstein failed to tie his damages analysis to the smallest salable unit. Samsung says he applied his regression analysis to end-user smartphones and tablets and then apportioned down from there to stand alone chips. (Dkt. No. 577 at 15–16.) ... [H]owever, Mr. Weinstein then summarily opines that this value should be "apportioned" down to the chip level for stand-alone "SoCs not sold in phones." (Id. at 188:15–18.) ... [W]ithout any explanation, the jury had no substantial evidence from which to conclude that the royalty rate for the smartphones and tablets properly captured the incremental value of the Asserted Patent, whether the much lower royalty rate for the stand-alone chips properly captured that amount, or whether it was somehow both ... Mr. Weinstein's report "concludes the sales prices of Samsung's devices increase by an amount tied to the benefits stemming from the accused processors" and that "[t]his approach stays sufficiently clear of the concerns addressed by the 'smallest salable unit' principle." (Dkt. No. 453 at 6.)" *In the United States District Court for the Eastern District of Texas-Marshall Division: Kaist IP US LLC, Plaintiff, v. Samsung Electronics Co., LTD., et al., Defendants. Civil Action No. 2:16-CV-01314-JRG, Memorandum Opinion and Order. Dkt. 676* **Exhibit B**

"A jury trial commenced in this case on June 11, 2018. On June 15, 2018, the jury returned a unanimous verdict (Dkt. No. 499) finding that Defendants Samsung Electronics Co. Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, LLC (collectively, "Samsung"); GlobalFoundries, Inc. and GlobalFoundries U.S. Inc. (collectively, "GlobalFoundries"); and Qualcomm

4

Inc. ("Qualcomm") each infringed one or more claims asserted by Plaintiff KAIST IP US LLC ("KAIST"), such claims being claims 1–6, 11–13, and 15–17 of U.S. Patent No. 6,885,055 (collectively, the "Asserted Claims"); that none of the Asserted Claims were invalid; that Samsung's infringement had been willful; that GlobalFoundries and Qualcomm's infringement had not been willful; that KAIST should recover from Samsung $400,000,000.00 for such infringement as a lump-sum royalty; … KAIST has moved for entry of Final Judgment (Dkt. No. 587), which the Court now GRANTS. Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the foregoing, the Court hereby ORDERS and ENTERS JUDGMENT as follows: 1. Samsung has infringed one or more of the Asserted Claims; 2. GlobalFoundries has infringed one or more of the Asserted Claims; 3. Qualcomm has infringed one or more of the Asserted Claims; 4. The Asserted Claims are not invalid; 5. Samsung's infringement was willful; 6. GlobalFoundries' infringement was not willful; 7. Qualcomm's infringement was not willful; 8. KAIST is hereby awarded damages from and against Samsung and shall accordingly have and recover from Samsung the sum of $203,003,416.00 U.S. Dollars …" *In the United States District Court for the Eastern District of Texas-Marshall Division: Kaist IP US LLC, Plaintiff, v. Samsung Electronics Co., LTD., et al., Defendants. Civil Action No. 2:16-CV-01314-JRG, Final Judgement. Dkt. 678* **Exhibit C**

The District Court in this Qualcomm case erred in dismissing the case for "frivolousness" because valid patents have a place in law and in fact. 35 U.S. Code § 282(a) states In General. "A patent shall be presumed valid. Each claim of a patent (… independent, dependent, or multiple dependent …) shall be presumed valid independently of the validity of other claims".

In the District Courts, invalidity must be proven on the heightened standard of "clear and convincing evidence" before a claim is considered invalid. Invalidating a claim(s) because one feels the technological rational, or person, behind the claimed inventions are "to fantastical" or "to unbelievable" has no basis in law.

All Plaintiff's cases concern motions to dismiss. Such motions do not resolve whether Plaintiff will ultimately prevail, but simply whether the complaint was sufficient to cross the Court's pleading threshold. In *Intel Corp. v. Future Link Sys*. Recovery may appear remote and unlikely on the face of the pleading, but that is not the test for dismissal. *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995) (citing *Scheuer*, supra, 416 U.S. at 236).

A complaint may not be dismissed under Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In reviewing a Rule 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 117 (1994). The review of such a motion is limited, and "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)).

Each time a Judge prematurely dismisses Plaintiff's patents; without reviewing the Defendant's invalidity contentions; and without a Marksman Hearing/claim construction, the Judge involves himself/herself in a conspiracy against rights: 18 U.S.C. § 241: "Section 241 makes it unlawful for two or more persons to agree to injure, threaten, or intimidate a person in the United States in the free exercise or enjoyment of any right or privilege secured by the Constitution or laws of the Unites States or because of his or her having exercised such a right." Unlike most conspiracy statutes, §241 does not require, as an element, the commission of an overt act. *Department of Justice* https://www.justice.gov/crt/statutes-enforced-criminal-section#:

Plaintiff is asking the Court to reconsider its judgement granting the Defendant

Qualcomm, motion to dismiss and let a jury decide Qualcomm's fate, again.

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 30th day of March, 2023, a true and correct copy of the foregoing "Plaintiff's Supplemental Authority in Support of Plaintiff's Motion for Reconsideration", was served upon the following Defendant by priority "express" mail:

>Joseph John Stevens
>
>PATTERSON & SHERIDAN, LLP
>
>50 West San Fernando Street, Suite 250
>
>San Jose, CA 95113
>
>Phone: (650) 384-4418
>
>Fax: (650) 330-2314
>
>Email: jstevens@pattersonsheridan.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

Exhibit A

# KAIST sues Samsung, Qualcomm for patent infringement

2019-03-10 : 17:05



Graphic by Cho Sang-won

By Jun Ji-hye

KAIST IP has filed a patent infringement lawsuit against Samsung Electronics and Qualcomm in the United States, claiming the companies violated the university's patent tied to key semiconductor technologies, industry sources said Sunday.

KAIST IP is a subsidiary of the Korea Advanced Institute of Science and Technology (KAIST) in charge of managing intellectual property (IP) belonging to the nation's top science and research university.

The latest lawsuit came after the licensing arm of the university filed a similar suit against Samsung, Qualcomm and GlobalFoundries in 2016. In June last year, a U.S. federal jury in Texas found Samsung guilty of infringing U.S. Patent No. 6,885,055 that relates to FinFet, ordering the Korean firm to pay a $400 million fine to the university. Qualcomm and GlobalFoundries were also found to have infringed the patent, but were not ordered to pay damages.

KAIST IP filed the new patent infringement suit Feb. 14, claiming Samsung Electronics has additionally violated its patent in new products production including smartphones.

FinFETs are the three-dimensional transistor structures that help send current more stably and efficiently. The technology is the key to producing modern processors.

The technology was developed in early 2000 in partnership with KAIST and Prof. Lee Jong-ho who was one of the key researchers at Wonkwang University. Lee is now a professor at Seoul National University.

In its written accusation, KAIST IP reportedly claimed the defendants have not stopped infringing on the university's patent despite last year's court ruling, saying they have continued to develop and commercialize new

products by utilizing the FinFet technology.

KAIST IP claimed those products included smartphones such as Samsung Galaxy S8, Galaxy S9, Galaxy Note 8 and Galaxy Note 9 as well as the next generation modem chip Exynos Modem 5100 and infotainment system supporting drivers.

Regarding the issue, Samsung Electronics said the technology used in its products was different from the university's patent technology.

"There is difference between KAIST's patent technology and Samsung's production method," a Samsung Electronics official said. "We will fully explain this during the trial."

Industry officials said Samsung may have to pay a larger fine, compared to the previous $4 million, if it loses the suit.

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| KAIST IP US LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:16-CV-01314-JRG |
| | § | |
| SAMSUNG ELECTRONICS CO., LTD., | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants'[1] Motion to Stay Case Pending *Ex Parte* Reexamination (the "Motion to Stay"). (Dkt. No. 651.) Having considered the Motion to Stay, the Court is of the opinion that it should be and hereby is **DENIED**.

Also before the Court are the following motions: (1) Defendants' Renewed Motion for Judgment as a Matter of Law on Non-Infringement and Invalidity (the "Liability JMOL") (Dkt. No. 578); (2) Samsung's Renewed Motion for Judgment as a Matter of Law for Damages of No More Than $6.2 Million (the "Damages JMOL") (Dkt. No. 577); (3) Samsung's Renewed Motion for Judgment as a Matter of Law on Willfulness (the "Willfulness JMOL") (Dkt. No. 580); (4) Motion by KAIST IP US ("KAIST") for Enhancement of Damages Due to Willful Infringement (Dkt. No. 586) (the "Motion for Enhancement"); (5) Samsung's Motion for New Trial and Contingent Motion of GlobalFoundries and Qualcomm for New Trial (Dkt. No. 579) (the "Motion

---

[1] Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.' Samsung Semiconductor, Inc.; Samsung Austin Semiconductor, LLC (collectively, "Samsung"); GlobalFoundries Inc. and GlobalFoundries U.S. Inc. (collectively, "GlobalFoundries"); and Qualcomm Inc. ("Qualcomm") (Samsung, GlobalFoundries, and Qualcomm collectively, the "Defendants").

Dockets.Justia.com

for New Trial"). Having considered these motions, and for the reasons set forth herein, the Court is of the opinion that Defendants' Liability JMOL, Samsung's Damages JMOL, and Samsung's Willfulness JMOL should be and hereby are **DENIED**. The Court further concludes that KAIST's Motion for Enhancement should be and hereby is **GRANTED**. Finally, the Court concludes that Samsung's Motion for New Trial should be and hereby is **CONDITIONALLY DENIED** subject to a remittitur in the amount of $203,003,416.

Finally, before the Court are (1) Motion by KAIST for Entry of Final Judgment as the Prevailing Party and Award of Costs and Pre- and Post-Judgment Interest (Dkt. No. 587) (the "Motion for Final Judgment"); and (2) Motion by KAIST for Exceptional Case and Award of Attorney Fees and Costs (Dkt. No. 585) (the "Motion for Fees and Costs"). In light of the foregoing, the Court **CARRIES** the Motion for Final Judgment and the Motion for Fees and Costs.

## I.     BACKGROUND

KAIST brought suit against Defendants alleging infringement of United States Patent No. 6,885,055 (the "'055 Patent" or the "Asserted Patent") entitled "Double-Gate FinFET Device And Fabricating Method Thereof." (Dkt. No. 1 ¶ 19.) Jong-Ho Lee is listed as the primary inventor of the '055 Patent. (Dkt. No. 1-1.) KAIST asserted that Defendants "commonly and/or jointly manufacture semiconductors and/or sell infringing application processor chips" that infringe upon the '055 Patent. (*Id.* ¶ 17.) A jury trial was held beginning on June 11, 2018. (Dkt. No. 487.) At trial, KAIST asserted infringement of Claims 1–6, 11–13, and 15–17 of the '055 Patent (the "Asserted Claims"). (Dkt. No. 429.) At the close of evidence, the parties moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on the issues of infringement, invalidity, willfulness, and damages, which were denied. (Dkt. No. 497.) On June 15, 2018, the jury returned a verdict finding that Samsung, GlobalFoundries, and Qualcomm had each infringed at least one of the Asserted Claims; that none of the Asserted Claims were invalid; that Samsung's

infringement had been willful but GlobalFoundries and Qualcomm's infringement had not been willful; and that KAIST should be awarded the following sums: $400,000,000.00 from Samsung, $0.00 from GlobalFoundries, and $0.00 from Qualcomm. (Dkt. No. 499.) The award against Samsung was designated as a lump sum and was found to be fair and reasonable compensation for Samsung's infringement. (*Id.*) These post-trial motions followed.

On October 31, 2018, more than four months after the jury returned its verdict, Samsung filed a request for *ex parte* reexamination at the U.S. Patent and Trademark Office ("PTO") challenging the Asserted Claims of the '055 Patent. (Dkt. No. 659 ¶ 2.) The PTO granted the request and, on reexamination, rejected the Asserted Claims. (Dkt. No. 659-3 at 103.) This rejection has not yet been made final by the PTO as KAIST has not yet exhausted its appeals of this determination. (*See* 659-1 ¶¶ 9–23.) Until a final determination is made, the Asserted Claims remain part of a duly issued United States Patent. *See* 35 U.S.C. § 307(a).

## II.     DEFENDANTS' MOTION TO STAY

As a threshold matter, the Court considers whether, as Defendants argue, a stay is warranted in light of the PTO's determination on reexamination. (Dkt. No. 651.) The Court determines that it is not.

In deciding whether to stay litigation pending reexamination, courts consider: "(1) whether the stay will unduly prejudice the nonmoving party; (2) whether the proceedings before the court have reached an advanced stage, including whether discovery is complete and a trial date has been set; and (3) whether the stay will likely result in simplifying the case before the court." *Papst Licensing GmbH & Co., KG v. Apple, Inc.*, No. 6:15-cv-1095-RWS, 2018 WL 3656491, at *2 (E.D. Tex. Aug. 1, 2018). None of these factors militate in favor of a stay while several clearly militate against a stay.

3

As to the first factor, a stay would be highly prejudicial to KAIST and would present Defendants with a clear tactical advantage. The Court notes the extreme dilatoriness and delay of Samsung's request for reexamination. Samsung waited until after the jury's verdict in this case, which found against Defendants on *all* their invalidity arguments raised at trial, and *then* it ran to the PTO with *new* invalidity arguments never raised before the jury. (*See* Dkt. No. 659-2 at 12.) In doing so, Samsung manipulated an administrative process designed to streamline disputes to *avoid* the need for a jury trial. There is little doubt this was done in order to gain instead a second bite at the apple.[2] *See* MPEP § 2209 ("Parties are cautioned that the reexamination statute, regulations, and published examining procedures do not countenance so-called 'litigation tactics' in reexamination proceedings.").

While Samsung is within its statutory rights to avail itself of the administrative remedies the Patent Act affords, such should not be used to effect a collateral attack on the verdict of a jury empaneled pursuant to the Seventh Amendment or the judgments of an Article III court. *See In re Swanson*, 540 F.3d 1368, 1379 n.5 (Fed. Cir. 2008) ("[A]n attempt to reopen a final federal court judgment of infringement on the basis of a reexamination finding of invalidity might raise constitutional problems."). If a final judgment in this case is entered, as KAIST has requested (Dkt. No. 587), KAIST's right to enforce that judgment will stand regardless of any subsequent determinations regarding the underlying patent. *See Moffitt v. Garr*, 66 U.S. 273, 283 (1861) (Title

---

[2] Having been denied repeated attempts to institute *inter partes* review of the Asserted Patent, Samsung's reexamination request is more likely akin to at least a fourth bite at the apple. *See* Decision, *Samsung Elecs. Co. v. KAIST IP US LLC*, IPR2017-01046, Paper 12 (P.T.A.B. Oct. 2, 2017) (denying institution); Decision, *Samsung Elecs. Co. v. KAIST IP US LLC*, IPR2017-01047, Paper 13 (P.T.A.B. Oct. 2, 2017) (denying institution); Decision, *Samsung Elecs. Co. v. KAIST IP US LLC*, IPR2018-00266, Paper 9 (P.T.A.B. May 29, 2018) (denying institution); Decision, *Samsung Elecs. Co. v. KAIST IP US LLC*, IPR2018-00267, Paper 9 (P.T.A.B. May 29, 2018) (denying institution).

to money judgments for patent infringement "does not depend upon the patent, but upon . . . the judgment of the court."). By contrast, if this case is stayed and no final judgment issues, the issuance of a final reexamination certificate would effect the destruction of this lawsuit.[3] *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1339 (Fed. Cir. 2013); *see also id.* at 1351 n.2 (Newman, J. dissenting). To stay the case at this stage would reward Samsung's dilatory tactics while substantially prejudicing KAIST's right to rely on a jury verdict that it spent significant hours and resources to secure. This factor weighs strongly against a stay.

As to the second factor, to say that the proceedings before the court have reached an advanced stage would be an understatement. Discovery is complete, a trial date has been set, a trial has occurred, and the jury and the Court have both issued their determinations on the merits of this case. This factor weighs strongly against a stay.

As to the third factor, simplification of the case, if any, would be negligible, if not microscopic. The jury has already rendered its verdict in this case (Dkt. No. 499) and the Court has already issued its findings of fact and conclusions of law regarding Defendants' equitable defenses (Dkt. No. 569). All that remains is for the Court to rule on the parties' post-trial motions, which the Court does today.[4] Thus, any simplification of the issues could only be *de minimis*. This factor is at best neutral.

Having found no factors weighing in favor of as stay and finding a majority of the factors weighing against such a stay, the Court determines and finds that a stay of this case in favor of

---

[3] *Fresnius* explains that "Congress expected reexamination to take place *concurrent* with litigation." 721 F.3d at 1339 (emphasis added). Samsung's request for reexamination was not concurrent with this litigation but took place several months after a trial on the merits was held and the jury returned its verdict.

[4] The Court herein denies Samsung's Motion for New Trial conditioned up a remittitur by KAIST. The Court will not speculate on what decision KAIST will make in that regard.

Samsung's dilatory reexamination request would be not only inappropriate but unfair. Consequently, the Court denies Defendants' Motion to Stay and will proceed to consider the parties' post-trial motions.

### III.   DEFENDANTS' MOTIONS RELATED TO LIABILITY AND WILLFULNESS

Having considered Defendants' Liability JMOL and Samsung's Willfulness JMOL, the Court finds that substantial evidence exists to support the jury's verdict on each issue.

#### A.   Legal Standard

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 937-38 (5th Cir. 2006).

#### B.   Infringement

In their Liability JMOL, Defendants assert that Plaintiff failed to establish that several limitations of the Asserted Claims were met in the accused products: (1) a "gate which is formed

6

on said . . . second oxide layer"; (2) a "first oxide layer"; (3) a "first oxide layer . . . with a thickness greater or equal to that of the gate oxide"; and (4) "a Fin active region which is a wall-shape single crystalline silicon." (Dkt. No. 578 at 1.) These limitations appear in Claims 1 and 13 of the '055 Patent from which the remaining Asserted Claims depend. (DX-001 at 12:2–27; 13:40–14:22.) Defendants further assert that there is no evidence of direct infringement by Defendant GlobalFoundries Inc. (Dkt. No. 578 at 1.)

### 1.    "gate which is formed on said . . . second oxide layer"

Defendants assert that the "undisputed evidence establishes . . . as a matter of law" that the limitation "a gate which is formed on said . . . second oxide layer" is not met. (Dkt. No. 578 at 5.) The parties did not request, and the Court did not provide, a construction of the phrase "formed on." (*See* Dkt. No. 179 (construing disputed claims).) Accordingly, the jury was instructed to apply its plain and ordinary meaning. (Dkt. No. 498 at 43:15–17.)

Defendants argue that KAIST's expert, Dr. Kelin Kuhn, identified the "second oxide layer" as a "silicon dioxide" layer formed on either side of the fin in the accused products. (Dkt. No. 490 at 9:1–10:7.) However, it is undisputed that in the accused product the "gate" is always formed on a hafnium layer that itself is formed on the silicon dioxide layer; the gate is not formed directly on the silicon dioxide layer.[5] (Dkt. No. 491 at 59:23–61:10.) Defendants argue that since it is undisputed that the "gate" is formed on the hafnium layer instead of the "second oxide layer," a finding of infringement is precluded as a matter of law. (Dkt. No. 578 at 7.)

KAIST responds that Defendants' argument requires construing the term "formed on" to mean "formed *directly* on." (Dkt. No. 592 at 3 (emphasis in original).) However, Dr. Kuhn testified

---

[5] The parties and their witnesses at times refer to "silicon dioxide" as "SiO2." Similarly, the parties and their witnesses at times refer to "hafnium" as "hafnium oxide," "HfO," "high-k," or a "high-k dielectric."

that "there's nothing in the claims that says that the gate is directly on an SiO2 layer." (Dkt. No. 490 at 23:4–5.) Moreover, Defendants' expert, Dr. Vivek Subramanian, testified that he did not dispute in his expert report that this element was met. (496 at 81:21–82:6.)

The Court agrees with KAIST that Defendants argument effectively asks the Court to construe "formed on" as "formed directly on." "In the absence of such a construction, however, the jury was free to rely on the plain and ordinary meaning of the term . . . ." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012). "[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial." *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1331 (Fed. Cir. 2009) (citations, quotations omitted). The jury heard testimony that the claims do not require the gate to be formed directly on the second oxide layer and was entitled to credit this testimony.

Moreover, that something may be considered to be "on" something else, even if there is an intervening layer, is consistent with the plain and ordinary meaning of the term. (*See* Dkt. No. 498 at 33:18–22 (instructing jurors that they "are permitted to draw such reasonable inferences . . . as [they] feel are justified in the light of common experience").) For example, the court observes that one might properly describe paint as being put "on" a wall even if there is an intervening layer of primer or describe a table as "on" the floor even if it is on a rug that itself is on the floor. The Court finds that there was substantial evidence from which the jury could conclude that the accused products contain a "gate which is formed on said . . . second oxide layer."

### 2.    "first oxide layer"

Defendants argue that the accused products do not have a layer that meets all the limitations of the "first oxide layer," but instead, KAIST identified the combination of the silicon dioxide layer and the hafnium layer as the "first oxide layer." (*See* Dkt. No. 490 at 21:22–22:4.) It is undisputed that the silicon dioxide layer and hafnium layer are two different layers formed by

8

separate processes at separate times and having separate properties. (*See* Dkt. No. 497 at 199:17–200:5.) However, according to Defendants, "the recited 'first oxide layer' cannot be made up of two separate layers formed at different times, as only one can be 'first.'" (Dkt. No. 578 at 9.) The express requirements of the "first oxide layer" cannot be met by either the silicon dioxide layer or hafnium layer alone, and therefore, according to Defendants, no reasonable jury could have found that this limitation was met. (*Id.* at 9–10.)

KAIST responds that this argument "is a surreptitious request for claim construction after trial." (Dkt. No. 592 at 7.) KAIST argues that the "overwhelming weight of evidence established that" the silicon dioxide and hafnium together constituted a "first oxide layer." (*Id.*; *see, e.g.*, Dkt. No. 490 at 15:3–9, 21:25–22:2; Dkt. No. 497 85:25–86:14.)

The Court agrees that Defendants argument again seeks to obtain a favorable claim construction after trial and that such has been waived. *Cordis*, 561 F.3d at 1331. Moreover, Defendants offer no explanation to the Court as to why the term "first" must be used in a temporal sense, precluding two layers formed at separate times from being the "first oxide layer," rather than, for example, a means of differentiating it from the "second oxide layer." The Court finds substantial evidence from the record that the jury was free to credit showing that the silicon dioxide and hafnium layers together meet the limitation of a "first oxide layer."

### 3.   "a first oxide layer . . . with a thickness greater or equal to that of the gate oxide"

Defendants argue that this limitation is not met because KAIST relied on a theory that the first oxide layer (at the top of the fin) and the gate oxide (on the sides of the fin) were "considered equal *with manufacturing variation*." (Dkt. No. 578 at 11 (emphasis in original) (quoting Dkt. No. 490 at 18:21–19:2).) This theory, Defendants assert, "fails as a matter of law, both literally and under the doctrine of equivalents." (*Id.*)

a.    **There is substantial evidence of literal infringement**

Defendants argue that this theory fails as a matter of literal infringement for several reasons. First, the term "greater or equal to" is a "mathematically precise, numerical boundary" that uses no words of approximation to add any flexibility. (*Id.* at 12.) Second, the Federal Circuit has already rejected the theory that manufacturing tolerances can be read into claim terms. (*Id.* at 13 (citing *Senmed, Inc. v. Richard-Allan Med. Indus., Inc.*, 888 F.2d 815, 820 n.10 (Fed. Cir. 1989); *Middleton, Inc. v. 3M*, 311 F.3d 1384, 1389 (Fed. Cir. 2002)).) Third, Defendants argue that, "Dr. Kuhn did not demonstrate that *any* accused product, much less *all* of them, satisfied this limitation" because she did not establish that the products she measured were "representative of all accused products." (*Id.*)

The Court finds these arguments unpersuasive. First, the Court does not find that the terms of the Asserted Claims must necessarily be interpreted with mathematical precision. Rather, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a personal of ordinary skill in the art in question at the time of the invention." *Phillips v. AHW Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). There is ample evidence in the record that a person of ordinary skill in the art would have understood the term "equal" to include some manufacturing variation. Defendants seek to elevate "equal" to mean "exactly equal" without any support in the evidence for such a construction.[6]

Dr. Subramanian admitted that "when a person of ordinary skill in the art is reading the '055 patent and reading the claim that says equal thickness on the upper surface and the sidewalls,

---

[6] Extending defendants argument to its logical conclusion, they would say that a person of ordinary skill in the art would not consider 1.0000000001 nm to be "equal" to 1.0000000002 nm. Defendants offer no evidence that such unerring precision is necessary in the relevant art such that the claims should be understood this way. In any event, Defendants seek in effect a post-verdict claim construction.

10

that person is reading the patent with the understanding of manufacturing tolerances." (Dkt. 496 at 99:20–100:1.) Dr. Kuhn testified that "you're going to see some level of manufacturing variation even in an extremely healthy uniform process." (Dkt. No. 491 at 102:11–13.) The jury was entitled to take this testimony into account in determining whether this limitation was met under its plain and ordinary meaning as understood by a person of skill in the art.

Second, the Court disagrees that the Federal Circuit has foreclosed any consideration of manufacturing tolerances in interpreting patent claims. To the contrary such considerations would be entirely appropriate if there is evidence that a person of ordinary skill in the art would understand the claims terms with these variations in mind. The Federal Circuit's decisions in *Senmed* and *Middleton* do not compel an opposite result. The *Senmed* court did not find that manufacturing tolerances were never relevant but found that they were not sufficient in that case to overcome prosecution history estoppel. *See* 888 F.2d at 820 & n.10. There is no similar prosecution history estoppel in this case.

In *Middleton*, the Federal Circuit criticized the patentee's reliance on a post-issuance supply contract showing manufacturing tolerances as evidence of a patent claim term. The Federal Circuit made the unremarkable observation that "[t]he meaning of a patent term . . . is not subject to revision or alteration by *subsequent* contract between the patentee and its suppliers." 311 F.3d at 1389 (emphasis added). What the *Middleton* court did *not* do, however, was to hold that manufacturing tolerances are never relevant. To the contrary, if such evidence "supplies some insight into the understanding of skilled artisans *at the time of invention*, it may have some relevance to claim construction." *Id.* (emphasis added). Here, KAIST has not attempted to revise the meaning of a claim term with a subsequent contract or other *post-hoc* evidence. Rather KAIST's experts—and Defendants' experts—testified that a person of ordinary skill in the art *at*

11

*the time* would have read the patent with manufacturing tolerances in mind. (*See, e.g.*, Dkt. 496 at 99:20–100:1.) The Court views this as entirely in keeping with *Phillips* and not afoul of the Federal Circuit's admonition in *Middleton*.

Finally, the Court finds that Dr. Kuhn provided substantial evidence that the accused products satisfied this limitation. As an initial matter, the Court agrees with KAIST that Defendants' criticism of the products Dr. Kuhn claimed were representative in her analysis is essentially a late-breaking, and thus waived, *Daubert* challenge. (Dkt. No. 592 at 9 (citing *Versata Software, Inc. v. SAP America, Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013)).) The reliability of Dr. Kuhn's analysis goes to the admissibility of Dr. Kuhn's opinion, not its sufficiency once offered. *See Stevenson v. E.I. DuPont De Nemours & Co.*, 327 F.3d 400, 407 (5th Cir. 2003).

Dr. Kuhn testified that she "analyzed transistors incorporating the Defendants' 14-nanometer bulk FinFET technology" and that this analysis was "representative of all the 14-nanometer LPE/LPP devices, chips, and products." (Dkt. No. 489 at 72:8–12, 73:21–24.) Dr. Kuhn testified that on average, "for the logic transistors, for all the data I had, was an upper surface measurement of 2.78 nanometers and a side-wall measurement of 2.65 nanometers," and for the I/O devices, "the upper surface on this one is 5.13, and the side-walls are 5.12, which is astonishingly close." (Dkt. No. 497 at 171:18–23, 172:9-15.) Defendants' own expert, Dr. Bob Wallace, admitted that "averaging would be appropriate" to measure "the thickness numbers at the top and sides of the Fin." (Dkt. No. 494 at 188:1–5.)

Further, Defendants' own internal documents confirm that the thickness was "equal on all sides." (Dkt. No. 490 at 16:5–24; PX0853 at 51.) Heedon Jeong, a senior engineer at Samsung, likewise testified that the thicknesses on all three sides of the Fin "are equivalent" and that "[t]here is no difference on the gate oxide on the sides and the gate oxide on the top of the fin." (Dkt. No.

493 at 47:16–20, 49:20–24.) Thus, there was substantial jury to conclude that the "first oxide layer" had "a thickness greater or equal to that of the gate oxide" in the accused products, and therefore that this limitation was met.

        **b.**       **There is substantial evidence of infringement by equivalents**

Even if this limitation were not literally met in the accused products, the jury had substantial evidence from which to find infringement under the doctrine of equivalents. Defendants argue that Dr. Kuhn's doctrine of equivalents analysis is insubstantial because it "does not focus on the differences in the *thicknesses* required by the claims." (Dkt. No. 602 at 6 (emphasis in original).) This argument is unpersuasive for two reasons. First, it is factually wrong. Dr. Kuhn testified that "under the doctrine of equivalents, the differences in the oxide layer *thicknesses* are insubstantial." (Dkt. No. 490 at 20:14–16 (emphasis added).) Second, it is legally inapposite. "Under the doctrine of equivalents, a product or process that does not literally infringe a patent claim may nevertheless be held to infringe 'if it performs substantially the same function in substantially the same way to obtain the same result.'" *Duncan Parking Techs., Inc. v. IPS Grps., Inc.*, 914 F.3d 1347, 1362 (Fed. Cir. 2019) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)). The test does not require an analysis of whether the relative dimensions are insubstantial. Dr. Kuhn provided competent testimony under the appropriate standard for the doctrine of equivalents. (Dkt. No. 490 at 20:17–25.)

Next, relying on *Lear Siegler, Inc. v. Sealy Mattress Co.*, Defendants argue that Dr. Kuhn's doctrine of equivalents analysis is "legally insufficient because it relies on the exact same 'manufacturing tolerances' she used for literal infringement." (Dkt. No. 578 at 16 (citing 873 F.2d 1442, 1425 (Fed. Cir. 1989)).) However, *Lear* does not stand for the proposition that a patentee cannot rely on the same theories for both literal infringement and the doctrine of equivalents. *Lear* merely requires "testimony explicitly comparing the claimed and accused devices as to all three

13

elements of equivalents" outlined in *Graver Tank*. 873 F.2d at 1426. Dr. Kuhn provided such testimony. (Dkt. No. 490 at 20:17–25.)

Finally, Defendants argue that KAIST's equivalents theory results in claim vitiation because it equates "greater than or equal to" with its polar opposite, "less than." (Dkt. No. 578 at 16 (citing *Moore U.S.A., Inc. v. Standard Reg. Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000)).) However, this is not the case. Rather, KAIST argues that manufacturing variations result in points of inequality because the layer is "bumpy at the atomic level." (Dkt. No. 592 at 15 (citing Dkt. No. 490 at 17:5–19:20).) Claim vitiation applies where "one of skill in the art would understand that the literal and substitute limitations are not interchangeable." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013). Defendants' own expert admitted that a person of ordinary skill in the art would read the claim language with manufacturing tolerances in mind. (Dkt. No. 496 at 99:20–100:1.) Thus, the it would not be clear to a person of skill in the art that "greater than or equal to" forecloses layers that are substantially equal within manufacturing tolerances.

### 4. "a Fin active region which is a wall-shape single crystalline silicon"

Defendants argue that that the accused products do not meet the "wall-shape" Fin limitation of the claims because "the irrefutable evidence shows that the accused fin is parabola-shaped," which "is critical because, unlike a wall, a parabola has no clear demarcations between its sides and upper-surface." (Dkt. No. 578 at 17.) It is ironic that Defendants argue there are no clear demarcations between the sides and top of the Fins of the accused products *immediately* after devoting seven pages of their motion to arguing that the thickness of the first oxide layer on the upper surface of the Fin is not greater than or equal to the gate oxide layer of the sides of the Fin, seemingly having no problem distinguishing the upper surface from the sides. (*See* Dkt. No. 578 at 10–16.) Defendant's witnesses Dr. Wallace and Mr. Jeong had no issue distinguishing the upper

14

surface and sides of the Fins either. (Dkt. No. 494 at 194:11–14; Dkt. No. 493 at 49:7–50:12.) Dr. Kuhn explained that Defendants' devices have a Fin active region that is wall-shape and single crystal. (Dkt. No. 489 at 76:9–78:9.) This is substantial evidence in the record from which the jury could conclude that this limitation is met.

### 5. Infringement by GlobalFoundries, Inc.

Defendant's challenge the jury's finding of infringement by GlobalFoundries, Inc. ("GFI"). Defendants do not dispute the finding of infringement as to GlobalFoundries U.S. Inc. ("GF US"), but dispute such finding as to GFI, as distinct from GF US, on the grounds that the undisputed evidence showed "that GFI is a holding company with no operations—including no sales, manufacturing, or other ordinary business activities." (Dkt. No. 578, at 18 (citing Dkt. No. 493 at 61:12–15, 72:2–74:16; Dkt. No. 494 at 50:13–14, 75:17–20).) The jury returned a verdict finding the "GlobalFoundries Defendants" liable for infringement but also finding such infringement was not willful and awarding $0.00 in damages for such infringement. (Dkt. No. 499.) The verdict defined the "GlobalFoundries Defendants" as "GlobalFoundries, Inc., and GlobalFoundries U.S. Inc., collectively." (*Id.* at 1.)

The Court notes with some level of frustration—as it did when Defendants objected to collective reference to "GlobalFoundries" for the *first time* after the close of all evidence—"that beginning with its preliminary jury instruction, the Court has indicated throughout the trial that the Defendants would be identified and referred to on that basis." (Dkt. No. 498 at 8:6–9.) Indeed, from the time they first introduced themselves to the venire panel, counsel for Defendants referred to GFI and GF US collectively as "GlobalFoundries." (Dkt. No. 487 at 11:14–16, 61:13–16 ("I am proud to be here . . . today representing the Defendants, Samsung, Qualcomm, and GlobalFoundries. Earlier you met representatives . . . of the three Defendants.").) Immediately after being sworn in, the Court instructed the jury members, without objection, that "throughout

15

the course of the trial you may hear [GFI and GF US] referred to collectively as either GlobalFoundries or as the GlobalFoundries Defendants." (Dkt. No. 488 at 11:8–10.) Defendants sat on their hands and never objected to this approach until all the evidence had been presented to the jury. In fact, from their opening statement onward, Defendants themselves regularly referred to "GlobalFoundries" as if it was a single defendant. (*Id.* at 64:12 ("GlobalFoundries is another Defendant involved here.").)

Thus, it was amply clear to the jury that references to "GlobalFoundries" throughout the trial would refer to *both* GFI and GF US. On that basis, the jury was free to credit evidence and testimony that "GlobalFoundries" infringed the Asserted Claims, including the opinions of Dr. Kuhn, as being equally applicable to both GFI and GF US. (*See, e.g.*, Dkt. No. 489 at 72:8–23, 73:25 *et seq.*) Indeed, in their cross-examination of Dr. Kuhn, Defendant's made no attempt to distinguish GFI from GF US. (Dkt. No. 491 at 94:19–23 ("Q. And you were asked to do an infringement analysis . . . of GlobalFoundries's products, right? A. Yes, sir.").)

The Court acknowledges that testimony was adduced at trial indicating that GFI is a holding company without operations. (*See, e.g.*, Dkt. No. 494 at 50:13–14.) However, the Rule 50(b) motion standard is not whether there was substantial evidence to support a finding contrary to the jury's verdict. Nor is the standard whether the Court sitting in place of the jury would have found the contrary evidence adequate to outweigh the evidence supporting the jury's verdict. Rather, the Court must determine whether there is substantial evidence to support the jury's verdict as those citizens returned it. The jury, being free to credit testimony about "GlobalFoundries" as

equally applicable to GFI and GF US, had substantial evidence from which to make a finding that GFI infringed the Asserted Claims.[7]

###    C.    Invalidity

Defendants assert that judgment as a matter of law "of invalidity is appropriate, as there is clear and convincing evidence that [the Asserted Claims] are invalid under 35 U.S.C. §§ 102, 103." (Dkt. No. 578 at 21.)

As an initial matter, the Court notes that Defendants argument that "Plaintiff conceded" that certain limitations are met in the prior art is unsupported in the record and misunderstands Defendants burden under Rule 50(b). (Dkt. No. 578 at 22.) KAIST did not stipulate that any limitations were met in the prior art. It was therefore Defendants burden to prove by clear and convincing evidence that *all* limitations were met in the prior art, and it is their burden now to demonstrate evidence that "points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless*, 880 F.3d at 1361. Having failed to point to any evidence to support such a conclusion as to several limitations, the Court finds that Defendants have failed to meet their burden.

The Court further finds that substantial evidence exists in the record from which the jury could have concluded that the limitations Defendants actually did challenge are not met in the asserted prior art.

---

[7] The Court observes that this issue has all the earmarks of the kind of challenge raised for the first time after a trial is complete and the appellate lawyers comb the record after the trial lawyers have left the field. Whether or not such is the case here, GFI is itself largely responsible for any problem about which it now complains. Here, GFI sat silently when the Court indicated these entities would be referred to collectively, and further, GFI regularly treated them as one and the same throughout the trial.

### 1. Limitations appearing in both independent Claims 1 and 13

Defendants argue that Claims 1–4 and 16–17 are invalid in view of U.S. Patent No. 5,844,278 ("*Mizuno (US)*").[8] Specifically, Defendants argue that four limitations that KAIST contended were not met by *Mizuno (US)* are in fact met. The Court notes that, though Defendants characterize this argument as directed only to certain Asserted Claims, if any of these four limitations are not met by *Mizuno (US)*, such evidence would support a finding of no invalidity as to independent Claim 1 and all of its dependent claims, i.e., Claims 1–6, 11–12, and 15–17. It would also support a finding of no invalidity as to independent Claim 13, which likewise contains each of these four limitations.

#### a. "a bulk silicon substrate"

Defendants argue that, on cross-examination, Dr. Kuhn conceded that *Mizuno (US)* does disclose a bulk silicon substrate. (Dkt. No. 578 at 22 (citing Dkt. No. 497 at 186:4–16; Dkt. No. 491 at 41:3–6, 42:12–14; PX-1290 at 9:1–4, Fig. 8A).) KAIST responds that Dr. Kuhn did no such thing. According to KAIST, Dr. Kuhn explained that *Mizuno (US)* was a silicon-on-insulator ("SOI") design and did not disclose a bulk silicon substrate. (Dkt. No. 592 at 20 (citing Dkt. No. 497 at 124:4–15, 129:16–130:12).) Dr. Kuhn agreed on cross-examination that Figure 8A of

---

[8] The Court distinguishes this reference from Japanese Published Patent Application No. 1996-139325 ("*Mizuno (JP)*"), which was not asserted by Defendants in this case and was asserted for the first time before the PTO *after* the jury's verdict in this case as part of Samsung's request for *ex parte* reexamination. (*See* Dkt. No. 651-2 at 3; 659-1 ¶ 2).) Indeed, Samsung specifically distinguished *Mizuno (JP)* from *Mizuno (US)* in its request for *ex parte* reexamination. (Dkt. No. 659-2 at 12 (stating that *Mizuno (US)* "is not part of any invalidity ground raised in this reexamination request").) The Court finds that consideration of *Mizuno (JP)* would be inappropriate on this record. Likewise, any attempt to overturn the jury's verdict, by this or another court, on such a basis would be inappropriate. *See Moffitt*, 66 U.S. at 283 (Title to money judgments for patent infringement "does not depend upon the patent, but upon . . . the judgment of the court."); *In re Swanson*, 540 F.3d at 1379 n.5 ("[A]n attempt to reopen a final federal court judgment of infringement on the basis of a reexamination finding of invalidity might raise constitutional problems.").

18

*Mizuno (US)*, shows "a protrusion extending up from its bulk substrate," (*Id.* (citing Dkt. No. 497 at 186:4–16)), but on redirect she clarified that the projection is connected to an SOI substrate, not a bulk substrate (*Id.* (citing Dkt. No. 497 at 195:8–18)).

The Court agrees that Dr. Kuhn clarified her testimony and reaffirmed her original testimony that *Mizuno (US)* does not disclose a bulk silicon substrate. This is substantial evidence from which the jury could conclude that Claim 1 and its dependents were not anticipated by *Mizuno (US)*.

> **b.      "a source/drain region which is formed on both sides of the Fin active region except where said gate overlaps with the Fin active region"**

Defendants next argue that *Mizuno (US)* in fact discloses a "source/drain region which is formed . . . except where said gate overlaps with the Fin active region." Defendants acknowledge that Dr. Kuhn testified that *Mizuno (US)* does not disclose such, but that "the source/drain would be diffusing under the gate." (Dkt. No. 578 at 22 (citing Dkt. No. 497 at 132:25–134:20).) However, Defendants contend that KAIST offered no evidence of such but that the evidence shows the opposite, citing only *Mizuno (US)* itself and its own experts' interpretation of the reference. (*Id.* at 23 (citing PX1280 Fig. 8A; Dkt. No. 496 at 55:24–56:15; Dkt. No. 497 at 34:8–35:2).) Indeed, Defendants consistently argue that "Dr. Kuhn *contended* that" a limitation is not met, as if Dr. Kuhn's testimony is mere attorney argument and not competent evidence. (*See, e.g.*, Dkt. No. 578 at 22.) Dr. Kuhn's testimony that a limitation is not met is evidence that the jury was entitled to credit over Defendants' experts' testimony to the contrary.

Defendants do not explain why Dr. Kuhn interpreting *Mizuno (US)* one way is not substantial evidence but its own experts interpreting the reference another way is substantial evidence. The jury was free to credit whichever experts and their testimony it found to be credible.

There is substantial evidence in the record from which the jury could have concluded that this limitation is not met in *Mizuno (US)*.

<div align="center">

**c.      "a Fin active region which is a wall-shape"**

</div>

KAIST's expert, Dr. Kuhn, opined that *Mizuno (US)* does not disclose a "wall-shape" Fin active region because there is no evidence *Mizuno (US)* uses the Fin shape and gates to create the fully depleted Fin active region. (Dkt. No. 497 at 131:1–132:24.) Defendants argue that this theory fails because Dr. Kuhn conceded that full depletion is not a requirement of the "wall-shape" term. (Dkt. No. 578 (citing Dkt. No. 497 at 186:17–24).) KAIST responds that Dr. Kuhn admitted only that the Court has not construed "wall-shape" to require full depletion but also explained that the term has a plain meaning to a person of ordinary skill in the art. (Dkt. No. 592 at 21 (citing Dkt. No. 497 at 131:1–132:24).) While Dr. Kuhn testifies that the "wall-shape" term is met because there is full depletion, she does not, in fact, ever link full depletion to the term "wall-shape" or explain why a person of ordinary skill in the art would understand "wall-shape" to require full depletion. (*See* Dkt. No. 497 at 131:1–132:24.)

However, it was not KAIST's burden to establish that this limitation is *not* met in *Mizuno (US)*. Rather, it was Defendants' burden at trial—and their burden on this motion—to identify evidence establishing that this limitation *has been* met by clear and convincing evidence. Defendants have not pointed to any such evidence, let alone evidence that "points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless*, 880 F.3d at 1361. Defendant have failed to meet their burden of establishing that this limitation was met.

<div align="center">

20

</div>

### d. "a contact region and a metal layer which are formed at said source/drain and gate contact region"

Defendants concede that Dr. Kuhn testified that *Mizuno (US)* "does not disclose the 'metal layer which is formed at said source/drain and gate contact region' as Mizuno's 'aluminum wiring is not one of the source/drain with a gate,' but is 'sitting up further.'" (Dkt. No. 578 at 23 (quoting Dkt. No. 497 at 134:21-136:16).) However, Defendants argue that *Mizuno (US)* "expressly discloses otherwise," citing the reference itself and their expert's testimony that it discloses "aluminum wiring" used as a "metal wiring layer." (*Id.*; Dkt. No. 497 at 35:25–36:17.) Dr. Kuhn explained why, in her opinion, a person of ordinary skill in the art would not interpret this reference to "aluminum wiring" as meeting the "contact region and a metal layer" limitation:

> [A]luminum is a material that diffuses like made in a semiconductor device. And device engineers do not put aluminum anywhere near an active gate. So aluminum wiring is certainly used, but it's always used away from the gate. In a process with a metal contact, the usual material will be tungsten or a refractory material. So this aluminum wiring is not one of the source/drain with a gate.

(Dkt. No. 497 at 135:14–136:13.) The jury was free to credit this testimony over that of Defendants' experts, and it—without more—constitutes substantial evidence from which the jury could have concluded that this limitation is not met in *Mizuno (US)*.

### 2. Additional Limitations

As noted above, Defendants failure to meet their burden to show that *each* of the four limitations discussed above are met, as well as their failure to establish the limitations of Claims 1 and 13—which they do not even raise in their motion—are each an independently sufficient reason to uphold the jury's verdict on invalidity as to all of the Asserted Claims. Nonetheless, for completeness, the Court considers Defendants' arguments as to the additional limitations of Claim 13 and the dependent Asserted Claims. That done, however, the Court finds that Defendants have failed to meet their burden as to these limitations as well.

21

### a.   Claims 5 and 6

Defendants argue that the additional limitations of Claims 5 and 6 are indisputably met under the Court's claim construction. Defendants argue that under the Court's construction, reducing "the parasitic capacitance between the gate and the bulk substrate," as required by Claim 5, "is satisfied by a second oxidation layer thickness between 20 nm and 800 nm." (Dkt. No. 578 at 23–24 (citing Dkt. No. 179 at 32).) Similarly, Defendants argue that the Court construed "the contact resistance is reduced," as required by Claim 6, to be met "merely by selecting the contact size to be greater than the fin width." (*Id.* at 23 (citing Dkt. No. 179 at 35–36).) Defendants argue that, because it is undisputed that *Mizuno (US)* discloses both of these structural elements—a "second oxidation layer" between 20 nm and 800 nm as well as a contact size greater than the fin width—that these limitations are met by *Mizuno (US)*. (*Id.* at 23–24.)

KAIST responds that the Court's construction is not an explanation of how the limitations are met, but an explanation of why the limitations are not indefinite in light of the teachings of the Asserted Patent. (Dkt. No. 592 at 22.) Though a limitation is not indefinite because the patent explains the steps required to meet it, it does not follow that any reference disclosing these steps also discloses the limitation. The Court agrees that without the teachings of the Asserted Patent, it would not be clear how to satisfy these limitations. (*Id.*; *see also* Dkt. No. 179 at 32, 35–36.)

Dr. Kuhn explained why *Mizuno (US)* failed to meet these limitations. (Dkt. No. 497 at 138:6–139:11.) The jury was free to believe her testimony over Defendants' experts' contrary testimony.

### b.   Claim 13

In its argument with regard to the additional limitation of Claim 13, "enlarging the width of said Fin active region within the oxidation layer as it approaches the bulk substrate," Defendants again note Dr. Kuhn's testimony that this limitation is not met by *Mizuno (US)*, but then argue that

it is "indisputably" the opposite, citing their own expert's testimony and *Mizuno (US)* itself. (Dkt. No. 578 at 24 (citing Dkt. No. 497 35:7–24, 140:22–141:21; Dkt. No. 496 at 67:10–69:6; PX1290, fig. 18.)

The fact that Dr. Kuhn disputed that this limitation was met means it is not "indisputably show[n]." (*Id.*) Dr. Kuhn and Dr. Subramanian both offered competent expert opinions about their respective interpretations of Figure 18 of *Mizuno (US)*. The jury was free to credit either one and the Court will not substitute its judgment for that of the jury's where substantial evidence to support the jury's finding exists.

### c.   Claims 11, 12, and 15

Defendants argue that Claims 11, 12, and 15 are invalid as obvious based upon combinations of *Mizuno (US)* and U.S. Patent Pub. No. 2002/0011612 ("*Hieda*") or *Mizuno (US)* and U.S. Patent No. 6,355,532 ("*Seliskar*"). (Dkt. No. 578 at 24–25.) Dr. Kuhn explained why a person of skill in the art would not be motivated to combine these references. (Dkt. No. 497 at 149:23–151:3, 154:15–157:16.) This is substantial evidence that the jury was entitled to credit in finding that the claims were not obvious.

### D.   Willfulness

Samsung challenges the jury's finding that it willfully infringed the Asserted Claims and requests judgement as a matter of law of no willfulness. (Dkt. No. 580.) KAIST opposes this motion and in its own motion requests that the Court enhance the damages awarded by the jury as a result of Samsung's willfulness. (Dkt. No. 586.) The Court concludes that there is substantial evidence to support the jury's finding of willfulness and that such willfulness warrants

enhancement of the damages awarded to KAIST. The Court therefore awards KAIST two times the amount of damages that the Court finds are supported by the evidence.[9]

### 1.   Judicial Estoppel

As a threshold matter, Samsung argues that KAIST is judicially estopped from arguing that Samsung acted willfully because it previously argued to the Court that Samsung did not rely on the Asserted Patent at all and because the Court accepted such an argument in finding against Samsung on its defense of equitable estoppel. However, Samsung's argument in this regard misunderstands this Court's prior fact-finding. In the Court's view, it's prior finding that Samsung did not "rely on a belief that Professor Lee would never assert the '055 patent when it decided to adopt the patented technology" (Dkt. No. 574 at FF 140; *see id.* at FF141–FF152) is not "plainly inconsistent" with a finding of willfulness, *In re Oparaji*, 698 F.3d 231, 235 (5th Cir. 2012).

The Supreme Court in *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, described conduct warranting enhancement under § 284 as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." 136 S. Ct. 1923, 1932 (2016). Where an individual or entity takes another's property without any regard for whether or not the victim is entitled to that property or will later seek to reclaim it, such conduct is "characteristic of a pirate" and equally characteristic of a lack of reliance on—or a lack of regard for—the conduct of the property owner. *Id.*

The Court found that Samsung thought the '055 Patent "was not quite important" and thus "did not pay really much attention to [it]." (Dkt. No. 574 at FF143 (quoting Dkt. No. 547-9, at

---

[9] The Court makes this determination mindful of the actual amount of damages the Court finds are supported by the evidence, as such is relevant to at least *Read* Factor 4. The Court makes this enhancement determination in order to determine an appropriate remittitur to offer KAIST. Should a jury in a new damages trial award a meaningfully different amount, the Court will, in such event, entertain motions to reconsider its decision with regard to enhancement.

113:25–114:8).) Samsung was "going to invest in creating a sub-20 nm process node *regardless* of the '055 Patent." (*Id.* at FF150 (emphasis added).) Samsung's knowledge of and subsequent disregard of the '055 Patent is equally consistent with a finding of willfulness as it is with a finding of no reliance. The Court concludes that KAIST is not judicially estopped from asserting that Samsung's conduct was willful.

### 2.   Substantial Evidence

Samsung next argues that KAIST failed to adduce substantial evidence to support a finding of willfulness. Samsung argues that no reasonable jury could have found that it copied the '055 Patent based upon two presentations given by Prof. Lee, the inventor of the '055 Patent, in 2006 and 2012. (Dkt. No. 580 at 6–8.) Samsung also argues that Dr. Kuhn was an inappropriate witness to testify about Samsung's alleged copying. (*Id.* at 8–11.) Samsung asserts that its pre-suit knowledge of the patent alone cannot support a finding of willfulness. (*Id.* at 11–12.) Additionally, Samsung argues that KAIST has failed to identify any non-patent materials upon which Samsung may have relied that fully disclose the invention of the '055 Patent. (Dkt. No. 603 at 2.)

KAIST responds by citing inventor and expert testimony that Prof. Lee's publication practiced the '055 Patent. (Dkt. No. 594 at 1 (citing Dkt. No 488 at 89:24–98:8, 93:15–94:15, 95:10–12; Dkt. No. 489 at 65:11–24, 66:12–67:16).) The presentations Prof. Lee gave to Samsung expressly discussed these publications. (*See, e.g.*, PX1608 at 9, 10; Dkt. No. 488 at 93:15–19.) KAIST also cites evidence that as early as 2002 Samsung was aware that Prof. Lee had filed for a patent for his invention and that he asked Samsung to take a license. (Dkt. No. 594 at 4–5.) Prof. Lee testified that Samsung was again approached about the patent in 2011 and 2012. (Dkt. No. 489 at 29:11–15.) The jury also heard that it was not until two to three years after this notice that the accused product was completed and the first infringement occurred. (Dkt. No. 494 at 7;17–8:8; Dkt. No. 493 at 48:20–23; Dkt. No. 491 at 212:25–213:3; Dkt. No. 497 at 71:25–72:2.)

25

In sum, KAIST adduced evidence that Samsung "was aware of the [Asserted Patent] prior to the current litigation," that the parties had "prior business dealings from which the jury could have inferred that [Samsung] believed that it needed [a] license," and "circumstantial evidence that [Samsung] copied [Prof. Lee's] technology." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1245 (Fed. Cir. 2017) This is substantial evidence to support a conclusion that "subjective recklessness led to willful infringement in this case." *Id.* Although Samsung "dispute[s] several of these facts, the jury was free to decide whose evidence it found more compelling on the question of willfulness." *Id.* Having such freedom, the jury reached a verdict that this Court must accept and respect.

### 3.    Enhancement

Having determined that there is substantial evidence to support the jury's finding of willfulness, the Court next turns to the question of enhancement under § 284. Considering the factors set forth by the Federal Circuit in *Read Corp. v. Portec, Inc.*, the Court finds that enhancement is warranted in this case. 970 F.2d 816, 827 (Fed. Cir. 1992).

*Read* Factor 1: As the Court has discussed, KAIST adduced evidence showing that Samsung had access to Prof. Lee's designs while it was developing the accused product, which tends to show that Samsung "deliberately copied the ideas or design of another." *Id.*

*Read* Factor 2: While Samsung asserted at trial reasons that it felt it did not infringe, the Court does not find any specific evidence of any investigation undertaken by Samsung which would have reasonably allowed it to arrive at this belief. (*See* Dkt. No. 607 at 6–7; Dkt. No. 616 at 2–3.) Accordingly, the Court does not find that Samsung "investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed." *Read*, 970 F.2d at 827.

*Read* Factor 3: The Court agrees with Samsung that its "behavior as a party to the litigation" is more appropriately analyzed in the context of KAIST's pending § 285 motion. *Id.*; *see Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 120-21 (E.D. Tex. 2017). That Court leaves that analysis to that context.

*Read* Factor 4: The Court agrees with Samsung that its "size and financial condition" are appropriate to consider as a potential mitigating factor rather than as a reason for enhancement. *Read*, 910 F.2d at 827; *see Idenix Pharms. LLC v. Gilead Sciences, Inc.*, 271 F. Supp. 3d 694, 701 (D. Del. 2017).

*Read* Factor 5: Samsung points to two issues in attempting to show the "[c]loseness of the case." *Read*, 910 F.2d at 827. First, Samsung notes that KAIST did not seek summary disposition on many of the issues ultimately tried to the jury. (Dkt. No. 607 at 11.) Second Samsung argues that it "had a strong argument, based on the Intel license, that damages for all Defendants should be no higher than $7.4 million." The jury's verdict awarding $400 million against Samsung alone is a fairly clear indication that Samsung's damages argument was not strong. Moreover, the Court does not view KAISTs decision not to seek summary disposition as dispositive. While the Court finds ample evidence to support the jury's verdict, which found against Samsung in every respect, the Court does not view the case as so close or not close as to meaningfully impact its decision to enhance the damages award.

*Read* Factor 6: The "duration of [Samsung's] misconduct" is relatively short. *Read*, 910 F.2d at 827. Infringement did not occur until 2015 and this case was brought in November of 2016. (*See* Dkt. No. 607 at 12.) However, the Court also considers as relevant Samsung's pre-infringement misconduct that later ripened into infringement. Other *Read* factors, including *Read* factor 1, make clear that pre-infringement conduct is relevant to the issue of enhancement. In that

27

respect, Samsung's misconduct began at least as early as 2011. (*See id.*) The Court views this factor as slightly favoring enhancement.

*Read* Factor 7: The Court does not agree with Samsung's assertion that its failure to take "[r]emedial action," *Read*, 970 F.2d at 827, is not relevant so long as the defendant disputes the jury's verdict. (Dkt. No. 607 at 12.) The Court expects that most defendants will not agree with a finding of an infringement, and it would completely obviate this factor if a defendant could avoid it simply by challenging the verdict.

*Read* Factor 8: The Court finds no evidence from the record that Samsung had a "motivation to harm" the patentee. *Read*, 970 F.2d at 827.

*Read* Factor 9: The Court finds some evidence that "defendant attempted to conceal its misconduct." *Read*, 970 F.2d at 827. KAIST points to conduct that occurred during the development of the accused product, though not to evidence that Samsung's actual infringement was concealed from KAIST. (Dkt. No. 586 at 15.) The Court views Samsung's pre-infringement misconduct, ultimately ripening into infringement, as having some relevance to the issue of enhancement. Accordingly, Samsung's repeated statements to Prof. Lee that they could not commercialize his invention while simultaneously developing the accused product, counsels in favor of enhancement. (*Id.* (citing PX1374 at 1; PX2068 at 1).)

Taking all these factors together, the Court finds that enhancement is warranted but not to the full extent allowed by § 284. Accordingly, the Court awards KAIST two-times, but not three-times, the amount of damages under § 284.

## IV.    THE PARTIES' MOTIONS RELATED TO DAMAGES AND NEW TRIAL

Samsung also moves for judgment as a matter of law on damages (Dkt. No. 577) and, separately, for a new trial, potentially conditioned on a remittitur (Dkt. No. 579). These issues are closely related. Therefore, the Court addresses them together.

### A.    New Trial on Damages

In its Damages JMOL, Samsung asserts that there is no evidence to support the jury's finding on damages and that the evidence at trial supports only its asserted damages theory—that damages should be no more than $6,200,000. In its Motion for New Trial, Samsung argues that the grounds asserted in its Damages JMOL in the alternative warrant a new trial that could be conditioned on a remittitur. The Court agrees with Samsung that the evidence proffered at trial is insufficient to support the jury's verdict of $400,000,000 against Samsung. However, the court disagrees that $6,200,000 is the appropriate amount to award in place of the jury's verdict.

The Federal Circuit applies regional circuit law to a court's decision to grant a remittitur or new trial. *Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012). Whether to grant a new trial or remittitur is within the discretion of the district court. *Id.* The Fifth Circuit follows the maximum recovery rule in deciding the amount of a remittitur. *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 364–65 (5th Cir. 2019). Under this approach, the court should "award the highest amount the jury could have awarded." *Id.* at 364. This approach "preserves as much of the jury's award as possible" and is the "only remittitur approach . . . compatible with the Seventh Amendment." *Id.* at 365; *see also* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2815 (3d ed. 2019).

Applying this approach, the Court determines that the maximum amount the jury could have awarded, based upon the evidence adduced at trial, is $101,501,708. Incorporating the

Court's determination regarding enhancement under § 284 discussed herein, the Court therefore conditions a new trial on damages on a remittitur of $203,003,416.[10]

### 1. Running royalty evidence was insufficient to support the jury's lump-sum verdict

In its first argument in its Damages JMOL, Samsung argues that running royalty evidence, such as that adduced by KAIST, is insufficient "as a matter of law" to support a lump-sum verdict like the one returned by the jury. (Dkt. No. 577 at 5.) In response, KAIST argues that no authority from the Federal Circuit prohibits the use of running-royalty evidence to award lump-sum damages. (Dkt. No. 593 at 1–2.) KAIST also argues that substantial evidence supported the jury's award of a lump sum beyond the $321,438,451 amount, which KAIST's damages expert, Roy Weinstein, testified was "the 'minimum amount' for the limited damages period of November 29, 2016 to May 14, 2018." (*Id.* at 2 (citing Dkt. No. 491 at 209:10–16); *see also id.* at 2–4.)

The Court agrees with KAIST that running-royalty evidence may be used to arrive at a lump-sum damages award so long as "some basis for comparison . . . exist[s] in the evidence presented to the jury." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326–30 (Fed. Cir. 2009). However, the Court disagrees that such evidence was presented in this case. The jury heard evidence that the minimum amount of damages adequate to compensate KAIST during the November 29, 2016 to May 14, 2018 period was $321,438,451. (Dkt. No. 491 at 208:5–7.) Of this amount, $219,936,743 is attributable to speed and power efficiencies derived from the invention and $101,501,708 are attributable to manufacturing cost savings derived from the invention. (*Id.*

---

[10] The Court disagrees with Samsung's assertion that if the Court finds the jury's verdict unsupported by the evidence its only option is to award $6,200,000, the amount Samsung asserted at trial, or that KAIST has waived it's right to a new trial. (*See* Dkt. No. 604 at 10.) The maximum recovery rule requires the Court to remit the highest amount supported by the evidence. Moreover, Samsung itself moved for a new trial. (Dkt. No. 579.)

at 204:22–207:25.) However, the jury was not presented with evidence from which to extrapolate beyond this period to award damages for the entire life of the patent, such as a per unit royalty rate or evidence of the anticipated number of units to be sold throughout the life of the patent.[11]

While the Court finds the jury's damages award unsupported by the evidence, the proper remedy is not to disregard KAIST's damages theory in its entirety. Rather, the maximum recovery rule requires the Court to award the maximum amount the jury could have awarded based upon the evidence. Mr. Weinstein clearly testified that Samsung was entitled to at least $321,438,451, although neither he nor any other expert gave the jury a basis to extrapolate beyond that number. Thus, the Court concludes that under the maximum evidence rule, it should award $321,438,451 or that portion of it that is otherwise supported by the evidence.

### 2. KAIST adduced substantial testimony accounting for the Intel license

Samsung argues that KAIST's evidence of damages is insubstantial because its expert, Mr. Weinstein, disregarded a license to the Asserted Patent taken by Intel, "giving it lip service but failing to incorporate it into his analysis." (Dkt. No. 577 at 6.) As an initial matter, the court notes that Samsung brings this motion under Federal Rule of Civil Procedure 50(b), challenging the sufficiency of the evidence presented at trial, not under Federal Rule of Evidence 702, challenging the reliability and admissibility of the evidence. Having failed to raise such an admissibility challenge before now and under Rule 50(a), the Court finds that such an argument has been procedurally waived. (*See* Dkt. Nos. 225, 505.)

---

[11] Mr. Weinstein noted only his per unit royalty rate for smartphones, which is $4.74. The parties in their briefing have had to rely on Mr. Weinstein's demonstratives, which are not evidence, to establish Mr. Weinstein's other royalty rates. (*See* Dkt. No. 577 at 16 (citing Dkt. No. 491 at 206:4–20; PDX 6.49).)

The first of the fifteen *Georgia-Pacific* factors is "the royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Under this factor, the Intel license was certainly relevant for the jury to consider in reaching is damages decision. Indeed, the record reflects that the jury heard substantial testimony about the Intel license and its disputed comparability or non-comparability to the hypothetical negotiation between the patentee and Defendants. (*See* Dkt. No. 491 at 193:9–198:9; Dkt. No. 497 at 55:20–56–12; 59:23–61:14.) The Court also instructed the jury that, "[i]n determining the reasonable royalty" it may consider "whether the patent owner had an established royalty for the invention." (Dkt. No. 498 at 64:22–25.)

The jury was made well aware of the Intel license and why it should be relevant to their considerations. However, the jury also heard substantial testimony regarding why the hypothetical negotiation between the patentee and the Defendants would have differed from the negotiation between the patentee and Intel. (Dkt. No. 194:8–197:20.) The jury was free to credit this testimony in reaching their final determination on damages.

The cases cited by Samsung are inapposite. *Laser Dynamics, Inc. v. Quanta Computer, Inc.* addressed whether an expert's testimony was reliable under FRE 702, not whether there was sufficient evidence to support the jury's verdict. 694 F.3d 51, 79 (Fed. Cir. 2012). In *Whitserve, LLC v. Computer Packages, Inc.*, the Federal Circuit found an expert's testimony insufficient to support the jury's verdict because the expert simply "recited each [*Georgia-Pacific*] factor and [made] a conclusory remark about its impact on the damages calculation before moving on," not because the expert failed to consider a comparable license. 694 F.3d 10, 31 (Fed. Cir. 2012). These cases do not fit the evidence presented in this trial to this jury.

32

3.      **The evidence in the record establishes a proper apportionment analysis**

Samsung argues that KAIST failed to introduce evidence of damages "tied directly to the *incremental value* of the asserted patent" and thus failed to adduce substantial evidence to support its damages theory. (Dkt. No. 577 at 9 (emphasis original).) Specifically, Samsung argues that KAIST failed to properly apportion (1) the improvements in bulk FinFET technology represented by the invention; (2) the power-and-speed benefits and cost savings attributed to Samsung's investment in the technology; and (3) the smallest salable patent practicing unit. (*Id.* at 9–16.) The Court finds that KAIST's damages evidence properly considered and took account of other improvements in the technology and Samsung's own investment. However, the Court finds that Mr. Weinstein failed to establish that his varied royalty rates between smartphones, tablets, and stand-alone chips properly credit the value attributable to the Asserted Patent. Therefore, the Court finds no substantial evidence to support Mr. Weinstein's damages attributable to the power-and-speed benefits.

As a threshold matter, the Court notes that Defendants did not challenge the admissibility of KAIST's experts' apportionment opinions as disclosed in their expert reports. Therefore, any such challenges are procedurally waived and the Court reviews Samsung's challenges only for the sufficiency of the evidence admitted at trial. *Stevenson*, 327 F.3d at 407.

a.      **KAIST's experts properly considered the Asserted Patent's improvement over the prior art**

Samsung argues that KAIST incorrectly assumed that the Asserted Patent alone was "responsible for *all* benefits of moving from the prior planar mode to the 14 nm bulk FinFET node." (Dkt. No. 577 at 10 (emphasis in original).) Accordingly, Samsung argues, the evidence adduced cannot support the jury's verdict because it failed to "consider the *incremental advancement of the*" Asserted Patent. (*Id.* at 11 (emphasis in original).)

33

KAIST responds that its experts did in fact analyze the prior art designs and concluded that they did not work and accordingly assigned them no value. (Dkt. No. 593 at 15–16.) Dr. Kuhn testified that she analyzed the prior art designs and concluded that "[t]hey just don't work" and that she "couldn't very well calculate benefits . . . from something that doesn't actually work." (Dkt. No. 491 at 36:14–24, 110:9–17.) Another of KAIST's experts, David Witt, similarly testified that if there had been "any type of FinFET device that had gone into production -- you know, people would have used it. I believe all previous attempts at it -- were not successful." (*Id.* at 164:11–22.) He concluded that because no such device was "reduced to practice, then . . . they have no attributable benefit." (*Id.* at 157:5–9.)

Instead, KAIST's experts analyzed the performance improvements of the 14 nm bulk FinFET design over the then dominate 20 nm planar transistor design. (*Id.* at 22:24-23:5, 126:5-12.) They also compared the cost saving of the 14 nm bulk FinFET design over the prior art 28 nm planar transistor design (which was cheaper to manufacture than the 20 nm design). (*Id.* at 28:5-29:3, 136:4-11.)

The jury heard competent testimony that the prior attempts at a FinFET design were unsuccessful and entitled to no value and thus the proper comparison was the incremental value of the patent over the commercially viable alternatives. The jury was free to credit this testimony.

**b.    The evidence adduced properly accounts for Samsung's contributions to the technology**

Samsung next argues that KAIST's damages theory failed to account for Samsung's contributions to the technology, specifically the hafnium oxide layer added by Samsung and Samsung's $300,000,000 investment in research and development. (Dkt. No. 577 at 11–14.)

With regard to the hafnium oxide layer, Dr. Kuhn testified that the 20 nm planar transistor, to which she compared the 14 nm bulk FinFET design, also included a hafnium oxide layer. (Dkt.

No. 491 at 22:24–23:5, 104:13–107:24.) Thus, Dr. Kuhn properly accounted for the hafnium oxide, present in the accused product and the prior art, and concluded that the benefits she identified were attributable to the bulk FinFET taught by the Asserted Patent, not the hafnium oxide layer. (Dkt. No. at 107:16–24.)

As to Samsung's $300,000,000 investment in the technology, KAIST argues that these costs were credited back in the 88% of benefits from the Asserted Patent that Mr. Weinstein opined Samsung should keep in the hypothetical negotiation. (Dkt. No. 593 at 16; *see also* Dkt. No. 491 at 208:1–14 ("[Samsung] gets to keep almost 2.4 billion [dollars]. Those are the -- that's its 88 percent share of the benefits.").) Second, KAIST argues that Dr. Kuhn explained that it would be inappropriate to credit this investment because Samsung was going to need to make an investment in a new node regardless. (Dkt. No. 593 at 17; *see also* Dkt. No. 491 at 108:21–109:23 ("Because of the way the industry is structured, there is going to be another node, and so there's the expense of going into manufacture. They are going to run another node no matter what. And it's not fair to attribute the cost of what is going to inevitably happen.").)

As KAIST aptly notes, Samsung obviously disagrees with KAIST's experts, "but this is what jury trials are for." (Dkt. No. 593 at 17.) The jury was free to consider Samsung's adduced testimony about these investments, but it was also free to credit KAIST's expert's analysis about these factors and conclusions that they did not entitle Samsung to a reduction in the royalty to be paid.

      **c.**     **There is not substantial evidence to support Mr. Weinstein's apportionment between smartphones, tablets, and stand-alone chips**

Samsung argues that Mr. Weinstein failed to tie his damages analysis to the smallest salable unit. Samsung says he applied his regression analysis to end-user smartphones and tablets and then apportioned down from there to stand alone chips. (Dkt. No. 577 at 15–16.) Mr. Weinstein provides

35

a detailed regression analysis in which he excludes all other variables that impact price other than speed and power and offers an opinion about the value increase in a smartphone or tablet attributable to a one-percent increase in speed (or power converted to speed). (Dkt. No. 491 at 188:6–14.)

However, Mr. Weinstein then summarily opines that this value should be "apportioned" down to the chip level for stand alone "SoCs not sold in phones." (*Id.* at 188:15–18.) Mr. Weinstein does not explain how or why he arrived at this apportionment. There is no explanation in the record as to why the speed and power benefits ultimately realized in the completed phone or tablet should not be captured by the stand-alone chip, which allegedly practices the Asserted Patent and will ultimately be incorporated into such a device. Without any explanation, the jury had no substantial evidence from which to conclude that the royalty rate for the smartphones and tablets properly captured the incremental value of the Asserted Patent, whether the much lower royalty rate for the stand-alone chips properly captured that amount, or whether it was somehow both.

The Court agreed with the conclusion of the Magistrate Judge, who initially heard Samsung's *Daubert* challenge, that Mr. Weinstein's report "concludes the sales prices of Samsung's devices increase by an amount tied to the benefits stemming from the accused processors" and that "[t]his approach stays sufficiently clear of the concerns addressed by the 'smallest salable unit' principle." (Dkt. No. 453 at 6.) Nonetheless, at trial, Mr. Weinstein gave no explanation for his apportionment between stand-alone chips and end-user devices or why they should be entitled to such disparate royalty rates despite both practicing the Asserted Patent. There is not, for example, testimony that end-user devices practice the patent *more* than stand-alone chips by perhaps including more transistors than the stand-alone chips. Nor is there testimony that the speed-and-power benefits are somehow more manifest in the end-user devices than in the stand-

36

alone chips. Indeed, such testimony would seem like a concession that some of the benefits being attributed in the end-user devices are attributable to something other than the Asserted Patent since both the end-user device and the stand-alone chip both practice the patent.

Absent any explanation for his apportionment between end-user devices and stand-alone chips, there was not substantial evidence from which the jury could include that the $219,936,743 attributed to speed and power efficiency were properly apportioned. (*See* Dkt. No. 491 at 206:4–20.) The Court thus excludes these damages from its offer of remittitur as unsupported by the evidence.

        **4.**      **KAISTs evidence of damages is consistent with the rules of the hypothetical negotiation**

             **a.**      **There was substantial evidence to support a finding that KAIST would receive 12% of the profits attributed to the Asserted Patent**

Samsung next criticizes Mr. Weinstein's calculation of damages based on a profit-share ratio of 12%. (Dkt. No. 577 at 17.) As an initial matter, the Court notes that there is no evidence that the jury, in fact, credited Mr. Weinstein's testimony that KAIST was entitled to 12% of the profits attributed to the Asserted Patent. KAIST asked for approximately $321 million for a roughly 18-month damages period as part of a running royalty. The jury instead awarded $400 million in a lump-sum award for the entire life of the patent. This amount is substantially less than that which KAIST would have received over the life of the patent had the jury agreed with Mr. Weinstein. Consequently, it is substantially less than Mr. Weinstein's proposed 12% profit share.

Additionally, the Court again notes, that Samsung brings this motion to challenge the sufficiency of the evidence, not its reliability or admissibility under FRE 702. Samsung did not challenge the admissibility of Mr. Weinstein's 12% figure under *Daubert* or via any other pre-trial

mechanism and has procedurally waived such an argument, which it raised for the first time after all such evidence was presented to the jury. (*See* Dkt. Nos. 225, 505.)

Finally, Samsung challenges the sufficiency of the evidence by making arguments to the Court that it never made in front of the jury. (*See* Dkt. No. 577 at 17–18 (citing no testimony or argument in the record challenging Mr. Weinstein's 12% figure).) The Court will not sit in the place of the jury and entertain evidence and arguments on a Rule 50(b) motion that were not heard by the jury at trial. Samsung has presented no evidence in the record to contradict or challenge Mr. Weinstein's opinion that a 12% profit share is appropriate, let alone evidence "so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless*, 880 F.3d at 1361.

### b.   Mr. Weinstein's testimony regarding actual sales and profits was proper and relevant for the jury to consider

Samsung next faults Mr. Weinstein for basing his opinion on "actual financial data" generated after the hypothetical negotiation rather than "any contemporaneous financial projections the parties" might have actually considered as part of the hypothetical negotiation. (Dkt. No. 577 at 19.) However, as Samsung itself admits, the Federal Circuit has stated that "the hypothetical negotiation analysis permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009).

Samsung's argument appears to be that Mr. Weinstein improperly instructed the jury that the parties in the hypothetical negotiation "have access in a sense to information about the future, to the future sales, the future profits associated with using the technology." (Dkt. No. 577 at 19 (citing 176:16–177:9).) However, Mr. Weinstein did not instruct the jury on the law. The Court did. In doing so, the Court properly instructed the jury that "[e]vidence of things that happened

38

after the infringement first began may be considered in evaluating the reasonably royalty only to the extent the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation." (Dkt. No. 498 at 63:5–9.) The Court also instructed the jury that they should "determin[e] a reasonable royalty *at the time of the hypothetical negotiation*." (*Id.* at 63:12–13 (emphasis added).)

The Court concludes that Mr. Weinstein's testimony relying upon actual financial data was appropriate for the jury to consider and that the jury was properly instructed on how to weigh this after-infringement information in considering what would have resulted from the hypothetical negotiation. The Court thus finds that this was appropriate and is substantial evidence that supports the jury's verdict.

### c.   Mr. Weinstein's regression analysis was reliable

Samsung renews its challenge, first made in its *Daubert* motion to exclude Mr. Weinstein's testimony, that Mr. Weinstein's regression model, which he uses to determine his speed-and-power-efficiency damages, was unreliable for failing to consider certain variables. (Dkt. No. 577 at 21; *see also* Dkt. No. 491 at 183:13–15; Dkt. No. 225.) As an initial matter, the Court notes that it has already excluded these damages on other grounds.

However, the Court agrees with the Magistrate Judge that this issue "amounts to a disagreement between experts as to what variables should be considered. That goes to the weight to be given to the opinion rather than its admissibility." (Dkt. 453 at 4.) The Court also agrees with KAIST that the proper means for Samsung to address these alleged disparities was through the crucible of cross-examination. The jury was free to credit Mr. Weinstein's testimony as well as any testimony challenging the variables he chose. While the Court finds this portion of Mr. Weinstein's damages opinion unsupported on other grounds, the Court does not conclude that

substantial evidence did not exist due to any alleged impropriety with Mr. Weinstein's regression model.

      5.      **There is no evidence to support Samsung's argument that exhaustion applies to any chips considered in Mr. Weinstein's analysis**

Samsung argues that KAIST "effectively sought both a first royalty from SAS for making Snapdragon chips and also a second royalty from SAS's downstream customer SEA for selling devices including Snapdragon chips." (Dkt. No. 577 at 21.) Samsung then cites to portions of Mr. Weinstein's testimony describing speed and power efficiency damages and cost savings damages analysis, which at no point mentions SAS or SEA. (*Id.* at 21–22 (citing Dkt. No. 491 at 202:15–205:16, 206:4–8, 206:21–208:14).) It then concludes without further citation, "Thus, [KAIST] included in its damages calculation both the SAS chips and also the SEA mobile products containing those same chips." (*Id.* at 22.) The Court agrees with KAIST that this is "an entirely new factual theory that was never presented to the jury." (Dkt. No. 593 at 25.) The Court finds no evidence in the record to support it.

The Court has already noted that it will not substitute itself in the place of the jury and entertain new evidence not presented to the jury at trial. There is no indication in the record, one way or another, whether chips in SAS and SEA products have been counted twice. As such, there is certainly no evidence that "points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless*, 880 F.3d at 1361.

In sum, the Court finds that the jury's damages verdict is unsupported by the evidence because there was not substantial evidence from which the jury could calculate a royalty beyond the damages period to which Mr. Weinstein opined or conclude that Mr. Weinstein's apportionment of speed and power efficiency damages was proper. However, under the maximum recovery rule, the Court finds that up to $101,501,708, representing the amount of damages Mr.

40

Weinstein opined were attributable to cost savings, is supported by the evidence. (*See, e.g.*, Dkt. No. 491 at 207:5–20.)

### B. New Trial on Liability

While the Court concludes that a new trial on damages, subject to remittitur, is appropriate, the Court disagrees with Defendants that a new trial on infringement and invalidity is likewise warranted. The Court finds no passion or prejudice in the jury's verdict or any other prejudicial error that would make a remittitur inappropriate and a complete new trial necessary. *See Evers v. Equifax, Inc.*, 650 F.2d 1793, 798 (5th Cir. 1981).

Defendants incorporate by reference their motions for judgment as a matter of law in arguing that the jury's verdict is against the great weight of the evidence. For the reasons discussed above, the Court disagrees. Each of the issues disputed in Defendants' motions for judgment as a matter of law boil down to a battle between the experts. The Court does not find that testimony proffered by one side so greatly outweighs the testimony proffered by the other as to warrant a new trial.

The Court likewise disagrees that a new trial is warranted because Dr. Subramanian was not permitted to testify that the "first oxide layer" cannot comprise two separate layers or that the "first oxide layer" and the "gate oxide layer" limitations must be met by two distinct structures. The Court finds that both of these opinions were properly excluded.

### 1. The jury's verdict does not reflect passion and prejudice

Samsung argues that the jury's verdict reflects passion and prejudice because the jury awarded an amount in excess of what KAIST requested as to Samsung but awarded no damages as to Qualcomm and GlobalFoundries. (Dkt. No. 579 at 15.) Samsung further argues that the jury's finding of willfulness only as to it also reflects passion and prejudice. (*Id.*)

41

While the Court ultimately concludes that the $400,000,000 verdict awarded by the jury was not supported by the evidence, the Court does not conclude that it was excessive in a manner that reflects prejudice. The jury heard expert testimony that KAIST should be awarded $321,438,451 for a roughly 18-month damages period as part of a running-royalty award. Instead, the jury awarded $400,000,000 as a lump-sum royalty covering the entire life of the patent. This is not more than KAIST asked for. It is less—significantly less over the life of the patent. Thus, the Court finds that the jury's verdict does not reflect passion and prejudice but a reasoned and measured attempt to try to extrapolate a running-royalty request into an appropriate lump-sum award.

That Samsung's co-defendants were assessed no damages does not indicate passion or prejudice on the part of the jury. The jury heard testimony that if one entity makes an accused product on behalf of another entity a royalty is only paid by one of those entities. (Dkt. No. 497 at 80:9–22.) Indeed, this is the very reason why Qualcomm's own expert opined that it should pay "essentially zero" in damages. (*Id.*) The jury also heard testimony that the hypothetical license would have included "make, sell, and have made rights, foundry rights, and rights for their customers." (*Id.* at 64:8–9.) The jury additionally heard testimony that Qualcomm and GlobalFoundries were mere customers of Samsung, relying on Samsung's 14-nanometer bulk FinFET technology, which the jury found infringes the Asserted Patent. (Dkt. No. 493 at 84:16–86:3; Dkt. No. 495 at 5:4–6:11.) Thus, it was reasonable for the jury to conclude that Samsung, who developed the accused technology, would have purchased rights for itself and its customers at the hypothetical negotiation.

Importantly, the Court does not determine whether such a conclusion by the jury would be unimpeachable. No party has challenged the jury's verdict of no damages as to Qualcomm and

42

GlobalFoundries. The Court merely determines that it is possible for the jury to have reached its conclusion dispassionately based upon the testimony presented and thus that the verdict does not reflect passion and prejudice.

The jury's finding of willfulness likewise does not reflect passion and prejudice. The jury heard evidence, discussed in detail herein, that Samsung had a unique and long-standing relationship with Prof. Lee, and that Qualcomm and GlobalFoundries were mere customers of the technology developed by Samsung relying on Prof. Lee's teachings. Such evidence reasonably supports the jury's finding that Samsung alone was willful.

Samsung also argues that a jury note asking whether the jury may "reward lump sum plus royalty payment for future sales" is an indication of the jury's intent to punish Samsung. (Dkt No. 579 at 15 (quoting Dkt. No. 498 at 120:2–7).) The Court finds that this note was only an indication of "some confusion or lack of understanding" with the Court's initial instructions. *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 620 (5th Cir. 1988). The Court further finds that its instructions in response to this note, which Defendants agreed to without objection (Dkt. No. 498 at 123:13–16), "effectively negated any confusion or impropriety," *Nissho-Iwai*, 848 at 620. The Court finds no prejudice indicated by the jury's note. A note from the jury asking some clarification from the Court after a lengthy and detailed charge are both common and reasonable, in this Court's experience.

Finally, Samsung argues that KAIST inappropriately "fostered" prejudice in the jury by arguing that Samsung stole property from Prof. Lee and Dr. Kuhn and inappropriately contrasting Samsung, a foreign company, with "Intel, the American company, who . . . followed the law." (Dkt. No. 579 at 15 (quoting Dkt. No. 498 at 109:11–12).) While the Court does not necessarily applaud these comments by KAIST during its closing arguments, particularly contrasting Samsung

with "the American company," the Court respects the reasonable latitude our jury trial system affords counsel as zealous advocates on behalf of their clients. Further, the Court instructed the jury not to be swayed by prejudice and that each party should be treated equally. (Dkt. No. 498 at 109:25–111:1.) Moreover, Samsung did not object to KAIST's closing at the time or at a sidebar immediately afterward. Absent such a contemporaneous objection or any indication that the jury's verdict was excessive, the Court does not find that KAIST's error, if any, "in final argument was of such magnitude . . . as to have seriously prejudiced defendants' right to a fair trial" such that a new trial is "required even in the absence of timely objection." *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir. 1975); *see also Nissho-Iwai*, 848 F.2d at 619–620.

### 2. The Court properly precluded Dr. Subramanian from testifying about the "first oxide layer" beyond the scope of his report

Defendants argue that the Court improperly excluded testimony within the scope of Dr. Subramanian's report, warranting a new trial. Defendants argue that in his report "Dr. Subramanian was unambiguous that these two oxides are *not* a single 'layer' as required by the claims but 'two layers.'" This argument is not correct. Dr. Subramanian stated consistently in his report that there was "*one* gate oxide" and that "[t]his gate oxide comprises two layers—an interfacial SiO2 layer and a high-k dielectric layer." (Dtk. No. 228-10 ¶ 108; *see id.* ¶¶ 102–125.) Consistent with his report, the Court allowed Dr. Subramanian to testify about these two layers. (*See* Dkt. No. 496 at 22:16–19 ("[W]hat you have is you have a Fin, you have an SiO2 layer, you have a Hafnium oxide layer, and then you have the gate. And that has important consequences on the interpretation.").) Consistent with his report, Dr. Subramanian testified that the SiO2 layer cannot be the "first oxide layer" because the gate electrode is not formed on it and that the hafnium oxide layer cannot either because it is not formed on the surface of the Fin. (*Compare* Dkt. No. 228-10 ¶¶ 112–113, *with* Dkt. No. 496 at 22:21–23:6.)

However, the Court precluded Dr. Subramanian from testifying that the layers are *separate* layers or that the hafnium oxide is an *intervening* layer because he did not "opine[] that the claimed oxide layer elements could not be met because the HfO layer is a different, intervening layer." (Dkt. No. 597 at 7.) Neither this language nor opinion appear in his report.

As a result, Defendants argue that they were "precluded from offering expert testimony responding to Dr. Kuhn's opinion that the HfO and SiO2 layers act in concert as one single layer." (*Id.*) However, Dr. Subramanian never opined in his report that the two layers do *not* act in concert. To the contrary, he consistently referred to them as forming "one gate oxide." (Dkt. No. 228-10 ¶ 107.)

Moreover, Defendants had already elicited testimony from Dr. Samavedam that "between the gate and the silicon Fin, we have two layers. We have Hafnium oxide layers that are in contact with the gate and a second oxide layer that is on top of the FIN." (Dkt. No. 494 at 85:6–9.) The Defendants likewise argued in their closing, relying on the testimony of Dr. Kuhn and Dr. Samavedam, that "the Hafnium oxide layer is a separate layer." (Dkt. No. 498:10–21.) Defendants have not explained why Dr. Subramanian's additional, duplicative testimony would have been meaningful or why preventing such duplication would be a meaningful error.

The Court thus concludes that Dr. Subramanian was properly confined to the scope of his report and that, even if any error existed, Defendants have not demonstrated that such error was anything more than harmless.

  **3.**  **The Magistrate Judge properly excluded Dr. Subramanian's opinion that a single structure cannot meet both the "first oxide layer" and "gate oxide layer" limitations**

As another ground for new trial, Defendants re-raise their objections to the Magistrate Judge's exclusion of Dr. Subramanian's opinion that one structure cannot satisfy both the "first oxide layer" and "gate oxide layer" limitations of the claims. (Dkt. No. 579 at 8–9; Dkt. No. 470.)

45

The Court reviews non-dispositive rulings of the Magistrate Judge for clear error or a conclusion contrary to law. *See* Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A). Finding none, the Court overrules these objections.[12]

Federal Circuit law is clear that "the use of two terms in a claim requires that they connote different meanings, not that they refer to two different structures." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) (emphasis omitted); *see also Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1320 n.9 (Fed. Cir. 2003) ("[W]e see no reason why, as a matter of law, one claim limitation may not be responsive to another merely because they are located in the same physical structure."). Moreover, as the Magistrate Judge correctly recognized, Dr. Subramanian's opinion that the "first oxide layer" and "gate oxide layer" must be distinct structures, would have excluded from the scope of the claims "an embodiment of the invention [disclosed in the specification] with a continuous layer of material in contact with the fin active region." (Dkt. No. 442 at 4 (citing '055 Pat. fig.3a, 3b).) "[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013).

The Court concludes that Dr. Subramanian's opinion that a single structure could not satisfy two limitations was contrary to law and thus properly excluded.

## V.    KAIST'S MOTIONS FOR FINAL JUDGMENT AND FEES AND COSTS

As discussed herein, the Court denies Defendants' Motion for New Trial conditioned on a remittitur by KAIST. KAIST's decision in this regard will impact the final judgment ultimately issued by this Court. Further, if KAIST elects a new trial on damages, the parties' conduct during

---

[12] For clarity, the Court likewise overrules the remaining objections in Dkt. No. 470.

such trial may bear on the Court's findings under § 285. Consequently, the Court determines that it should defer action on KAIST's Motion for Final Judgment and Motion for Fees and Costs until after KAIST files a remittitur or a new trial on damages is concluded. Such motions are carried.

## VI.   CONCLUSION

For the reasons set forth herein, Defendants' Motion to Stay Case Pending *Ex Parte* Reexamination (Dkt. No. 651) is **DENIED**.

Defendants' Renewed Motion for Judgment as a Matter of Law on Non-Infringement and Invalidity (Dkt. No. 578), Samsung's Renewed Motion for Judgment as a Matter of Law for Damages of No More Than $6.2 Million (Dkt. No. 577), and Samsung's Renewed Motion for Judgment as a Matter of Law on Willfulness (Dkt. No. 580) are likewise each **DENIED**.

The Motion by KAIST for Enhancement of Damages Due to Willful Infringement (Dkt. No. 586) is **GRANTED** as set forth herein.

Samsung's Motion for New Trial and Contingent Motion of GlobalFoundries and Qualcomm for New Trial (Dkt. No. 579) is **CONDITIONALLY DENIED** subject to a remittitur in the amount of $203,003,416. KAIST shall file such a remittitur within 14 days of the issuance of this Order. If KAIST does not file such a remittitur, the Court shall order a new trial on damages as to Samsung to begin on **Monday, March 16, 2020** and directs the parties to prepare accordingly.

The Motion by KAIST for Entry of Final Judgment as the Prevailing Party and Award of Costs and Pre- and Post-Judgment Interest (Dkt. No. 587) and the Motion by KAIST for Exceptional Case and Award of Attorney Fees and Costs (Dkt. No. 585) are each **CARRIED** pending KAIST's filing of a remittitur or the completion of a new trial on damages.

So **ORDERED** and **SIGNED** this 13th day of February, 2020.

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

48

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| KAIST IP US LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:16-CV-01314-JRG |
| | § | |
| SAMSUNG ELECTRONICS CO., LTD.,, | § | |
| SAMSUNG ELECTRONICS AMERICA, | § | |
| INC,  SAMSUNG SEMICONDUCTOR, | § | |
| INC.,  SAMSUNG AUSTIN | § | |
| SEMICONDUCTOR, LLC, | § | |
| GLOBALFOUNDRIES, INC., | § | |
| GLOBALFOUNDRIES U.S. INC., | § | |
| QUALCOMM INC., | § | |
| | § | |
| Defendants. | § | |

## FINAL JUDGMENT

A jury trial commenced in this case on June 11, 2018. On June 15, 2018, the jury returned a unanimous verdict (Dkt. No. 499) finding that Defendants Samsung Electronics Co. Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, LLC (collectively, "Samsung"); GlobalFoundries, Inc. and GlobalFoundries U.S. Inc. (collectively, "GlobalFoundries"); and Qualcomm Inc. ("Qualcomm") each infringed one or more claims asserted by Plaintiff KAIST IP US LLC ("KAIST"), such claims being claims 1–6, 11–13, and 15–17 of U.S. Patent No. 6,885,055 (collectively, the "Asserted Claims"); that none of the Asserted Claims were invalid; that Samsung's infringement had been willful; that GlobalFoundries and Qualcomm's infringement had not been willful; that KAIST should recover from Samsung $400,000,000.00 for such infringement as a lump-sum royalty; that KAIST should recover from GlobalFoundries $0.00 for such infringement; and that KAIST should recover from Qualcomm $0.00 for such infringement.

On January 18, 2019, the Court issued findings of fact and conclusions of law, wherein the Court held that KAIST is not barred from asserting its patent infringement claims based on equitable estoppel or implied license. (Dkt. No. 574.) On February 13, 2020 the Court issued an Order addressing the parties' renewed motions for judgment as a matter of law, motion for new trial, and motion for enhancement of damages under 35 U.S.C. § 284. (Dkt. No. 676.) In that Order, the Court left undisturbed the jury's findings regarding infringement, invalidity, and willfulness but otherwise concluded that the evidence adduced a trial did not support a damages award higher than $101,501,708.00, that an enhancement of two-times that damages amount pursuant to § 284 was appropriate, and that a new trial on damages should be denied conditioned on a remittitur by KAIST of $203,003,416.00. (*Id.*) On February 19, 2020, KAIST accepted remittitur in the amount of $203,003,416.00. (Dkt. No. 677.)

KAIST has moved for entry of Final Judgment (Dkt. No. 587), which the Court now **GRANTS**.

Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the foregoing, the Court hereby **ORDERS** and **ENTERS JUDGMENT** as follows:

1. Samsung has infringed one or more of the Asserted Claims;

2. GlobalFoundries has infringed one or more of the Asserted Claims;

3. Qualcomm has infringed on or more of the Asserted Claims;

4. The Asserted Claims are not invalid;

5. Samsung's infringement was willful;

6. GlobalFoundries' infringement was not willful;

7. Qualcomm's infringement was not willful;

2

8.  KAIST is hereby awarded damages from and against Samsung and shall accordingly have and recover from Samsung the sum of $203,003,416.00 U.S. Dollars;

9.  KAIST is hereby awarded damages from and against GlobalFoundries and shall accordingly have and recover from GlobalFoundries the sum of $0.00 U.S. Dollars;

10. KAIST is hereby awarded damages from and against Qualcomm and shall accordingly have and recover from Qualcomm the sum of $0.00 U.S. Dollars;

11. Pursuant to Federal Rule of Civil Procedure 54(d), Local Rule CV-54, and 28 U.S.C. § 1920, KAIST is the prevailing party in this case and shall recover its costs from Defendants, and KAIST is directed to file its proposed Bill of Costs;

12. Pursuant to 35 U.S.C. § 284, the Court awards pre-judgment interest applicable to all sums awarded herein, at the applicable prime rate for each quarter, compounded quarterly, from January 1, 2015 until the date of the entry of this Judgment;

13. Pursuant to 28 U.S.C. § 1961, the Court awards post-judgment interest applicable to all sums awarded herein, at the statutory rate, from the date of entry of this Judgment until paid; and further

KAIST's Motion for Exceptional Case and Award of Attorney Fees and Costs (Dkt. No. 585) is **CARRIED**. All other requests for relief now pending before the Court and not specifically addressed herein are **DENIED**. The Clerk is directed to **CLOSE** the above-captioned case.

**So ORDERED and SIGNED this 21st day of February, 2020.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

3

SAppx270

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LARRY GOLDEN,

          Plaintiff,

    v.

QUALCOMM, INC.,

          Defendant.

Case No. 22-cv-03283-HSG

**ORDER DENYING MOTION FOR RECONSIDERATION**

Re: Dkt. No. 51

Pending before the Court is Plaintiff Larry Golden's motion for reconsideration of the Court's order granting Defendant Qualcomm's motion to dismiss, Dkt. No. 49. Dkt. No. 51.[1] Qualcomm filed an opposition (Dkt. No. 53, "Opp."), and Plaintiff then filed a document styled as "supplemental authority." (Dkt. No. 54). The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). The Court **DENIES** the motion.

## I. LEGAL STANDARD

In the Northern District of California, Local Rule 7-9 allows for the filing of motions for reconsideration only with respect to interlocutory orders made in a case prior to the entry of final judgment. *See* Civil L.R. 7-9(a). Post-judgment motions for reconsideration are construed as motions to alter or amend judgment under Federal Rule of Civil Procedure 59(e) (motion to alter or amend judgment) or motions for relief from judgment or order under Federal Rule of Civil Procedure 60(b) (motion for relief from judgment).

---

[1] In addition to the motion, Dkt. No. 51, Plaintiff submitted Dkt. No. 52, entitled "Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Reconsideration." The Court considered both filings.

Motions for reconsideration should not be frequently made or freely granted; they are not a substitute for appeal or a means of attacking some perceived error of the court. *See Twentieth Century - Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981). "[T]he major grounds that justify reconsideration involve an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989) (quoting *United States v. Desert Gold Mining Co.*, 433 F.2d 713, 715 (9th Cir. 1970)).

Rule 60(b) lists six grounds for relief from a judgment: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial; (3) fraud by the adverse party; (4) the judgment is void; (5) the judgment has been satisfied; (6) any other reason justifying relief. Fed. R. Civ. P. 60(b); *School Dist. 1J v. ACandS Inc.*, 5 F.3d 1255, 1263 (9th Cir.1993).

## II. DISCUSSION

Plaintiff's motion does not present any basis for reconsideration of the Court's dismissal order or the resulting judgment. It simply contends that the Court was wrong to dismiss his case, raising substantially the same arguments Plaintiff presented in opposing the motion to dismiss. Plaintiff has every right to make these arguments on appeal, but he may not relitigate them here. The Court has issued its ruling, final judgment has been entered, and this case remains closed. The motion for reconsideration is thus **DENIED**, and the Clerk is directed not to accept any further filings in this closed case.

**IT IS SO ORDERED.**

Dated:  4/6/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA - OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

**F I L E D**

APR 1 4 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Fee
Paid

|  |  |
|---|---|
| LARRY GOLDEN<br><br>*Pro Se* Plaintiff,<br><br>V.<br><br>QUALCOMM INC.<br><br>Defendant. | CASE NO: <u>4:22-cv-03283-HSG</u><br><br>**(JURY TRIAL DEMANDED)**<br><br>**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**<br><br>April 13, 2023 |

## PLAINTIFF'S NOTICE OF APPEAL

PLEASE TAKE NOTICE that Plaintiff Larry Golden, hereby appeals to the

United States Court of Appeals for the Federal Circuit from the dated March 15,

2023 "Order Granting [Qualcomm's] Motion to Dismiss" (Dkt. No. 49) as well as

any other orders, rulings, findings, and/or conclusions adverse to Larry Golden.

This notice of appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A) because it is "filed with the district clerk within 30 days after entry of the judgment or order appealed from."

As part of this notice of appeal, Larry Golden submits the required filing fee of $505 and respectfully requests the district clerk to prepare the record on appeal pursuant to Federal Rule of Appellate Procedure 10(a).

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net



# U.S. District Court

## California Northern - Oakland

Receipt Date: Apr 17, 2023 11:26AM

Larry
Golden
740 Woodruff Rd.
Apt. 1102
Greenville, SC 29607-4061

Rcpt. No: 411017801                  Trans. Date: Apr 17, 2023 11:26AM                  Cashier ID: #AJ

| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
|----|---------|----------------------|-----|-------|-----|
| 203 | Notice of Appeal/Docketing Fee | | 1 | 505.00 | 505.00 |

| CD | Tender | | | | Amt |
|----|--------|---|---|---|-----|
| CH | Check | #5116 | 04/13/2023 | | $505.00 |
| | | | Total Due Prior to Payment: | | $505.00 |
| | | | Total Tendered: | | $505.00 |
| | | | Total Cash Received: | | $0.00 |
| | | | Cash Change Amount: | | $0.00 |

**Comments:** 4:22-cv-03283-HSG

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2023-1818

**Short Case Caption** Golden v. Qualcomm Incorporated

---

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

---

I certify that I served a copy of the foregoing filing on Larry Golden

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐
☐ Facsimile Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Larry Golden | atpg-tech@charter.net |
| | |
| | |
| | |
| | |

☐ Additional pages attached.

Date: June 16, 2023

Signature: /s/ John A. Yates

Name: John A. Yates